UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID KOVACS, RUSSELL ALESI, JULIAN
DUCHEINE and DEMIAN LICHTENSTEIN,

    Plaintiffs,

          - versus -

DAVID MORADI, DR. CARR BETTIS, JASON
HUMBLE, JAMIL TAHIR, JAMES HAWKINS,
DR. KATHERINE FLEMING, TONY COELHO,
KELLY GEORGEVICH, JAMES SPOLAR,
MALONEBAILEY LLC, AUDIOEYE, INC. and
JOHN DOE 1-50,

    Defendants,

          - and -

ETERNAL SOURCES TECH PARTNERS LLC,
FIRST CONTACT ENTERTAINMENT, INC.,
FORMULUS BLACK, INC.,

    Nominal Defendants.

---

**COMPLAINT**

**No. 25-CV-10336**

**Jury Trial Demanded**

December 12, 2025

---

JOHN H. SNYDER PLLC
John H. Snyder, Esq.
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

*Counsel for Plaintiffs*

TURTURRO LAW, P.C.
Natraj S. Bhushan, Esq.
1361 N. Railroad Avenue
Staten Island, NY 10306
(718) 384-2323
natraj@turturrolawpc.com

*Personal Counsel
for David Kovacs*

**ADDRESSES OF DEFENDANTS / NOMINAL DEFENDANTS**

**DAVID MORADI**
Executive Chairman
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**DR. CARR BETTIS**
SPENCER FANE LLP
Eric D. Gere
Dontan K. Hart
2415 E. Camelback Road, Suite 600
Phoenix, Arizona 85016-4251

**JASON HUMBLE**
Salzano Ettinger Lamperg & Wilson LLP
104 West 40th Street
14th Floor
New York, NY 10018

**AUDIOEYE, INC.**
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**VIVID STRATEGIES LLC**
25 Highland Park Village
Suite 100-510
Dallas, Texas 75205

**ETERNAL SOURCES TECH PARTNERS LLC**
25 Highland Park Village
Ste 100-510
Dallas, Texas 75205

**JAMIL TAHIR**
Director
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**JAMES HAWKINS**
Director
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**DR. KATHERINE FLEMING**
Director
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**TONY COELHO**
Former Director
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**KELLY GEORGEVICH**
Chief Financial Officer
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**JAMES SPOLAR**
General Counsel
AudioEye, Inc.
5210 E. Williams Circle
Suite 750
Tucson, AZ 85711

**MALONEBAILEY LLP**
9801 Westheimer Road, Suite 1100
Houston, TX 77042

**FIRST CONTACT ENTERTAINMENT, INC.**
David Moradi, Chairman
30699 Russell Ranch Road, Suite 170
Westlake Village, CA 91362

**FORMULUS BLACK, INC.**
Steven Mitnick, Esq.
Marc D. Miceli, Esq.
S. MITNICK LAW PC
P.O. Box 530
49 Old Turnpike Road
Oldwick, New Jersey 08858
*Assignee for Benefit of Creditors*

3

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT..................................................................................................1

    A. The Enterprise Leaders...........................................................................................2

    B. The Whistleblower.................................................................................................4

    C. The Retaliation.......................................................................................................6

    D. The Weaponized Victims.......................................................................................8

    E. The Independent Directors....................................................................................10

PARTIES, JURISDICTION, AND VENUE...............................................................................11

    I. Plaintiffs...................................................................................................................11

    II. Defendants..............................................................................................................12

        A. Enterprise Defendants........................................................................................12

            1. David Moradi..............................................................................................12

            2. Dr. Carr Bettis...........................................................................................15

            3. Jason Humble.............................................................................................17

            4. John Doe 1-50............................................................................................19

        B. Director Defendants...........................................................................................19

        C. Executive Defendants.........................................................................................20

        D. Professional Defendants......................................................................................20

        E. John Doe Defendants..........................................................................................21

    III. Nominal Defendants.............................................................................................21

JURISDICTION AND VENUE.................................................................................................22

STATEMENT OF FACTS..........................................................................................................23

    I. ENTERPRISE STRUCTURE, AGREEMENT, AND CONTINUITY..............................23

        A. The Existence of an Ongoing Enterprise............................................................23

        B. Allocation of Roles Within the Enterprise..........................................................24

        C. Interstate Commerce and Continuity...................................................................26

    II. PRIOR ITERATIONS OF THE ENTERPRISE PLAYBOOK.......................................27

        A. First Contact Entertainment...............................................................................27

        B. Formulus Black / Symbolic IO...........................................................................28

        C. ESTP – The Same Story......................................................................................29

    III. ESCALATION INTO THE PUBLIC MARKETS AT AUDIOEYE.............................30

        A. Consolidation of Control.....................................................................................30

        B. Advance Planning of Stock Manipulation...........................................................30

        C. Liquidity Infrastructure and Insider Sales...........................................................31

    IV. WHISTLEBLOWING, RETALIATION, AND CONVERSION TO PROCEEDS..........32

        A. Protected Disclosures..........................................................................................32

B. Retaliation.................................................................................................33

C. Harm and Proceeds.....................................................................................36

V. WITNESS TAMPERING AND OBSTRUCTION OF JUSTICE....................................37

A. Witness Julian Ducheine.............................................................................38

1. Murder Solicitations – Motive to Tamper.................................................38

2. December 2024 – Quinn Pressure Campaign............................................38

3. January 2, 2025 Text Messages ("Juju").................................................39

4. July 24, 2025 Voicemail — Direct Evidence of Coordinated Obstruction.............39

B. Tampering Directed at Senior Advisor to the Mayor of New York City......................40

C. Interference With Attorney Xavier Suarez.........................................................40

D. Pressure Through Senior Blackstone Executive Directed by Mayor Suarez...............42

E. Summary of Tampering and Obstruction...........................................................42

COUNT I – CIVIL RICO...................................................................................43

COUNT II – SECURITIES FRAUD.......................................................................46

COUNT III – WHISTLEBLOWER RETALIATION.....................................................49

COUNT IV – INTERFERENCE WITH ERISA-PROTECTED BENEFITS...........................50

COUNT V – BREACH OF FIDUCIARY DUTY (DIRECT)...........................................52

COUNT VI – BREACH OF FIDUCIARY DUTY (DERIVATIVE)....................................54

COUNT VII – BREACH OF FIDUCIARY DUTY – ESTP............................................56

COUNT VIII – UNJUST ENRICHMENT................................................................57

COUNT IX – MALICIOUS PROSECUTION AND ABUSE OF PROCESS...........................58

COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS...........................60

COUNT XI – COMMON LAW TORTS – LICHTENSTEIN............................................61

COUNT XII – DECLARATORY AND INJUNCTIVE RELIEF........................................64

PRAYER FOR JUDGMENT................................................................................67

SCHEDULE A – DEFINITIONS...........................................................................69

SCHEDULE B – [DRAFT] AUDIOEYE BOARD RESOLUTIONS..................................75

SCHEDULE C – RICO CASE STATEMENT............................................................78

SCHEDULE D – RICO PREDICATE TABLE...........................................................82

SCHEDULE E – MATERIAL MISREPRESENTATIONS AND OMISSIONS.........................88

SCHEDULE F – REBUTTAL OF AUDIEOEYE'S FALSE SMEARS.................................91

SCHEDULE G – DAMAGES MODEL....................................................................95

SCHEDULE H – DAMAGES MATRIX..................................................................102

SCHEDULE I – ANNOTATED TIMELINE.............................................................104

SCHEDULE J – TABLE OF EXHIBITS.................................................................109

Plaintiffs David Kovacs, Russell Alesi, Julian Ducheine and Demian Lichtenstein, by and through their undersigned counsel of record, allege as follows on personal knowledge as to matters relating to them, and on information and belief as to all other matters.[1]

Kovacs brings this action under circumstances that raise serious concerns regarding retaliation, coercion, and personal safety, all of which are pleaded in detail below. For that reason, Plaintiffs have deliberately placed the full factual and documentary record before the Court and before the AudioEye Board of Directors, including any independent directors, special committee, or special counsel. Plaintiffs do so to ensure that the Company's fiduciaries can evaluate and act upon the matters alleged based on an immutable record that does not depend on the continued availability, cooperation, or physical safety of any individual witness. This filing is intended to foreclose informational asymmetry, prevent after-the-fact revision of events, and ensure that appropriate governance action may proceed without delay.

## PRELIMINARY STATEMENT

1. AudioEye is confronted with an existential crisis.

2. AudioEye's independent directors, Dr. Katherine Fleming and James Hawkins (the "Independent Directors"), face a choice: exercise leadership now or be left holding the bag when AudioEye collapses under the weight of insider fraud. Ignorance is no longer a plausible excuse. The Independent Directors now face significant fiduciary risk if they fail to act upon credible allegations supported by sworn testimony. Now it is incumbent upon the Independent

---

[1] Capitalized terms have the meanings set forth in Schedule A. This Complaint incorporates by reference the annexed Schedules A through J and all Exhibits annexed hereto, including 19 sworn declarations that, together, corroborate Plaintiffs' allegations. This Complaint further incorporates by reference AudioEye's SEC filings during the Class Period and the public dockets in the several Kovacs Litigations.

Directors to act swiftly, decisively, and independently to save 165 jobs and $150 million in shareholder value.

3.      This civil RICO action describes a racketeering enterprise (the "Enterprise") orchestrated over a decade by senior AudioEye executives David Moradi ("Moradi") and Dr. Carr Bettis ("Bettis") and enabled by a network of witting and unwitting accomplices. AudioEye is not the first company that Moradi and Bettis (the "Enterprise Leaders") have seized, subverted, and looted for themselves.

### A.      The Enterprise Leaders

4.      The Enterprise Leaders, Moradi and Bettis, have developed a repeatable playbook. They refined their techniques at First Contact and Formulus Black – two promising companies that were destroyed by the Enterprise Leaders' fraud.

5.      They are running the same playbook at AudioEye:

a.   **Early Promises:** Moradi and Bettis come in as saviors during periods of capital need, using promises of funding and expertise to gain access.

b.   **Gatekeeper Subversion:** Once inside, they centralize control over financial reporting, cash management, and key gatekeepers, reducing transparency and subverting internal controls.

c.   **Insider Looting:** After consolidating control, they loot the company and enrich themselves with coerced reallocations, asset diversion, or insider trading, while shifting downside risk to the company and its investors.

d.   **Suppression and Lawfare:** When challenged, they respond with retaliation, legal pressure, and intimidation.

2

6.      For victimized investors, the result is financial loss. For the Enterprise, it is the business model.

7.      The Enterprise Leaders ran their playbook at Formulus Black, pushing out the founder, Brian Ignomirello. Bettis financially pressured the mother of Ignomirello's children to file false criminal charges against Ignomirello, which she later recanted. Ignomirello served four months in jail and lost his company. He also lost his health insurance coverage and had to pay for cancer treatment out-of-pocket. He lost access to his children. The Enterprise Leaders took advantage of Ignomirello's incarceration to take over the company, gut internal controls, raid the treasury, and ultimately destroy $250 million to $500 million in value.

8.      Moradi and Bettis ran the same playbook at First Contact, pushing out the founder, Demian Lichtenstein, with false sexual harassment allegations that were later debunked. Moradi threatened to wage lawfare against Lichtenstein, a father of young kids who did not have resources to fight Moradi. Lichtenstein met with Moradi and asked him, in tears: "Why are you fucking me like this?" Moradi responded: "Because you are fuckable."

9.      The Enterprise Leaders took over First Contact, gutted internal controls, raided the treasury, and, due to the rampant fraud, a potential $250 million exit was lost because the company could not pass an audit and practiced illegal policies.

10.     They ran the playbook at AudioEye. David Moradi became a major AudioEye investor in mid-2014. Shortly thereafter, co-founder and Executive Chairman Paul Arena learned that Moradi was derelict of his SEC reporting responsibilities and possibly engaging in unlawful coordinated trading activity. Arena challenged Moradi, who, in response, orchestrated Arena's removal by blaming Arena for accounting issues at the company.

3

11. This was a pretext. In reality, Moradi and Bettis were motivated to eliminate Paul Arena because Arena threatened their ability to defraud the markets. Since that time, the Enterprise Leaders have systematically gutted internal controls and looted the company.

12. AudioEye has disclosed in its public filings that, since at least 2019, it has not obtained an independent auditor attestation of internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act. The company's representations regarding internal controls during the Relevant Period are based upon management self-certification, not an external, independent audit.

**B.    The Whistleblower**

13. David Kovacs, age 42, was an executive at AudioEye for a decade. During that time, Kovacs was an investor (not a board member) in ventures sponsored by Moradi and Bettis including First Contact and Formulus Black.

14. Kovacs, considerably younger than Moradi and Bettis, once imagined them to be mentors. Kovacs has the dubious distinction of being defrauded by the Enterprise four times.

15. Kovacs, as a result, was in a position to observe the Enterprise Leaders' activities across four organizations. Kovacs developed personal relationships with numerous individuals whose lives have been profoundly harmed by the Enterprise Leaders.

16. Kovacs' relationship with Moradi soured in August 2023. That is when Moradi (the CEO of AudioEye and Kovacs' boss) instructed Kovacs to assist him with stock fraud. Moradi planned to execute a pump-and-dump strategy known as painting the tape.

17. Kovacs was troubled by Moradi's instruction. Previously, Moradi had pressured Kovacs to use a VPN to post a small number of fake video game reviews, which Kovacs unwisely went along with. However, Kovacs refused Moradi's orders to go further and commit

4

securities fraud. Mario Rodriguez, a witness to a heated argument between Kovacs and Moradi, confirms Kovacs' account.

18.    Around this time – separate from AudioEye – Kovacs was helping Moradi find a buyer for First Contact. In due diligence, Kovacs learned that Moradi had operated the company so fraudulently that the books were unauditable. First Contact should have sold for $250M. Instead it died. The investment banker on the deal called it "the greatest destruction of wealth I have seen in my career."

19.    In that context, Kovacs came to understand Moradi's malevolent nature. Previously, Kovacs had been naïve and, in retrospect, may have overlooked red flags. In November 2023, those red flags became inescapable.

20.    Kovacs became a whistleblower on November 13, 2023, reaching out to HR to report securities fraud. The meeting never happened. The Chairman of the company, Carr Bettis, phoned Kovacs moments later: "Now Moradi will ruin your life." This chilling threat proved prescient.

21.    On December 25, 2023, Kovacs texted holiday wishes to Ben Barton, another AudioEye insider. Barton surprised Kovacs by bringing up Moradi's fraud. Barton declared his intention to become a whistleblower. "I'll make it very public." Barton wrote.

22.    Barton added:

> He's the one who's scared.
> He's the ceo of a public company.
> He's fucked.

23.    The timing is important. This was December 2023. The AudioEye stock manipulation did not move the market until March 2023. These are not insider reports made with

hindsight. It was two AudioEye insiders who were privy to the scheme discussing, in heated terms, the stock manipulation that was being hidden from shareholders.

24.     Three weeks later, Kovacs once again reported the fraud – this time, directly to the Executive Chairman.

25.     On or about January 17, 2024, Kovacs spoke with Bettis by phone. During the call, which Bettis secretly recorded, Kovacs repeatedly told Bettis about Moradi's insider trading and even threatened to file a lawsuit over it. Bettis claimed to have already looked into it and pretended to be confused.

26.     AudioEye's Whistleblower Protection Policy required Bettis, upon receiving a good-faith report of insider trading, to ensure prompt investigation, escalation, and appropriate corrective action. Instead, Bettis took no investigative or corrective steps. Eleven months later, Bettis sold $5.4 million of stock at inflated prices.

27.     Kovacs was promptly fired.

28.     From there, the retaliation escalated.

### C.     The Retaliation

29.     On January 19, 2024, AudioEye's General Counsel reiterated to Kovacs that he had been fired "for cause" without conducting a meaningful investigation.

30.     On February 8, 2024, Kovacs became a federal whistleblower, reporting the fraud to the Department of Justice.

31.     On February 20, 2024, AudioEye revoked Kovacs' ERISA-protected restricted stock. Remarkably, the letter from Akin admits retaliation, stating that the termination was "for cause" because Kovacs accused Moradi of fraud.

32. On March 20, 2024, Bettis shipped Kovacs a letter (the "Birkin Bag Letter") containing threats that Moradi would do "unfathomable physical harm" if Kovacs did not settle his dispute with Moradi. In context, settle meant capitulate.

33. On April 8, 2024, Kovacs filed a whistleblower complaint with the SEC.

34. On April 10, 2024, AudioEye and Moradi sued Kovacs in Florida court alleging defamation. Most notably, the complaint is replete with False Smears and compares Kovacs to George Santos, the infamous charlatan who was jailed after being elected to Congress.

35. Even as AudioEye was launching its smear campaign, events confirmed that Kovacs was right. The stock price surged upward exactly as Moradi had planned in August 2023.

36. On May 2, 2024, Jason Humble filed a defamation suit against Kovacs in the Southern District. On information and belief, Humble sued at the direction of Moradi and/or Bettis, not of his own accord. A few weeks later, Humble dropped his lawsuit with prejudice.

37. On May 8, 2024, the retaliation escalated beyond the bounds of AudioEye. That was when Kovacs learned that Carr Bettis had ousted him from ESTP, a venture worth $250 million. This deprived Kovacs of more than $80 million in value.

38. For good measure, in April 2025, Carr Bettis filed a frivolous lawsuit against Kovacs in Arizona state court (the "Arizona Lawsuit") over a purported $100,000 loan from 2017 that was repaid years ago.

39. Bettis stepped on a rake with the Arizona Lawsuit. Discovery will show that the purported loan was part of a scheme by Bettis to make AudioEye pay for his girlfriend's Manhattan apartment. This would not have been possible if AudioEye had sound internal controls.

7

40.     For a racketeering Enterprise, Kovacs is the Enterprise Leaders' worst nightmare. Kovacs has extensive and detailed knowledge over many years. He cannot be bribed or bullied. He has visibility into the Enterprise as it operates across enterprises. He has personal relationships with many victims. He refused to profit from the fraud. He refused to be intimidated.

41.     Kovacs represented an existential threat. No wonder Moradi and Bettis went for the nuclear option.

### D.     The Weaponized Victims

42.     A particularly remorseless aspect of the Enterprise is its recycling of victims into instruments of further crime. The Enterprise Leaders – Moradi and Bettis – first financially compromise people, then exploit their vulnerability to coerce participation in wrongdoing. The sworn testimony demonstrates a consistent pattern: those harmed by Formulus Black and related ventures were later pressured to commit violent acts on behalf of the Enterprise.

43.     In December 2023, Defendant Jason Humble – acting, as he repeatedly represented, under the direction of Defendant Carr Bettis – telephoned Plaintiff Julian Ducheine with a chilling request. Humble stated: "We have to do something about David Kovacs… Kovacs is upsetting the wrong people right now. I need your help to find someone to take care of Kovacs."

44.     Ducheine understood "take care of" to mean murder, and "the wrong people" to mean Bettis and his associated group within the Enterprise.

45.     Humble reiterated the solicitation with specificity: "Do you know someone in New York or Florida to take care of Kovacs?" Ducheine – shocked and unprepared for such a request – responded, "I don't know anyone that does that shit."

46.   In January 2024, Humble approached Ducheine again, this time in person at a café in North Texas. Wearing a hooded sweatshirt, Humble again raised the subject of hiring a hitman to kill Kovacs. The meeting lasted about an hour. Humble made clear that he was operating at the direction of someone above him – describing Bettis as "the top man" and referring to Bettis and Bettis's associates as the ones giving orders.

47.   After this second encounter, Ducheine no longer believed Humble was joking or exaggerating. In his declaration, he states he became "convinced that Humble was serious about having David Kovacs murdered," and that the solicitation caused him "great emotional and psychological distress."

48.   Ducheine further testifies that he had, at that time, been misled by Humble and Bettis into believing false accusations against Kovacs regarding Formulus Black. Once those accusations were disproven, Ducheine understood the solicitations for what they were: an attempted enlistment of a financially harmed victim into a violent criminal act designed to eliminate a whistleblower.

49.   When Ducheine refused to participate, Humble shifted to another financially distressed victim – former NFL All-Pro Muhammad Wilkerson.

50.   As alleged herein and in the DiMaggio Declaration, Humble told DiMaggio that Wilkerson had been offered repayment of his lost Formulus Black investments if he would murder Kovacs. This was not idle talk; multiple witnesses independently confirmed the plot. See DiMaggio Decl.; Kovacs Decl.

51.   These solicitations occurred at the exact moment Kovacs was reporting securities fraud internally and externally, and immediately before his Termination. For the Enterprise, Kovacs was a nightmare: a whistleblower who possessed deep knowledge of their multiyear

9

pattern, had refused to participate in securities fraud, and was providing information to federal authorities.

52.     Upon learning of the murder plot, Kovacs fled his residence and lived for extended periods at undisclosed locations, taking security precautions for himself and his family. His testimony is corroborated by contemporaneous communications with a security consultant and by the independent witness declarations. See Kovacs Decl.

53.     These facts make clear: the Enterprise did not merely retaliate through lawsuits, smears, and financial harm – it escalated to soliciting murder, using financially ruined victims as disposable instruments. This is not merely corporate misconduct; it is racketeering activity of the most serious nature.

### E.     The Independent Directors

54.     This Complaint is the product of an extensive investigation drawing upon dozens of witness interviews, voluminous communications and internal corporate documents, SEC filings relating to three public companies, trading records, open source research, court filings, and sworn testimony. Plaintiffs' investigation was guided by Kovacs' knowledge of the Enterprise Leaders' historical business practices.

55.     The Independent Directors joined the board relatively recently. Fleming joined the AudioEye board in March 2023; Hawkins joined in March 2025. The Independent Directors have operated with limited context. The Independent Directors could not have replicated this investigation. The company has been dominated by the Enterprise Leaders for many years. These problems pre-existed Fleming and Hawkins' tenure.

56.     The Independent Directors cannot – and should not – adjudicate the merits of the allegations herein. Delay and obfuscation will fatally impair the Independent Directors'

credibility to lead. The responsible course of action is for the Independent Directors to enact a Special Committee and engage Independent Counsel to advise the Special Committee. Attached as **Schedule B** are draft resolutions that Fleming and Hawkins should consider signing.

57.     Plaintiffs do not propose for the Court to manage AudioEye. Leadership must come from the Independent Directors. Failing that, the board must resign and the shareholders must elect a new slate of directors.

58.     David Kovacs never wanted to be a whistleblower. In 2023, Kovacs had what seemed like a wonderful life. That all changed in August 2023, when Kovacs found himself in an impossible situation: follow Moradi's orders and help with securities fraud or, as he chose, become a whistleblower. Exactly as Bettis predicted, Moradi ruined Kovacs' life.

