UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID KOVACS, RUSSELL ALESI, JULIAN
DUCHEINE, and DEMIAN LICHTENSTEIN,

    Plaintiffs,

            - versus -

DAVID MORADI, DR. CARR BETTIS, JASON
HUMBLE, JAMIL TAHIR, JAMES HAWKINS,
DR. KATHERINE FLEMING, TONY COELHO,
KELLY GEORGEVICH, JAMES SPOLAR,
MALONEBAILEY LLC, AUDIOEYE, INC., and
JOHN DOE 1–50,

    Defendants,

            - and -

ETERNAL SOURCES TECH PARTNERS LLC,
FIRST CONTACT ENTERTAINMENT, INC.,
FORMULUS BLACK, INC.,

    Nominal Defendants.

No. 1:25-cv-10336

**MEMORANDUM OF LAW
IN SUPPORT OF TRO AND
PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiffs seek narrow, process-protective relief to preserve the integrity of these proceedings. They do not ask the Court to adjudicate liability, resolve disputed factual issues, or make findings of criminal conduct. Plaintiffs ask the Court to prevent further witness intimidation, preserve evidence, and restrain extraordinary dissipation of assets pending an expedited hearing on a preliminary injunction.

1

The sworn record already demonstrates completed witness chilling, credible threats perceived as serious by multiple witnesses, and a substantial risk of continued obstruction that cannot be cured after the fact. This application is therefore prophylactic, not punitive. Its purpose is to ensure that Plaintiffs' due process rights are respected and the sanctity of the record preserved.

<strong>PURPOSE OF THE ROBUST RECORD</strong>

Plaintiffs submit a comprehensive evidentiary record for three independent and legitimate reasons, each directly relevant to the relief sought.

**A. Protection of Parties and Witnesses**

First, the record serves a protective function. Where witnesses have been threatened, intimidated, or coerced, the creation of a clear, contemporaneous evidentiary record reduces the risk of further harm by making interference visible, traceable, and judicially cognizable. A transparent record removes incentives for escalation by ensuring that misconduct cannot occur in silence.

This consideration is particularly salient where, as here, sworn testimony describes actual witness intimidation causing Plaintiffs to lose access to highly probative evidence. These are actual, real, completed witness withdrawals. The damage is already done. Plaintiffs need a TRO and Preliminary Injunction to limit the damage and prevent future witness intimidation.

Plaintiffs have made appropriate criminal referrals regarding the most serious allegations in the record. However, criminal investigations proceed on their own timeline and do not obviate the need for immediate civil process protection. Witnesses are being chilled now, and the integrity of this civil proceeding cannot await the conclusion of any criminal investigation or prosecution.

**B. Promotion of Governance Reform**

Second, the record provides a factual foundation for responsible corporate governance. The Preliminary Statement of the Complaint in this matter calls upon the Independent Directors, Dr. Katherine Fleming and James Hawkins, to exercise leadership. AudioEye's Board cannot discharge its fiduciary duties in a timely fashion – nor can independent special counsel meaningfully investigate – without a firm factual foundation. The declarations and exhibits submitted herewith provide the needed factual foundation for the Independent Directors to act.

Plaintiffs anticipate that the Board may retain independent counsel with access to internal materials unavailable to Plaintiffs. The record submitted here does not purport to replace such an investigation. It provides an organized baseline – timeline, documents, sworn testimony – upon which independent review can build.

**C. Factual Basis For Injunctive Relief**

Third, Plaintiffs understood from the outset that injunctive relief would likely be required. Witnesses were being pressured through litigation tactics, third-party communications, and legal intermediaries. The submission of a robust record was therefore necessary to give the Court a robust factual basis for entering injunctive relief to protect the sanctity of the record.

**FACTUAL BACKGROUND (SUMMARY)**

The factual record is set forth in detail in the Complaint, sworn declarations, and accompanying schedules. Several points are dispositive for purposes of interim relief.

First, Plaintiff Kovacs engaged in protected whistleblower activity, reporting suspected securities fraud internally, to the Company's Chairman, and to federal authorities. He was

3

terminated shortly thereafter and stripped of ERISA-protected benefits by written admission of Company counsel.

