UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
:
DAVID KOVACS, RUSSELL ALESI, JULIAN      :     No. 25-cv-10336 (JPO)
DUCHEINE and DEMIAN LICHTENSTEIN,        :
:
Plaintiffs,      :     **DECLARATION OF**
:     **JASON J. HUMBLE**
v.               :     **IN SUPPORT OF HIS**
:     **MOTION TO DISMISS**
DAVID MORADI, DR. CARR BETTIS, JASON     :     **THE COMPLAINT**
HUMBLE, JAMIL TAHIR, JAMES HAWKINS, DR.  :
KATHERINE FLEMING, TONY COELHO, KELLY    :
GEORGEVICH, JAMES SPOLAR, MALONEBAILEY   :
LLC, AUDIOEYE, INC. and JOHN DOE 1-50,   :
:
Defendants,      :
:
and              :
:
ETERNAL SOURCES TECH PARTNERS LLC, FIRST :
CONTACT ENTERTAINMENT, INC., FORMULUS    :
BLACK, INC.,                             :
:
Nominal Defendants,    :
:
------------------------------------------------------------------------ X

JASON J. HUMBLE declares as follows:

1.      I am one of the defendants in the above-captioned action.  I submit this Declaration in support of my motion to dismiss the Complaint as against me, and for the purpose of setting the record straight and refuting the most heinous lies spread about me in plaintiffs' smear job (which they disguised as a Complaint), and to place before the Court true and correct copies of the documents described below.

2. Although there is much that can be said, I will limit my statements to those that I understand will be most relevant for purposes of this motion to dismiss. I have personal knowledge of the facts set forth herein, except as otherwise stated.

**Background**

3. I am the founder of Humble Advisory Group LLC, offering consultancy services to early-stage (pre-IPO) ventures. These ventures ranged from firms boasting proprietary technology to those trading global commodities, banking instruments, and assets.

4. Over a span of 20 years, I have led consultancy initiatives across various sectors and industries.

5. Before becoming a leading consultant, I accumulated extensive experience in sales, public relations, and marketing while working at several Fortune 500 companies.

6. Outside of my professional work, I have dedicated a significant part of my career to philanthropy, serving on the board of the Precious Dreams Foundation, and forming Humble Philanthropy to effect positive change in foster care, housing projects, and Christian communities globally.

**Introduction to Kovacs and AudioEye**

7. I met Mr. Kovacs at a networking event held in New York City approximately 10 years ago or so.

8. We seemed to hit it off, and because I looked up to him and was enamored by the stories he told, I agreed to begin working with him by helping him find individuals that could potentially invest in different projects that he was proposing.

9. At some point, Mr. Kovacs informed me that he was doing some work for AudioEye, Inc. ("AudioEye"), a leading digital accessibility company, although he claimed that

he did not receive any compensation from AudioEye.  I thought it would be a good opportunity to work for AudioEye, and so with Mr. Kovacs' assistance, AudioEye hired me as a sales representative.

10.    Although I was performing at a high-level and doing well, I was laid off from AudioEye in or around 2020, as part of a large round of layoffs that the company made to streamline its business.  My relationship with Mr. Kovacs had started to become strained around that time, and I believe that he may have had a role in AudioEye's decision to lay me off.

11.    During my time at AudioEye, I never held any type of supervisory responsibility over Mr. Kovacs, nor did I have any decision-making authority over personnel matters at AudioEye.  I had no involvement whatsoever with AudioEye's decision to terminate Mr. Kovacs' employment for cause years after my own employment with AudioEye ended.

**Formulus Black**

12.    One of the other projects that Mr. Kovacs and I worked on together was for his company, Formulus Black.  Mr. Kovacs introduced me to Formulus Black in or around May 2018.

13.    Mr. Kovacs described Formulus Black as an up-and-coming technology company with the prospect of becoming a billion-dollar company.

14.    I was excited about the opportunity, and I introduced Mr. Kovacs and Formulus Black to several individuals within my circle.  These individuals purchased equity shares in the company and existing shares in the company for a total of approximately $1.3 million.

15.    In or around the summer of 2019, Mr. Kovacs informed me that Formulus Black was doing a "down round" and needed to raise additional capital to continue operations.

3

16.    Around that time, I introduced Formulus Black to an investor named Jerrod Kerr. Mr. Kerr was introduced to me shortly before then by one of the plaintiffs in this action, Julian Ducheine.

