# EXHIBIT 1

PCH4KOVC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID KOVACS, *et al.*,

                    Plaintiffs,

          v.                              25 Civ. 10336 (JPO)

DAVID MORADI, *et al.*,

                                          Telephone Conference

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          December 17, 2025
                                          3:10 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                          District Judge

                         APPEARANCES

JOHN H. SNYDER
     Attorney for Plaintiffs

QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Defendant DAVID MORADI
BY:  ADAM ABENSOHN
     RICHARD COREY WORCESTER
     DAN HUMPHREY

HERRICK, FEINSTEIN LLP
     Attorneys for Defendant CARR BETTIS
BY:  JOHN H. CHUN

PCH4KOVC

(Case called)

MR. SNYDER:  This is John Snyder, counsel for the plaintiff.  Good afternoon, and thank you for seeing us on such short notice.

THE COURT:  Good afternoon.

Counsel for Mr. Moradi?

MR. ABENSOHN:  Your Honor, this is Adam Abensohn for Mr. Moradi.  And on the line with me is my colleague Corey Worcester and my colleague Dan Humphrey.

THE COURT:  Good afternoon.

And counsel for Dr. Bettis?

MR. CHUN:  Good afternoon, your Honor.  John Chun of Herrick, Feinstein on behalf of Dr. Bettis.

THE COURT:  Good afternoon, everyone.  Again, this is Judge Oetken.  Just remind you to state your name each time you speak so the court reporter can be clear about who is speaking.

I wanted to have an initial call.  So I scheduled this after receiving the filing of plaintiff's motion for a temporary restraining order with a memorandum of law, which was filed on Monday.  I did receive a response, dated, I guess, today, filed by defendant Mr. Moradi.  It's a long complaint, and there is a brief memorandum in support of a TRO.  I've read the memorandum.  I haven't read the entirety of the complaint. But I'd like to give you, Mr. Snyder, an opportunity to speak briefly to why a temporary restraining order is warranted and

PCH4KOVC

what it is you are seeking in the way of specific relief as part of a TRO.

MR. SNYDER:  Thank you, your Honor.

To address your question, this case and the TRO application is about witness intimidation and whistleblower retaliation.  It does not depend -- I've reviewed the defendant's papers -- it does not depend on securities fraud. It's about what happened to a whistleblower and other witnesses after the concerns were reported and the cooperation began.

The case relates to alleged securities misconduct, and claims for that do exist and are alleged.  But they are not what this TRO application is about.  This TRO application is about protecting the witnesses about making sure that they are not harassed.  As your Honor will see from our submission, we've submitted I think 19 declarations from 17 different witnesses.  And virtually every one of them has expressed, to one degree or another, concern of retaliation as a result of coming out against Mr. Moradi and Mr. Bettis.  Part of my obligation as an attorney who goes and brings forth witness statements is to protect the witnesses when they express those concerns and particularly where here, those concerns seem to have a substantial basis.

Therefore, your Honor, that is the core of the TRO that I'm seeking is to protect my witnesses and to prevent the record from being compromised before all the other issues and

PCH4KOVC

there are clearly going to be very chewy securities issues, and I see there are issues of preclusion. We will work through those. But first and foremost, I need to protect the record. So that's what I'm here to do today.

THE COURT: I don't think you can just come in and get witness protection or whatever without first showing there is a likelihood of success on federal claims that are properly in this Court.

So the initial question I would ask is, we see a lot of civil RICO claims. In this case it's hard to provide a basis for federal jurisdiction, and they fail because the predicates aren't met or because there's no enterprise alleged or whatever. So my first question, just on the merits of the underlying claims, is why is this not precluded by *res judicata* given that, according to defendants' submissions claims that were already the basis for this were already dismissed in two actions in state court?