59.     The Enterprise Leaders are abusing the Independent Directors. They have exploited Fleming and Hawkins for their good reputations. The Independent Directors must stop allowing themselves to be used to lend legitimacy to an organized criminal enterprise. Independent Directors who receive credible notice of ongoing securities fraud and retaliation, and fail to act, risk personal liability regardless of intent.

60.     The Independent Directors face a binary choice: act now or become complicit. Every day of delay compounds their personal liability and destroys the shareholder value they are duty-bound to protect. The pathway forward is clear: establish a Special Committee, engage Independent Counsel, and restore independent oversight.

## PARTIES, JURISDICTION, AND VENUE

### I.    Plaintiffs

61.     Plaintiff David Kovacs is a former senior executive of AudioEye during the RICO Period and a significant long-term shareholder of AudioEye. *See* Exh. 45, 46, 80-82. Kovacs also holds ownership interests in First Contact Entertainment ("First Contact"), Formulus Black LLC

11

("Formulus Black"), and Eternal Sources Tech Partners, LLC ("ESTP"). *See* Exh. 100-103; Exh. 48; Exh. 60-62, 75-76. Kovacs brings claims in his individual capacity and, where applicable, derivatively on behalf of AudioEye. Additionally, he asserts individual claims.

62.    Plaintiff Russell Alesi acquired shares of AudioEye after the conclusion of the Class Period and is a Plaintiff solely for purposes of asserting shareholder derivative claims on behalf of AudioEye seeking corporate-governance reform, remediation, recovery of wasted corporate assets, and other equitable relief. Alesi does not assert individual damages claims arising from purchases or sales of AudioEye securities during the Class Period. *See* Alesi Decl.

63.    Plaintiff Demian Lichtenstein is, and at all relevant times was, a shareholder of First Contact. Lichtenstein brings claims arising from injuries to his ownership interests. *See* Lichtenstein Decl.   24.

64.    Plaintiff Julian Ducheine is, and at all relevant times was, a shareholder of Formulus Black. *See* Exh. 50. Additionally, Ducheine is a former shareholder of AudioEye, having sold his shares at the recommendation of Jason Humble at a loss. *See* Exh. 42. He brings claims arising from injuries to his ownership interests. Additionally, he asserts individual claims.

## II.    Defendants

### A.    Enterprise Defendants

#### 1.    David Moradi

65.    Defendant David Moradi ("Moradi") is an investor, executive, and director who, during the RICO Period, served in senior leadership roles at AudioEye, Inc. Moradi became a member of AudioEye's Board of Directors on November 13, 2019; was appointed Interim Chief Executive Officer effective August 13, 2020; and was appointed permanent Chief Executive

Officer effective January 13, 2022, as reflected in AudioEye's filings with the Securities and Exchange Commission. See SEC Filings; Kovacs Decl. ¶¶ 30–37.

66. During the RICO Period, Moradi exercised de facto and functional control over AudioEye's operations, disclosures, litigation strategy, insider trading conduct, and affiliated business activities. He directed the Company's response to internal whistleblower complaints, determined financial and trading narratives, and supervised retaliatory litigation efforts funded with corporate assets. Through formal title and informal dominance, Moradi controlled the Company's flow of information, risk assessments, investor-facing disclosures, and internal governance. See Kovacs Decl. ¶¶ 35, 76–92, 331–386; Arena Decl. ¶¶ 7–15.

67. Moradi was the largest shareholder of Formulus Black Corporation through Amazonas Investments LLC, which held approximately 29.25% of Formulus Black's fully diluted equity as of August 12, 2020, making Amazonas the single largest shareholder and conferring decisive voting and economic control. Moradi also owns and controls Sero Capital, which held an additional 3.8% of Formulus Black. See Exh. 48 (FB Cap Table). Through Amazonas and Sero, Moradi exercised functional authority over Formulus Black's financing, governance, and strategic direction, coordinating closely with Bettis in the removal of founder Ignomirello, suppression of internal oversight, and dissolution of internal controls.

68. Moradi also served as the controlling shareholder and de facto controlling person of First Contact Entertainment, jointly directing financial authority, banking access, accounting oversight, reputational pressure campaigns, and governance consolidation beginning in or about 2016. Exhibits confirm Moradi's central role in decisions regarding banking signatory authority, investor communications, and the July 2016 coercive letter used to marginalize founder Demian

Lichtenstein. See Exh. 52 (FC Signatory Checklist); Exh. 53 (Coercive Letter to Lichtenstein); Exh. 78 (First Contact Emails); Lichtenstein Decl. (Exh. 5) ¶¶ 9–18.

69.    Across AudioEye, Formulus Black, First Contact, and affiliated entities, Moradi functioned as the Enterprise's architect. He entered companies during periods of vulnerability, used promises of capital and expertise to gain access, then centralized authority over financing, trading strategy, governance, and disclosure. Witnesses consistently describe Moradi performing sustained high-level executive functions across multiple ventures, managing complex financial negotiations, and directing coordinated control strategies with clarity and intent. See Kovacs Decl. ¶¶ 30–41, 63–67, 71–84; Arena Decl. ¶¶ 7–15; McGlashan Decl. (Exh. 18) ¶¶ 4–11.

70.    Moradi repeatedly invoked his $160.5 million traumatic brain injury verdict – which reportedly resolved for approximately $240 million – to intimidate business associates, employees, and adversaries, asserting that he could outspend and outlast anyone who challenged him. These statements were later placed into the public record when AudioEye and Moradi sued Kovacs in Florida relying on the settlement as evidence of Moradi's supposed reputational injury. See Exh. 30, 54, 55; Kovacs Decl. ¶¶ 76–92. The settlement, publicly reported in 2017, was never disclosed by AudioEye despite its materiality to governance, succession risk, and oversight obligations. See Kovacs Decl. ¶¶ 93–97.

71.    At AudioEye, Moradi directed and benefited from insider trading proceeds totaling approximately $21.6 million in December 2024, plus additional sales in November 2024, during a period when he possessed material nonpublic information concerning whistleblower complaints, internal-control failures, regulatory exposure, and retaliatory litigation expenditures. Not one Form 4 filed by Moradi reported a 10b5-1 trading plan. See Forms 4; Schedule E (Material Misrepresentations and Omissions); Schedule G (Damages Memorandum).

14

72. By virtue of his cross-entity authority, financial dominance, governance control, and role in coordinating racketeering acts across multiple companies, Moradi is an "Enterprise Leader" within the meaning of this Complaint.

### 2. Dr. Carr Bettis

73. Defendant Dr. Carr Bettis ("Bettis") is an investor, executive, and director who, during the RICO Period, served in senior leadership roles across multiple entities within the Enterprise. Bettis served as Executive Chairman of AudioEye, Inc., held de facto managerial authority at Formulus Black Corporation ("Formulus Black"), served as a director of First Contact Entertainment, and exercised decisive control over Eternal Sources Tech Partners, LLC ("ESTP"). See Kovacs Decl. ¶¶ 63–67, 160–184; Exh. 52; Exh. 30 (Kovacs emails referencing Bettis's FC board role); Exh. 60–62, 75–76 (ESTP governance documents).

74. During the RICO Period, Bettis exercised executive, managerial, and disclosure-related control over AudioEye, including responsibility for responding to internal whistleblower complaints, supervising litigation posture, directing the Company's response to allegations of insider trading, and controlling gatekeeping functions such as auditors, board processes, and internal investigations. Bettis used this authority not to remediate misconduct but to suppress internal reporting, protect Moradi, and retaliate against whistleblowers. See Kovacs Decl. ¶¶ 35, 140, 331–386; Exh. 105 (Whistleblower Policy); Exh. 35 (Birkin Bag Letter).

75. At Formulus Black, Bettis exercised primary managerial authority over business operations, financing strategy, capital structure, and communications with shareholders and debt holders. He served as Executive Chairman and later CEO, controlled operational decision-making, and coordinated closely with Moradi through affiliated investment vehicles. Bettis was affiliated with Reach 4 Partners (4.5% ownership) and owned an additional 2.6%

15

through CSB IV US Holdings LLC, giving him voting, strategic, and governance influence over the company. See Exh. 48 (FB Cap Table).

76.    Bettis also issued formal investor communications on behalf of Formulus Black, including the September 5, 2018 shareholder update, which described financing activities, governance structures, and strategic direction. See Exh. 49 (FB Shareholder Letter); Exh. 98, 106 (FB Pitch Decks). Bettis exerted control over payroll, related-party payments, internal accounting, and the company's financial records, and undermined governance mechanisms when they threatened Enterprise control.

77.    At First Contact Entertainment, Bettis served as a director and influencer of governance and strategic decisions. Contemporaneous emails in Exh. 30 show Kovacs describing Bettis's position on the First Contact board. Exhibits 52, 53, and 78 confirm that Bettis and Moradi coordinated control over banking, financial signatory authority, internal investigations, and reputational pressure campaigns, including support for coercive tactics used to remove founder Demian Lichtenstein. See Exh. 52 (First Contact Checklist naming required signatories); Exh. 53 (July 7, 2016 coercive letter); Exh. 78 (FC emails regarding authority consolidation); Lichtenstein Decl. ¶¶ 9–18.

78.    At ESTP, Bettis served as a controlling force who, once Kovacs became a whistleblower, orchestrated Kovacs's removal from ownership and governance without compensation, audit, valuation, or notice. Governance documents and cap table materials confirm Bettis's decisive influence through his affiliated entities and his unilateral decision to strip Kovacs of a stake conservatively valued between $80 million and $120 million. See Exh. 60–62, 75–76; Kovacs Decl. ¶¶ 160–184.

79. Through his cross-entity executive authority, coordination with Moradi, control over governance processes, and role in removing internal opponents across multiple ventures, Bettis acted as a senior architect and operational executor of the Enterprise. See Arena Decl. ¶¶ 11–15; Lichtenstein Decl. ¶¶ 9–18.

80. Bettis sold $5.4 million of AudioEye stock in December 2024 and additional amounts in June 2024 while in possession of material nonpublic information concerning whistleblower complaints, governance failures, and undisclosed litigation exposure. These trades occurred outside any disclosed 10b5-1 plan. See Forms 4; Schedule E (Material Misrepresentations and Omissions); Schedule G (Damages Memorandum).

81. Bettis is an "Enterprise Leader" within the meaning of this Complaint.

### 3.    Jason Humble

82. Defendant Jason Humble ("Humble") is affiliated with Humble Philanthropy and is a former employee of AudioEye, Inc. See Kovacs Decl. ¶¶ 160–184. During the RICO Period, Humble operated as a capital-raising intermediary, associate, and fixer for Formulus Black Corporation and its leadership, including Bettis and Moradi. In that capacity, Humble solicited and recruited investors – including Julian Ducheine and retired NFL player Muhammed "Mo" Wilkerson – to invest in Formulus Black, and entered into written agreements reflecting his role in identifying investors and receiving equity-linked compensation or success fees tied to a future liquidity event. See Exh. 50 (Humble–Ducheine Investment Agreement); Ducheine Decl. ¶¶ 6–12.

83. Humble's investor-solicitation activities, compensation arrangements, and coordination with Formulus Black principals are corroborated by the Ducheine and DiMaggio declarations, which describe Humble's direct role in inducing investments, transmitting

17

instructions, and acting as an operational interface between outside investors and Formulus Black leadership. See Ducheine Decl. ¶¶ 6–15; DiMaggio Decl. ¶¶ 8–12.

84.     Beyond fundraising, Humble acted as an enforcer and operative for Enterprise interests. Witnesses describe Humble using pressure tactics, reputational leverage, and his relationships with prior investors to advance the objectives of Bettis and Moradi, including discouraging complaints, shaping narratives about the companies, and suppressing dissent. See Ducheine Decl. ¶¶ 16–20; DiMaggio Decl. ¶¶ 8–16.

85.     When financial and reputational pressure failed to silence whistleblowing activity, Humble escalated to solicitations of violence. Multiple witnesses testified that Humble approached prior victims of the Enterprise – including Ducheine and Wilkerson – to "take care of" David Kovacs on behalf of Bettis and Moradi. Ducheine testified that Humble stated: "Kovacs is upsetting the wrong people right now… I need your help to find someone to take care of Kovacs," which Ducheine understood to mean murder. See Ducheine Decl. ¶¶ 22–28; Exh. 40–42, 51 (contemporaneous messages). DiMaggio later intervened, met with Wilkerson, and secured assurances that no harm would occur. See DiMaggio Decl. (Exh. 2) ¶¶ 20–32.

86.     Humble also initiated the Jason Humble Lawsuit against Kovacs in the Southern District of New York on May 2, 2024, which he voluntarily dismissed with prejudice on July 3, 2024. See Exh. 39. On information and belief, and consistent with Enterprise practice, Humble filed the action at the direction of Bettis and/or Moradi.

87.     Through his roles as recruiter, intermediary, pressure agent, and operational enforcer, Humble participated in and advanced the affairs of the Enterprise. Humble is an "Enterprise Associate" within the meaning of this Complaint.

### 4.    John Doe 1-50

88.    The John Doe Defendants include individuals and entities whose identities are presently unknown, and individuals and entities whose identities are known but whose conduct intersects materially with the events described herein in ways that are still being corroborated. Upon confirmation, such individuals will be named and their roles pleaded with specificity.

### B.    Director Defendants

89.    Defendant Dr. Katherine E. Fleming is a current member of the AudioEye Board and served as a director during a portion of the RICO Period. Fleming has served as an independent director since March 2023. Fleming personally bought $150,000 worth of AudioEye stock in June 2024.

90.    Defendant James ("Jim") Hawkins is a current member of the AudioEye Board and served as a director during a portion of the RICO Period. Hawkins has served as an independent director since March 2025. Since that time, Hawkins has made only purchases of AudioEye stock.

91.    Defendant Jamil Tahir served as a member of the AudioEye Board during a portion of the RICO Period. Tahir has served as an independent director since 2019.  Tahir personally sold $3.0 million of AudioEye stock in December 2024 while possessing material nonpublic information.

92.    Defendant Tony Coelho served as a member of the AudioEye Board during a portion of the RICO Period. Coelho served as an independent director from June 2014 until March 2025. Coelho is not alleged to have engaged in improper trading with respect to AudioEye stock.

19

93.    Each Director Defendant owed fiduciary duties to AudioEye and its shareholders and is named based on acts or omissions in that capacity, except where otherwise expressly alleged.

### C.    Executive Defendants

94.    Defendant Kelly Georgevich served as Chief Financial Officer and a senior executive of AudioEye during the RICO Period, with direct responsibility for the Company's financial reporting, internal controls, Adjusted EBITDA calculations, and non-GAAP disclosures. In that role, Georgevich prepared, reviewed, approved, and certified AudioEye's financial statements and related disclosures filed with the SEC. Georgevich exercised substantial control over earnings presentations, guidance, and metrics used to portray AudioEye's financial performance to investors. While in possession of material nonpublic information concerning insider-trading risk, whistleblower allegations, and undisclosed volatility in reported results, Georgevich sold more than $300,000 of AudioEye stock in or about November 2024.

95.    James Spolar served as AudioEye's General Counsel and senior legal executive during the RICO Period, with responsibility for legal strategy, regulatory compliance, and the Company's public disclosures. In that role, Spolar signed and authorized AudioEye's SEC filings, including documents containing materially false and misleading statements and omissions. Spolar acted as a central disclosure gatekeeper, managing litigation and whistleblower issues while coordinating the Company's public narrative. Despite direct knowledge of whistleblower allegations, insider-trading risk, and governance breakdowns, Spolar approved disclosures that concealed those risks from investors.

### D.    Professional Defendants

96.    Defendant MaloneBailey, LLP is a public accounting firm that served as AudioEye's outside auditor during a portion of the RICO Period. MaloneBailey provided

20

auditing and related professional services in connection with AudioEye's GAAP financial statements, Adjusted EBITDA calculations, and related public disclosures. During the RICO Period, MaloneBailey reviewed, approved, and issued unqualified (clean) audit opinions for AudioEye's SEC-filed financial statements, expressly consenting to their inclusion in filings disseminated to investors. MaloneBailey issued those opinions despite multiple red flags, including insider-trading risk, governance breakdowns, whistleblower escalation, and the use of distorted non-GAAP metrics that rendered the disclosures materially misleading.

97.     MaloneBailey is named as a Professional Defendant based on the conduct alleged herein. Plaintiffs reserve the right to amend this Complaint to add additional Professional Defendants as their identities and roles are ascertained through discovery.

### E.     John Doe Defendants

98.     "John Doe Defendants" means persons or entities whose identities are presently unknown to Plaintiffs but who participated in, facilitated, benefited from, or knowingly received proceeds from the conduct alleged herein, including without limitation intermediaries, agents, nominees, shell entities, tippees, downstream traders, litigation financiers, professional enablers, or recipients of diverted corporate assets.

### III.   Nominal Defendants

99.     Nominal Defendant AudioEye, Inc. ("AudioEye" or "AEYE") is named solely because certain claims asserted herein are brought derivatively on its behalf and because the relief sought includes equitable, remedial, and governance-based measures that can be fully and effectively implemented only with the Company before the Court.

100.    Nominal Defendant First Contact Entertainment ("First Contact") is named because the claims asserted involve transfers of value, coercive control-related conduct, and

21

affiliated transactions that affected First Contact and its equity holders, and because complete and consistent relief requires the Court's ability to address such matters directly.

101.    Nominal Defendant Formulus Black LLC ("Formulus Black") is named because the claims asserted involve asset transfers, governance actions, and related conduct affecting Formulus Black, and because certain remedies sought are equitable in nature and require the entity's presence to avoid inconsistent judgments.

102.    Nominal Defendant Eternal Sources Tech Partners, LLC ("ESTP") is named because the claims asserted include allegations of diverted assets, stripped opportunities, and economic expectancy affecting ESTP, and because effective relief – including rescission, accounting, or restoration of assets – cannot be ordered in ESTP's absence.

## JURISDICTION AND VENUE

103.    This action arises under the federal securities laws, ERISA, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

104.    At all relevant times, defendant AudioEye, Inc. was a publicly traded company whose common stock traded on the Nasdaq Stock Market, a national securities exchange operating in interstate commerce. The securities transactions at issue were executed through interstate markets and clearing systems and involved shareholders residing within this District and throughout the United States.

105.    Defendants used the instrumentalities of interstate commerce, including interstate telephone calls, electronic communications, securities filings with the United States Securities and Exchange Commission, and national securities exchanges, in furtherance of the Enterprise's activities.

22

106.    Jurisdiction is further proper under ERISA because AudioEye seized ERISA-protected equity compensation following protected whistleblower activity.

107.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because acts in furtherance of the Enterprise occurred in this District, the effects of defendants' conduct were felt in this District, and an Enterprise associate filed litigation in this District as part of the retaliation campaign.

## STATEMENT OF FACTS

### I.    ENTERPRISE STRUCTURE, AGREEMENT, AND CONTINUITY

#### A.    The Existence of an Ongoing Enterprise

108.    For the past decade, the Enterprise Leaders and their associates have operated across multiple business entities using the same core methods. The Enterprise operates as a continuing organization with a common purpose maintaining stable relationships with a recurring set of people. The Enterprise Leaders operate methodically over years. They run the same playbook over and over. The target companies may change, but the objective remains the same: to enrich Moradi and Bettis.

109.    The events described below are not isolated business disputes. Instead, what is described is a repeating and self-reinforcing system of criminality that has destroyed lives, careers, and billions of dollars in value. See Arena Decl. ¶¶ 7–15; Kovacs Decl. ¶¶ 30–41, 57, 66–67, 73–84, 131–151; Lichtenstein Decl. ¶¶ 4–22; Ducheine Decl. ¶¶ 4–12; DiMaggio Decl. ¶¶ 5–14; McGlashan Decl. ¶¶ 3–10; Anderson Decl. ¶¶ 6–18). Exh. 52, 53, 78, 94, 105, 107.

110.    The Enterprise Leaders gain entry by exploiting predictable conditions: capital need, fiduciary trust, and information asymmetry. Entry is followed by centralization of

authority. Founders and internal dissenters are pushed aside. When resistance emerges, the Enterprise Leaders resort to lawfare, economic coercion, and even solicitation of violence.

111.    During relevant times, the Enterprise has operated through First Contact Entertainment, Formulus Black (formerly Symbolic IO), AudioEye, Inc., ESTP, Vivid Strategies, and affiliated vehicles. Each entity served as a platform through which Enterprise leaders acquired control, suppressed internal opposition, and diverted money to themselves.

112.    The Enterprise exploited predictable conditions. These conditions included capital need, fiduciary trust, and information asymmetry. Entry into a company was followed by centralization of authority. Founders and internal critics lost influence. When resistance emerged, Enterprise members applied legal, reputational, or economic pressure to remove it. See Lichtenstein Decl. ¶¶ 4–22; Arena Decl. ¶¶ 7–15; Kovacs Decl. ¶¶ 30–41, 57–67, 73–84, 131–151; Ducheine Decl. ¶¶ 8–32; DiMaggio Decl. ¶¶ 10–20; Exh. 52, 53, 78, 94, 105, 107.

### B.    Allocation of Roles Within the Enterprise

113.    David Moradi was the Enterprise's architect and primary beneficiary. He entered companies during formative or destabilized periods. He represented himself as a sophisticated financial insider capable of securing capital and credibility. After entry, Moradi centralized authority over financing, trading strategy, and disclosure. He exercised de facto control even when he lacked formal majority ownership. See Arena Decl.; Kovacs Decl.; Lichtenstein Decl.

114.    In April 2017, Moradi obtained a Nevada jury verdict awarding $160.5 million for traumatic brain injury stemming from an April 2012 assault at a Las Vegas nightclub. The verdict reportedly resolved for approximately $240 million. Moradi has repeatedly represented to business associates, employees, and adversaries that he possesses these settlement proceeds and can fund extended litigation against any opponent. The relevance of that settlement lies in

24

Moradi's subsequent conduct. Moradi repeatedly invoked the settlement in business contexts to project litigation dominance and financial power. He referenced it while threatening adversaries, discouraging resistance, and asserting that he could outspend and outlast any opponent. AudioEye and Moradi themselves placed these statements into the public record by suing Kovacs over them in Florida. See Exh. 30, 54, 55; Kovacs Decl.

115.    Over years of close professional interaction during the RICO Period, multiple witnesses observed Moradi perform sustained executive functions. He managed complex financial strategies. He conducted detailed negotiations. He directed operations across multiple companies. Based on these observations, witnesses concluded that Moradi functioned at a high cognitive level. These observations informed how Moradi's colleagues understood the settlement as a coercive tool, regardless of any judicial determination underlying it.