Second, retaliation escalated beyond employment action into lawfare and reputational attack. AudioEye and its CEO filed a Florida action asserting numerous factual smears later disproven or abandoned, as documented in Schedule F. Witnesses cited this pattern – public accusation first, vindication later – as a primary reason for refusing to cooperate regardless of the truth.

Third, corporate insiders sold approximately $35.2 million of AudioEye stock between June 2024 and January 2025. Approximately $30 million of that selling occurred on December 4, 2024, contemporaneously with the Company's announcement of a registered equity offering. None of the selling insiders disclosed trading pursuant to a Rule 10b5-1 plan.

Fourth, the record contains sworn testimony describing witness intimidation, coercive legal pressure, and – at the extreme – attempted solicitation of lethal harm against a whistleblower through intermediaries.

Figure 1 (submitted as a demonstrative exhibit) depicts AudioEye's adjusted closing stock price from August 2023 through March 2025, annotated with contemporaneous events drawn from the record.



***Figure 1***
***Market Context***



Plaintiffs do not offer this chart to establish liability, scienter, or damages. It provides objective context corroborating the timing of whistleblowing activity, retaliation, insider liquidation, and witness interference already established through documentary evidence.

The chart demonstrates that the alleged retaliation and insider sales did not occur in isolation but followed a coherent, documented timeline.

## LEGAL STANDARD

A temporary restraining order is warranted where the movant demonstrates irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits with the balance of hardships tipping decidedly in the movant's favor, and where relief serves the public interest. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund*, 598 F.3d 30, 35 (2d Cir. 2010).

Irreparable harm must be actual and imminent, not speculative. *Salinger v. Colting*, 607 F.3d 68, 81–82 (2d Cir. 2010).

5

Independently, courts possess inherent authority to enjoin conduct that interferes with the administration of justice, including witness intimidation and evidence spoliation. *In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir. 1985).

## ARGUMENT

### I.  Plaintiffs Have Shown Serious Questions Going to the Merits

The Complaint pleads detailed claims supported by sworn testimony, recordings, contemporaneous documents, and public filings. At this stage, Plaintiffs need not prove liability. They need only show sufficiently serious questions warranting interim protection of the Court's process.

### II.  Plaintiffs Face Actual and Imminent Irreparable Harm

#### A. Witness Interference Is Per Se Irreparable Harm

Witness intimidation and coercion inflict irreparable harm because they corrupt the truth-seeking function itself. *Feit & Drexler*, 760 F.2d at 415.

Here, witness chilling has already occurred. Two witnesses with firsthand knowledge agreed to execute declarations, had drafts prepared, and then withdrew solely due to fear of retaliation. This is completed, non-speculative harm.

Schedule K provides a ranked, citation-anchored index of the evidentiary record demonstrating intimidation, coercion, and retaliation directed at witnesses and potential witnesses.

#### B. Spoliation Risk Warrants Immediate Preservation

The duty to preserve evidence is triggered beyond dispute. *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Where obstruction is alleged, courts need not wait for destruction to occur. *Kronisch v. United States*, 150 F.3d 112, 126–27 (2d Cir. 1998).

6

### C. Extraordinary Asset Dissipation Warrants Restraint

Courts may restrain extraordinary asset transfers to preserve equitable remedies. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1101–02 (2d Cir. 1972). Plaintiffs seek only to restrain non-ordinary-course transfers pending a prompt hearing.

### III.  Anticipated Ad Hominem Attacks Are Legally Irrelevant

Defendants may attempt to shift focus through personal attacks on Plaintiff Kovacs. These attacks are discredited. AudioEye and Moradi, in the Florida Lawsuit, smeared Kovacs with a kitchen-sink litigation attack involving about 20 false smears.

In the record submitted herewith, those false smears are definitively rebutted. David Kovacs told the truth. AudioEye and Moradi grievously lied about a whistleblower for the purpose of intimidating him and destroying his life.