17.    Mr. Kerr was on the fence about whether to invest in Formulus Black.  Mr. Kovacs was becoming impatient because Formulus Black needed the capital to continue, and he kept pushing me to close the investment with Mr. Kerr.  Because I felt bad for Mr. Kerr, who was a paraplegic, and because I had faith in Mr. Kovacs and believed in Formulus Black's potential for tremendous growth, I offered to personally guarantee Mr. Kerr's investment as a favor to him.  Mr. Kerr agreed, and he invested $500,000 in the company.

18.    Unfortunately, Formulus Black could not overcome its struggles, and it began liquidation proceedings in New Jersey in November 2021.

19.    I believe that all of the investors in Formulus Black lost their investments, except for a small handful of investors, including Mr. Ducheine and Mr. Kerr, whose investment I personally guaranteed.  I also did not make any money from Formulus Black, as Mr. Kovacs structured my deals so that I would not earn any compensation until after Formulus Black was sold, which never happened.

**Defamation Lawsuit**

20.    In early-2024, I learned that Mr. Kovacs had made defamatory statements about me to Mr. Kerr and to certain of my friends and colleagues.  Among other things, Mr. Kovacs accused me of stealing Mr. Kerr's investment.

21.    Mr. Kovacs' statements were both lies and deflections.  I have access to the relevant records and wire receipts which demonstrate that a large portion of Mr. Kerr's investment was transferred to Mr. Kovacs and his family, while the balance was sent to Formulus Black.  In fact,

despite my efforts to obtain investors for Formulus Black, I never received any funds from Formulus Black.

22.    I understand that it was these defamatory statements that prompted Mr. Kerr to sue me on the guarantee and accuse me of fraud.  Before then, Mr. Kerr had accepted my periodic payments on the guarantee, which totaled over $200,000 at that point.  After Mr. Kerr commenced his lawsuit, I provided to his attorneys the wire receipts reflecting that Mr. Kerr's investment went to Mr. Kovacs and Formulus Black, and not to me.  As a result, Mr. Kerr withdrew his fraud claim, and we subsequently settled the matter.

23.    As a result of Mr. Kovacs' lies, which caused injury to my reputation and professional and personal relationships and caused Mr. Kerr to sue me, I commenced a defamation lawsuit against Mr. Kovacs in the Southern District of New York on May 2, 2024.

24.    Shortly after I commenced that lawsuit, Mr. Kovacs reached out to me through an intermediary.  The intermediary called me and then conferenced in Mr. Kovacs.  During that call, Mr. Kovacs sounded as if he was crying, and he begged me to settle the lawsuit.  After some further discussions with Mr. Kovacs, we agreed to settle the lawsuit.

25.    Mr. Kovacs and I entered into a settlement and release agreement titled "Settlement Agreement and Mutual Release" (the "Release Agreement"), with an effective date of June 29, 2024.  A true and correct copy of the Release Agreement is attached hereto as **Exhibit A**.

26.    Following the execution of the Release Agreement, Mr. Kovacs and I entered into a stipulation voluntarily dismissing the lawsuit on July 3, 2024.  A true and correct copy of the Stipulation of Dismissal is attached hereto as **Exhibit B**.

27.    As part of our settlement, and as reflected in the Release Agreement, Mr. Kovacs released me "from any and all liability for any and all Claims from the beginning of time until the

5

Effective Date of this Settlement Agreement [June 29, 2024] relating to or arising in any way out of the allegations asserted, or which could have been asserted, by Kovacs (whether known or unknown, suspected or unsuspected, accrued or unaccrued, asserted or not asserted) in the Lawsuit."

**The Ducheine Recording**

28.    Several months later, in December 2024, I had a telephone conversation with Julian Ducheine, a mutual acquaintance and former investor in Formulus Black.  The call was intended to serve as an olive branch on both of our parts after we had a temporary falling out over the collapse of Formulus Black.  During this call, Mr. Ducheine disclosed that Mr. Kovacs was continuing to smear me, and that Mr. Kovacs was trying to enlist Mr. Ducheine to help in fabricating a story about me working with Dr. Carr Bettis to commit insider trading at AudioEye.

29.    Mr. Ducheine also revealed that Mr. Kovacs -- who was engaged in litigation with Dr. Bettis at the time -- attempted to bribe him with up to "20% of all the winnings" that Mr. Kovacs would earn from a potential countersuit against Dr. Bettis in exchange for Mr. Ducheine's assistance.

30.    I was deeply disturbed by what I heard.  Not only were Mr. Kovacs' smears about me false, but it seemed like Mr. Kovacs was openly violating our Release Agreement, which included a non-disparagement provision.