MR. SNYDER: Yes, your Honor. First of all, the conduct that is being alleged in this case is different and actually postdates the conduct that was alleged in those prior cases. Again, this is not primarily about securities fraud. It is primarily -- the securities fraud provides the motive and the context. The real meat of the claim is witness retaliation, intimidation, obstruction, ERISA whistleblower retaliation and then associated federal wire fraud predicates.

PCH4KOVC

I would also point out, your Honor, this is not just David Kovacs versus David Moradi. There are multiple plaintiffs, including other AudioEye shareholders who were not parties to the prior action and who are not precluded.

The other thing I would point out is the New York litigation that Mr. Kovacs brought, it was filed, I believe, in April of 2024. And the fraudulent -- the securities fraud that's discussed in the complaint, that continued for another year after. And therefore it could not have been adjudicated. So those are the two points on that. It's different parties, and it's different conduct that postdates what was at issue in those prior cases. And, again, we're not seeking a TRO on securities fraud. We are seeking a TRO on protecting witnesses.

THE COURT: If you could just give me a high level overview of what the evidence is about witness retaliation and when it was happening.

MR. SNYDER: Absolutely. I would refer your Honor primarily to the declarations of Julian Ducheine and in this Nicky DiMaggio. They are both submitted under oath. Your Honor, both of them, I doubt your Honor is going to want it today, but both of them are available to testify any time your Honor wants. They set forth, in considerable detail, a course of conduct where people affiliated with Mr. Moradi and Mr. Bettis, solicited harm to Mr. Kovacs. It's under oath.

It's stated in detail.  It's corroborated by documentary evidence.

There was a subsequent meeting, I believe it was on June 3 of 2025, whereby the conduct of the person who had been approached indicated that it had been a real threat against Mr. Kovacs.  So the retaliation, it began on January 17, 2024, when AudioEye fired Mr. Kovacs after he reported insider trading.  It continued in February of 2024 when they took away his ERISA-protected restricted stock.  It continued after that in March when the executive chairman of the company, Dr. Carr Bettis sent a very, very threatening letter to Mr. Kovacs.  It continued in April when litigation was filed. And then in May when Mr. Kovacs was kicked out and deprived of his equity in a different company.

So there is a long series of rather extreme retaliation against a whistleblower that culminated in what appears to be a serious, bona fide, real attempt to have Mr. Kovacs harmed.

Your Honor, I will concede -- I will not concede, but readily acknowledge that the facts set forth here are extreme, and they are unusual.  It does not make them untrue.  And when faced with a factual scenario like this, it's my duty to bring it to the Court's attention and to do everything in my power to make sure the witnesses who are coming forward and who are trusting me enough to come forward are protected.

PCH4KOVC

THE COURT:  You've just described what you allege is witness intimidation going back almost two years.  I would rarely grant a TRO for something that's been going on for months, much less years on the theory that it's too late to come to court and say there is an emergency.  So what has happened recently that makes this a pressing issue now?

MR. SNYDER:  Yes, your Honor.  As I say in the memorandum of law and in my declaration, there are multiple witnesses, including two in particular, who I interviewed; I drafted, you know, very carefully, a declaration, went over it with them.  At the last moment they backed out citing fears of retaliation.  So it's not talking, your Honor, about something that happened a year ago or two years ago.  It's something that happened last week.  That's number one.

Number two, on a broader level, I got this case in July.  As I'm sure my colleagues at Quinn Emmanuel will point out, the allegations are startling.  And that's why I took -- I was between a rock and a hard place because I wanted to move forward as quickly as I could, reasonably move forward.  But I also have to make sure if I'm going to bring something of this weight to back it up.  And so I moved forward as promptly as I could and absolutely, you know, with complete diligence, your Honor.

THE COURT:  Give me one second.

MR. SNYDER:  Did I lose you?

PCH4KOVC

THE COURT:  I'm here.  I'm just looking through some of the declaration.

MR. SNYDER:  I would refer you primarily to Ducheine and DiMaggio on this point.