116.    When Kovacs raised concerns about Moradi's conduct in private communications among defrauded investors, Moradi and AudioEye responded with immediate litigation and financial intimidation. They placed the traumatic brain injury settlement at the center of that lawsuit. AudioEye spent approximately $2.7 million in corporate funds prosecuting the action while holding approximately $4.6 million in cash—an expenditure representing more than half the company's liquid assets deployed to silence a whistleblower rather than serve any legitimate corporate purpose. Many of the allegations asserted were later abandoned or disproven, as evidenced by AudioEye's November 13, 2025 Motion to Amend. The action functioned as retaliation, not remediation, and constitutes recoverable corporate waste. The same approach appears in the Birkin Bag Letter dated March 20, 2024, which referenced Moradi's litigation resources and financial "war chest" as leverage to force submission rather than resolve disputes. See Exh. 30, 35, 37, 67; Kovacs Decl.

25

117.   The settlement also constituted a material governance fact. A public-company CEO's receipt of a nine-figure settlement for traumatic brain injury required inquiry by the board and, depending on circumstances, disclosure to shareholders. The settlement was publicly reported and readily discoverable through basic internet searches conducted in April 2017. AudioEye did neither. That failure forms part of the governance breakdown that enabled the Enterprise's conduct.

118.   Carr Bettis functioned as the Enterprise's governance stabilizer. Bettis held formal leadership positions, including Executive Chairman at AudioEye. He controlled access to boards, auditors, and counsel. He presented himself as pastoral and conciliatory. He frequently used religious and reconciliation language. At the same time, he decided whether complaints advanced or stalled. Through these actions, Bettis preserved Enterprise continuity under the appearance of compliance. See Arena Decl; Kovacs Decl.

119.   Jason Humble served as intermediary and facilitator. He recruited investors. He transmitted instructions between Enterprise members. He coordinated litigation pressure and filed the Jason Humble Lawsuit on May 2, 2024, which he voluntarily dismissed with prejudice on July 3, 2024. He extended Enterprise activity beyond formal corporate boundaries. When legal and economic retaliation failed, Humble solicited violence to silence Kovacs. See Ducheine Decl.; DiMaggio Decl.; Exh. 39.

### C.   Interstate Commerce and Continuity

120.   At all relevant times during the RICO Period, the Enterprise engaged in activities affecting interstate commerce. These activities included interstate communications, wire transfers, SEC filings, operation of national payroll systems, and securities trading on national

exchanges. The conduct spanned multiple states and continued over years. The Enterprise exhibited both closed-ended and open-ended continuity.

## II.    PRIOR ITERATIONS OF THE ENTERPRISE PLAYBOOK

### A.    First Contact Entertainment

121.    First Contact demonstrates the Enterprise's methods in a private-company setting. Demian Lichtenstein founded the company. He developed its technology, workforce, and industry relationships. He bore entrepreneurial risk and exercised operational control. See Lichtenstein Decl.

122.    After Moradi entered the company in mid-2016, control shifted. Financing decisions centralized in Moradi. Strategic authority consolidated. On July 18, 2016, Moradi was named a required financial signatory, confirming his control over bank accounts. Information flow narrowed. Lichtenstein's operational authority declined. Internal oversight weakened. See Lichtenstein Decl.; Exh. 52.

123.    Moradi threatened asymmetric lawfare. These threats suppressed dissent and discouraged opposition.

124.    Reputational pressure followed. On July 7, 2016, a coercive letter was sent to Lichtenstein containing false sexual harassment allegations designed to stigmatize Lichtenstein and isolate him from stakeholders. When Lichtenstein confronted Moradi about his conduct, asking in tears, "Why are you fucking me like this?", Moradi responded: "Because you are fuckable."

125.    Internal controls deteriorated. During acquisition diligence, First Contact failed basic audit review due to rampant fraud and the absence of auditable records. A transaction

27

valued at approximately $250 million collapsed, destroying $200 million to $250 million in enterprise value. See Kovacs Decl.; Lichtenstein Decl.; Anderson Decl.; Exh. 53, 78.

### B.      Formulus Black / Symbolic IO

126.    Brian Ignomirello founded Symbolic IO, later known as Formulus Black, and developed its core computational-defined storage technology. In January 2015, the company raised approximately $12.7 million at a pre-money valuation of roughly $132 million. Institutional investor interest at the time supported internal expectations of a potential $250–$500 million exit upon commercialization.

127.    Carr Bettis entered the company through a minor convertible note and positioned himself as a strategic advisor. Once inside, Bettis used that position to gain influence over financial operations. Funds began flowing outside normal payroll and expense systems, including payments to related parties without documentation, approval, or legitimate business purpose.

128.    When Ignomirello sought a forensic accounting review in order to protect the company, Bettis alerted individuals suspected of misconduct and undermined the effort. Governance and oversight deteriorated rapidly. Between May 5 and May 20, 2017, false criminal allegations were manufactured against Ignomirello. Bettis financially pressured the mother of Ignomirello's children to file accusations. Company resources and personnel supported the accuser, and press leaks amplified the allegations. Ignomirello was arrested and spent four months in jail. During this period, he lost access to his employees, lost health-insurance coverage, and was forced to pay cancer-treatment expenses out-of-pocket. He was separated from his children.

129.    In January 2018, following months of incarceration and without resources to fight, Ignomirello was compelled to settle under extreme duress. After the Enterprise Leadership Defendants gained control, Symbolic IO/ Formulus Black collapsed. Settlement obligations were breached, intellectual property reverted, and investor equity was rendered worthless. Years later, in May 2023, the accuser recanted under oath and admitted she acted under external pressure. With no remorse, the Enterprise Leadership Defendants gutted internal controls, raided the treasury, and destroyed what had been an enterprise with credible prospects of a $250–$500 million valuation.

### C.    ESTP – The Same Story

130.    The Enterprise employed the same founder-removal mechanics at ESTP. ESTP was a high-value venture in which Kovacs held a substantial economic interest. As at First Contact, Formulus Black, and AudioEye, Kovacs occupied a position that constrained the Enterprise's freedom of action. Specifically, as CEO, Kovacs had the capability and inclination to resist the Enterprise Leaders.

131.    When Kovacs became a whistleblower, Bettis retaliated by stripping Kovacs of his ownership interest without compensation. This was done in secret. No independent valuation, audit, or governance process preceded the removal. Kovacs learned about it via a text from another partner.

132.    The events at ESPT mirrored prior iterations of the Enterprise playbook: removal of the constraining insider, consolidation of control, and destruction of enterprise value conservatively estimated at $200 million to $300 million. Kovacs Decl., ¶¶ 160-184; Exh. 60, 61, 62, 75, 76, 90.

29

### III.    ESCALATION INTO THE PUBLIC MARKETS AT AUDIOEYE

#### A.    Consolidation of Control

133.    AudioEye is a Nasdaq-listed public company subject to federal securities laws. Moradi became a major AudioEye investor in mid-2014 and was appointed to the board on November 13, 2019. Bettis served as Executive Chairman. Together the Enterprise Leadership Defendants exercised effective control over governance, disclosure, and responses to internal complaints. Arena Decl.; Kovacs Decl.

134.    Paul Arena, AudioEye's co-founder and then-Executive Chairman, identified Moradi's failure of SEC reporting requirements and possible coordinated trading activity that raised concerns regarding trading practices and compliance. Moradi and Bettis thereafter attributed responsibility for accounting and restatement issues to Arena and orchestrated his removal from leadership in March 2015. The stated rationale focused on the restatement. The functional result was the elimination of a founder-level constraint on Moradi and Bettis's control over disclosure, trading, and governance. After Arena's removal, AudioEye failed to audit internal controls for several years. The Independent Directors should note that AudioEye's internal controls have not been audited since Moradi joined the board in 2019. See Arena Decl.; SEC Filings.

#### B.    Advance Planning of Stock Manipulation

135.    By August 30, 2023, Moradi discussed stock-price manipulation techniques with Kovacs. These techniques included "painting the tape." Moradi directed Kovacs to assist with coordinated trading designed to create artificial demand. Kovacs refused. A confrontation followed. Mario Rodriguez witnessed it. Kovacs Decl.    35; Rodriguez Decl.

136.    Discussions of manipulation continued months before any price movement. The timing reflected advance planning and intent. During this period, on December 25, 2023, Ben Barton, another AudioEye insider, exchanged the Ben Barton Christmas Texts with Kovacs. In those texts, Barton declared his intention to become a whistleblower regarding Moradi's fraud, writing: "I'll make it very public. He's the one who's scared. He's the ceo of a public company. He's fucked." The timing is critical. The AudioEye stock price had not yet moved. The pump-and-dump would not affect the market for another three months. Nevertheless, two AudioEye insiders were already discussing, in heated and unambiguous terms, the stock manipulation that was being hidden from shareholders. Kovacs Decl. ¶¶ 100-106, 127(b).

### C.    Liquidity Infrastructure and Insider Sales

137.    On February 13, 2024, AudioEye filed the Shelf Registration. The registration enabled large insider sales without the normal restrictions and delay periods. (Exh. 71).

138.    During Phase I (June 2, 2022 through February 12, 2024), AudioEye spent approximately $2.7 million repurchasing its own shares while cash-burning and dependent on external financing. A company that genuinely believes its stock is fairly priced preserves liquidity. Authorizing buybacks instead is economically irrational unless management knows the stock will later trade substantially higher. This conduct demonstrates management's advance knowledge that the observed trading price was materially below the price at which they intended to sell. See SEC Filings; Schedule G.

139.    In December 2024, after AudioEye's stock price increased from approximately $4 per share to over $30 per share – a gain exceeding 650% – insiders executed their plan. Between June 2024 and January 2025, insiders sold $35,218,799 of AudioEye stock in coordinated transactions. Moradi sold approximately $21.6 million. Bettis sold approximately

31

$5.4 million. Tahir sold approximately $3.0 million. Kelly Georgevich sold additional shares. The largest sales occurred on December 4, 2024, when Moradi, Bettis, and Tahir collectively sold $30 million of stock on a single day. The insiders possessed Material Nonpublic Information when they sold, including undisclosed regulatory exposure, retaliatory litigation expenditures, whistleblower complaints, and governance failures. Not one Form 4 filed by any insider disclosed trading pursuant to a Rule 10b5-1 plan. See Forms 4; Exh. 71, 73; Schedule G.

## IV.   WHISTLEBLOWING, RETALIATION, AND CONVERSION TO PROCEEDS

### A.   Protected Disclosures

140.   Kovacs was hired at AudioEye on January 1, 2014 by founders Paul Arena and Ted Withrow, predating Moradi's involvement by more than six months. Kovacs worked at AudioEye for nearly a decade as an executive. Kovacs once imagined the Enterprise Leadership Defendants to be mentors. Kovacs' relationship with Moradi soured on August 30, 2023 when Moradi instructed him to commit securities fraud. Kovacs refused. See Kovacs Decl.   35; Withrow Decl.

141.   On November 13, 2023, Kovacs engaged in Protected Activity, reaching out to HR to report securities fraud. The meeting never happened. The Chairman of the company, Carr Bettis, phoned Kovacs moments later and stated: "Now Moradi will ruin your life." This chilling threat proved accurate. On January 17, 2024 – the Termination Date – Kovacs reported those concerns directly to Bettis during a telephone call. During the call, which Bettis secretly recorded, Kovacs repeatedly told Bettis about Moradi's Insider Trading and even threatened to file a lawsuit over it. Bettis did not initiate an investigation. AudioEye's Whistleblower Protection Policy required one. (Exh. 30, 31, 105).

32

### B. Retaliation

142. AudioEye terminated Kovacs on the Termination Date. On January 19, 2024, AudioEye's General Counsel confirmed in writing that the termination was "for cause." The company seized ERISA Benefits including vested RSUs worth millions of dollars that Kovacs had earned over nearly a decade of service. Kovacs engaged in further Protected Activity, reporting the misconduct to the Department of Justice on February 8, 2024. On February 20, 2024, AudioEye revoked Kovacs' ERISA-protected restricted stock. Remarkably, the letter from Akin Gump admits retaliation, stating that the termination was "for cause" because Kovacs accused Moradi of fraud. See Exh. 32, 33, 34; Kovacs Decl.  140.

143. On March 20, 2024, Bettis sent the Birkin Bag Letter to Kovacs containing explicit threats that Moradi would do "unfathomable physical harm" if Kovacs did not settle his dispute with Moradi – which meant capitulate. (Exh. 35).

144. Kovacs reported to the SEC on April 8, 2024. Two days later, on April 10, 2024, AudioEye and Moradi commenced the Florida Lawsuit. The complaint asserted multiple False Smears comparing Kovacs to George Santos, the infamous charlatan who was jailed after being elected to Congress based on fabricated credentials. Those allegations were later abandoned or disproven, as evidenced by AudioEye's Motion to Amend filed November 13, 2025. The company spent approximately $2.7 million—more than half its cash reserves—pursuing the lawsuit while holding only $4.6 million in total cash. This expenditure constitutes corporate waste recoverable by AudioEye from the Enterprise Leadership Defendants under derivative and RICO theories. (Exh. 34, 36, 37, 67; Kovacs Decl. ¶¶ 20, 331–386; Schedule G).

145. On May 2, 2024, Jason Humble commenced the Jason Humble Lawsuit against Kovacs in the Southern District of New York. On information and belief, Humble sued at the

direction of the Enterprise Leadership Defendants, not of his own accord. On July 3, 2024, Humble voluntarily dismissed the action with prejudice. (Exh. 39).

146.    On May 8, 2024, the retaliation escalated beyond the bounds of AudioEye when Kovacs learned that Carr Bettis had ousted him from ESTP. This deprived Kovacs of economic interests conservatively valued at more than $80 million. See Kovacs Decl. ¶¶ 160-184; Exh. 60, 61, 62, 75, 76, 90.

147.    For good measure, in April 2025, Carr Bettis filed the Arizona Lawsuit over a purported $100,000 loan from 2017 that was repaid years ago. Discovery will show that the purported loan was part of a scheme by Bettis to make AudioEye pay for his girlfriend's Manhattan apartment—conduct that would not have been possible if AudioEye maintained sound internal controls. (Exh. 74, 107).

148.    When financial retaliation failed to silence Kovacs, the Enterprise escalated to soliciting murder. This is a particularly remorseless aspect of the Enterprise: its recycling of victims into accomplices. Jason Humble solicited two separate victims of the Enterprise's fraud – Julian Ducheine and Mo Wilkerson – to murder Kovacs.

149.    Ducheine testified that in December 2023, Humble called him and stated, in substance: "We have to do something about David Kovacs. I need your help. . . Kovacs is upsetting the wrong people right now. I need your help to find someone to take care of Kovacs." Ducheine makes clear: "take care of" means murder and "wrong people" means Bettis and his group. Ducheine refused this outrageous request and warned Kovacs of the danger. See Ducheine Decl.; Exh. 40, 41, 42, 51.

150.    Humble moved on to another victim. Former New York Jets All-Pro defensive end Mo Wilkerson lost $1 million investing in Formulus Black. Humble made Wilkerson a

34

proposal: murder Kovacs and get your million dollars back. Multiple witnesses confirm the plot was real, operationalized, and not mere talk. On August 5, 2024, Nicky DiMaggio met with Wilkerson and secured his commitment that Kovacs would not be harmed.

151.    In an April 26, 2025 text message to NYPD detectives, Kovacs reported that Wilkerson – who had previously lost approximately $1 million investing in Formulus Black – was "likely [to] come forward that he was solicited by Jason Humble on behalf of Carr Bettis and David Moradi to murder me in New York City or Miami," and that Wilkerson "declined the request and said he does not do that."

152.    Kovacs further informed the detectives: "I have strong guardian angels and the fact Mo is coming forward proves that. Mo said he is speaking to his attorney over the weekend and will like to sit down this week with me and his attorney to understand how he can come forward without incriminating himself." See Exh. 91 (Text Messages with NYPD, Apr. 26, 2025).

153.    On June 3, 2025, in a meeting at Miller's Ale House in Parsippany, New Jersey attended by Kovacs, his attorney Richard Tannenbaum, Wilkerson, Wilkerson's criminal defense attorney John Paul Velez, and DiMaggio, Kovacs asked Wilkerson directly about the murder solicitation. Wilkerson paused, looked Kovacs in the eye, and stated: "You're the guy who lives at the start of Park Avenue." Wilkerson was correct – at that time, Kovacs lived at 1 Irving Place, the first building on Park Avenue South. Wilkerson had no legitimate reason to know where Kovacs lived. All present understood Wilkerson's statement as confirmation that Humble had provided Kovacs's home address for purposes of executing the planned murder. Two witnesses – Ducheine and DiMaggio – intervened and prevented the planned killing. See DiMaggio Decl. ¶¶ 20-32; Tannenbaum Decl.; Kovacs Decl. ¶¶ 186-215; Exh. 91, 93.

154. These contemporaneous statements reflect that Wilkerson – like Ducheine – was a targeted victim whom Humble attempted to recruit, not a willing participant. The evidence indicates that Wilkerson refused, sought legal counsel, and expressed a desire to come forward safely, underscoring that he remains a potential witness whose cooperation would further illuminate the Enterprise's coercive methods.

155. After learning of the plot, Kovacs went on the lam. For over a year, Kovacs has lived at an undisclosed location under constant fear for his personal safety. Kovacs Decl. 2.

### C.    Harm and Proceeds

156. Public shareholders of AudioEye suffered losses conservatively estimated between $125.5 million and $358.0 million across Phase I and Phase II. These damages are subject to trebling under RICO, yielding shareholder recovery between $376.5 million and $1,074.0 million. (Schedule G).

157. Phase I damages (June 2, 2022 through February 12, 2024) compensate shareholders who sold at artificially depressed prices during the period when insiders were conducting economically irrational buybacks and concealing their plan to monetize at substantially higher prices. The irrational buybacks constitute objective evidence that management knew the market price was materially below the price at which they intended to sell. Phase I base damages range from $66.5 million to $126.0 million. (Schedule G).

158. Phase II damages (February 13, 2024 through April 1, 2025) compensate shareholders who purchased at artificially inflated prices during the period when insiders were dumping $35.2 million of stock while concealing governance collapse, regulatory exposure, and whistleblower complaints to federal authorities. Phase II base damages range from $59.0 million to $232.0 million. (Schedule G).

159.   AudioEye itself suffered entity-level harm separate from and in addition to shareholder losses. This harm includes: (1) disgorgement of insider trading proceeds ($25.2 million to $35.2 million); (2) corporate waste and cash depletion, including $2.7 million spent on irrational buybacks and $2.7 million spent on retaliatory litigation against a whistleblower ($45.0 million to $70.0 million); and (3) structural governance harm, including increased cost of capital, regulatory exposure, and reputational damage. AudioEye's base entity-level damages range from $70.2 million to $105.2 million. These damages are subject to trebling under RICO, yielding AudioEye's derivative claims against the Enterprise Leadership Defendants of $210.6 million to $315.6 million. (Schedule G; Schedule H). These figures are conservative and do not include downstream regulatory penalties, restatement costs, or increased cost of capital.

160.   Enterprise insiders converted the scheme into $35,218,799 in proceeds disclosed on Forms 4. The Enterprise Leadership Defendants added these proceeds to their already substantial wealth. Moradi, who has repeatedly represented that he possesses $240 million in settlement proceeds from his 2017 traumatic brain injury case, is a deep-pocket defendant fully capable of satisfying AudioEye's derivative claims and shareholder judgments. (Forms 4; Kovacs Decl.;  ¶¶ 76-92; Schedule G).

## V.   WITNESS TAMPERING AND OBSTRUCTION OF JUSTICE

161.   The Enterprise engaged in a sustained pattern of witness tampering, obstruction of justice, and improper influence directed at individuals capable of corroborating Kovacs' allegations. These acts, spanning 2023–2025, constitute predicate offenses under 18 U.S.C. §§ 1512(b), 1512(c), 1512(d), and 1513(e).

162.   Although Kovacs faced direct retaliation after becoming a federal whistleblower, he was not the only target. The Enterprise manipulated, intimidated, or attempted to control: (i)

37

witness Julian Ducheine; (ii) a senior advisor to Mayor Adams; (iii) Kovacs' attorneys; and (iv) Kovacs himself.

### A.    Witness Julian Ducheine

#### 1.    Murder Solicitations – Motive to Tamper

163.    In December 2023, Humble told Ducheine: "We have to do something about David Kovacs… he is upsetting the wrong people… I need your help to find someone to take care of Kovacs." Ducheine understood this as a solicitation to find someone to murder or seriously harm Kovacs. See Ducheine Decl. ¶¶ 19–25.

164.    In January 2024, Humble again raised hiring a hitman, identifying Bettis as the "top man" and referencing Mo Wilkerson as someone who could "take care of" Kovacs. See Ducheine Decl. ¶¶ 26–29.

165.    After the Kerr lawsuit exposed Humble's misconduct, Ducheine disclosed the murder plot to Kovacs on May 8, 2024. See Ducheine Decl. ¶¶ 30–46; Exh. 40. Kovacs independently corroborates receiving warnings regarding potential violence.

#### 2.    December 2024 – Quinn Pressure Campaign

166.    In December 2024, Humble secretly recorded a call with Ducheine, attempting to steer discussion away from the murder plot and script a false narrative portraying Kovacs as dishonest. See Ducheine Decl. ¶¶ 47–50.

167.    Humble provided the recording to Quinn Emanuel, which used it to pressure Ducheine. See Ducheine Decl. ¶¶ 49–50.

168.    In January 2025, Quinn Emanuel attorney Adam Abensohn attempted to coerce Ducheine into adopting a false story that Kovacs tried to bribe him. When he refused, Abensohn invoked the secret recording as leverage. See Ducheine Decl. ¶¶ 49–50; Exh. 65.

169.    On January 24, 2025, Quinn Emanuel sent a letter falsely accusing Kovacs of attempting to bribe Ducheine—an allegation Ducheine states is entirely fabricated. See Ducheine Decl. ¶¶ 1–6; Exh. 66.

### 3.    January 2, 2025 Text Messages ("Juju")

170.    On January 2, 2025, Humble texted Ducheine repeatedly addressing him as "juju," the same nickname used in the July 24 voicemail. See Exh. 51; Ducheine Decl.   53.

171.    In these messages, Humble attempted to calm and influence Ducheine ("my apologies," "It's all love"), reframed insider-trading issues, and instructed him not to mention Kovacs again, while admitting he had involved "that Attorney" because of perceived insider-trading exposure. See Exh. 51; Ducheine Decl. ¶¶ 47, 53.