Although David Kovacs will be personally vindicated in this action, this case is not about Mr. Kovacs. Plaintiffs do not seek to engage in ad hominem disputes. The case is compelling not because of any individual's testimony, but because it is built on Defendants' own admissions and indisputable documentary evidence. As reflected in Schedule L (the Load-Bearing Facts Table), few core facts are meaningfully disputed, and almost none depend on witness credibility. The essential facts are established by documents, recordings, SEC filings, business records, and Defendants' own conduct.

### IV.  Balance of Hardships and Public Interest Favor Relief

Defendants suffer no cognizable hardship from orders requiring them to preserve evidence, refrain from witness interference, and avoid extraordinary asset dissipation – duties they already owe. By contrast, denial of relief risks permanent corruption of the judicial process.

7

The public interest strongly favors protection of whistleblowers, preservation of judicial integrity, and deterrence of witness intimidation.

## V.  No Bond Should Be Required

Courts may waive a bond where relief enforces existing legal duties and serves the public interest. *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997). Plaintiffs are seeking relief that protects all parties' interests in a fair adjudication. The Independent Directors and innocent shareholders benefit from evidence preservation and witness protection.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court:

1.  Enter the requested Temporary Restraining Order;

2.  Issue an Order to Show Cause on an expedited schedule;

3.  Direct Defendants to preserve all relevant evidence and refrain from witness interference; and

4.  Grant such other relief as the Court deems just and proper.

Dated:  New York, New York
        December 15, 2025

JOHN H. SNYDER PLLC

By: _____

John H. Snyder
Thomas C. Sima
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc
*Counsel for Plaintiffs*

**SCHEDULE K**
**Witness Interference, Retaliation, and Evidentiary Risk**

| Rank-Severity | Actor(s) | Target | Conduct Described in Record | Relevance to TRO Factors | Record Support |
|---|---|---|---|---|---|
| 1 Extreme | Jason Humble (allegedly acting in coordination with Moradi and Bettis) | David Kovacs | Humble allegedly solicited Ducheine to locate a hitman to murder Kovacs in New York or Miami. When Ducheine declined, Humble stated Wilkerson would handle it. Wilkerson later met with DiMaggio, who convinced him he had bad information. Wilkerson indirectly confirmed the plot's seriousness on June 3, 2025, making comments suggesting he had been told Kovacs's home address ("the start of Park Avenue"). | Demonstrates extraordinary risk to a party and to the judicial process; potential elimination of a whistleblower and irreparable interference with adjudication. | DiMaggio Decl. (Exh. 2) ¶¶ 6–36; Ducheine Decl. (Exh. 3) ¶¶ 19–29; Kovacs Decl. (Exh. 1) ¶¶ 154–185; Complaint ¶¶ 148–155; Exhs. 91, 93, 113 |
| 2 Extreme | Bettis and associates | Brian Ignomirello | After requesting a forensic accounting review of suspected financial irregularities at Formulus Black, founder Ignomirello was removed from the company following the initiation of criminal proceedings based on allegations later recanted under oath. Ignomirello was incarcerated for several months and, during that period, was cut off from employees and company communications. During his incarceration, company operations and financial controls were assumed by Carr Bettis. | Illustrates use of criminal process to neutralize a founder-witness and suppress investigation; evidences capacity for severe obstruction. | Kovacs Decl. (Exh. 1) ¶¶ 230–234; Complaint ¶¶ 7, 126–129; Exh. 94 |
| 3 Extreme | Moradi and Bettis | Two unnamed witnesses | Two witnesses with extensive first-hand knowledge initially agreed to execute declarations, had drafts prepared, and then declined solely due to fear of retaliation, including anticipated litigation or professional consequences. | Completed witness chilling constitutes actual, non-speculative irreparable harm occurring now. | Snyder Decl. ¶¶ 10–13 |
| 4 Extreme | Bettis | Luke Destin | Declaration describes intimidation and coercive conduct following an alleged sexual assault, including statements leveraging status and identity to discourage reporting or cooperation. | Evidence of coercion aimed at suppressing witness cooperation. | Destin Decl. (Exh. 10) ¶¶ 8–11 |