31.    During this call, I was at my home in Texas -- which I understand is a "one-party" state for purposes of recording conversations -- and once I heard what Mr. Ducheine was saying about Mr. Kovacs' smears and plans to fabricate a fake insider trader story, I began recording the conversation and I asked Mr. Ducheine to repeat himself.  To be clear, it was not my intent to record the conversation when the call started, and I only started recording the conversation after

6

Mr. Ducheine began making statements about Mr. Kovacs' smears and lies about me.  The purpose of the recording was not to hurt Mr. Ducheine, but to protect myself from Mr. Kovacs.

32.    Concerned by what I heard, including Mr. Kovacs' intent to make up a story about Dr. Bettis engaging in insider trading, I provided the recording to Dr. Bettis.

33.    I understand that Dr. Bettis may have then provided the recording to AudioEye and its attorneys, and that the recording was disclosed during discovery in one of the lawsuits between them and Mr. Kovacs.

**The Current Action**

34.    Within months of the recording being disclosed, Mr. Kovacs and Mr. Ducheine commenced the above-captioned action against me and others on December 12, 2025.

35.    I was shocked to read the allegations asserted against me in the Complaint, which alleged that I attempted to carry out a murder-for-hire plot against Mr. Kovacs in December 2023 and January 2024 at Dr. Bettis' direction, and that my defamation lawsuit against Mr. Kovacs in May 2024 was nothing more than retaliatory lawfare commenced at the direction of Dr. Bettis or Mr. Moradi.

36.    The allegations in the Complaint are lies.  I have never solicited Mr. Ducheine or anyone else to carry out a murder-for-hire plot against Mr. Kovacs.  Nor was I ever asked to do so by Dr. Bettis or anyone else.  The very notion of the plot is preposterous, and any accusation to the contrary is a lie.

37.    Their story also does not make any sense.  Why would I risk my and my family's livelihoods to arrange a murder of someone who allegedly blew the whistle at a company I no longer worked for?  Especially when that person was someone I had just entered into a Release Agreement with months earlier.  It simply does not add up.

7

38.     As for the accusation about my lawsuit, I commenced my defamation lawsuit against Mr. Kovacs because I was defamed by Mr. Kovacs, not because anyone directed me to do so.  If there was some ulterior motive for the lawsuit, then it would not have made sense for me to settle it so quickly.

39.     I believe that these lies were made up about me, and that I was sued by plaintiffs, only because I recorded a phone call with Mr. Ducheine that incriminated Mr. Kovacs in wrongdoing, and I turned that recording over to Mr. Kovacs' adversaries.

40.     I also believe, although I do not know for certain, that Mr. Kovacs may have threatened to have Mr. Ducheine investigated, and that Mr. Ducheine agreed to cooperate with Mr. Kovacs and do his bidding rather than face a potential investigation.  The basis for my belief is that, shortly after we had the discussion that was recorded, Mr. Ducheine called me and informed me that Mr. Kovacs had recently met with the then-Mayor of New York City and was overheard telling the Mayor that he would like to have certain people investigated.

41.     It is noteworthy that during the recorded call with Mr. Ducheine, there was no hint of any fearfulness or distress on Mr. Ducheine's part.

42.     Moreover, as reflected in text messages between Mr. Ducheine and me that were attached to the Complaint as Exhibit 51, Mr. Ducheine sent New Years' wishes and a picture of his family to me in January 2025, asked me for a private banking connection weeks later, and then even asked me to make a donation to his child's "Toddler of the Year" campaign in July 2025, which I did.  These do not appear to be the actions of somebody who was approached to participate in a murder plot and was then fearful of and emotionally distressed by me.

43.     I also have one final comment to make about David Kovacs.  He is the epitome of the phrase "if you tell a lie long enough, it becomes the truth."  He has lied so much about so many

8

things over the years, that it seems he has become incapable of telling the truth.  He values people only so long as they benefit him, and he will turn against anyone who disagrees with him.  And in any relationship, Mr. Kovacs is two-faced and he only brings stress, foul language, negative connotations, and derogatory remarks about others.  My fallout with Mr. Kovacs years ago was simply because I was internally disturbed by having to speak with him every day, and I wanted to remove myself from an unhealthy relationship.  My life drastically improved after I cut Mr. Kovacs out of it, but he seems to have become obsessed with me, and he keeps trying to find ways to drag me down -- this time, with an outrageous lie about me trying to have him murdered.  My hope is that after this newest action is dismissed, Mr. Kovacs will finally leave me and my family alone.

**Conclusion**

44.    For all of the foregoing reasons, and those set forth in my accompanying Memorandum of Law, I respectfully request that the Court grant my motion to dismiss plaintiffs' Complaint as against me.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Texas, this 27th day of February, 2026.

_____
JASON J. HUMBLE

9