THE COURT:  This is an unusual TRO request because, I mean, these are all things, at least most of the ones you're talking about are things everyone is legally obligated to do anyway.  In other words, the evidence preservation duty arises by operation of law when there is notice of a dispute or a lawsuit.  Witness protection, non-retaliation, those are crimes.  Or to the extent there is whistleblower retaliation, that's a civil action that needs to be proven in court.

You're asking me to, sort of, determine a lot of these things without much of a record and sort of believe what seems to be a very long and complicated story of a conspiracy that's been fought out in, it sounds like, a few different lawsuits in courts, you know, without much to go on and certainly without hearing the other side.  So I guess it's a pretty unusual request.

MR. SNYDER:  Well, I don't want to necessarily characterize usual or unusual.  But it's certainly justified. I have put forth a documentary record consisting of 19 declarations by 17 witnesses and over 100 exhibits.  I have Ducheine, Mr. Lichtenstein, Mr. DiMaggio, and Mr. Kovacs standing by, ready to answer any questions your Honor may have.

So I have done everything that I can think to do to produce a robust record to support the TRO.

In terms why it's required, yes, of course, these are obligations that everyone already has, which argues, in some sense, in my favor. Because in terms of the balance of the equities, there's nothing really on that side of the ledger.

I have put before the Court, as your Honor notes, quite a lot of detail. The factual basis, not only for civil claims relating to retaliation and intimidation, but also evidence that the intimidation is continuing, and it's having a substantial effect on my case.

In terms of a TRO, lost evidence is an irreparable injury. It's almost the quintessential example. I have put before your Honor and shown your Honor declarations and corroborating evidence that there has been witness intimidation. There has been very severe retaliation. We have multiple witnesses who describe a potential plot of violence.

Your Honor, yes, this is an unusual circumstance because publicly traded companies do not normally act this way. But I'm sorry to say, your Honor, that appears to be what has happened here.

THE COURT: Mr. Abensohn, would you like to respond?

MR. ABENSOHN: I would. Thank you, your Honor.

The Court put its finger on two glaring issues here, the estoppel concern and the concern that there is nothing

PCH4KOVC

identified that would give rise to any urgency or emergency. And I want to correct some of record what we heard from counsel as to both.

First of all, there is simply no question that the roots of this case is the exact same subject matter that was addressed and resolved in the first of Mr. Kovacs's two New York actions. We heard counsel say this case is about retaliation. His claim in the first New York action was a retaliation claim, a wrongful discharge claim. That claim was dismissed.

We hear counsel saying, well, a lot of has happened since. There is still a pending case in Florida where he claimed as an affirmative defense, retaliatory discharge. If there is anything to add on this, he has a forum in which to do it. But in point of fact, there were no allegations describing anything recent. The securities fraud, according to the allegation in this complaint at paragraph 16 and 135 reached its pinnacle in November of '23. Mr. Kovacs alleged to have known about it in real time.

The retaliatory discharge was alleged for January '24, nearly two years ago. Of course, Mr. Kovacs was aware of that in real time. In fact, he filed a lawsuit over it.

This murder-for-hire allegation, counsel said that it was early '25 that a meeting occurred. Actually, according to his pleadings, Mr. Ducheine got word of this in late '23 and

PCH4KOVC

attended a meeting on it in early '24. So, again, two years ago. There is no new development. There is no emergency.

On the question of estoppel, retaliation is the exact same thing that has been alleged previously. There have now been two New York commercial division judges. It wasn't even related cases that were decided by the state tribunal. There are two judges who each dismissed. The second did it on estoppel grounds. Estoppel doesn't get any better for a plaintiff when they try a third time. There is simply no question these allegations could have been made previously in other forums.

And as far as this question of, well, he just wants to make sure records are preserved. He wants to make sure witnesses aren't intimidated. As your Honor pointed out, we are operating under those obligations. That's my job every day. And there is actually a judge in Florida presiding over a case in which these allegations are out there. That judge is perfectly equipped to grant any kind of emergency relief if there was actually any need for it, having to do with witness, having to do with documents, or having to do with anything else.