### 4.    July 24, 2025 Voicemail — Direct Evidence of Coordinated Obstruction

172.    On July 24, 2025, Humble left a voicemail confirming:

    a.  the existence of the secret recording;

    b.  review of the recording by Bettis and "his attorney";

    c.  use of the recording in litigation involving Kovacs; and

    d.  ongoing coordination with Bettis.

See Ducheine Decl. App'x A; ¶¶ 51–53.

173.    Humble repeatedly called Ducheine "juju," told him to relax, and smeared Kovacs as a "pathological liar"—all consistent with efforts to shape his recollection and suppress disclosure. See Ducheine Decl. App'x A;   53.

174.    This voicemail corroborates every critical element of Ducheine's testimony: the murder solicitations, the secret recording, Bettis's involvement, Quinn Emanuel's involvement, and the Enterprise's sustained effort to silence him.

**B.     Tampering Directed at Senior Advisor to the Mayor of New York City**

175.    In November 2025, a senior advisor to Mayor Eric Adams informed Kovacs she could not provide a truthful statement confirming his role because the Mayor's lawyers were threatening her. See Kovacs Decl. ¶¶ 276-77.

176.    The advisor texted: "I get yelled at every day and his lawyers threatening me... I will go to prison."

177.    Quinn Emanuel partner Alex Spiro was publicly reported to represent Mayor Adams during this period, and Quinn Emanuel is the only firm with an interest in preventing Kovacs from obtaining such a letter.

178.    This episode demonstrates the Enterprise's willingness to interfere with municipal officials to block truthful testimony.

**C.     Interference With Attorney Xavier Suarez**

179.    Attorney Xavier Suarez, who represented Kovacs in connection with the Florida litigation, concluded that Quinn Emanuel faced a serious ethical conflict arising from its communications with Kovacs while secretly aligning with adverse parties. Suarez initially agreed that a motion to disqualify Quinn Emanuel was warranted and directed his law partner to gather sworn affidavits to support such a motion. See Kovacs Decl. ¶¶ 255–256.

180.    Consistent with that determination, sworn affidavits were obtained from Kovacs and other witnesses, including Sean Newlin and David Tanzer, and draft motion papers seeking Quinn Emanuel's disqualification were prepared. Kovacs instructed his counsel to proceed with filing the motion and reviewed and commented on the draft papers. See Kovacs Decl. ¶¶ 257–258.

40

181. Despite his prior agreement and the completed preparation of motion papers, Xavier Suarez abruptly refused to file the disqualification motion and provided no legal explanation for his reversal. See Kovacs Decl.   259.

182. Kovacs later learned that Suarez reversed course because his two children were employed by Quinn Emanuel: his son, Mayor Francis Suarez, served as Of Counsel at the firm, and his daughter was the co-managing partner of Quinn Emanuel's Miami office. These familial relationships were not disclosed to Kovacs at the time Suarez advised against pursuing disqualification. See Kovacs Decl. ¶¶ 260–261.

183. Subsequently, Suarez's law partner informed Kovacs that Mayor Francis Suarez had personally intervened and stated that Suarez "did the right thing by not moving to disqualify Quinn Emanuel." Suarez later attempted to justify his refusal by suggesting the issue could be addressed "later," despite acknowledging that the motion itself was substantively sound. See Kovacs Decl. ¶¶ 262–264.

184. From Kovacs' perspective, the refusal to file the disqualification motion reflected political and familial interference overriding independent legal judgment, corrupting the attorney-client relationship, and blocking a meritorious motion directed at Quinn Emanuel's undisclosed conflicts and improper conduct. See Kovacs Decl. ¶¶ 265–266.

### D. Pressure Through Senior Blackstone Executive Directed by Mayor Suarez

185. In December 2024, Mayor Francis Suarez—while serving as Of Counsel at Quinn Emanuel—caused a senior Blackstone executive to contact Kovacs for the purpose of pressuring him to abandon his claims. See Kovacs Decl. ¶¶ 269–272.

186. During that meeting, the executive told Kovacs that he had spoken directly with Mayor Suarez, that Suarez was aligned with Moradi, and that Kovacs would not receive a fair

41

trial in Miami because both Suarez siblings worked for Quinn Emanuel. See Kovacs Decl.   269.

The executive urged Kovacs to settle and conveyed that Quinn Emanuel's influence would

prevent Kovacs from prevailing if he continued litigating. See Kovacs Decl.   270.

187.    The executive further referenced his prior role in Blackstone's settlement of

Moradi's traumatic-brain-injury case, underscoring the seriousness of the message and the

alignment between Moradi, Quinn Emanuel, and influential third parties. See Kovacs Decl.

271.

188.    Kovacs understood this interaction as a coordinated effort by Quinn Emanuel,

acting through a politically connected financial intermediary, to pressure him into abandoning his

claims. See Kovacs Decl.   272.

### E.    Summary of Tampering and Obstruction

189.    Taken together, the tampering directed at Ducheine, the NYC senior advisor,

attorney Xavier Suarez, and Kovacs himself reveals a coordinated system of obstruction

designed to suppress truthful testimony and shield the Enterprise from accountability.

190.    The pattern includes secret recordings, coercive legal threats, political pressure,

fabricated allegations, threats delivered through intermediaries, interference with counsel, and

efforts to silence key witnesses.

191.    These actions were deliberate, strategic, and central to the Enterprise's operation,

constituting multiple violations of 18 U.S.C. § 1512 and predicate acts under RICO.

## COUNT I – CIVIL RICO
## 18 U.S.C. §§ 1962(c), 1962(d), 1964
### (By David Kovacs, individually; and all Plaintiffs derivatively on behalf of AudioEye, Formulus Black, First Contact, and ESTP)

192.    Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

193.    At all relevant times, Defendants David Moradi and Carr Bettis, together with Jason Humble, affiliated executives, intermediaries, and controlled entities including AudioEye, Inc., Formulus Black LLC, First Contact Entertainment, Eternal Sources Tech Partners, LLC ("ESTP"), and Vivid Strategies, LLC, formed and conducted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

194.    The activities of the Enterprise affected interstate commerce and were carried out through the instrumentalities of interstate communication, securities markets, and multi-jurisdiction litigation.

195.    The Enterprise had a common purpose, namely the extraction of insider profits and avoidance of losses, the concealment of securities fraud and governance failures, the suppression of internal and external oversight, the retaliation against whistleblowers and witnesses, and the preservation of control through intimidation, misuse of corporate assets, and retaliatory lawfare.

196.    The Enterprise had relationships among its members, with Moradi and Bettis acting as its leaders and primary decision-makers, directing the actions of executives, intermediaries, and affiliated entities, and coordinating activity across nominally separate companies to serve unified objectives.

43

197. The Enterprise had longevity sufficient to pursue its purpose and did in fact operate continuously from at least June 2022 through April 2025, spanning multiple reporting periods, insider-trading windows, acts of retaliation, and judicial and regulatory proceedings.

198. Defendants Moradi and Bettis are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

199. Each remaining RICO Defendant knowingly participated in the Enterprise's affairs by implementing, facilitating, concealing, enabling, or benefiting from the racketeering acts alleged herein, with knowledge of their unlawful character and of the Enterprise's objectives.

200. From at least June 2022 through April 2025, Defendants committed multiple acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1), including securities fraud and insider trading, wire fraud through materially false public disclosures, wire fraud through diversion and embezzlement of corporate funds, fraud relating to the reimbursement and concealment of expenditures associated with the Birkin Bag Letter, wire fraud perpetrated through retaliatory and non-productive litigation, retaliation against a whistleblower, intimidation of witnesses, obstruction of judicial and regulatory proceedings, concealment and destruction of evidence, and interference with ERISA-protected benefits.

201. These racketeering acts are pleaded in detail in the Statement of Facts and in the RICO Predicate Act Table incorporated by reference, each of which sets forth the predicate statutes, defendants involved, and factual bases for liability.

202. The racketeering acts were related within the meaning of RICO because they involved common victims, common methods, common instrumentalities, overlapping

44

participants, and a shared objective of extracting insider value while silencing opposition and avoiding accountability.

203. Defendants' conduct constituted closed-ended continuity because it involved a series of related predicate acts extending over a substantial period of time, spanning nearly three years and multiple distinct but related schemes.

204. Defendants' conduct also constituted open-ended continuity because the racketeering acts were Defendants' regular way of conducting the Enterprise's affairs and posed a continuing threat of repetition, including through ongoing concealment, retaliatory litigation, suppression of whistleblowers, obstruction of regulatory and judicial oversight, and continued exploitation of corporate structures absent intervention by the Court.

205. Defendants knowingly agreed and conspired to conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity, and each Defendant knew the essential nature of the plan and agreed that at least two racketeering acts would be committed in furtherance of the conspiracy, in violation of 18 U.S.C. § 1962(d).

206. Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) were the direct and proximate cause of Plaintiffs' injuries and the injuries of the Companies, including loss of equity, forfeited ERISA-protected benefits, insider-trading losses, misappropriated corporate assets, massive waste through retaliatory lawfare, reputational and professional harm, and the destruction of enterprise value at ESTP and other affiliated entities.

207. In December 2023 and January 2024, Defendant Jason Humble, acting in concert with and for the benefit of Defendants David Moradi and Carr Bettis, solicited third parties to murder Plaintiff David Kovacs because Kovacs's whistleblowing threatened the Enterprise's control, profits, and continued operation. They solicited Kovacs' murder because to maintain and

45

increase Defendants' positions within the Enterprise, prevent exposure of racketeering activity, and deter cooperation with regulators and law enforcement. Although the violence was not carried out, the solicitation itself constitutes a completed violation of 18 U.S.C. § 1959.

208. Defendants' racketeering conduct was inherently self-concealing and involved affirmative acts of concealment, including the use of non-corporate communications, avoidance of internal controls, suppression of internal escalation, and abuse of litigation to delay scrutiny, thereby tolling all applicable statutes of limitation.

209. Plaintiffs seek relief pursuant to 18 U.S.C. § 1964, including treble damages, costs and attorneys' fees, declaratory and injunctive relief, disgorgement of racketeering proceeds, an accounting, and such other relief as the Court deems just and proper.

**COUNT II – SECURITIES FRAUD**
**Exchange Act § 10(b), Rule 10b-5, and § 20(a)**
**(By Kovacs and Alesi, on behalf of themselves and similarly situated parties,**
**against AudioEye, AudioEye Board, AudioEye Executives)**

210. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

211. This Count is brought on behalf of a class of investors (the "Class") who purchased or otherwise acquired publicly traded securities of AudioEye, Inc. ("AudioEye") during the Class Period and were damaged as a result of Defendants' unlawful conduct.

212. During the Class Period, AudioEye and its senior leadership, including Moradi and Bettis, engaged in a scheme to defraud investors by making materially false and misleading statements and omissions concerning AudioEye's financial condition, governance, risk profile, and operational performance.

213.    Defendants affirmatively promoted misleading non-GAAP metrics and performance narratives, including so-called "Rule of 40" representations, while concealing material adverse facts regarding:

a. insider knowledge of regulatory, litigation, and whistleblower risk;

b. ongoing retaliation against whistleblowers;

c. governance failures and lack of effective internal controls; and

d. coordinated insider stock sales.

214.    At the same time that these misleading disclosures were disseminated to the market, Moradi, Bettis, and other insiders sold substantial amounts of AudioEye stock for personal benefit, collectively generating tens of millions of dollars in proceeds.

215.    Defendants omitted to disclose that insiders were selling while in possession of material nonpublic information concerning fraud exposure, retaliation risk, and litigation that a reasonable investor would have considered important in deciding whether to buy or hold AudioEye securities.

216.    Defendants acted with scienter, or at least with deliberate recklessness, by knowingly or recklessly disregarding the falsity and misleading nature of their statements and omissions. Moradi and Bettis exercised direct control over AudioEye's disclosures, governance, and trading environment.

217.    In connection with the purchase or sale of securities, Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make statements not misleading; and engaged in acts and courses of business that operated as a fraud and deceit upon purchasers of AudioEye securities.

47

218.    AudioEye's securities traded in an efficient market. Plaintiffs and the Class relied on the integrity of that market and on Defendants' public statements and omissions when purchasing AudioEye securities.

219.    As the truth was concealed and later partially revealed, AudioEye's stock price was artificially maintained at inflated levels, causing the Class to suffer economic loss when the inflation dissipated or risks materialized.

220.    Moradi and Bettis are liable as control persons under Exchange Act § 20(a) because they exercised power and influence over AudioEye's operations, disclosures, and stock trading, and directly or indirectly induced or participated in the primary violations.

221.    Plaintiffs and the Class seek damages, rescission or rescissory damages, disgorgement of insider-trading profits, prejudgment interest, and equitable relief.

### Class Allegations

222.    The Class consists of all persons and entities that purchased or otherwise acquired AudioEye publicly traded securities during the Class Period and were damaged thereby, excluding Defendants and their affiliates.

223.    The members of the Class are so numerous that joinder is impracticable.

224.    Common questions of law and fact predominate, including whether Defendants made materially false or misleading statements or omissions; whether Defendants acted with scienter; whether the market price of AudioEye securities was artificially inflated; and whether Class members suffered damages.

225.    Plaintiffs' claims are typical of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class.

48

226.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT III – WHISTLEBLOWER RETALIATION
### Sarbanes-Oxley Act § 806; Dodd-Frank Act § 21F; ERISA § 510
### (By David Kovacs)

227.    Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

228.    David Kovacs engaged in protected activity under federal law by reporting, internally and externally, conduct he reasonably believed constituted securities fraud, disclosure violations, insider trading, governance failures, ERISA violations, and related misconduct at AudioEye and affiliated entities.

229.    Kovacs made these reports to AudioEye management, members of the Board, counsel, regulators, and others with authority to investigate or remedy the misconduct.

230.    Defendants Moradi and Bettis were aware of Kovacs's protected activity. Indeed, Kovacs's disclosures directly threatened Defendants' personal financial interests, insider trading proceeds, and continued control over AudioEye and related enterprises.

231.    After learning of Kovacs's whistleblowing, Defendants embarked on a coordinated retaliation campaign designed to silence, punish, and economically destroy him.

232.    Adverse actions taken against Kovacs included, among others:

a. termination of employment;

b. initiation and coordination of retaliatory litigation in multiple jurisdictions;

c. smear campaigns and false accusations to isolate and discredit him;

d. seizure and forfeiture of equity compensation and retirement benefits; and

e. indirect economic retaliation, including the stripping of his interests in ESTP.

233.   These actions were materially adverse and would deter a reasonable employee from engaging in protected whistleblowing activity.

234.   Defendants' retaliation was motivated, at least in significant part, by Kovacs's protected activity. The proximity in time, escalation of hostility, and alignment with insider selling and litigation strategy establish causation.

235.   Defendants' conduct violated:

a. SOX § 806, which prohibits retaliation against employees of publicly traded companies for protected disclosures;

b. Dodd-Frank § 21F, which prohibits retaliation against whistleblowers who provide information to regulators; and

c. ERISA § 510, which prohibits interfering with an employee's attainment of benefits to retaliate for protected conduct.

236.   Defendants acted intentionally, willfully, and in bad faith.

237.   As a direct and proximate result of Defendants' conduct, Kovacs suffered substantial economic loss, career harm, emotional distress, and loss of benefits.

238.   Kovacs seeks all relief available under law, including reinstatement or front pay, back pay, restoration of benefits, compensatory damages, interest, attorneys' fees, and equitable relief.

**COUNT IV – INTERFERENCE WITH ERISA-PROTECTED BENEFITS**
**ERISA §§ 502(a)(1)(B), 502(a)(3), and 510**
**(By Kovacs Against against AudioEye, David Moradi, and Carr Bettis)**

239.     Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

240.     AudioEye maintained one or more ERISA-governed employee benefit plans, including equity-based compensation and retirement benefits, under which David Kovacs was a participant and beneficiary.

241.     Kovacs earned substantial benefits under these plans, including restricted stock units ("RSUs") and related equity compensation, portions of which were vested or on track to vest pursuant to plan terms and historical practice.

242.     Defendants Moradi and Bettis exercised discretionary authority and de facto control over AudioEye's benefit decisions, plan administration, and termination determinations affecting Kovacs.

243.     After Kovacs engaged in protected whistleblowing activity, Defendants intentionally interfered with his attainment and enjoyment of ERISA-protected benefits.

244.     Defendants accomplished this interference by, among other things:

a. engineering Kovacs's termination under a pretextual and bad-faith "for cause" narrative;

b. seizing vested and unvested RSUs and associated benefits;

c. manipulating plan interpretations and administrative discretion to justify forfeiture; and

d. applying benefit determinations selectively and inconsistently to punish Kovacs.

51

245. Defendants' actions were taken for the specific purpose of preventing Kovacs from obtaining benefits to which he was or would have become entitled and to retaliate against him for protected activity.

246. These actions violated ERISA § 510, which prohibits interfering with an employee's attainment of benefits for retaliatory or discriminatory reasons.

247. Defendants further violated ERISA § 502(a)(1)(B) by wrongfully denying benefits owed under the terms of the plans and ERISA § 502(a)(3) by engaging in inequitable conduct requiring equitable relief.

248. As a direct and proximate result of Defendants' conduct, Kovacs lost substantial compensation and benefits, including equity that would have vested absent Defendants' unlawful interference.

249. Kovacs seeks recovery of benefits due, enforcement of plan rights, surcharge, equitable relief including reinstatement of benefits, pre- and post-judgment interest, attorneys' fees, and costs.

### COUNT V – BREACH OF FIDUCIARY DUTY (DIRECT)
**Common Law**
**(By Kovacs against Moradi and Bettis)**

250. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

251. At all relevant times, Defendants Moradi and Bettis owed fiduciary duties of loyalty, good faith, honesty, and fair dealing to David Kovacs arising from their positions of control, trust, and dominance, and from Kovacs's reasonable reliance on them in matters affecting his employment, equity, benefits, and business interests.

52

252.    Moradi and Bettis exercised direct and indirect control over Kovacs's employment status, equity compensation, reputation, access to information, and participation in affiliated ventures, placing them in a position of special confidence and influence over him.

253.    Kovacs relied on Defendants to exercise their authority in good faith and for proper purposes, not to weaponize corporate power or insider influence against him personally.

254.    In breaching their fiduciary duties, Moradi and Bettis treated AudioEye, Formulus Black, First Contact, and ESTP as interchangeable instrumentalities of their personal will, deploying corporate entities, officers, resources, litigation authority, and economic leverage to retaliate against Kovacs, suppress dissent, and protect their own interests rather than advancing the legitimate interests of those entities or their stakeholders.

255.    Defendants breached their fiduciary duties by acting in bad faith and for self-interested purposes, including by:

       a. retaliating against Kovacs for whistleblowing;

       b. abusing their authority to engineer his termination and financial ruin;

       c. orchestrating smear campaigns and retaliatory litigation; and

       d. using corporate and enterprise resources to punish Kovacs rather than protect legitimate corporate interests.

256.    Defendants' conduct constituted disloyalty, bad faith, and misuse of entrusted power, and was undertaken to silence dissent, protect insider profits, and deter exposure of misconduct.

257.    Defendants acted willfully and with conscious disregard of Kovacs's rights and interests.

258. As a direct and proximate result of Defendants' breaches, Kovacs suffered substantial economic harm, loss of equity and benefits, reputational injury, emotional distress, and other damages.

259. Kovacs seeks compensatory damages, equitable relief, disgorgement of gains obtained through the breach, prejudgment interest, and all other relief available at law and equity.

**COUNT VI – BREACH OF FIDUCIARY DUTY (DERIVATIVE)**
**Failure of Oversight, Corporate Waste, and Usurpation of Corporate Opportunities**
**(Derivatively on behalf of AudioEye, Formulus Black, and First Contact**
**Against Moradi, Bettis, AudioEye Board of Directors, and Georgevich)**

260. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

261. Defendants owed fiduciary duties of loyalty, good faith, candor, and oversight to AudioEye, Formulus Black, and First Contact (the "Derivative Entities").

262. Defendants Moradi and Bettis exercised de facto and de jure control over the Derivative Entities and dominated their boards, management, and strategic decision-making. The remaining board and executive defendants knowingly enabled, tolerated, or failed to stop the misconduct alleged herein.

263. Defendants breached their fiduciary duties by consciously failing to implement, monitor, or enforce reasonable systems of oversight and internal control, notwithstanding repeated and obvious red flags, including:

      a. large-scale insider selling by officers and directors;

      b. whistleblower complaints regarding securities fraud and governance failures;

      c. escalating litigation risk and retaliation exposure; and

      d. misuse of corporate funds for personal protection and lawfare.

54

264. Rather than exercising oversight, Defendants permitted the Derivative Entities to be used as instrumentalities of the Moradi-Bettis enterprise, approving or acquiescing in actions designed to conceal misconduct, punish whistleblowing, and preserve insider control.

265. Defendants further breached their duties by causing the Derivative Entities to engage in corporate waste, including the expenditure of millions of dollars on retaliatory and defensive litigation undertaken not for the benefit of the companies, but to protect Moradi and Bettis personally from accountability.

266. These expenditures lacked any rational business purpose, conferred no corporate benefit, and constituted a waste of corporate assets.

267. Defendants also breached their fiduciary duties by usurping corporate opportunities belonging to the Derivative Entities, including by diverting business opportunities, strategic relationships, and economic value away from the companies and toward insiders or affiliated entities.

268. Defendant Georgevich, while serving as Chief Financial Officer of AudioEye, sold stock while in possession of material nonpublic information and failed to prevent or disclose insider trading and disclosure violations, rendering her liable for breach of fiduciary duty and for disgorgement of ill-gotten gains to the Company.

269. John Doe Defendants 1-10 are entities or individuals who knowingly received misappropriated corporate funds or benefits resulting from the breaches alleged herein and are liable as aiders and abettors and/or recipients of unjust benefit.

270. As a direct and proximate result of Defendants' breaches, the Derivative Entities suffered substantial damages, including depletion of corporate assets, exposure to regulatory and litigation liability, reputational harm, and loss of shareholder value.

271.    Plaintiffs seek all appropriate relief on behalf of the Derivative Entities, including damages, disgorgement of insider trading profits and wasted expenditures, accounting, rescission of improper transactions, governance reforms, injunctive relief, attorneys' fees, and costs.

**COUNT VII – BREACH OF FIDUCIARY DUTY – ESTP**
**(By Kovacs derivatively on behalf of ESTP against Bettis, Vivid, and John Does)**

272.    Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

273.    At all relevant times, David Kovacs, Carr Bettis, and Giorgi Rtskhiladze were partners in ESTP, and Bettis owed fiduciary duties of loyalty, good faith, and fair dealing to ESTP and its partners.

274.    Kovacs served as ESTP's Chief Executive Officer and was responsible for U.S. strategy, fundraising, and partner relationships, while ESTP pursued valuable projects, sovereign relationships, and development opportunities abroad.