| Rank-Severity | Actor(s) | Target | Conduct Described in Record | Relevance to TRO Factors | Record Support |
|---|---|---|---|---|---|
| 5 Extreme | Bettis | David Kovacs | Correspondence delivered to David Kovacs contained language referencing severe physical harm and litigation consequences if his claims were not withdrawn. The letter was transmitted via Bettis' wife's UPS account rather than direct contact and was sent during an active whistleblower dispute, contemporaneous with escalating litigation and retaliatory conduct. | Direct intimidation of a whistleblower; supports need for immediate protective relief. | Kovacs Decl. (Exh. 1) ¶¶ 128–130; Exh. 35 |
| 6 High | Defendants' associates | Senior advisor to the Mayor of New York City | Record describes the advisor expressing fear of criminal exposure and stating she was discouraged by counsel from providing corroborative information regarding Kovacs's volunteer service. | Interference with cooperation by a public servant; risk to integrity of fact-finding. | Kovacs Decl. (Exh. 1) ¶¶ 276–277; Complaint ¶¶ 175–177; Exh. 23 |
| 7 High | Humble; Quinn Emanuel | Julian Ducheine | Record describes references to a covert recording of Ducheine reviewed by Bettis and counsel, accompanied by communications perceived as legally threatening or intimidating. | Evidence of witness pressure through intermediaries and legal channels. | Ducheine Decl. (Exh. 3) ¶¶ 48–56; Exhs. 65, 66; Complaint ¶¶ 166–174 |
| 8 High | Quinn Emanuel | Xavier Suarez (former counsel) | Record describes conduct and conflicts affecting counsel independence, including intervention that resulted in withdrawal of a prepared motion to disqualify conflicted counsel. | Potential interference with access to conflict-free representation; impairment of adversarial process. | Kovacs Decl. (Exh. 1) ¶¶ 253–268; Complaint ¶¶ 179–184 |
| 9 High | Moradi | Demian Lichtenstein | Declaration describes coercive litigation tactics and false accusations used to force surrender of equity and silence a founder. | Pattern of using legal process to suppress witnesses and opposition. | Lichtenstein Decl. (Exh. 5) ¶¶ 201–214; Complaint ¶¶ 92–101 |
| 10 High | Moradi and Bettis | Paul Arena | Record describes removal of a senior executive following objections to undisclosed transactions and trading concerns. | Retaliation against internal governance oversight. | Arena Decl. (Exh. 4) ¶¶ 7–15; Kovacs Decl. (Exh. 1) ¶¶ 188–196 |

| Rank-Severity | Actor(s) | Target | Conduct Described in Record | Relevance to TRO Factors | Record Support |
|---|---|---|---|---|---|
| 11 Motive Evidence | Moradi and Bettis | Public shareholders / market | SEC Form 4 filings reflect substantial insider sales during the Relevant Period, including Moradi's sales in November 12–14 and December 4, 2024, and Bettis's sales in June and December 2024, totaling approximately $35 million. | Demonstrates strong financial incentive contemporaneous with alleged misconduct and retaliation; supports asset-preservation relief. | Complaint ¶¶ 140–148; SEC Forms 4; Exhs. 71–73 |

**SCHEDULE L**
**Top 25 "Load-Bearing Facts"**

The following table identifies what Plaintiffs provisionally consider to be among the top twenty-five *Load-Bearing Facts* in this case as it presently stands. These facts are described as "load-bearing" because they independently support the core theories of liability, retaliation, and obstruction.

| | I. PROTECTED WHISTLEBLOWING ACTIVITY | | | | |
|---|---|---|---|---|---|
| # | Load-Bearing Fact | Primary Source(s) | Reasonably Disputed? | Credibility-Dependent? | Independent Corroboration |
| 1 | Moradi asked Kovacs on Aug. 30, 2023 to use VPNs for manipulative stock activity | Kovacs Decl.; independent witness | Limited | Partial | Independent witness; later market conduct |
| 2 | Kovacs refused to participate in the fraud | Kovacs Decl. | Limited | Partial | HR report; Bettis call; DOJ & SEC filings; retaliation sequence |
| 3 | Kovacs reported suspected securities fraud to HR on Nov. 13, 2023 | HR Email (Morelli) | No | No | Contemporaneous HR email |
| 4 | Kovacs reported insider trading to Chairman Bettis on Jan. 17, 2024 | Recorded call | No | No | Audio recording |
| 5 | Bettis secretly recorded the Jan. 17 call | Recorded call | No | No | Recording itself |
| 6 | Kovacs filed a DOJ whistleblower report on Feb. 8, 2024 | DOJ submission | No | No | Government record |