I'll also add that counsel I think talked briefly about having raised these issues with law enforcement. According to the pleadings here, these issues were raised with the FCC and with the Department of Justice over a year ago.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PCH4KOVC

There is not a whiff of a suggestion that either agency thought anything of it, took any action on it, or sought any need to take any action on it. So as things now stand, there are three other courts who have not seen this problem. There are two federal agencies, including the Department of Justice that have not seen this problem. And we are now two years north of when this problem supposedly emerged and there is a Christmas rush to suddenly get injunctive relief. It is, excuse the extreme phrasing, frivolous. There is no merit either on the claim, and there is certainly no urgency, emergency, anything that could warrant the kind of relief that is being sought here.

THE COURT: Mr. Chun, anything to add?

MR. CHUN: No, thank you, your Honor. We join in Mr. Abensohn's argument.

MR. SNYDER: Your Honor, may I respond?

THE COURT: Yes, is that Mr. Snyder?

MR. SNYDER: Yes, this is John Snyder.

A brief response. I'm very happy that Mr. Abensohn brought up Julian Ducheine and his knowledge of what happened and that it happened in December '23 and January 2024. Because as Mr. Ducheine himself states in his declaration, he was himself intimidated by Mr. Moradi's counsel. And for that reason, delayed coming forward to assist Mr. Kovacs. So yes, various people knew various things at various times. It took someone like me to come in and pull all the strings together,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

conduct an investigation, put the puzzle together and then -- and that's what happened here. So yes, Mr. Ducheine did have knowledge. He was intimidated and inhibited from coming forward and delayed assisting Mr. Kovacs because of the intimidation. So this is a case in point of exactly how the intimidation is causing Mr. Kovacs to have difficulty making his case.

MR. ABENSOHN: Your Honor, if there is any need, I'm happy to address that. But if there isn't, I, of course, I defer to the Court.

THE COURT: You may, Mr. Abensohn.

MR. ABENSOHN: What counsel is alluding to is the allegation that I intimidated this witness. Your Honor, it is hard for me to underscore just how absurd that is. I'm a former federal prosecutor. I've spent 30 years in practice. This suggestion is absurd. It is part and parcel of Mr. Kovacs's litigating strategy, generally. One he would describe in the plainest terms on a recorded phone call where he said explicitly he was going to pursue "smear campaigns against my client." That he did not think my client should "be living or breathing on this earth" that he planned to lie, his words were "you say it enough, it becomes true." This is who we are dealing with. This is the extent of the merit of the so-called intimidation.

And with respect to counsel's statement, I think he

PCH4KOVC

said "it takes someone like me to do this."  The reason it takes someone like him, point of fact, is because I think three or four other firms have been disengaged as Mr. Kovacs' counsel over the course of this flurry of litigation he has thrown at the courts over the past two years.  He is a serial litigator. He keeps filing new claims immediately or a month after they've been dismissed.  This claim is a fever dream.  But more importantly for present purposes, it doesn't describe anything remotely qualifying as the kind of emergency that would justify injunctive relief.

MR. SNYDER:  Your Honor, if I may briefly respond, John Snyder.  I feared that this is what my colleagues for the defense would do.  As I was afraid they were going to engage in ad hominem smears of my client who is a whistleblower and is characteristic to what is done generally, very often, too often to whistleblowers.  You either say they are crazy or they have a vendetta.  And that's what they're doing to Mr. Kovacs. You'll hear or you may hear, your Honor, secretly-recorded phone calls that Mr. Kovacs thought was private that took place on the worst day of his life, where he was being fired for reporting securities fraud.  And as a result, he was going to lose or he feared he was going to lose his healthcare to get access to an operation that he was going to have in early February.  And so, yeah, yes, you caught him on the worst day of his life.  And you taped the phone call secretly.  And

PCH4KOVC

Mr. Kovacs said things, you know, in the heat of the moment that if he had known they were going to be played in federal court, probably he would have been more restrained.  But your Honor, I would caution you not to take an out-of-context phone call and read more into it than there is.  You saw the guy on the worst day of his life.  That's it.