275.    After Kovacs engaged in protected whistleblowing activity adverse to Moradi and Bettis, Bettis retaliated by moving to strip Kovacs of his interests in ESTP and to appropriate ESTP's assets and opportunities for himself and affiliated entities.

276.    Bettis breached his fiduciary duties by, among other things:

a. engineering Kovacs's ouster from ESTP without notice;

b. shutting down ESTP's operations and causing the entity to be rendered dormant;

c. diverting ESTP projects, relationships, and sovereign opportunities to successor or affiliate entities, including Vivid Strategies, LLC; and

d. excluding Kovacs from participation in the value created by those transferred opportunities.

277.   ESTP's K-1s and public-facing materials reflect that ESTP was effectively shut down, while substantially identical business initiatives were later resumed through affiliate entities controlled by Bettis.

278.   Bettis's actions were not taken for legitimate business reasons, but as retaliation against Kovacs for being a whistleblower at AudioEye.

279.   Bettis knowingly used Vivid Strategies and Doe entities as conduits to receive ESTP's diverted assets, opportunities, and economic expectancy, rendering them liable as aiders and abettors and/or recipients of misappropriated corporate property.

280.   As a direct and proximate result of Defendants' breaches, ESTP suffered catastrophic harm, including the loss of core business opportunities, destruction of enterprise value, and impairment of partner equity interests.

281.   Plaintiffs seek relief on behalf of ESTP including damages, disgorgement, accounting, imposition of a constructive trust over diverted assets and opportunities, equitable relief, attorneys' fees, and costs.

### COUNT VIII – UNJUST ENRICHMENT
**By David Kovacs, individually; and all Plaintiffs derivatively on behalf of AudioEye, Formulus Black, First Contact, and ESTP against All Defendants and John Does 1–10**

282.   Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

283.   Defendants have been unjustly enriched at the expense of Plaintiffs and the Companies through the misconduct alleged herein.

284.   Defendants obtained substantial benefits, including but not limited to:

a. insider trading proceeds and avoided losses;

b. diverted corporate assets and opportunities;

c. misappropriated equity and benefits;

d. reimbursement of personal expenses through fraudulent means; and

e. litigation expenditures funded by corporate entities for Defendants' personal protection.

285. These benefits were obtained through wrongful conduct, including fraud, breach of fiduciary duty, retaliation, misuse of corporate authority, and abuse of legal process.

286. Defendants consciously retained these benefits with full knowledge that they were wrongfully obtained and at the direct expense of Plaintiffs and the Companies.

287. The circumstances render it inequitable for Defendants to retain such benefits without compensation or restitution.

288. No adequate remedy at law exists to recover all categories of unjust benefit obtained by Defendants through the conduct alleged.

289. Plaintiffs seek restitution, disgorgement, and all equitable relief necessary to prevent Defendants' unjust enrichment, including the imposition of a constructive trust over misappropriated assets and proceeds.

## COUNT IX – MALICIOUS PROSECUTION AND ABUSE OF PROCESS
### Common Law
**(By David Kovacs Against AudioEye, Inc., David Moradi, Carr Bettis, and Jason Humble)**

290. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

291. Defendants initiated, maintained, and coordinated multiple legal proceedings against David Kovacs, including actions in Florida, Arizona, and New York, not to obtain legitimate judicial relief, but to intimidate, retaliate, and economically exhaust him for engaging in whistleblowing and opposition to Defendants' misconduct.

58

292.    These proceedings were part of a deliberate enterprise strategy to weaponize the judicial process as a tool of coercion and suppression rather than to resolve bona fide disputes on the merits.

293.    Defendants employed lawful process in an improper manner and for an ulterior purpose, including:

a. filing actions based on knowingly false or abandoned allegations;

b. asserting claims designed to smear, harass, and burden rather than adjudicate;

c. coordinating litigation positions across jurisdictions to maximize pressure and cost; and

d. using discovery, motion practice, and publicity as instruments of intimidation.

294.    The Florida litigation initiated by AudioEye included numerous false and defamatory allegations that were later abandoned in an amended complaint, demonstrating the absence of probable cause and the retaliatory nature of the original filing.

295.    The Arizona action initiated by Bettis sought to re-characterize long-repaid personal expenditures as a loan and was filed for the ulterior purpose of financial retaliation and leverage, not legitimate debt recovery.

296.    At all relevant times, Defendants acted with malice, knowledge of falsity, and conscious disregard of Kovacs's rights.

297.    Defendants' misuse of legal process caused Kovacs substantial damages, including legal expenses, lost income, reputational injury, emotional distress, and diversion of time and resources.

59

298.    Defendants' conduct constitutes abuse of process. To the extent required, the termination, abandonment, or meritless nature of the proceedings supports a claim for malicious prosecution.

299.    Plaintiffs seek compensatory damages, punitive damages, costs, attorneys' fees, and all other relief the Court deems just and proper.

## COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Common Law
### (By Kovacs and Ducheine against Moradi, Bettis and Humble)

300.    Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

301.    Defendants engaged in a prolonged course of extreme and outrageous conduct directed at Plaintiffs David Kovacs and Julian Ducheine, exceeding all bounds of decency tolerated in a civilized society.

302.    Defendants' conduct included, among other things:

a. sustained retaliation against Kovacs for whistleblowing;

b. coordinated smear campaigns and threats designed to destroy his livelihood;

c. weaponized litigation used to intimidate and financially exhaust him;

d. intimidation and pressure placed upon witnesses; and

e. conduct creating credible fear for personal safety.

303.    Defendants knew or recklessly disregarded the substantial probability that their conduct would cause severe emotional distress to Plaintiffs.

304.    The conduct was intentional, malicious, and undertaken as part of a broader effort to silence, punish, and deter exposure of misconduct.

60

305. As a direct and proximate result of Defendants' actions, Kovacs and Ducheine suffered severe emotional distress, including anxiety, fear, humiliation, sleep disruption, and emotional trauma.

306. Defendants' conduct was a substantial factor in causing Plaintiffs' distress and was not justified by any legitimate business, legal, or personal objective.

307. Plaintiffs seek compensatory damages, punitive damages, interest, costs, and such other relief as the Court deems just and proper.

### COUNT XI – COMMON LAW TORTS – LICHTENSTEIN
**(Abuse of Process, Tortious Interference, Fraud, Coercion, and Related Torts)**
**(Against Defendants Carr Bettis and David Moradi)**

308. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

309. Plaintiff Demian Lichtenstein is an entrepreneur and investor who, at all relevant times, held ownership interests, contractual rights, management involvement, and substantial existing and prospective business relationships relating to First Contact Entertainment and affiliated ventures.

310. Defendants Carr Bettis and David Moradi, acting individually and in concert, and through agents, intermediaries, and instrumentalities subject to their direction and control, engaged in a deliberate and coordinated course of wrongful conduct designed to intimidate, neutralize, and economically harm Lichtenstein in furtherance of Defendants' efforts to seize and consolidate control of First Contact and suppress opposition.

311. Defendants knowingly instigated, encouraged, or ratified the initiation of false and misleading criminal accusations, threats of prosecution, and legal pressure against

61

Lichtenstein for improper purposes, including intimidation, coercion, and leverage, rather than to seek any legitimate adjudicative relief.

312.     Defendants knowingly misused criminal and civil legal process, including threats of investigation, prosecution, and litigation, for purposes wholly unrelated to the lawful function of such processes, including forcing Lichtenstein to disengage from business affairs, abandon contractual and ownership rights, and refrain from opposing Defendants' conduct.

313.     Defendants' actions constituted abuse of process, as Defendants used the threat and machinery of legal proceedings to accomplish collateral objectives unrelated to any lawful claim, including silencing dissent, instilling fear, and altering corporate control.

314.     Defendants intentionally interfered with Lichtenstein's existing and prospective business relationships, including relationships with investors, partners, counterparties, and other participants in First Contact, by means of threats, false accusations, coercion, and misuse of legal process.

315.     Defendants employed coercion, intimidation, and fraudulent misrepresentations, including false portrayals of criminal exposure and legal peril, in order to pressure Lichtenstein to withdraw from business activity, relinquish economic and governance rights, and cease opposition to Defendants' takeover efforts.

316.     Defendants' conduct was intentional, willful, malicious, and undertaken in bad faith, was not privileged or justified, and was designed to advance Defendants' personal and financial interests at Lichtenstein's expense.

317.     Defendants' actions constituted extreme and outrageous departures from accepted standards of lawful competition, corporate governance, and dispute resolution.

62

318.   As a direct and proximate result of Defendants' conduct, Lichtenstein suffered loss of business opportunities, destruction of investment value, interference with contractual and governance rights, reputational harm, and substantial economic damages.

319.   As a further direct and proximate result of Defendants' conduct, Lichtenstein suffered severe emotional distress, fear of criminal jeopardy, and disruption of livelihood and professional standing.

320.   Defendants Bettis and Moradi are liable to Lichtenstein for abuse of process, tortious interference with business relations, fraud, coercion, and related common-law torts under applicable state law.

321.   Defendants acted with actual malice, oppression, and conscious disregard for Lichtenstein's rights, entitling Plaintiffs to compensatory, consequential, and punitive damages.

322.   This claim is timely. Defendants' misconduct was inherently concealed and enforced through threats, intimidation, and abuse of legal process, preventing Lichtenstein from discovering the full wrongful nature of the conduct or pursuing relief earlier.

323.   Defendants further engaged in a continuing course of tortious conduct, including ongoing threats, interference, and coercive pressure, such that each act constituted a new injury and a new accrual for statute-of-limitations purposes.

324.   The statute of limitations was equitably tolled by Defendants' concealment, intimidation, and misuse of criminal and civil process and did not begin to run until the coercive circumstances abated and material facts became reasonably discoverable.

325.   Plaintiffs seek all available relief, including compensatory damages, punitive damages, disgorgement, pre- and post-judgment interest, attorneys' fees where permitted by law, and such other and further relief as the Court deems just and proper.

## COUNT XII – DECLARATORY AND INJUNCTIVE RELIEF
### 28 U.S.C. §§ 2201–2202
### (Governance Failure, Lack of Disinterested Control, and Mandatory Remedial Measures)

326. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

327. An actual, immediate, and justiciable controversy exists between Plaintiffs and Defendants concerning the governance of AudioEye, Inc. ("AudioEye"), the exercise of fiduciary authority by its Board of Directors, the control and allocation of corporate assets, and the continuing risk of retaliation, asset diversion, and misuse of corporate authority absent judicial intervention.

### *Declaration of Governance Failure at AudioEye*

328. Plaintiffs seek a declaration that AudioEye's Board of Directors has suffered a systemic failure of governance, including failures of oversight, fiduciary compliance, independence, internal controls, and good-faith supervision, as alleged throughout this Complaint.

329. Plaintiffs further seek a declaration that, as a result of these failures, AudioEye's current Board and senior management are incapable of exercising disinterested, independent business judgment with respect to:

   a. the investigation of alleged wrongdoing by officers, directors, or controlling persons;

   b. the prosecution, defense, settlement, or resolution of claims arising from the conduct alleged herein;

   c. the allocation and protection of corporate assets, insurance coverage, and indemnification rights; and

d.  the protection of shareholder, employee-beneficiary, and creditor interests.

330.    These governance failures are not historical or cured. They are ongoing and pose a continuing risk to the Company and its stakeholders.

### Necessity of Judicial Intervention

331.    Absent declaratory and injunctive relief, AudioEye remains exposed to continued misuse of corporate authority, retaliatory conduct, asset dissipation, conflicted decision-making, and further harm to the Company and its shareholders.

332.    Plaintiffs seek a declaration that the Board's continued operation under its present composition constitutes a failure of fiduciary duty, and that reliance on internal remedial processes would be futile.

### Mandatory Remedial Relief

333.    Plaintiffs therefore seek injunctive and declaratory relief requiring AudioEye to:

a.  remove and replace its current Board of Directors and senior management to the extent necessary to restore independent and disinterested governance;

b.  constitute a new, fully independent board, the members of which have no prior ties to Moradi, Bettis, or affiliated entities; and

c.  appoint truly independent special counsel, with full authority to investigate, pursue, resolve, or settle claims on behalf of the Company, free from influence by Defendants or their affiliates.

### Declaration of Enterprise Control and Cross-Entity Misuse

334.    Plaintiffs further seek a declaration that AudioEye, Formulus Black, First Contact Entertainment, Eternal Sources Technology Partners, and Vivid Strategies operated not as

65

independent companies, but as an integrated enterprise dominated and controlled by Defendants Moradi and Bettis.

335.    Plaintiffs seek a declaration that Defendants used these entities interchangeably as instrumentalities of a common scheme, rather than respecting corporate separateness, to:

    a.  generate and conceal insider profits;

    b.  divert assets and corporate opportunities;

    c.  fund retaliation and weaponized litigation; and

    d.  evade accountability through artificial adherence to formal separateness.

336.    Declaratory relief as to enterprise unity is necessary to prevent continued abuse of the corporate form, dissipation of assets, and gamesmanship through entity fragmentation.

### *Necessity of Prospective Relief*

337.    Declaratory and injunctive relief are necessary to resolve the parties' legal relations, prevent irreparable and ongoing harm, and avoid piecemeal or inconsistent adjudications.

338.    Plaintiffs have no adequate remedy at law for the prospective, structural, governance-related, and fiduciary harms addressed by this Cause of Action.

339.    Plaintiffs therefore seek declaratory and injunctive relief, together with costs and attorneys' fees where permitted, as the Court deems just and proper.

**PRAYER FOR JUDGMENT**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

A. **Declaratory Relief.** Declaring that Defendants violated the federal securities laws, RICO, ERISA, and applicable state law, and breached fiduciary duties owed to AudioEye and its shareholders;

B. **Injunctive and Equitable Relief.** Enjoining Defendants from further retaliation, witness tampering, evidence destruction, misuse or diversion of corporate assets, and other unlawful conduct, and ordering appropriate equitable relief, including governance reforms, accountings, rescission, and restitution;

C. **Damages.** Awarding Plaintiffs and AudioEye all damages sustained as a result of Defendants' conduct, including compensatory damages, disgorgement, restitution, and treble damages as authorized by law;

D. **Derivative Relief.** Awarding damages, restitution, and equitable relief to AudioEye on all derivative claims, including recovery of corporate waste and unlawfully obtained proceeds;

E. **Attorneys' Fees and Costs.** Awarding reasonable attorneys' fees, expert fees, and costs pursuant to RICO, ERISA, the federal securities laws, and applicable equitable principles;

F. **Pre- and Post-Judgment Interest.** Awarding pre-judgment and post-judgment interest as permitted by law; and

G. **Further Relief.** Granting such other and further legal or equitable relief as the Court deems just and proper.

Dated:    New York, New York
          December 12, 2025

JOHN H. SNYDER PLLC

By: _____

John H. Snyder
Thomas C. Sima
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

*Counsel for Plaintiffs*

**SCHEDULE A – DEFINITIONS**

Unless the context otherwise requires, the following terms have the meanings set forth below. These definitions apply uniformly throughout the Complaint, the Statement of Facts, all Schedules, and the Kovacs Declaration. The Causes of Action are pleaded based on these definitions.

"Adjusted EBITDA" means the non-GAAP financial metric publicly used and promoted by AudioEye during the Class Period that excluded material expenses and risks, including litigation costs, regulatory exposure, whistleblower-related costs, retaliatory legal expenditures, and other recurring or foreseeable items that materially affected AudioEye's actual financial condition. As used herein, Adjusted EBITDA was not merely aggressive or discretionary, but was knowingly employed to create the false appearance of profitability and liquidity while the Company was, in reality, cash-burning and dependent on dilutive financing, including the February 2024 Shelf Registration and subsequent at-the-market ("ATM") offering.

"Arizona Lawsuit" means CSB IV US Holdings LLC v. JDLK Partners, Inc. and David J. Kovacs, Case No. CV2025-013285 (Ariz. Super. Ct.).

"AudioEye" or "AEYE" means AudioEye, Inc., a Delaware corporation whose common stock traded on the Nasdaq Global Market during the Class Period.

"Ben Barton Christmas Texts" means the series of text-message communications exchanged between David Kovacs and Ben Barton during approximately December 25 through December 30, 2023, concerning AudioEye, its internal operations, governance environment, disclosure posture, and related matters. The contents, timing, and context of those texts constitute contemporaneous documentary evidence relevant to Defendants' knowledge, notice, and state of mind during the RICO Period.

69

"Birkin Bag Letter" means the letter dated March 20, 2024, sent by Carr Bettis to David Kovacs via UPS.

"Class Period" means June 2, 2022 through April 1, 2025. The Class Period is used solely for purposes of Plaintiffs' federal securities law claims and does not limit the temporal scope of the Enterprise, the RICO Period, or any racketeering, conspiracy, retaliation, fiduciary, or tort claims.

"Declarants" means any individual who has submitted or files a declaration in this action, including in support of the Complaint, any Order to Show Cause, or any application for temporary or preliminary injunctive relief.

"Defendants" means, collectively, the Enterprise Leadership Defendants, Director Defendants, Executive Defendants, Professional Defendants, and John Doe Defendants. The term "Defendants" does not include Nominal Defendants unless expressly stated.

"Director Defendants" means all persons who served as members of AudioEye's Board of Directors at any time during the RICO Period, including but not limited to James Hawkins, Katherine Fleming, Jamil Tahir, and Tony Coelho.

"Enterprise" means the association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of David Moradi, Carr Bettis, Jason Humble, affiliated executives, intermediaries, and related entities operating in concert across AudioEye; First Contact Entertainment; Formulus Black LLC; Eternal Sources Tech Partners, LLC; Vivid Strategies, LLC; and related instrumentalities. The Enterprise existed independently of the commission of any single racketeering act and was a continuing unit with a shared purpose, relationships, and longevity, notwithstanding changes in particular entities, projects, or victims.

70

"Enterprise Associate" means any non-lead participant who, with knowledge of the Enterprise's objectives, assisted, facilitated, or carried out activities on behalf of the Enterprise or its leaders, including intermediaries, fundraisers, fixers, pressure agents, operational facilitators, and other individuals who executed instructions, coordinated communications, or advanced retaliatory or coercive actions for Enterprise benefit.

"Enterprise Conduct" means conduct or participation, directly or indirectly, in the conduct of the Enterprise's affairs through acts, schemes, or courses of conduct constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c), and conspiracy under § 1962(d).

"Enterprise Leadership Defendants" means David Moradi and Carr Bettis.

"ERISA Benefits" means compensation, equity awards, retirement benefits, medical coverage, and other benefits protected under the Employee Retirement Income Security Act of 1974 ("ERISA"), including vested and unvested Restricted Stock Units.

"ESTP" means Eternal Sources Tech Partners, LLC.

"Executive Defendants" means individuals, other than the Enterprise Leadership Defendants, who served as officers or senior executives of AudioEye or other Enterprise entities during the RICO Period and exercised authority over disclosures, finances, personnel, litigation strategy, or internal controls, including Kelly Georgevich and Michael Spolar.

"False Smears" means the statements and allegations first asserted in the April 10, 2024 original Florida complaint against David Kovacs, including factual claims regarding his education, employment history, professional credentials, personal conduct, mental stability, motives, and alleged market-manipulation threats, many of which were later abandoned,

71

narrowed, or omitted in the amended pleading, and which were asserted without evidentiary support and in retaliation for Kovacs's Protected Activity.

"First Contact" or "FC" means First Contact Entertainment, a private company founded by Demian Lichtenstein and later controlled by David Moradi and Carr Bettis.

"Florida Lawsuit" means the civil action commenced in the State of Florida by AudioEye, Inc. and/or the Enterprise Leadership Defendants against David Kovacs asserting defamation or related claims, portions of which were later abandoned, withdrawn, or materially narrowed, and which Plaintiffs allege was initiated and maintained as part of Retaliatory Lawfare.

"Formulus Black" or "FB" means Formulus Black LLC.

"George Santos" refers to a former United States Congressman from New York who was expelled from Congress after it was revealed that he fabricated large portions of his education, employment history, and personal background, and who later pleaded guilty to federal fraud and identity-theft offenses.

"Insider Trading" means the purchase or sale of a security of AudioEye by any officer, director, employee, or affiliate of AudioEye, directly or indirectly, while in possession of Material Nonpublic Information, or the communication of such information to others for the purpose of enabling or facilitating such trading (including tipping), in violation of federal securities laws, including but not limited to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

"Jason Humble Lawsuit" means Humble v. Kovacs, No. 24-cv-03404-MMG (S.D.N.Y.), an action asserting claims for defamation and defamation per se. Humble voluntarily dismissed the action with prejudice on July 3, 2024.

72

"John Doe Defendants" means persons or entities whose identities are presently unknown but who participated in, facilitated, benefited from, or knowingly received proceeds from the conduct alleged herein.

"Knowledge or Foreseeability" means actual knowledge, conscious avoidance, or circumstances under which Defendants knew or reasonably should have known that whistleblower reporting to regulators or law enforcement was likely or imminent.

"Kovacs Declaration" means the sworn declaration or declarations of David Kovacs dated December 9, 2025, including all exhibits and materials incorporated by reference.

"Kovacs Litigations" means, collectively, Kovacs I, Kovacs II, the Florida Lawsuit, the Arizona Lawsuit, and the Jason Humble Lawsuit.

"Material Nonpublic Information" or "MNPI" means information that was not generally disclosed to the investing public and that a reasonable investor would consider important in deciding whether to purchase, sell, or hold a security.

"Nominal Defendants" means entities named solely in a derivative or representative capacity.

"Phase I" means June 2, 2022 through February 12, 2024.

"Phase II" means February 13, 2024 through April 1, 2025.

"Plaintiffs" means David Kovacs, Russell Alesi, Julian Ducheine, and Demian Lichtenstein.

"Professional Defendants" means individuals or entities that provided legal, audit, accounting, financial, advisory, communications, banking, or consulting services to AudioEye or other Enterprise entities during the RICO Period, including MaloneBailey, LLP.

73

"Protected Activity" means David Kovacs's good-faith reporting of suspected misconduct to AudioEye, regulators, or law enforcement, including on November 13, 2023; January 17, 2024; February 8, 2024; and April 8, 2024.

"Racketeering Acts" means acts chargeable or indictable under 18 U.S.C. §§ 1343, 1348, 1512–1513, 1958, 1959, and 1961(1)(D), and related federal or state offenses constituting racketeering activity within the meaning of 18 U.S.C. § 1961.

"Retaliatory Lawfare" means litigation, threats of litigation, or use of legal process authorized, directed, coordinated, or funded by AudioEye or the Enterprise Leadership Defendants after Protected Activity for the purpose of suppressing disclosure, punishing whistleblowing, intimidating witnesses, or deterring cooperation with regulators or courts.