| II. IMMEDIATE RETALIATION BY COMPANY | | | | | |
|---|---|---|---|---|---|
| # | Load-Bearing Fact | Primary Source(s) | Reasonably Disputed? | Credibility-Dependent? | Independent Corroboration |
| 7 | Kovacs was terminated immediately after reporting to Bettis | Termination letter | No | No | Documentary timing |
| 8 | Termination was designated "for cause" | Spolar / Akin letters | No | No | Written admissions |
| 9 | On Feb. 20, 2024, AudioEye revoked ERISA-protected equity | Akin Gump letter | No | No | Admission by counsel |
| 10 | Akin Gump letter expressly tied forfeiture to fraud accusations | Akin Gump letter | No | No | Admission by counsel |

| III. DEFAMATION AS A RETALIATORY TOOL | | | | | |
|---|---|---|---|---|---|
| # | Load-Bearing Fact | Primary Source(s) | Reasonably Disputed? | Credibility-Dependent? | Independent Corroboration |
| 11 | AudioEye & Moradi sued Kovacs in Florida for defamation | Florida complaint | No | No | Court filing |
| 12 | Florida complaint contained detailed factual smears | Florida complaint | No | No | Pleading text |
| 13 | Kovacs disproved every factual smear with documents | Schedule F | No | No | Diplomas; employer letters |
| 14 | Smears were later abandoned or walked back | Amended pleadings | No | No | Litigation record; Schedule F |

| IV. INSIDER TRADING AND MARKET CONDUCT | | | | | |
|---|---|---|---|---|---|
| # | **Load-Bearing Fact** | **Primary Source(s)** | **Reasonably Disputed?** | **Credibility-Dependent?** | **Independent Corroboration** |
| 15 | AudioEye insiders sold ~$35.2M of stock in 2024–25 | SEC Forms 4 | No | No | SEC filings; Schedule G |
| 16 | Moradi personally took ~$26.3M (≈75%) | Forms 4 | No | No | SEC filings |
| 17 | Largest sales occurred Dec. 4, 2024 | Forms 4 | No | No | SEC filings |
| 18 | Dec. 4 sales coincided with ATM announcement | Form 8-K + Forms 4 | No | No | SEC Filings |
| 19 | No insider disclosed a Rule 10b5-1 plan | Forms 4 | No | No | SEC Filings – No Record |
| 20 | AudioEye publicly claimed EBITDA profitability during this period | Earnings calls | No | No | Transcripts; Press Releases |
| **V. WITNESS INTIMIDATION & COMPLETED CHILLING** | | | | | |
| # | **Load-Bearing Fact** | **Primary Source(s)** | **Reasonably Disputed?** | **Credibility-Dependent?** | **Independent Corroboration** |
| 21 | Bettis sent threatening "Birkin Bag Letter" | UPS delivery; letter (Exh. 35) | No | No | UPS business records; photographs |
| 22 | Two witnesses withdrew from declarations due to fear | Snyder Decl. ¶¶ 10–13 | No | No | Correspondence |

14

| VI. EXTREME OBSTRUCTION ALLEGATIONS (NON-ESSENTIAL TO CORE LIABILITY) | | | | | |
|---|---|---|---|---|---|
| # | Load-Bearing Fact | Primary Source(s) | Reasonably Disputed? | Credibility-Dependent? | Independent Corroboration |
| 23 | Ducheine was twice solicited by Humble to arrange Kovacs's murder | Ducheine Decl. | Yes | Yes | Contemporaneous statements. NYPD Text Messages; Mike Dow Texts |
| 24 | Humble referenced acting at direction of "Carr" | Ducheine Decl.; voicemail (Exh. 113) | No | No | Voicemail recording |
| 25 | DiMaggio independently corroborated murder plot & Wilkerson involvement | DiMaggio Decl. | No | Yes | Kovacs, Ducheine, Tannenbaum, Text Messages |