Also, your Honor --

THE COURT:  Well, I think just the delay in timing. We're talking about events, a murder-for-hire plot from almost two years ago.  Why should he get a TRO now?  The fact that he has a new lawyer and the lawyer has put together a long submission, that doesn't justify a delay in seeking a temporary restraining order.

MR. SNYDER:  Your Honor, as I stated, I want to make this very clear.  This is a TRO responsive to current, active not only fears being told to me but also witnesses who are pulling out.  And it compromises the ability of Mr. Kovacs to effectively have due process if he can't have witnesses or if his witnesses are being intimidated.

THE COURT:  What do you mean by intimidated?  How are they being intimidated, because Mr. Abensohn is questioning them?

MR. SNYDER:  We'll start with Mr. Kovacs himself.  And you see because he is a whistleblower, and you see what's been done to him.  Then there are other witnesses who see what was

PCH4KOVC

done to him.  Who see Mr. Kovacs, his reputation has been destroyed.  He has been financially ruined.  And quite justifiably, these witnesses are fearful to come forward.  And then you add the fact that there is this plot that does go back aways.  Mr. Ducheine, the first time he gave a witness statement was to me, and it was very recently.  So I have not let any grass grow under my feet on this.  I brought it to your Honor's attention as soon as --

THE COURT:  The question is not whether you did.  The question is whether your clients did, not whether you did.

MR. SNYDER:  Your Honor, it's very common in a situation like this for someone like Mr. Kovacs to gather -- to put the evidence together over time.  You don't know, necessarily, as you're living life the significance of something that you look at in hindsight and say, oh, that was significant.

What I'm telling you, your Honor, is that I had multiple witnesses pull out because they are afraid.  They're afraid because of the same things that are being done to Mr. Kovacs.  They don't want it done to them.  They will, to some extent be protected if your Honor puts in a TRO.  I can tell them the Court is protecting you.  If not I fear I won't have access --

THE COURT:  The law protects them.

MR. SNYDER:  Your Honor, under the circumstances that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PCH4KOVC

needs to be reinforced because witnesses are -- and your Honor, I've laid out -- and the defense talks about as a sprawling narrative but context is important.  To tell a story like this you have to put it into a context.  So yes, I tell a story that goes back to create a pattern and show you a pattern.  And this is something that -- your Honor, we're bringing it forward as soon as we reasonably can in view of the fact that we are losing access to witnesses and evidence out of intimidation and fear of witnesses.  That's why I want the TRO.

THE COURT:  Okay.  Well, the evidence before me does not sufficiently establish likelihood of success on the merits or serious questions going to the merits for a couple of reasons.

One, is that it seems to me there is a substantial *res judicata* issue.

Second, these issues of witness protection and retaliation I think are complicated.  And there are plausibility issues with a lot of this story.  There is another side to it, clearly, as indicated from the other cases.

But more importantly at the end of the day, I think the dispositive fact is this something you are alleging has been going on for close to two years.  It's an ongoing story.  There's multiple cases in the Second Circuit and the Southern District saying that not coming forward within weeks, certainly within months, a couple months most, for a TRO are sufficient

PCH4KOVC

grounds on its own on the basis of an insufficient showing of irreparable harm, given the delay, and I think that's the case here.  Whether there is a preliminary injunction in the works is a different question, because you could have much more evidence put forward and hear from the other side.  But I don't think there is any case that has merit here for a temporary restraining order and the request for a temporary restraining order is denied.  Thanks everyone.  We are adjourned.

(Adjourned)