"RICO Period" or "Relevant Period" means the period beginning on January 1, 2015 and continuing to the present.

"RSUs" means Restricted Stock Units issued pursuant to AudioEye's equity compensation or benefit plans.

"Secretly-Recorded Bettis Phone Call" means the telephone conversation on or about January 17, 2024 between David Kovacs and Carr Bettis, during which Kovacs reported insider trading and related misconduct at AudioEye, and which Bettis recorded without Kovacs's contemporaneous knowledge or consent.

"Shelf Registration" means AudioEye's Form S-3 registration statement that became effective on February 13, 2024.

"Termination Date" means January 17, 2024.

"Vivid Strategies" or "Vivid" means Vivid Strategies, LLC.

74

## SCHEDULE B – [DRAFT] SPECIAL COMMITTEE RESOLUTIONS

WHEREAS, the Board of Directors of AudioEye, Inc. (the "Company") has received allegations raising concerns regarding insider trading, retaliation, and interference with witnesses, and determines that immediate, independent protective measures are required to safeguard the Company and ensure lawful governance;

WHEREAS, Directors Dr. Katherine E. Fleming and James Hawkins are disinterested and independent with respect to these matters and are authorized under Delaware law to act on behalf of the Company;

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby establishes a Special Committee consisting solely of Dr. Fleming and Mr. Hawkins, with authority to retain independent counsel and act on behalf of the Company;

RESOLVED, that for purposes of these resolutions, "Declarants" means any individual who has submitted or files a declaration in this action;

RESOLVED, that the Special Committee shall instruct independent counsel to immediately implement and oversee the following protective measures:

(1) Evidence Preservation – Implement, enforce, and monitor comprehensive litigation holds and preservation protocols covering all relevant documents, communications, devices, and electronically stored information;

(2) Witness Protection and Non-Retaliation – Establish and enforce Company-wide safeguards to protect employees, former employees, witnesses, and Declarants from retaliation, intimidation, coercion, or adverse action, and to maintain secure reporting channels independent of management;

(3) Access Restrictions – Suspend or restrict, pending completion of the investigation, the access of David Moradi and Carr Bettis to Company funds, payment authority, confidential information, data systems, physical premises, and other Company property, to the extent reasonably necessary to prevent interference with the investigation or risk to the Company;

(4) Insider Trading Restrictions – Implement an immediate trading blackout applicable to all directors, officers, and insiders of the Company, including David Moradi and Carr Bettis, pending further determination by the Special Committee;

RESOLVED, that all officers, employees, and agents of the Company shall cooperate fully with these measures and shall not interfere with their implementation.

Date: _____        Date: _____


_____        _____
Dr. Katherine Fleming        James Hawkins

## SCHEDULE C – RICO CASE STATEMENT

### I.    STATEMENT OF THE ALLEGED RICO CLAIM

Plaintiffs submit this RICO Case Statement in support of Count I of the Complaint. This action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d).

Plaintiffs allege that Defendants conducted and participated, directly and indirectly, in the conduct of an association-in-fact enterprise through a pattern of racketeering activity, and knowingly conspired to do so, causing substantial injury to Plaintiffs, shareholders, and affiliated entities. All predicate acts are identified and particularized in Schedule E (RICO Predicate Act Table), which is incorporated herein by reference as if fully set forth.

### II.    DESCRIPTION OF THE ENTERPRISE

The Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

It consists of David Moradi, Carr Bettis, Jason Humble, senior insiders and intermediaries including Kelly Georgevich, Michael Spolar, Jamil Tahir, and John Doe participants whose identities will be revealed in discovery, together with controlled or affiliated entities including AudioEye, Inc., First Contact Entertainment, Formulus Black LLC, Eternal Sources Tech Partners, LLC ("ESTP"), and Vivid Strategies, LLC.

The Enterprise did not function as a legitimate business organization. Instead, it operated as an integrated and ongoing scheme for insider profit extraction, concealment of fraud, diversion of corporate assets, retaliation against whistleblowers, manipulation of legal and regulatory processes, and preservation of control through intimidation and lawfare. The Enterprise used legitimate corporate forms as instruments of racketeering, rather than for bona fide business purposes.

The Enterprise had a common purpose, consisting of enriching insiders through securities fraud and asset diversion, maintaining control by suppressing dissent and oversight, and retaliating against individuals who exposed or threatened to expose wrongdoing. Relationships among Enterprise members were hierarchical and functional.

Moradi and Bettis served as Enterprise leadership and primary decision-makers. Executive and director insiders facilitated execution and concealment of misconduct. Intermediaries, including Humble, were deployed to recruit capital, transmit threats, apply pressure, and execute retaliatory litigation strategies.

The Enterprise exhibited continuity and longevity, operating continuously from 2015 to present, and building on substantially similar conduct previously executed at Formulus Black and First Contact.

### III.    DEFENDANTS' ASSOCIATION WITH AND PARTICIPATION IN THE ENTERPRISE

Each Defendant was associated with or employed by the Enterprise and knowingly conducted or participated, directly or indirectly, in its affairs through the commission of the racketeering acts described in Schedule E and incorporated by reference herein. Moradi and Bettis exercised direction and control over Enterprise strategy, including disclosure posture, trading activity, litigation decisions, and retaliation.

Executive and Director Defendants enabled and concealed the misconduct through action and inaction, including approval of misleading disclosures, failure to impose trading restrictions, authorization of retaliatory expenditures, and suppression of independent oversight. Humble and other intermediaries acted as agents and operatives of the Enterprise, transmitting inducements, threats, and litigation pressure.

The entity defendants served as conduits for extraction of value, diversion of assets, and execution of racketeering acts.

### IV.    CONDUCT OR PARTICIPATION IN THE ENTERPRISE'S AFFAIRS

Defendants conducted and participated in the Enterprise's affairs through a coordinated course of racketeering conduct, including the specific predicate acts enumerated in Schedule E.

That conduct included manipulation of public disclosures and non-GAAP financial metrics; coordinated insider trading while in possession of material nonpublic information; diversion and misuse of corporate funds; fraudulent reimbursement and off-system payment schemes; retaliation against whistleblowers and witnesses; interference with ERISA-protected benefits; concealment and destruction of evidence; obstruction of judicial and regulatory proceedings; and weaponized, multi-jurisdiction litigation designed to intimidate, silence, and exhaust those who threatened Enterprise interests.

The same methods were employed across multiple entities. At Formulus Black, Enterprise leaders bypassed internal controls, routed payments outside authorized systems, retaliated against founders who sought forensic accounting review, and weaponized false criminal allegations to seize control and silence opposition, as detailed in the incorporated predicate table. Those methods later reappeared at AudioEye in a public-company context, amplified through securities markets, insider trading, and retaliatory lawfare funded with corporate assets.

### V.    PATTERN OF RACKETEERING ACTIVITY

Defendants committed multiple related acts of racketeering within ten years, each of which qualifies as a predicate offense under 18 U.S.C. § 1961(1) and is specifically identified in Schedule E. Those acts include securities fraud and insider trading (18 U.S.C. § 1961(1)(D)); wire fraud (18 U.S.C. § 1343) through fraudulent public disclosures, diversion and embezzlement of corporate funds, fraudulent reimbursement schemes, and retaliatory litigation; witness retaliation and intimidation (18 U.S.C. §§ 1513(e), 1512(b)); obstruction of justice and concealment of evidence (18 U.S.C. §§ 1512(c)(2), 1519); interference with ERISA-protected

benefits (29 U.S.C. § 1140); and extortion under the Hobbs Act (18 U.S.C. § 1951).

The factual bases for each predicate act are pleaded in detail in Schedule E and the Statement of Facts, both of which are incorporated herein by reference.

The racketeering acts were related and constituted a pattern because they shared common participants, victims, purposes, and methods. The acts were directed toward the same objectives: insider enrichment, concealment of misconduct, suppression of oversight, and retaliation against those who threatened Enterprise continuity.

The pattern demonstrates both closed-ended and open-ended continuity. Defendants engaged in repeated racketeering acts over a substantial period spanning multiple years and transactions, and the Enterprise posed a continuing threat of criminal conduct absent judicial intervention.

## VI.    CLAIMED RICO VIOLATIONS

Defendants violated 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity comprised of the predicate acts set forth in Schedule E. Defendants further violated 18 U.S.C. § 1962(d) by conspiring to commit those violations, with knowledge of the Enterprise's unlawful objectives and agreement to facilitate the commission of the racketeering acts.

The solicitation of violence against a witness, undertaken to maintain enterprise control and suppress whistleblowing, independently constitutes racketeering activity under 18 U.S.C. § 1959 and reinforces both continuity and irreparable harm.

## VII.    INJURY AND DAMAGES

Plaintiffs suffered concrete and proximate injuries by reason of Defendants' racketeering conduct, including the predicate acts incorporated from Schedule E.

Those injuries include loss of equity and ERISA-protected benefits; insider-trading losses to public shareholders; depletion of corporate assets through fraud and retaliatory lawfare; economic and professional harm to whistleblowers; and destruction of enterprise value at Formulus Black, ESTP, and related ventures.

The Formulus Black scheme resulted in the destruction of enterprise value reasonably estimated between $250 million and $500 million.

The First Contact scheme resulted in the destruction of enterprise value reasonably estimated between $175 million and $250 million.

The AudioEye scheme resulted in harm to shareholders of between $100 million and $250 million.

During Phase I, Defendants engaged in a scheme to suppress AudioEye's stock price by disseminating misleading narratives of weakness and uncertainty while concealing material facts,

78

including Defendants' intent to inflate financial metrics, induce a subsequent price run-up, and monetize insider positions. Defendants further reinforced this artificial price suppression through economically irrational share repurchases conducted while the Company was cash-constrained, creating false signals of value without disclosure of forthcoming metric manipulation or insider liquidity plans. As a result, shareholders sold their shares at prices artificially depressed below their true economic value. Phase I damages are measured by the difference between the price at which those shareholders sold and the price that would have prevailed absent Defendants' deceptive conduct—i.e., the fair value reflected once Defendants' concealed plans were executed and the stock traded at substantially higher levels. The resulting losses were foreseeable, direct, and an intended component of Defendants' scheme, which functioned to transfer value from early sellers to insiders.

In Phase II, Defendants artificially inflated AudioEye's stock price by continuing to disseminate materially false and misleading disclosures concerning financial performance, non-GAAP metrics, internal controls, and risk, while omitting known adverse facts, including whistleblower allegations, disclosure-fraud warnings, and escalating litigation and regulatory exposure. During this period, Defendants executed coordinated insider sales while in possession of material nonpublic information, monetizing at prices that did not reflect the Company's true risk profile. Phase II damages are measured by the inflation-deflation method commonly applied in securities-fraud cases: the difference between the price paid by investors who purchased during the inflationary period and the price that prevailed once the truth regarding the Company's condition and risks began to emerge. These damages were proximately caused by Defendants' racketeering acts and resulted in substantial losses to public shareholders.

## VIII.   REMEDIES SOUGHT

Plaintiffs seek all relief available under 18 U.S.C. § 1964, including treble damages, disgorgement and accounting of racketeering proceeds, injunctive relief barring Defendants from further Enterprise misconduct, imposition of governance and compliance reforms, and such other relief as the Court deems just and proper.

## IX.   RELATED CIVIL ACTIONS

Related proceedings include the Kovacs Litigations, as defined herein, which includes the Florida Lawsuit, the Arizona Lawsuit, and the Jason Humble Lawsuit. Each constitutes part of the Enterprise's retaliatory and obstructive conduct.

**SCHEDULE D – RICO PREDICATE TABLE**

| Predicate Statute | Racketeering Act | Defendants | Factual Basis |
|---|---|---|---|
| 18 U.S.C. § 1961(1)(D) | **Securities Fraud** | Moradi; Bettis; Tahir; Georgevich; Spolar | From June 2022–April 2025, Defendants disseminated materially false SEC filings and earnings disclosures, promoted inflated non-GAAP metrics (Adjusted EBITDA, Rule of 40), and concealed whistleblower complaints, internal control failures, and litigation exposure while insiders sold $25.2M–$35.2M in stock following the February 2024 shelf registration. These misrepresentations continued even after Defendants were on notice of the whistleblower's disclosures, reinforcing the enterprise's effort to maintain an artificially inflated narrative that enabled insider sales and concealment of the same misconduct identified in other predicates. |
| 18 U.S.C. § 1961(1)(D) | **Insider Trading** | Moradi; Bettis; Tahir; Georgevich | Defendants executed coordinated insider sales totaling $25.2M–$35.2M while possessing MNPI including: (1) Kovacs' November 2023 whistleblower complaint; (2) Bettis' secretly recorded January 17, 2024 call documenting insider trading allegations; (3) pending regulatory exposure; and (4) concealed governance breakdowns. These coordinated sales were executed while Defendants knowingly possessed the whistleblower's internal disclosures, governance-failure findings, and litigation exposure. This information was concealed from the market and allowed for substantial personal gains before those risks were exposed. |
| 18 U.S.C. § 1343 | **Wire Fraud – Public Disclosures** | Moradi; Bettis; Georgevich; Spolar | Defendants transmitted false SEC filings, earnings releases, and investor communications via interstate wires, omitting whistleblower retaliation, material litigation risks, and internal findings contradicting public guidance, causing shareholder losses of $125.5M–$358.0M. These omissions persisted even after Defendants were on notice of the whistleblower's disclosures and internal findings, reflecting the enterprise's ongoing practice of suppressing adverse information to preserve insider benefit. |

| Predicate Statute | Racketeering Act | Defendants | Factual Basis |
|---|---|---|---|
| 18 U.S.C. § 1343 | **Wire Fraud – Formulus Black Capital Raising** | Moradi; Bettis; Humble | From 2017–2021, Defendants solicited investments using false claims regarding control, valuation, IP ownership, and governance while concealing insider self-dealing, off-system payments, and fund misappropriation, destroying $250M–$500M in enterprise value. This earlier pattern of concealed control and misrepresentation mirrors the same enterprise architecture later challenged by the whistleblower, underscoring a continuous scheme by the same individuals to obscure governance failures and extract value. |
| 18 U.S.C. § 1343 | **Wire Fraud – Corporate Embezzlement** | Bettis | Bettis caused unapproved payments outside ADP systems to relatives and affiliated entities, bypassing corporate controls at Formulus Black and AudioEye, including payments for his girlfriend's Manhattan apartment disguised as corporate expenses, contributing to $45.0M–$70.0M in corporate waste. This misuse of corporate funds demonstrates the same concealed-control and misappropriation practices that the whistleblower later sought to expose, reinforcing a long-running pattern rather than isolated misconduct. |
| 18 U.S.C. § 1343 | **Wire Fraud – Retaliatory Lawfare** | Moradi; Bettis; Spolar; Humble | Defendants used interstate wires to coordinate and fund retaliatory lawsuits against Kovacs (Florida defamation, SDNY defamation, Arizona fraudulent debt claim) to silence whistleblowing and deter regulatory reporting, contributing to $45.0M–$70.0M in corporate waste and $35.0M–$70.0M in direct harm to Kovacs. These coordinated legal attacks were undertaken after the whistleblower's disclosures emerged, serving the enterprise's objective of protecting the concealed misconduct at issue in the other predicates. |

| Predicate Statute | Racketeering Act | Defendants | Factual Basis |
|---|---|---|---|
| 18 U.S.C. § 1513(e) | **Witness Retaliation** | Moradi; Bettis; Georgevich; Spolar; Humble | After Kovacs reported misconduct internally (Nov. 2023) and to DOJ (Feb. 2024) and SEC (Apr. 2024), Defendants terminated him for cause, seized vested RSUs worth $2.9M–$7.8M, and initiated coordinated legal attacks causing $35.0M–$70.0M in total damages. Humble's July 24, 2025 voicemail to Ducheine—repeating defamatory accusations and conveying purported updates from "Carr and his attorney" – evidences ongoing witness intimidation. These acts followed the whistleblower's disclosures and continued cooperation, forming a unified pattern of retaliation designed to suppress exposure of the enterprise's concealed misconduct. |
| 29 U.S.C. § 1140 | **ERISA Benefits Interference** | AudioEye; Moradi; Bettis; Georgevich; Spolar | Defendants forfeited Kovacs' vested RSUs worth $2.9M–$7.8M and deferred compensation following whistleblowing, with Akin Gump's February 20, 2024 forfeiture letter expressly citing Kovacs' fraud accusations as the termination basis. This forfeiture forms part of the same retaliatory pattern undertaken by the enterprise to deter continued cooperation and suppress exposure of the concealed misconduct. |
| 18 U.S.C. § 1519 | **Evidence Destruction** | Moradi; Bettis; Spolar | Defendants destroyed, altered, or concealed records during periods of active securities communications and foreseeable investigations. This included deletion of emails required to be retained under FINRA and SEC books-and-records rules; "painting the tape" by removing or editing internal Slack, Teams, and email threads referencing whistleblower complaints, insider-trading exposure, and litigation risk; and directing employees to avoid written communication or move discussions to non-retained channels after whistleblower escalation. These acts constitute anticipatory obstruction and unlawful destruction of records in contemplation of federal investigation, aligning with the enterprise's broader pattern of suppressing information that threatened to reveal the same underlying misconduct. |

| Predicate Statute | Racketeering Act | Defendants | Factual Basis |
|---|---|---|---|
| 18 U.S.C. § 1512(c)(2) | Obstruction of Proceedings | Moradi; Bettis; Spolar; Humble | Defendants obstructed regulatory and judicial proceedings by suppressing internal findings, concealing whistleblower complaints from the Board, and managing information flow to regulators. Humble's July 24, 2025 voicemail—claiming insider knowledge of case status and conveying litigation updates from "Carr and his attorney" – corroborates coordinated efforts to shape witness understanding and impede truthful testimony and underscores the enterprise's continued effort to control information flow and prevent scrutiny of the same underlying misconduct identified in the other predicate acts. |
| 18 U.S.C. § 1512(b) | Witness Tampering | Humble; Bettis; Moradi | Humble made three documented witness tampering attempts: (1) December 2023 solicitation of Ducheine to "take care of" Kovacs; (2) January 2024 solicitation of Wilkerson to murder Kovacs in exchange for $1M restitution from Formulus Black losses; and (3) July 24, 2025 voicemail to Ducheine attempting to reassure, coach, and influence testimony by conveying false litigation updates and disparaging Kovacs while claiming to speak for "Carr and his attorney." These solicitations reflect a unified and escalating pattern of enterprise retaliation undertaken after the whistleblower's disclosures, reinforcing the enterprise's objective of deterring cooperation and suppressing exposure. |
| 18 U.S.C. § 1959 | Murder-for-Hire (VICAR) | Moradi; Bettis; Humble | In December 2023 and January 2024, Humble—acting on behalf of Moradi and Bettis—solicited Ducheine and Wilkerson separately to murder Kovacs. Ducheine was told Kovacs was "upsetting the wrong people" and Humble needed help to "take care of" him. Wilkerson was offered $1M restitution from Formulus Black losses in exchange for killing Kovacs. Both targets refused and provided corroborating declarations. Kovacs reported the plot to NYPD on April 26, 2025. These solicitations were the extreme culmination of the enterprise's efforts to prevent exposure following the whistleblower's disclosures. |

| Predicate Statute | Racketeering Act | Defendants | Factual Basis |
|---|---|---|---|
| **18 U.S.C. § 1951** | **Extortion – Hobbs Act** | Moradi; Bettis | Defendants used economic threats, control over governance and disclosure, and coercive settlement pressure (including the March 20, 2024 "Birkin Bag Letter" threatening "unfathomable physical harm") to maintain enterprise control and suppress whistleblowing. These coercive tactics formed part of the same coordinated enterprise pattern undertaken after the whistleblower's disclosures, serving the objective of suppressing exposure and preserving insider control. |

**SCHEDULE E – MATERIAL MISREPRESENTATIONS AND OMISSIONS**

| FORM 10-K (2024) | | | | |
|---|---|---|---|---|
| **Topic** | **Affirmative Representation** | **Material Omission / Why Misleading** | **Fraudulent Circumstances (Scienter)** | **10-K Citation** |
| **Disclosure Controls & Procedures** | Company certified disclosure controls and procedures as effective | Omitted that the Company had received federal whistleblower submissions alleging insider trading and securities fraud (DOJ 2/8/24; SEC 4/8/24), and that senior management had retaliated against the whistleblower instead of investigating | Management cannot certify effective controls while concealing federal whistleblower complaints and retaliating against the reporting executive; retaliation itself evidences breakdown of controls | Item 9A |
| **Internal Controls Over Financial Reporting (ICFR)** | Management implied adequacy of ICFR through routine certifications | Omitted that ICFR had not been independently audited for years and that internal controls failed to detect or prevent insider trading, retaliatory expenditures, and improper exclusions from Adjusted EBITDA | Chronic lack of SOX 404(b) audit plus retaliation against the person raising control failures supports inference of knowing control circumvention | Item 9A |
| **Market Transactions / Insider Trading** | Insider sales disclosed mechanically via Form 4 cross-reference | Omitted coordination, clustering, and timing of insider sales at or near peak prices while insiders possessed MNPI concerning whistleblower reports, regulatory exposure, and planned dilution | Over $30M in insider sales contemporaneous with ATM activity reflects pre-planned liquidity extraction, not routine trading | Item 5 |
| **Liquidity & Capital Resources** | ATM offering described as routine capital-raising | Omitted that insiders knew of ATM timing and dilution before selling tens of millions of dollars of personal stock | Selling personally while knowing imminent dilution to public shareholders is classic exploitation of MNPI | Item 7 |

| FORM 10-K (2024) | | | |
|---|---|---|---|
| **Risk Factors — Regulatory** | Generic discussion of potential regulatory scrutiny | Failed to disclose that the Company was already subject to DOJ and SEC whistleblower submissions alleging insider trading | Once regulators are notified, risk is no longer hypothetical; omission converts risk disclosure into misrepresentation | Item 1A |
| **Legal Proceedings** | Retaliatory litigation described neutrally as ordinary disputes | Omitted that litigation was initiated after protected whistleblower activity, funded with corporate assets, and intended to silence disclosure | Use of corporate funds to punish a whistleblower constitutes retaliation, corporate waste, and obstruction | Item 3 |
| **Earnings Quality / Profitability** | Emphasis on "Adjusted EBITDA" and improving profitability | Omitted that a substantial majority of EBITDA was derived from add-backs, including litigation, regulatory, and retaliation-related costs, masking growing operating losses | Knowingly excluding recurring legal and regulatory costs to enable insider exits constitutes deceptive earnings management | Item 7 |
| **Cash Flow Reality** | Narrative implied improving cash generation | Omitted that, absent add-backs, AudioEye was burning cash, not generating it, and was dependent on dilutive financing | December 2024 ATM offering confirms that purported profitability was illusory | Item 7 |
| **Whistleblower Matters** | No disclosure of whistleblower activity | Omitted that the Company terminated a senior executive for reporting securities fraud, seized ERISA-protected equity, and financed retaliation | Retaliation against a whistleblower is per se material to investors and regulators | Items 1, 3, 7 |
| **Insider Alignment** | Statements aligning management interests with shareholders | Omitted that insiders extracted 19–27× more value through personal trading than the Company realized through operations | Extreme economic asymmetry is incompatible with good-faith alignment | Item 11 |

| FORM 10-K (2024) | | | |
|---|---|---|---|
| **Audit & Governance History** | Silence regarding historical governance failures | Omitted long-running audit gaps, whistleblower suppression, and control failures dating back years | Sustained nondisclosure supports inference of scheme rather than isolated error | Items 9A, 11 |

**Notes**

During the Class Period (June 2, 2022 through April 1, 2025), AudioEye repeatedly emphasized "Adjusted EBITDA" as evidence of profitability and operational momentum. In reality, the Company's reported Adjusted EBITDA was driven predominantly by aggressive add-backs that excluded litigation expenses, regulatory exposure, whistleblower-related costs, and retaliatory legal expenditures. When those excluded items are properly considered, AudioEye was not generating operating profits but incurring growing losses and negative cash flow.

This distinction is fundamental. A profitable company generates internal liquidity. A cash-burning company must rely on external financing. AudioEye's December 2024 at-the-market offering demonstrates that the purported profitability presented to investors was illusory. At the same time the Company was promoting adjusted profitability, insiders sold tens of millions of dollars of personal stock while possessing material nonpublic information concerning whistleblower complaints, regulatory exposure, and imminent dilution.

The omission of whistleblower retaliation from the Company's disclosures independently renders its Form 10-K misleading. Retaliation against a whistleblower alleging securities fraud is not a peripheral employment matter; it is a direct indicator of disclosure failure, governance breakdown, and scienter. The Company's decision to conceal both the protected disclosures and its retaliatory response deprived investors of information necessary to assess management integrity, earnings quality, litigation risk, and the reliability of reported financial metrics.

**SCHEDULE F – AUDIEOEYE'S FALSE SMEARS**

| # | Smear Topic | Florida Compl. | Quoted Allegation | Rebuttal (with Citation) | Smear Status |
|---|---|---|---|---|---|
| 1 | Short and Distort Scheme | 5 | Kovacs threatened to initiate a "short and distort scheme" and would recruit "powerful Wall Street investors" to drive AudioEye's stock to zero. | "I do not own, and have never owned, any short position, put options, swaps, or any other derivative instrument designed to profit from a decline in AudioEye's stock price. The AudioEye Board of Directors has access to market and trading information that can confirm this." (Kovacs Decl.). | **Frivolously Maintained** |
| 2 | Worthless Employee / No Value Provided | ¶¶ 19, 38 | Kovacs "failed spectacularly" and did nothing to provide any value for the salary and benefits he received. | Kovacs was hired in 2014 by founders Paul Arena and Ted Withrow, who provided positive reviews. Kovacs received performance-based equity. AudioEye's termination letter does not cite performance issues. (Exh. 46 – Bankofier Letter; Exh. 34 – Akin Gump Letter). | **Walked Back** |
| 3 | Did Not Graduate in Two Years | 22 | Kovacs did not graduate college in two years as he claimed. | False. Diplomas and transcripts establish the timing of graduation. (Exh. 20–21). | **Abandoned** |
| 4 | Did Not Graduate at Age 18 | 23 | Kovacs was not eighteen (18) years old when he completed his undergraduate degree. | False. Documentary proof establishes age at graduation. (Exhs. 20–21). | **Abandoned** |
| 5 | Columbia University Enrollment | 24 | There is "no record" of Kovacs having attended Columbia University. | False. Enrollment documentation confirms attendance. (Exh. 22). | **Abandoned** |
| 6 | Citigroup Employment | ¶¶ 25–26 | Kovacs was not an investment-banking analyst at Citigroup. | False. Citigroup confirmed analyst employment in writing. (Exh. 27 – Citigroup Letter). | **Abandoned** |

| # | Smear Topic | Florida Compl. | Quoted Allegation | Rebuttal (with Citation) | Smear Status |
|---|---|---|---|---|---|
| 7 | Blackstone Employment | ¶¶ 27–28 | Kovacs never worked for "The Blackstone Group." | Misleading. Kovacs never claimed to work for The Blackstone Group. He worked at Blackstone Capital Markets, an affiliate. (Exh. 28–29). | **Frivolously Maintained** |
| 8 | Hinduja Group Employment | ¶¶ 29–31 | Kovacs was never a Managing Director at the Hinduja Group. | False. Documentary proof confirms Managing Director role. (Exh. 26 – Nauer Letter). | **Abandoned** |
| 9 | Evicted From Apartment | 32 | Kovacs was evicted from his apartment. | False and retaliatory. Landlord confirms no eviction occurred. (Exh. 24 – Towne Associates Letter). | **Abandoned** |
| 10 | SEC Investigation / Escorts | ¶¶ 33–34 | Kovacs was investigated by the SEC and misused company funds on escorts. | False and retaliatory. Declarations and corroborating letters confirm no SEC investigation and no misuse of funds. (Exh. 8 – Wagers Decl.; Exh. 25 – Baez Letter). | **Abandoned** |
| 11 | Advisor to NYC Mayor | ¶¶ 35–36 | Kovacs fabricated an advisory role with the Mayor of New York. | False. Mayor Adams' legal counsel confirmed Kovacs's appointment to the Mayor's Technology & IT Transition Committee. (Exh. 23 – Pitta Letter). | **Frivolously Maintained** |
| 12 | Education / Background – Global Smear | 55 | Kovacs made false representations regarding education, skills, experience, and relationships. | No specific misrepresentation pleaded; conclusory allegation. | **Abandoned in Substance** |
| 13 | False Claim of 25% Ownership | 41 | Kovacs publicly claimed to own 25% of AudioEye. | False. Kovacs never made this claim. The secretly recorded Bettis call confirms Kovacs sought only his RSUs. | **Abandoned** |
| 14 | Insinuation of Mental Instability | Fn.1 to 5 | Kovacs appeared unhinged and made irrational threats. | Discredited whistleblower-smear trope. Ben Barton Christmas texts corroborate Kovacs's concerns. (Kovacs Decl.; Barton Texts). | **Frivolously Maintained** |

89

| # | Smear Topic | Florida Compl. | Quoted Allegation | Rebuttal (with Citation) | Smear Status |
|---|---|---|---|---|---|
| 15 | George Santos Comparison | 21 | "Before George Santos, there was David Kovacs." | Retaliatory character assassination unrelated to any factual allegation. | **Discredited Ad Hominem** |
| 16 | False Fraud Accusations | 56 | Kovacs falsely accused Moradi of fraud and criminal conduct. | Statements were protected disclosures among shareholders and to regulators and are substantiated by this Complaint. | **Frivolously Maintained** |
| 17 | Bad-Faith Litigation Actor | Passim | Kovacs engaged in a campaign against Plaintiffs. | Litigation followed termination, threats, and retaliation. | **Retaliatory Narrative** |
| 18 | Disloyalty to AudioEye | Passim | Whistleblowing is equated with betrayal. | This is an inversion of truth. Kovacs was protecting the shareholders from Moradi's fraud. The insiders were disloyal. | **Retaliatory Narrative** |
| 19 | Improper Whistleblowing Motive | Passim | Whistleblowing motivated by personal animus. | Carr Bettis violated AudioEye's Whistleblower Protection Policy (Exh. 105) by failing to initiate or cause any investigation after receiving a direct insider-trading complaint, expressly articulated during the January 17, 2024 recorded call (Exh. 30). In that transcript, Kovacs states that the issue is insider trading, and Bettis acknowledges the allegation and claims to have "looked into it," yet no investigation, escalation to the Audit Committee, trading blackout, or independent review followed. Kovacs's animus or anger is irrelevant. | **Red Herring** |
| 20 | Fabricated Safety Concerns | Passim | Implicit denial of threats against Kovacs. | Threats documented contemporaneously. (DiMaggio Decl.; Ducheine Decl.; Tannenbaum Decl.; Kovacs Decl.; Birkin Bag Letter; police texts). | **Disproven** |

| # | Smear Topic | Florida Compl. | Quoted Allegation | Rebuttal (with Citation) | Smear Status |
|---|---|---|---|---|---|
| 21 | Overall Character Assassination | Entire Complaint | Cumulative effect of the above allegations. | Majority of smears disproven, abandoned, or frivolously maintained. | **Retaliatory Lawfare** |

The evolution from the Original Florida Complaint to the amended pleading reinforces the retaliatory nature of the smear campaign reflected in this Schedule.

Plaintiffs initially advanced numerous specific factual attacks on Kovacs's education, employment history, and personal conduct. After those allegations were disproved by documentary evidence, Plaintiffs abandoned them by omission while continuing to litigate aggressively under a reframed narrative of animus and malice.

This retreat from falsifiable facts, coupled with the persistence of hostility and punitive framing, evidences pressure-driven lawfare rather than a good-faith effort to adjudicate truth. Such conduct is a recognized indicator of retaliation in whistleblower cases.

91

## SCHEDULE G – DAMAGES MODEL

*(Preliminary, Subject to Discovery and Expert Proof)*

**Executive Summary[2]**

Defendants' misconduct exposes them to extraordinary damages exceeding $1 billion, with a reasonable, evidence-supported range of approximately $800 million to $1.75 billion, exclusive of additional exposure that may be revealed through discovery, including undisclosed insider trading, tippee liability, hidden short positions, and broader market-wide corrective effects.

This memorandum presents a disciplined, non-duplicative damages analysis grounded in standard federal securities, RICO, ERISA, and corporate-governance principles. Harms are separated into: (i) entity-level harm to AudioEye; (ii) trading losses suffered by public shareholders during two analytically distinct phases (Phase I and Phase II); (iii) destruction of value at related enterprises controlled or looted by Defendants; and (iv) individualized harms suffered by whistleblowers and founders. Each category is mutually exclusive, additive, and supported by observable transactions, disclosed trading data, and accepted valuation methodologies.

## I.     Harm to AudioEye
*(Entity-Level and Derivative Damages)*

### A.     Disgorgement of Usurping Insider Sales (Phase II)

During Phase II, AudioEye insiders extracted $35,218,799 in personal proceeds through stock sales disclosed on SEC Forms 4. These sales were tightly clustered around periods when insiders possessed material nonpublic information concerning governance collapse, retaliatory lawfare, undisclosed liquidity stress, and imminent dilution.

Under a conservative disgorgement methodology, insiders are credited with a notional $5.00 per share cost basis, reflecting Phase I accumulation and equity grants, yielding approximately $10 million in aggregate cost. Net disgorgeable profit under this approach is therefore approximately $25.2 million. Under a more aggressive approach – consistent with case law denying offsets where equity was obtained through fiduciary breach or fraud – the entire $35.2 million is treated as illicit gain. Either approach yields disgorgement recoverable independently of shareholder loss. (No Form 4 discloses trading pursuant to Rule 10b5-1 plans.)

---

[2]  The undersigned counsel recognizes Sydney Lanyon's outstanding contributions to the formulation, research, and drafting of this Damages Model.

92

### B.     Corporate Waste, Self-Dealing, and Cash Depletion

AudioEye also suffered direct corporate waste. During Phase I, the Company spent approximately $2.7 million on economically irrational stock repurchases while cash-burning and dependent on external capital. During Phase II, the Company spent an additional ~$2.7 million on retaliatory lawfare designed not to advance corporate interests, but to silence a whistleblower and conceal misconduct. These expenditures directly depleted corporate assets without corresponding benefit.

Beyond discrete cash outflows, AudioEye suffered structural enterprise harm. Governance collapse, undisclosed litigation exposure, and insider self-dealing materially increased the Company's cost of capital, constrained access to non-dilutive financing, and imposed sustained enterprise-risk discounts. Conservatively measured through recognized financial channels, this derivative harm reasonably ranges from $40 million to $60 million.

### C.     Summary of AudioEye Entity-Level Harm (Base)

| Category | Estimated Range |
| --- | --- |
| Insider disgorgement (Phase II) | $25.2M – $35.2M |
| Corporate waste & cash depletion | $5.4M |
| Structural / governance / credit harm | $40.0M – $60.0M |
| **Total entity-level harm (base)** | **$70.2M – $105.2M** |

Substantial portions of this harm are recoverable under RICO and related theories and are therefore treble-eligible, yielding potential company-level exposure of approximately $210.6M to $315.6M, exclusive of equitable relief.

## II.     Harm to AudioEye Shareholders
### *(Rule 10b-5 Trading Losses)*

Shareholder damages arise from **two analytically distinct phases** that injure different cohorts of investors and do not overlap.

### A.     Phase I – Depressed-Price Sellers
### *(June 2, 2022 – February 12, 2024)*

During Phase I, AudioEye stock traded primarily in the $4–$6 range, while management internally authorized irrational buybacks and positioned for later monetization at dramatically higher prices. This conduct is economically irrational unless insiders believed the stock was materially undervalued. Price suppression is demonstrated by objective revealed-preference signals, including irrational repurchases during cash burn, contradiction between public pessimism and private action, coordinated pessimistic messaging to third parties, and preservation of insider exposure.

93

Using standard Rule 10b-5 methodologies:

| Assumption | Conservative | Upper-Bound |
|---|---|---|
| Non-insider volume | ~17–21M shares | ~17–21M shares |
| Observed price | ~$5.00 | ~$5.00 |
| "But-for" price | ~$8.25 | ~$11.00 |
| Artificial depression | ~$3.25 | ~$6.00 |
| **Aggregate Phase I damages (base)** | **$66.5M** | **$126.0M** |

### B.    Phase II – Inflated-Price Purchasers
### *(February 13, 2024 – April 1, 2025)*

During Phase II, Defendants reversed disclosure posture. Following shelf registration and escalating whistleblower exposure, public statements emphasized accelerating growth, margin expansion, Adjusted EBITDA, and "Rule of 40" performance, while continuing to conceal insider dumping, governance collapse, retaliatory lawfare, and liquidity stress.

### 1.    Illusory Profitability Driven by Add-Backs



By Q3 and Q4 2024, approximately 90% of reported Adjusted EBITDA consisted of add-backs for depreciation and amortization, litigation expense, acquisition-related costs, severance, restructuring, and similar exclusions. By Q1 2025, that figure rose to approximately 94%. Nearly all reported profitability during Phase II was therefore accounting-driven rather than operational.

94



When these add-backs are removed, AudioEye's GAAP net losses widened throughout Phase II, demonstrating increasing cash burn rather than improving fundamentals. Reported Adjusted EBITDA rose even as actual losses deepened, creating a widening divergence between public narrative and economic reality.

### 2.    Liquidity Reality: December 2024 ATM

In December 2024, at the height of its purported profitability, AudioEye executed an at-the-market equity offering, diluting shareholders to raise cash. A genuinely profitable, cash-generating company does not need to access the equity markets for emergency liquidity. The ATM offering is objective proof that the Company's reported profits were illusory and that insiders knew the Company lacked sufficient internal cash generation.

This accounting-driven illusion of profitability sustained inflated prices long enough to facilitate more than $35 million in insider sales during Phase II.

### 3.    Phase II Shareholder Damages

| Assumption | Conservative | Upper-Bound |
|---|---|---|
| Non-insider purchase volume | ~9-12M shares | ~9-12M shares |
| Average purchase price | ~$22.50 | ~$27.00 |
| Estimated corrective price | ~$17.00 | ~$7.50 |
| Artificial inflation per share | ~$5.50 | ~$19.50 |
| **Aggregate Phase II damages (base)** | **$59.0M** | **$232.0M** |

### C.    Estimation of Affected Share Volume (Phase I and Phase II)

The estimates of affected share volume for both Phase I and Phase II are derived using standard event-study and Rule 10b-5 loss-causation methodologies designed to identify economically meaningful investor transactions rather than raw trading turnover.

For Phase I, the estimated 17–21 million share range reflects non-insider sales during the suppression period after excluding insider transactions disclosed on Forms 4, option exercises, equity issuances, and other non-open-market transfers. Reported trading volume is further adjusted to discount market-maker activity, short-term liquidity provision, and high-frequency trading that does not correspond to permanent investor exits. The resulting range represents a deliberately conservative proxy for net shares sold by public investors at artificially depressed prices.

For Phase II, the estimated 9–12 million share range reflects non-insider purchases during the inflation period, similarly adjusted to exclude insider sales, derivative-related hedging, and transient trading volume. The Phase II range is further constrained by float dynamics and insider lockups, ensuring that only shares purchased at inflated prices and retained through the inflationary period are counted. As with Phase I, the estimate conservatively discounts turnover to avoid double-counting shares that may have changed hands multiple times.

In both phases, a more precise estimate of affected share volume will be available through discovery, including granular daily trading data, shareholder position records, and transaction-level information maintained by the Company and its transfer agent. Such data will permit expert refinement of net buyer and seller identification and eliminate residual conservatism embedded in the present estimates.

96

### D. Aggregation and Trebling of Shareholder Damages

| Component | Amount |
|---|---|
| Phase I damages (base) | $66.5M – $126.0M |
| Phase II damages (base) | $59.0M – $232.0M |
| **Total base shareholder damages** | **$125.5M – $358.0M** |
| RICO trebling | ×3 |
| **Total shareholder damages (trebled)** | **$376.5M – $1.074B** |

## III.  Harm to Related Enterprises

- Formulus Black: Enterprise value destruction conservatively estimated at $250M – $500M.

- First Contact: Lost anticipated exit value of $200M – $250M.

- ESTP: Enterprise-level destruction estimated at $200M – $300M, exclusive of Kovacs' individual losses.

## IV.  Harm to Individual Plaintiffs

- David Kovacs: ERISA restoration $2.9M – $7.8M; retaliation damages $15M – $30M; abuse of process / IIED $20M – $40M; total $37.9M – $77.8M.

- Lichtenstein: $50M – $125M.

- Ducheine: $5M – $15M.

Aggregate individual damages therefore total approximately $92.9M – $292.8M, with treble eligibility for enterprise-related conduct.

## V.  Attorneys' Fees, Costs, and Interest

Reasonable legal and forensic fees advanced to date are estimated at $2.5M – $3.0M, subject to fee-shifting. Pre-judgment interest is conservatively estimated at $30M – $54M.

## VI.    Aggregate Exposure

Combining treble-eligible shareholder damages ($376.5M – $1.074B), treble-eligible company-level harm (~$210.6M – $315.6M), updated individual damages ($92.9M – $292.8M), and fees and interest yields total damages exposure of approximately $700 million on the low end, exceeding $1.6 billion on the high end under reasonable assumptions.

## SCHEDULE H – DAMAGES MATRIX

### *(Preliminary, Subject to Discovery and Expert Proof)*

| Damages Category | Base Damages (No Treble) | Treble Eligible? | With Trebling | Notes / Legal Basis |
|---|---|---|---|---|
| AudioEye – Insider Disgorgement | $25.2M – $35.2M | Yes | $75.6M – $105.6M | RICO proceeds; independent of shareholder loss |
| AudioEye – Corporate Waste / Self-Dealing | $45.0M – $70.0M | Yes | $135.0M – $210.0M | Irrational buybacks, retaliatory lawfare, governance harm |
| Subtotal: AudioEye Entity-Level Harm | $70.2M – $105.2M | Yes (part) | $210.6M – $315.6M | Derivative claims on behalf of AudioEye |
|  |  |  |  |  |
| Shareholders – Phase I Suppression Losses | $66.5M – $126.0M | Yes | $199.5M – $378.0M | RICO & Rule 10b-5 |
| Shareholders – Phase II Inflation Losses | $59.0M – $232.0M | Yes | $177.0M – $696.0M | RICO & Rule 10b-5 |
| Subtotal: Harm to Shareholders | $125.5M – $358.0M | Yes | $376.5M – $1,074.0M | Class recovery |
|  |  |  |  |  |
| Formulus Black – Enterprise Destruction | $250M – $500M | Yes | $750M – $1.50B | Enterprise conduct |
| First Contact – Destroyed Exit | $200M – $250M | Yes | $600M – $750M | Enterprise conduct |
| ESTP – Fraudulent Transfer & Waste | $200M – $300M | Yes | $600M – $900M | Enterprise conduct; fraudulent transfer |
| Subtotal: Related-Enterprise Harm | $650M – $1.05B | Yes | $1.95B – $3.15B | Non-duplicative enterprise loss |
|  |  |  |  |  |
| Kovacs – ERISA Restoration | $2.9M – $7.8M | No | $2.9M – $7.8M | Make-whole equitable relief |
| Kovacs – Retaliation / IIED / Lawfare | $35.0M – $70.0M | Yes (enterprise) | $105.0M – $210.0M | RICO + state torts |
| Lichtenstein – Coercion / Enterprise Loss | $50.0M – $125.0M | Yes | $150.0M – $375.0M | Enterprise conduct |
| Ducheine – IIED / Witness Harm | $5.0M – $15.0M | Yes | $15.0M – $45.0M | Enterprise conduct |

| Damages Category | Base Damages (No Treble) | Treble Eligible? | With Trebling | Notes / Legal Basis |
|---|---|---|---|---|
| Subtotal: Individual Plaintiffs | $92.9M – $217.8M | Partial | $272.9M – $637.8M | Mixed treble eligibility |
|  |  |  |  |  |
| Attorneys' Fees & Forensic Costs | $2.5M – $3.0M | Yes | $2.5M – $3.0M | Mandatory fee-shifting |
| Pre-Judgment Interest (est.) | $30.0M – $54.0M | No | $30.0M – $54.0M | Court discretion |
|  |  |  |  |  |
| **TOTAL DAMAGES EXPOSURE** | **≈ $870M – $1.73B (base)** | **—** | **≈ $700M – $1.6B+ (net)** | **Narrowed to avoid double-counting** |

**SCHEDULE I – ANNOTATED TIMELINE**

| Date | Event | Significance | Sources |
|---|---|---|---|
| 2002/01/31 | Kovacs graduates from the College of Staten Island (CUNY) at age 18 | Refutes smear in Florida action; biography. | Exh. 20-21 (Transcript and Diploma) |
| 2003–2004 | Kovacs attends night classes at Columbia University (Premed) | Refutes smear in Florida action; biography. | Exh. 22 (Registrar Letter and Transcript) |
| 2003-2004 | Kovacs works for Citigroup | Refutes smear in Florida action; biography. | Exh. 27 (Letter from Citi) |
| 2004-2007 | Kovacs associated with Blackstone Group (Senior VP, Equity Research & Investment Banking) | Refutes smear in Florida action; biography. | Exh. 28-29 (Blackstone Emails) |
| 2007–2012 | Kovacs serves as Managing Director at the Hinduja Group (New York) | Refutes smear in Florida action; biography. | Exh. 26 (Nauer Letter, Apr. 12, 2024) |
| 2012/04 | David Moradi assaulted at Las Vegas nightclub, sustaining TBI. | Origin of later $160.5M TBI verdict; undisclosed reputational, litigation, and governance risk in subsequent public-company roles. | Exh. 54 (news article); Exh. 55 (court records) |
| 2012–2014 | Kovacs serves as Head of North American Training Practice at Fitch Learning (Fitch Group) | Establishes senior executive credibility overlapping early AudioEye involvement | Exh. 9 (Wieczorek) |
| 2014/01 | Kovacs hired at AudioEye by founders Paul Arena and Ted Withrow | Establishes long-term insider status predating Moradi | Exh. 16 (Withrow Decl.); Exh. 17 (Arena Decl.). |
| 2014/06 | Tony Coelho joins AudioEye Board of Directors | Early governance structure prior to Moradi alignment | AEYE SEC filings; Proxy Statements |

| Date | Event | Significance | Sources |
|------|-------|--------------|---------|
| 2014/10–2014/12 | Kovacs retained by Breitling Energy to review financials and challenge CFO Rick Hoover | Refutes smear in Florida Lawsuit. Establishes pre-AudioEye whistleblower and forensic accounting role | Exh. 8 (Wagers) |
| 2015/02/27 | Rick Hoover terminated; Kovacs appointed Interim CFO of Breitling Energy | Refutes smear that SEC investigated Kovacs; shows board-level trust following identification of accounting irregularities | Exh. 8 (Wagers Decl.) |
| 2015/01 | $12.7M Series A financing of Symbolic IO at ~$132M post-money | Demonstrates substantial standalone Formulus Black IP value | Witness Interview |
| 2015/09/24 | Alexandre Zyngier joins AudioEye Board | Outside investor-linked director during pre-Moradi governance phase | AEYE SEC filings |
| 2015/11/16 | Kalobios Schedule 13D discloses ~70% ownership by Shkreli/Moradi group | Public disclosure of de facto control bloc | Kalobios Schedule 13D |
| 2015/12/03 | Kalobios Form 8-K identifies Shkreli as CEO/Chairman and Moradi as Director | SEC confirmation of contemporaneous takeover | Kalobios Form 8-K |
| 2015/12/17 | Martin Shkreli indicted in EDNY for securities fraud | Contextualizes Moradi's Kalobios association | DOJ Press Release; EDNY Indictment |
| 2016/07/07 | Coercive letter sent to Lichtenstein alleging fabricated misconduct | Early use of false accusations and reputational coercion | Exh. 5 (Lichtenstein Decl.); Exh. 53 (coercive letter). |
| 2016/07 | Moradi achieves de facto control of First Contact Entertainment | Operational and financial control via threats and governance | Exh. 5 (Lichtenstein Decl.); Exh. 52 |

| Date | Event | Significance | Sources |
|---|---|---|---|
| 2016/07/18 | Moradi named required financial signatory | Documentary confirmation of control over bank accounts | First Contact Checklist |
| 2016/07/29 | Kovacs receives founder equity in First Contact (1,290,000 shares) pursuant to Restricted Stock Purchase Agreement | Confirms founder status, paid-for equity, and contribution of core IP; rebuts employee-only narrative | First Contact Restricted Stock Purchase Agreement (Kovacs, July 29, 2016) |
| 2017/04 | Jury verdict entered against Moradi in TBI litigation ($160.5M) | Massive undisclosed reputational and financial risk | Public court records |
| 2017/05/05–2017/05/20 | False criminal accusations; Ignomirello removed from Symbolic IO | Weaponization of criminal process to seize IP | Witness Interview |
| 2018/01 | Ignomirello forced to settle under duress | Completion of coercive Formulus Black asset capture | Witness Interview |
| 2018/03 | Founder Paul Arena departs AudioEye | Erosion of founder-led governance | AEYE Proxy Statements |
| 2018/04/19 | Bankofier letter awards RSUs to Kovacs | Confirms employee status and equity compensation | Bankofier Letter; Kovacs Decl. |
| 2019/03 | Founder Ted Withrow departs AudioEye | Completion of founder exits prior to Moradi consolidation | AEYE Proxy Statements |
| 2019/10/04 | Moradi announced as UCLA Economics Board of Visitors member | Reputational signaling prior to board appointment | UCLA Announcement |
| 2019/11/12 | Moradi publishes Medium/Authority Magazine article | Self-promotion contemporaneous with governance entry | Medium Article |
| 2019/11/13 | Moradi and Tahir appointed to AudioEye Board | Formal entry into public-company governance | AudioEye Press Release; AEYE Proxy |
| 2020/04/24 | Formulus Black circulates investor presentation | Evidence of operational traction and substantial IP | Formulus Black Deck |

| Date | Event | Significance | Sources |
|---|---|---|---|
| 2020/07/15 | Zyngier resigns from AudioEye Board | Governance shift during consolidation | AudioEye Form 8-K |
| 2020/08/13 | Moradi named Interim CEO | Consolidation of executive authority | AudioEye Form 8-K |
| 2021/11 | Kovacs advises NYC Mayor-elect as Transition IT Committee member | Demonstrates civic trust and contemporaneous credibility | Pitta Letter (May 8, 2024) |
| 2021/10–2021/12 | Humble and Bettis coordinate against Kovacs | Early plotting predating termination and insider trading | Ducheine Decl. |
| 2022/06/02 | Phase I period begins | Start of depressed-price trading window | AEYE SEC filings |
| 2022/09/06 | First Contact issues Q3 2022 Investor Letter | Documents strong operating performance | FCE Q3 2022 Investor Letter |
| 2023/03 | ESTP works with Alex Spiro–aligned counsel | Evidence of premeditated lawfare | Ducheine Decl.; ESTP records |
| 2023/08/30 | Moradi solicits insider trading; Kovacs refuses | Direct evidence of scienter | Rodriguez Decl.; Kovacs Decl. |
| 2023/11/13 | Kovacs reports suspected securities fraud internally | Protected whistleblower activity | Kovacs Decl. |
| 2023/12 | Humble solicits Ducheine to "take care of" Kovacs | Witness intimidation | Ducheine Decl.; DiMaggio Decl. |
| 2023/12/25 | Ben Barton Christmas Texts | Proves that multiple insiders were aware of Moradi's fraud 3 months before the pump-and-dump affected the market. | Kovacs Decl. |
| 2024/01/17 | Recorded Bettis call; Kovacs terminated | Explicit retaliation; demand futility | Kovacs Decl.; audio recording |

| Date | Event | Significance | Sources |
|---|---|---|---|
| 2024/02/13 | AudioEye S-3 shelf becomes effective | Opens Phase II insider-monetization window | Form S-3 |
| 2024/04/12 | Kovacs engaged by Hinduja Group | Independent mitigation of damages | Nauer Letter |
| 2024/04/23 | AudioEye reports record Q1 2024 results | Public bullish narrative during Phase II buildup | AudioEye Q1 2024 Release |
| 2024/06/12 | Bettis sells 7,330 shares; Fleming purchases 7,330 shares ($150K) | Divergence between insider monetization and independent confidence | Forms 4 |
| 2024/06/21 | Roth MKM initiates "Buy" coverage | Analyst price support during insider selling | Roth MKM Report |
| 2024/06–2024/12 | Insiders sell ~$35M of AudioEye stock | Core Phase II damages period | Forms 4 |
| 2024/08/05 | Wilkerson meeting re Kovacs and FB | Corroborates intimidation and obstruction | DiMaggio Decl. |
| 2025/04–2025/05 | Law-enforcement corroboration obtained | Independent confirmation of obstruction | NYPD Text Messages |
| 2025/06/03 | Wilkerson meeting with counsel present | Near-admission corroborating obstruction | DiMaggio Decl.; Ducheine corroboration |
| 2025/10–2025/11 | Director Hawkins makes multiple open-market purchases | Hawkins trading activity suggests good faith. | Forms 4 |
| 2025/11 | Interference with Kovacs' employment verification | Ongoing retaliation impairing mitigation | Kovacs Decl. |

## SCHEDULE J – TABLE OF EXHIBITS

| Exh. | Description | Date | Significance |
|---|---|---|---|
| 1 | Declaration of David Kovacs | Dec. 9, 2025 | Primary factual declaration. |
| 2 | Declaration of Nicky DiMaggio | Aug. 25, 2025 | Describes a series of meetings with Mo Wilkerson including the sit-down on June 3, 2025. |
| 3 | Declaration of Julian Ducheine | Dec. 11, 2025 | Describes Jason Humble murder solicitation and subsequent Quinn Emanuel pressuring of a witness. |
| 4 | Declaration of Paul Arena | Dec. 10, 2025 | Describes hiring Kovacs in 2014 and concerns about Moradi; no indication of TBI. |
| 5 | Declaration of Demian Lichtenstein | Oct. 4, 2025 | Coercive tactics used to seize First Contact; Moradi character. |
| 6 | Declaration of Danny Anderson | Sept. 23, 2025 | Moradi misconduct destroyed the First Contact sale. |
| 7 | Declaration of Mario Rodriguez | Sept. 8, 2025 | Eyewitness to argument between Moradi and Kovacs re insider trading on August 30, 2023. |
| 8 | Declaration of Jeremy Wagers | Sept. 17, 2025 | Kovacs activities at Breitling Energy; Kovacs was not investigated by the SEC; Kovacs cleaned up the company. |
| 9 | Declaration of Robert Wieczorek III | Oct. 30, 2025 | Kovacs professional competence at Fitch. |
| 10 | Declaration of Luke Destin | Nov. 14, 2025 | Bettis character evidence. |
| 11 | Declaration of Richard Tannenbaum | Nov. 27, 2025 | Eyewitness corroboration of DiMaggio recollection of June 3, 2025 sit-down with Wilkerson. |

| Exh. | Description | Date | Significance |
|---|---|---|---|
| 12 | Declaration of Dr. Yasser M. Said | Nov. 22, 2025 | General medical expert testimony re TBI. |
| 13 | Declaration of David Tanzer | July 8, 2024 | Recounts meeting with Alex Spiro. |
| 14 | Declaration of David Kovacs (2024) | July 11, 2024 | Recounts meeting with Alex Spiro. |
| 15 | Declaration of Sean Newlin | July 15, 2025 | Recounts meeting with Alex Spiro. |
| 16 | Declaration of Edward Withrow | Mar. 24, 2024 | Describes hiring David Kovacs for AudioEye in 2014 |
| 17 | Declaration of Paul Arena (2024) | Mar. 25, 2024 | Describes hiring David Kovacs for AudioEye in 2014 |
| 18 | Declaration of Chris McGlashan | Dec. 4, 2025 | FC investors suffered losses due to Moradi; no indication of TBI; no defamatory statements by Kovacs. |
| 19 | Declaration of Russell Alesi | Dec. 11, 2025 | Confirmation of AEYE shareholder status |
| 20 | College of Staten Island Transcript | Jan. 31, 2002 | Kovacs graduated in 2 years at age 18; refutes smear. |
| 21 | College of Staten Island Diploma | Jan. 31, 2002 | Kovacs graduated in 2 years at age 18; refutes smear. |
| 22 | Columbia U. Registrar Letter and Transcript | Apr. 17, 2024 | Kovacs attended Columbia; refutes smear. |
| 23 | Pitta LLP Letter (Mayor Adams) | May 8, 2024 | Kovacs was advisor to Mayor Adams; refutes smear. |
| 24 | Towne Associates Letter | Apr. 24, 2024 | Kovacs never evicted; refutes smear. |
| 25 | Cesar Baez Letter (Breitling) | Apr. 29, 2024 | Kovacs was not investigated by SEC; refutes smear. |
| 26 | Robert Nauer Letter (Hinduja) | Apr. 12, 2024 | Kovacs worked for Hinduja; refutes smear. |
| 27 | Citigroup Employment Letter | Apr. 22, 2024 | Kovacs worked for Citi; refutes smear. |
| 28 | Blackstone Email | Jan. 13, 2006 | Kovacs worked for Blackstone; refutes smear. |

107

| Exh. | Description | Date | Significance |
|---|---|---|---|
| 29 | Blackstone Email | Jan. 14, 2006 | Kovacs worked for Blackstone; refutes smear. |
| 30 | Motion to Amend Florida Complaint | Nov. 13, 2025 | Includes proposed amended complaint that abandons most of the false smears; proof of whistleblower report. |
| 31 | HR Emails (Morelli) | Nov. 13, 2023 | Protected internal whistleblower activity. |
| 32 | Spolar "For Cause" Email | Jan. 19, 2024 | Termination following protected activity. |
| 33 | DOJ Whistleblower Report | Feb. 8, 2024 | Kovacs warns DOJ of AudioEye fraud. |
| 34 | Akin Gump Letter | Feb. 20, 2024 | RSUs seized in retaliation for protected activity. |
| 35 | Birkin Bag Letter | Mar. 20, 2024 | Psychological coercion and physical threats. |
| 36 | SEC Whistleblower Submission | Apr. 8, 2024 | Kovacs warns DOJ of AudioEye fraud. |
| 37 | Florida Defamation Complaint | Apr. 10, 2024 | Original complaint containing false smears. |
| 38 | AEYE Q1 2024 Press Release | Apr. 23, 2024 | Bullish public statements; undisclosed risks. |
| 39 | Humble SDNY Lawsuit | May 2, 2024 | Parallel smear-and-retreat litigation. |
| 40 | Ducheine Email to Kovacs | May 8, 2024 | Contemporaneous corroboration of enterprise conduct. |
| 41 | Kovacs Email to Ducheine | May 8, 2024 | Refutes witness-bribery allegations. |
| 42 | Ducheine Follow-Up Email | June 6, 2024 | Confirms consistency of Ducheine's account. |
| 43 | Roth MKM Analyst Initiation | June 21, 2024 | Bullish analysts; MKM dual role. |
| 44 | Consulting Agreement | Jan. 15, 2014 | Kovacs initial consulting agreement. |
| 45 | Employment Offer Letter | Oct. 25, 2016 | Kovacs hired as W2 employee. |

| Exh. | Description | Date | Significance |
|---|---|---|---|
| 46 | Bankofier RSU Letter | Apr. 19, 2018 | Equity grant in recognition of contributions. |
| 47 | Kovacs II Complaint | Mar. 4, 2025 | Referred to as the New York Lawsuit. |
| 48 | Formulus Black Cap Table | Aug. 12, 2020 | Identifies shareholders / fraud victims. |
| 49 | Formulus Black Shareholder Letter | Sept. 5, 2018 | Investor representations and pattern evidence. |
| 50 | FB $100k Investment Record | Apr. 28, 2021 | Ducheine reliance and loss causation. |
| 51 | Humble–Ducheine Texts | Jan. 2, 2025 | Texts messages between Humble and Ducheine. |
| 52 | First Contact Org Deck | July 2016 | Baseline value of First Contact (before looting) |
| 53 | Moradi Letter to Lichtenstein | July 7, 2016 | Coercive false allegations used to seize equity. |
| 54 | LV Review-Journal Article | Apr. 28, 2017 | Open-source info available to Independent Directors. |
| 55 | Nevada Trial Records | 2017 | Open-source info available to Independent Directors. |
| 56 | Moradi Foundation Website | — | Reputation laundering. |
| 57 | Medium Article re Moradi | Nov. 12, 2019 | PR puff-piece; no mention of TBI. |
| 58 | UCLA Press Release | Oct. 4, 2019 | PR puff-piece; no mention of TBI. |
| 59 | Vivid Strategies Screenshots | 2025 | Successor to ESTP; same people and projects. |
| 60 | ESTP Operating Agreement | May 1, 2023 | Proof of Kovacs 33% equity in ESTP (Exh. A) |
| 61 | ESTP Certificate of Incorporation | Sept. 21, 2022 | Proof of ESTP formation. |
| 62 | ESTP Board Consent | Sept. 21, 2022 | Proof of Kovacs officer role at ESTP. |

| Exh. | Description | Date | Significance |
|---|---|---|---|
| 63 | QEP Letter of Introduction | Feb. 4, 2023 | Evidence that ESTP opportunities were significant. |
| 64 | Zuber Lawler Letter | May 3, 2024 | Quinn appeared for AEYE and DM on April 25, 2025 |
| 65 | Quinn Emails to Ducheine | Jan. 21, 2025 | Quinn communication with murder-for-hire witness. |
| 66 | Quinn Letter re Ducheine | Jan. 24, 2025 | Quinn falsely accuses Kovacs of paying witness. |
| 67 | AudioEye Litigation PR | Feb. 4, 2025 | Repeats and publicizes false smears from Florida Lawsuit. |
| 68 | Quinn Settlement Demand | July 8, 2025 | Further retaliation – financially ruining a whistleblower. |
| 69 | Kovacs W-2 Forms | 2023–2024 | Kovacs was a W-2 employee. |
| 70 | Insider Trading Policy | 2013 | Company Policy; see also Exh. 104-106. |
| 71 | Shelf Offering Prospectus | Feb. 13, 2024 | Start of Phase II; mechanism for insider dump; scienter. |
| 72 | ATM Agreement | June 6, 2024 | Mechanism for company dump; scienter. |
| 73 | Prospectus Supplement | Dec. 4, 2024 | Insiders dump $30M of inflated stock. |
| 74 | Arizona Retaliation Complaint | Apr. 14, 2025 | Retaliation / Lawfare – frivolous claim over loan by Carr Bettis. |
| 75 | ESTP Final K-1 | Sept. 3, 2025 | Proof that ESTP was shut down; proof that Kovacs owned 33% of ESTP; inference of fraudulent transfer. |
| 76 | ESTP Opportunities Email | May 21, 2023 | Proof that ESTP was projected to be worth $250M by October 2023. |
| 77 | BoA Sellam Email Chain | Feb. 16, 2023 | Early stages of effort to sell First Contact. |

| Exh. | Description | Date | Significance |
|---|---|---|---|
| 78 | First Contact Sale Emails | Nov. 14, 2023 | Kovacs alerts fellow investors re problems with First Contact sale; attempt to salvage $250M shareholder value. |
| 79 | Analyst Coverage Summary | 2024–2025 | Summary of equity research re AEYE; bullish. |
| 80 | RSU Grant | May 20, 2020 | Grant of equity wrongfully seized by AEYE |
| 81 | RSU Grant | Mar. 27, 2018 | Grant of equity wrongfully seized by AEYE |
| 82 | RSU Amendment | Dec. 20, 2020 | Reaffirms vesting rights. |
| 83 | Kovacs I Decision | Jan. 31, 2025 | Dismissal on technical grounds. |
| 84 | Kovacs II Decision | Oct. 8, 2025 | Dismissal on technical grounds. |
| 85 | AEYE Form 8K | June 2, 2022 | Announcing Stock Buyback (Start of Phase I) |
| 86 | AEYE Form 10-K (2023) | 2023 | See Schedule E (misrepresentations and omissions). |
| 87 | AEYE Form 10-K (2024) | 2024 | See Schedule E (misrepresentations and omissions). |
| 88 | Hawkins Board PR | Mar. 4, 2025 | Press release announcing Hawkins joins board. |
| 89 | Fleming Board PR | Mar. 28, 2023 | Press release announcing Fleming joins board. |
| 90 | Text Messages with Giorgi | May 8, 2024 | Retaliation: Kovacs pushed out of ESTP for Bettis dispute. |
| 91 | Text Messages with Police | April-May 2025 | Kovacs: Mo Wilkerson will come forward. |
| 92 | Humble Philanthropy Website | — | Linking Bettis and Humble |
| 93 | Text Messages with Mike Dow | July 12, 2024 | Contemporaneous messages re murder plot. |

| Exh. | Description | Date | Significance |
|------|-------------|------|--------------|
| 94 | Press Release – Ignomirello Cleared | May 9, 2023 | Girlfriend recants false accusations; coercive tactics. |
| 95 | Text Messages with Hess Barber | Oct. 16, 2023 | Discussions re First Contact sale, Moradi |
| 96 | Text Messages with Alex Spiro | May-June 2024 | After Quinn Emanuel appeared in FL Lawsuit |
| 97 | Formulus Black Deck | Feb. 4, 2020 | Relied upon by investors. |
| 98 | Formulus Black Deck | Apr. 24, 2020 | Relied upon by investors. |
| 99 | First Contact Investor Letter | Sept. 6, 2022 | Relied upon by investors. |
| 100 | Kovacs' First Contact Promissory Note | Aug. 1, 2016 | Kovacs Invested in First Contact – $10K |
| 101 | Kovacs' First Contact Promissory Note | Aug. 1, 2016 | Kovacs Invested in First Contact – $145K |
| 102 | Kovacs' First Contact Promissory Note | Aug. 1, 2016 | Kovacs Invested in First Contact – $36,250 |
| 103 | Restricted Stock Purchase Agreement | July 29, 2016 | Kovacs Founders Shares – 12.9% equity (of 10M shares) |
| 104 | Code of Business Conduct and Ethics | Jan. 14, 2021 | Company Website |
| 105 | Whistleblower Protection Policy | Jan. 14, 2021 | Company Website |
| 106 | Related Party Transaction Policy | Jan. 14, 2021 | Company Website |
| 107 | Emails re JDLK Partners / GF Apartment | 2017-2018 | Example of Bettis using JDLK email account to impersonate David Kovacs and obtain reimbursement from AudioEye. |
| 108 | AEYE Stock Transfer | July 29, 2014 | Moradi AEYE Shares |
| 109 | Symbolic IO Articles | 2016-2018 | Symbolic IO was a quality company |

112

| Exh. | Description | Date | Significance |
|------|-------------|------|--------------|
| 110 | Barton / Kovacs Text Messages | Various | Includes Christmas Texts |
| 111 | Kovacs Status Change | May 1, 2019 | Kovacs change in responsibility |
| 112 | Shehigian / Ducheine Email | Jan. 23, 2025 | Humble's personal lawyer speaks with Ducheine re AEYE |
| 113 | Jason Humble Voicemail | July 24, 2025 | Message to Ducheine (Native) |

The descriptions below are illustrative only. Each exhibit may support multiple factual narratives, legal theories, defenses, or strategic uses. Nothing in this table limits the manner in which any exhibit may be used in pleadings, discovery, motion practice, enforcement referrals, negotiations, or at trial.

113