UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID KOVACS, RUSSELL ALESI, JULIAN DUCHEINE and DEMIAN LICHTENSTEIN, <br><br> *Plaintiffs,* <br><br> v. <br><br> DAVID MORADI, DR. CARR BETTIS, JASON HUMBLE, JAMIL TAHIR, JAMES HAWKINS, DR. KATHERINE FLEMING, TONY COELHO, KELLY GEORGEVICH, JAMES SPOLAR, MALONEBAILEY LLC, AUDIOEYE, INC. and JOHN DOE 1-50, <br><br> *Defendants,* <br><br> and <br><br> ETERNAL SOURCES TECH PARTNERS LLC, FIRST CONTACT ENTERTAINMENT, INC., FORMULUS BLACK, INC., <br><br> *Nominal Defendants.* | Case No. 25-CV-10336 (JPO) <br><br> MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS AUDIOEYE, INC. AND DAVID MORADI'S MOTION TO DISMISS THE COMPLAINT |

JOHN H. SNYDER PLLC

John H. Snyder, Esq.
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

*Counsel for Plaintiffs*

April 6, 2026

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

LEGAL STANDARD ........................................................................................................... 4

BACKGROUND .................................................................................................................. 5

    A. Internal Reporting and Immediate Retaliation (Nov. 2023 – Jan. 2024) ......................... 5

    B. Post-Termination Escalation (Feb. – Apr. 2024) .............................................................. 5

    C. Post-SEC Retaliatory Lawfare (Apr. – Jul. 2024) ............................................................ 6

    D. Insider Sales and Monetization (Jun. 2024 – Jan. 2025) ................................................. 7

    E. Witness Pressure and Obstruction (Dec. 2024 – Nov. 2025) ........................................... 7

ARGUMENT ....................................................................................................................... 8

    I.    NO RES JUDICATA BAR FOR LATER CONDUCT ................................................... 8

    A.  The Transactional Test: Ongoing Retaliation Campaign .................................................. 8

    B. Claim-by-Claim Map: Which Acts Postdate Which Filings ............................................ 10

    C. Issue Preclusion Does Not Apply to Issues Not Actually Litigated ................................. 12

    II. THE RICO CLAIM IS PLAUSIBLE ....................................................................... 13

    A. Enterprise Structure ...................................................................................................... 13

    B. Defendants' Objections Fail .......................................................................................... 15

    C. RICO Standing ............................................................................................................. 16

    III. THE SECURITIES FRAUD CLAIM IS ADEQUATELY PLEADED ......................... 16

    A. Substance ...................................................................................................................... 16

    B. Standing ........................................................................................................................ 17

    C. Kovacs I Distinguished ................................................................................................. 18

    IV. THE RETALIATION CLAIMS ARE TIMELY AND SUPPORTED ......................... 18

    A. Pre-Termination Protected Activity ............................................................................... 18

    B. Post-SEC Retaliatory Acts ............................................................................................ 19

    V. EQUITY FORFEITURE AND THE PLAN-DOCUMENT QUESTION .................... 20

    VI. THE REMAINING CLAIMS ARE ADEQUATELY PLEADED ............................... 22

    VII. THE DERIVATIVE CLAIMS SHOULD BE PRESERVED ..................................... 22

    VIII. LEAVE TO REPLEAD SHOULD BE GRANTED .................................................. 23

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007)........................................................................................4

*Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machs. Corp.,*
  110 F.4th 106 (2d Cir. 2024)..................................................................................8, 9

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................5

*Boyle v. United States,*
  556 U.S. 938 (2009) ....................................................................................13, 14, 15

*Curtis v. Citibank, N.A.,*
  226 F.3d 133 (2d Cir. 2000)................................................................................10, 11

*D'Addario v. D'Addario,*
  901 F.3d 80 (2d Cir. 2018)......................................................................................16

*Daly v. Citigroup Inc.,*
  939 F.3d 415 (2d Cir. 2019)....................................................................................19

*Digital Realty Tr., Inc. v. Somers,*
  583 U.S. 149 (2018) ................................................................................................19

*Dister v. Cont'l Grp., Inc.,*
  859 F.2d 1108 (2d Cir. 1988)..................................................................................21

*Feeley v. NHAOCG, LLC,*
  62 A.3d 649 (Del. Ch. 2012)...................................................................................22

*Howell v. N.Y. Post Co.,*
  81 N.Y.2d 115 (1993)..............................................................................................22

*Int'l Bhd. of Teamsters v. Daniel,*
  439 U.S. 551 (1979) ................................................................................................17

*Kuriyan v. Schreiber,*
    No. 23-cv-2381, 2024 WL 3539234 (S.D.N.Y. July 25, 2024) ...........................................10

*Maharaj v. Bankamerica Corp.,*
    128 F.3d 94 (2d Cir. 1997) ...............................................................................................10

*Nemec v. Shrader,*
    991 A.2d 1120 (Del. 2010) ...............................................................................................22

*Russell v. N.Y.U.,*
    42 N.Y.3d 377 (2024) .......................................................................................................12

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985) ..........................................................................................................16

*Storey v. Cello Holdings, L.L.C.,*
    347 F.3d 370 (2d Cir. 2003) ...........................................................................................9, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..........................................................................................................17

*United States v. Turkette,*
    452 U.S. 576 (1981) ........................................................................................................13, 15

*United States ex rel. Ladas v. Exelis, Inc.,*
    824 F.3d 16 (2d Cir. 2016) ...............................................................................................23

## Statutes and Rules

15 U.S.C. § 78u-6(h)(1)(A) (Dodd-Frank § 21F) .............................................................19

18 U.S.C. § 1512 (Witness Tampering) ............................................................................11

18 U.S.C. § 1514A (SOX § 806) .......................................................................................19

18 U.S.C. § 1961 et seq. (RICO) ......................................................................................16

29 U.S.C. § 1140 (ERISA § 510) ..............................................................................8, 19, 21

Fed. R. Civ. P. 12(b)(6) ......................................................................................................4

Fed. R. Civ. P. 15(a)(2) .....................................................................................................23

Fed. R. Civ. P. 23.1 ...........................................................................................................22

## PRELIMINARY STATEMENT

Defendants prove in the very first sentence of their moving brief exactly why the motion must be denied. They begin with a disputed smear: that Kovacs was fired because he "lied about his qualifications."

That speaks volumes.

Plaintiffs devoted substantial effort to dismantling that accusation. Schedule F to the Complaint does so in detail based on over two dozen documentary records and sworn declarations (see Exh. 1-29). The Complaint demonstrates that Moradi and AudioEye have already retreated from their false smears in Florida. On November 13, 2025, they filed an amended complaint in Florida that abandoned nearly all the original "false qualifications" allegations. Yet here, in federal court, Defendants dig up the same discredited accusations and present them as established fact.

When you have a winning motion to dismiss, you do not open with a discredited and disputed factual claim.

That opening exposes the central defect in the Defendants' motion: it depends on the Court accepting Defendants' version of disputed facts. Rule 12(b)(6) requires the opposite. A party with a genuine legal entitlement to dismissal does not need to lead with a contested smear. Defendants do so because their motion is not a legal attack on the sufficiency of the pleadings. It is an invitation to resolve factual disputes in their favor at the threshold.

The same problem recurs throughout the brief. Defendants repeatedly lean on out-of-context snippets of a recorded telephone call among Carr Bettis, David Kovacs, and Kovacs' fiancée. Bettis recorded the call without Kovacs's knowledge on the day he was fired. Whatever Defendants say the recording proves, it is contested evidence, not an adjudicated fact. Their

1

reliance on it to ascribe motive, attack credibility, and demand dismissal with prejudice only confirms the point: this motion rests on disputed facts, not on pleading defects.[1]

*   *   *

This case is part of a sprawling conflict among the parties involving six separate lawsuits in four jurisdictions. Plaintiffs' Complaint fully discloses this prior litigation and attaches and incorporates relevant pleadings and decisions from those cases. Nobody is running away from the record. We put before the Court nineteen sworn declarations and over 100 exhibits. Our cards are on the table.

David Kovacs worked for David Moradi for a decade. When Kovacs became a whistleblower, he had no litigation experience. Moradi is a disciplined and effective CEO who controls not only substantial personal wealth but also AudioEye's corporate treasury, which he deployed against Kovacs to considerable effect. Moradi is a formidable adversary with a notable record of winning lawsuits, including a Nevada verdict of approximately $160 million involving a Blackstone affiliate. Those in Mr. Kovacs's position should think twice before stepping into the ring with Moradi.

Kovacs got in the ring. He led with his chin and got knocked out. Then he got up and got knocked out again. Kovacs sued AudioEye and Moradi twice in New York state court and lost both times. Kovacs I was filed on April 5, 2024 and dismissed with prejudice on January 31, 2025.

---

[1] Defendant Bettis filed a separate Notice of Motion to Dismiss (ECF 32), represented by Herrick, Feinstein LLP, but did not submit an independent memorandum of law. His motion relies entirely on the Memorandum of Law filed in support of Defendants AudioEye, Inc. and David Moradi's Motion to Dismiss. Plaintiffs' opposition to the AudioEye/Moradi motion therefore applies with equal force to Bettis's motion. To the extent any argument in the AudioEye/Moradi brief is directed specifically at Bettis's conduct, Plaintiffs address it herein. Bettis's decision to adopt co-defendants' arguments wholesale does not insulate him from the allegations specific to his role – the Complaint alleges that Bettis functioned as the Enterprise's governance stabilizer across four entities (Compl. ¶ 118), personally suppressed whistleblower complaints (Compl. ¶ 141), directed the retaliatory removal of Kovacs from ESTP (Compl. ¶¶ 130–32), and was identified by Humble as "the top man" directing the solicitation of violence against Kovacs (Compl. ¶ 46). Those allegations state claims against Bettis individually, and nothing in the AudioEye/Moradi brief addresses them.

Kovacs II was filed on March 4, 2025 and dismissed on res judicata grounds on October 8, 2025. Moradi proved the stronger litigant in both actions. Kovacs had meritorious claims and lost them. Those defeats are part of the public record and are acknowledged here without evasion. Subject to appeal, those outcomes stand. This case does not ask the Court to revisit them.

This case is not Round 3.

This case is about the winning fighter (and his associates) grabbing a tire iron and continuing to beat their opponent after the referee stopped the fight. The Complaint alleges that after prevailing in the prior actions, Defendants and their associates continued to escalate – through retaliatory litigation funded with corporate assets, economic coercion, witness tampering, and, as alleged by multiple sworn witnesses, the solicitation of violence against a federal whistleblower. The prior actions were about an employment dispute. This case concerns the retaliation campaign that followed.

The Complaint alleges a sequence of retaliatory acts that escalated over eighteen months:

- internal reporting to HR on November 13, 2023;
- same-day termination on January 17, 2024, hours after reporting directly to AudioEye's Executive Chairman;
- forfeiture of equity compensation on February 20, 2024 under disputed plan terms, accompanied by threats of litigation and a demand for silence;
- a letter on March 20, 2024 warning of "unfathomable physical harm";
- an SEC whistleblower report on April 8, 2024;
- a Florida defamation action filed two days later;
- a second retaliatory lawsuit filed May 2, 2024 and dismissed with prejudice weeks later;
- the stripping of an ownership interest valued at over $80 million on May 8, 2024;

3

- $35.2 million in insider stock sales between June 2024 and January 2025;

- a sustained witness-tampering campaign extending through July 2025;

- and, as alleged by multiple sworn witnesses, the solicitation of violence against a federal whistleblower – further corroborated in June 2025, when the individual allegedly solicited confirmed knowledge of Kovacs's home address at a meeting attended by counsel. That event postdated the filing of both prior actions and the dismissal of Kovacs I and preceded the dismissal of Kovacs II.

These are not different shadings of an old employment dispute. Almost every material act identified here postdated the filing of Kovacs I. Several of the most serious acts also postdated the dismissal of Kovacs I, and some postdated the dismissal of Kovacs II. Claims based on those later events could not have been raised before they occurred. Plaintiffs do not rely on a theory of belated insight; they rely on later events, later injuries, and a retaliatory course of conduct that was still unfolding after Kovacs I was filed.

Res judicata bars relitigation of adjudicated claims. It does not immunize new conduct occurring after the judgment. No authority supports the proposition that a prior employment dispute forecloses civil RICO liability for subsequent insider trading, witness tampering, and retaliatory lawfare.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In addition, the Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit. *Id.* The

4

complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## BACKGROUND

Before addressing the legal arguments, Plaintiffs set forth the dated sequence of events that forms the factual spine of this action. Each event is drawn from the Complaint, its exhibits, and incorporated declarations.

### A. Internal Reporting and Immediate Retaliation (Nov. 2023 – Jan. 2024)

November 13, 2023. Kovacs reached out to AudioEye's HR department to report concerns about securities fraud. Bettis, AudioEye's Executive Chairman, called Kovacs "moments later" and stated: "Now Moradi will ruin your life." Compl. ¶¶ 20, 141.

December 25, 2023. Ben Barton, another AudioEye insider, exchanged text messages with Kovacs in which Barton declared his own intention to become a whistleblower regarding Moradi's trading activity: "I'll make it very public. He's the one who's scared. He's the ceo of a public company. He's fucked." Compl. ¶¶ 21–22. The stock price had not yet moved. The insider sales would not begin for another six months. Compl. ¶¶ 136, 139.

January 17, 2024. Kovacs reported insider trading directly to Bettis during a telephone call that Bettis secretly recorded. Compl. ¶¶ 141–42. Kovacs was terminated the same day. *Id.*

January 19, 2024. AudioEye's General Counsel confirmed in writing that the termination was "for cause." Compl. ¶ 142.

### B. Post-Termination Escalation (Feb. – Apr. 2024)

February 8, 2024. Kovacs reported AudioEye's insider trading to the Department of Justice. Compl. ¶ 142.

February 13, 2024. AudioEye filed a Shelf Registration, enabling large insider sales without normal restrictions and delay periods. Compl. ¶ 137.

February 20, 2024. Akin Gump, acting as AudioEye's outside counsel, sent a letter to Kovacs purporting to forfeit his equity compensation under the "2016 Incentive Compensation Plan," threatening litigation, and demanding silence. The letter stated that the termination was "for cause" because Kovacs had accused Moradi of fraud. Compl. ¶ 142; Compl., Ex. 34. As discussed in Section V below, the plan citation in the Akin letter does not match the plan governing the RSU award in the record.

March 20, 2024. Bettis sent the "Birkin Bag Letter" to Kovacs warning of "unfathomable physical harm" if Kovacs did not capitulate. Compl. ¶ 143; Compl., Ex. 35.

April 8, 2024. Kovacs filed a whistleblower complaint with the SEC. Compl. ¶ 144.

### C. Post-SEC Retaliatory Lawfare (Apr. – Jul. 2024)

April 10, 2024 – two days after the SEC report. AudioEye and Moradi filed the Florida defamation action against Kovacs. Compl. ¶ 144. The complaint included allegations that were later abandoned or narrowed in a November 13, 2025 amended complaint. *Id.* The Complaint alleges that the Florida action was funded with approximately $2.7 million in corporate funds – more than half of AudioEye's liquid assets. *Id.*

May 2, 2024. Jason Humble filed a defamation suit against Kovacs in SDNY. Compl. ¶ 145. On information and belief, Humble filed at the direction of the Enterprise Leaders. *Id.* Humble voluntarily dismissed with prejudice on July 3, 2024. *Id.*

May 8, 2024. Bettis stripped Kovacs of his ownership interest in ESTP – a venture valued at over $80 million – without compensation, valuation, or notice. Compl. ¶ 146. The same day, Ducheine disclosed to Kovacs that Humble had solicited others to physically harm him. Compl. ¶ 165.

6

### D. Insider Sales and Monetization (Jun. 2024 – Jan. 2025)

Between June 2024 and January 2025, AudioEye insiders sold $35,218,799 of stock in coordinated transactions. Moradi sold approximately $21.6 million; Bettis sold approximately $5.4 million; Tahir sold approximately $3.0 million; Georgevich sold over $300,000. Compl. ¶ 139. The largest sales occurred on December 4, 2024, when Moradi, Bettis, and Tahir collectively sold $30 million on a single day. *Id.* No insider disclosed trading pursuant to a Rule 10b5-1 plan. *Id.*

These sales occurred while insiders possessed material nonpublic information concerning whistleblower complaints to the DOJ and SEC, governance failures, regulatory exposure, and retaliatory litigation expenditures. *Id.*

### E. Witness Pressure and Obstruction (Dec. 2024 – Nov. 2025)

December 2024. Humble secretly recorded a call with Ducheine, attempting to steer discussion away from the solicitation of physical harm and construct a false narrative. Compl. ¶¶ 166–67.

January 2025. Quinn Emanuel allegedly used the recording to pressure Ducheine. Attorney Adam Abensohn, the complaint alleges, tried to pressure Ducheine into adopting a false story that Kovacs had tried to bribe him. When Ducheine refused, Abensohn allegedly invoked the recording as leverage. Compl. ¶¶ 168–69. On January 24, 2025, Quinn Emanuel sent a letter falsely accusing Kovacs of attempted bribery – an allegation Ducheine states is fabricated. Compl. ¶ 169.

April 2025. Bettis filed the Arizona lawsuit against Kovacs – a purported debt collection action over a $100,000 loan from 2017 that had been repaid. Compl. ¶ 147.

June 3, 2025. At a meeting at Miller's Ale House in Parsippany, New Jersey, attended by Kovacs, his attorney, Wilkerson, Wilkerson's criminal defense attorney, and DiMaggio, Wilkerson confirmed knowledge of Kovacs's home address – stating "You're the guy who lives at the start of

7

Park Avenue." Compl. ¶ 153. All present understood this as confirmation that Humble had provided Kovacs's home address in connection with the solicitation of physical harm. *Id.* This meeting postdated the filing of both prior actions and the dismissal of Kovacs I. It preceded the dismissal of Kovacs II.

July 24, 2025. Humble left a voicemail for Ducheine confirming the existence of the secret recording, its review by Bettis and "his attorney," and ongoing coordination. Compl. ¶ 172.

November 2025. A senior advisor to Mayor Adams informed Kovacs she could not provide a truthful statement because "the Mayor's lawyers [were] threatening" her. Compl. ¶¶ 175–76.

## ARGUMENT

## I.    NO RES JUDICATA BAR FOR LATER CONDUCT

Defendants' res judicata argument is the centerpiece of their motion. It requires identity of (1) the parties (or those in privity with them), (2) a valid final judgment on the merits, and (3) claims that were, or could have been, raised in the prior action. *See Beijing Neu Cloud Oriental Sys. Tech. Co. v. IBM*, 110 F.4th 106, 113–14 (2d Cir. 2024). The third element is dispositive: whether Plaintiffs' current claims arise from the "same transaction or series of transactions" as the claims adjudicated in Kovacs I and Kovacs II.

They do not.

### A.  The Transactional Test: Ongoing Retaliation Campaign

Kovacs I was a four-count state-court action asserting retaliatory discharge, tortious interference, defamation, and intentional infliction of emotional distress. It was filed in April 2024. The factual predicate was Kovacs's termination from AudioEye in January 2024. The Commercial Division dismissed the action with prejudice on January 31, 2025.

The Complaint here does not allege a single adverse employment action. It alleges a sequence of retaliatory acts that escalated over eighteen months, from internal reporting through

8

termination, forfeiture, threats, lawfare, economic destruction, witness pressure, and alleged solicitation of violence. The acts span four corporate entities (AudioEye, First Contact, Formulus Black, ESTP), involve defendants who were not parties to the prior actions (Humble, Tahir, Hawkins, Fleming, Coelho, Georgevich, Spolar, MaloneBailey), and include federal causes of action – RICO, Section 10(b), Dodd-Frank, ERISA – that were not and could not have been asserted in the Commercial Division.

New York's transactional test asks whether claims "arise out of the same transaction or series of transactions" and considers whether "the facts are related in time, space, origin, or motivation, that they form a convenient trial unit, and that their treatment as a unit conforms to the parties' expectations." *Beijing Neu Cloud*, 110 F.4th at 114. The retaliation campaign alleged here fails that test when compared to Kovacs I:

**Different in time.** The core conduct alleged here postdates the filing of Kovacs I. The insider sales ($35.2 million) occurred between June 2024 and January 2025 – after Kovacs I was filed in April 2024. The witness-tampering campaign ran from December 2024 through July 2025. The Wilkerson confirmation of Kovacs's home address occurred in June 2025 – after both prior actions were filed and after the dismissal of Kovacs I, but before the dismissal of Kovacs II.

**Different in scope.** Kovacs I involved one employee and one employer. This action involves a multi-entity enterprise, a decade of alleged cross-company misconduct, and individual defendants and nominal defendants who were not parties to the prior proceedings.

**Different in legal theory.** Civil RICO, Section 10(b), Dodd-Frank § 21F, and ERISA § 510 were not asserted in Kovacs I and, for the most part, could not have been asserted in the Commercial Division.

Courts decline to apply res judicata where later claims involve materially different conduct from the prior action. *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 383 (2d Cir. 2003) (earlier

9

judgment does not bar claims insofar as they rely on conduct postdating the first action); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139–40 (2d Cir. 2000) (claim preclusion does not bar claims based on events arising after the filing of the earlier complaint); *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (claim preclusion inapplicable where "material change in circumstances" since prior adjudication).

Defendants' reliance on *Kuriyan v. Schreiber*, No. 23-cv-2381 (JLR), 2024 WL 3539234 (S.D.N.Y. July 25, 2024), is misplaced. *Kuriyan* involved a later RICO suit arising from the same parties, the same subject matter, and the same pre-existing alleged scheme already placed before the state court. The court found preclusion because the RICO theory rested on predicate acts that predated the earlier complaint and on allegations the plaintiff had already injected into the prior action through a supplemental affidavit. This case is materially different. It involves different actors, different entities, different claims, and a large body of retaliatory and obstructive conduct that arose after *Kovacs I* was filed. On those facts, *Kuriyan* is inapposite.

The relevant preclusion date is April 5, 2024, when Kovacs I was filed. That is the operative line under Second Circuit law. "The crucial date is the date the complaint was filed," and a plaintiff has "no continuing obligation to file amendments to the complaint to stay abreast of subsequent events." *Curtis*, 226 F.3d at 139.

Kovacs II does not reset that line. It was a later-filed action, dismissed on res judicata grounds precisely because the court treated it as derivative of Kovacs I, and it remains on appeal. Defendants are free to argue that particular claims should have been brought in Kovacs II, but they cannot use that later, derivative case to rewrite the basic claim-preclusion rule that later-arising conduct is measured against the filing of the first action.

### B. Claim-by-Claim Map: Which Acts Postdate Which Filings

The complaint's timeline confirms that the core retaliatory, obstructive, and enterprise-related conduct at issue here overwhelmingly arose after *Kovacs I* was filed.

| Alleged Conduct | Date | Postdates Kovacs I? | Supporting Claims / Significance |
|---|---|---|---|
| Florida defamation action | Apr. 10, 2024 | Yes | RICO (retaliatory lawfare); post-whistleblower retaliation context. |
| Humble SDNY suit | May 2, 2024 | Yes | RICO (retaliatory lawfare). |
| ESTP interest stripped / Kovacs learns of ouster | May 8, 2024 | Yes | Breach of fiduciary duty; unjust enrichment; RICO. |
| Ducheine email corroboration to Kovacs | May 8, 2024 | Yes | Supports IIED and the RICO witness-intimidation narrative. |
| Insider sales (approx. $35.2 million) | Jun. 2024 – Jan. 2025 | Yes | Securities fraud (Count II); RICO motive / wire-fraud context. |
| Quinn pressure campaign | Dec. 2024 | Yes | RICO (witness tampering). |
| "Juju" texts / false bribery accusation | Jan. 2, 2025 | Yes | RICO (witness tampering). |
| Arizona lawsuit | Apr. 2025 | Yes | RICO (retaliatory lawfare). |
| Wilkerson meeting with counsel present | Jun. 3, 2025 | Yes | IIED; RICO (witness intimidation / 18 U.S.C. § 1512). |
| Humble voicemail confirming coordination | Jul. 24, 2025 | Yes | RICO (witness tampering; obstruction). |
| Interference with Kovacs's employment verification | Nov. 2025 | Yes | Ongoing retaliation; relevant to damages and mitigation. |

That chronology alone distinguishes this case from authorities involving materially overlapping parties, transactions, and pre-existing conduct.

Every act in this chart postdates the filing of Kovacs I. A plaintiff cannot be precluded from asserting claims based on events that had not yet occurred when the prior action was commenced. *Storey*, 347 F.3d at 383 (claims based on post-filing conduct not precluded); *Curtis*, 226 F.3d at 139-40 (same). Plaintiffs need not show that every implication of Defendants' conduct was immediately apparent in April 2024. It is enough that the claims pressed here rest on later events that had not yet occurred, and on a retaliatory sequence that had not yet fully matured, when Kovacs I was filed.

11

Several acts, including the July 24, 2025 Humble voicemail and the November 2025 interference with the Mayor Adams advisor, postdate the dismissal of both prior actions. The June 3, 2025 Wilkerson meeting postdated the filing of both prior actions and the dismissal of Kovacs I, but preceded the dismissal of Kovacs II. Claims arising from this later conduct are not precluded.

Kovacs II was a narrow RSU/contract action. It did not assert RICO, securities fraud, Dodd-Frank retaliation, or any of the other federal claims at issue here. Its dismissal on res judicata grounds (as a claim that could have been raised in Kovacs I) does not extend preclusion to claims based on conduct that occurred after Kovacs I was filed.

### C. Issue Preclusion Does Not Apply to Issues Not Actually Litigated

Defendants invoke collateral estoppel, arguing that the Kovacs I court's rejection of Kovacs's "reasonable belief" allegations bars his retaliation claim here. Issue preclusion requires that the issue was "actually litigated and decided" in the prior proceeding. *Russell v. N.Y.U.*, 42 N.Y.3d 377, 384 (2024).

Kovacs I was decided on a motion to dismiss. The Commercial Division held that Kovacs "does not allege Defendants engaged in any specific activities that Plaintiff reasonably believed were illegal." Compl., Exh. 83 at 5. That is a ruling on the sufficiency of pleadings, not a finding on the merits. Whatever preclusive effect the Commercial Division's dismissal may carry, it did not resolve the sufficiency of a materially different record, one now supported by specific trades, specific dates, specific insider-sale amounts, and a series of later-arising acts that were not before that court.

The factual record is now materially different. The Complaint is supported by nineteen declarations and specific data from public SEC filings showing $35.2 million in insider sales. Kovacs I had none of this. The prior court said Kovacs failed to identify specific trades. This

12

Complaint identifies $35.2 million in specific trades, by specific insiders, on specific dates, in the absence of 10b5-1 plans.

## II. THE RICO CLAIM IS PLAUSIBLE

### A. Enterprise Structure

To allege a RICO enterprise, a plaintiff must plead "a group of persons associated together for a common purpose of engaging in a course of conduct," proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944–45 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). An association-in-fact enterprise need not have "a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948. Nor must it have "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* The enterprise need only possess three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue that purpose. *Id.* at 946.

The Complaint satisfies each requirement.

***Purpose.*** The Enterprise existed for a common purpose: to infiltrate companies during periods of financial or governance vulnerability, centralize control over financing and disclosure, extract value through manipulated transactions, and insulate participants from accountability. Compl. ¶¶ 108–12, 195. That purpose remained constant across four entities and more than a decade of activity. The Enterprise exploited the same "predictable conditions" each time – "capital need, fiduciary trust, and information asymmetry" – followed by centralization of authority, removal of founders or internal dissenters, and diversion of proceeds. Compl. ¶¶ 110, 112.

***Relationships.*** The Enterprise operated through defined, interdependent roles. Moradi functioned as the architect: he identified target companies, entered during periods of vulnerability,

13

centralized control over financing and disclosure, and directed trading strategy. Compl. ¶ 113. Bettis functioned as the governance stabilizer: he held formal leadership positions including Executive Chairman at AudioEye, controlled access to boards, auditors, and counsel, and determined whether internal complaints advanced or were suppressed. Compl. ¶ 118. Humble functioned as the intermediary: he recruited investors, transmitted instructions between participants, coordinated litigation pressure against dissenting shareholders, and – when other methods failed – escalated to solicitations of violence. Compl. ¶ 119. These are not the overlapping activities of undifferentiated co-conspirators. They are complementary functions within a single organizational unit – precisely the kind of role differentiation that strengthens the inference of enterprise structure. *See Boyle*, 556 U.S. at 948 (while fixed roles are not required, "different members may perform different roles at different times"). The Complaint further alleges that Moradi and Bettis acted as the Enterprise's "leaders and primary decision-makers, directing the actions of executives, intermediaries, and affiliated entities, and coordinating activity across nominally separate companies to serve unified objectives." Compl. ¶ 196.

*Longevity.* The Enterprise operated at First Contact beginning in mid-2016, before any AudioEye-specific predicate act. Compl. ¶¶ 121–25. It operated at Formulus Black beginning no later than 2015. Compl. ¶¶ 126–29. It continued at ESTP after the AudioEye events, where Bettis replicated the same founder-removal mechanics by stripping Kovacs of his ownership interest without compensation, audit, or notice. Compl. ¶¶ 130–32. The Complaint alleges that the Enterprise "operate[d] continuously from at least June 2022 through April 2025, spanning multiple reporting periods, insider-trading windows, acts of retaliation, and judicial and regulatory proceedings." Compl. ¶ 197. Its duration is not measured by the span of any single predicate act. It is measured by the organizational continuity that connected activity across entities and across years. *See Boyle*, 556 U.S. at 948 (enterprise "must remain in existence long enough to pursue a

14

course of conduct"); *Turkette*, 452 U.S. at 583 (enterprise proved by evidence of "an ongoing organization" whose associates "function as a continuing unit").

### B. Defendants' Objections Fail

*First*, Defendants argue the Enterprise is merely "an assemblage of disparate actors." MTD Br. at 21. The Complaint alleges the opposite: specific roles, coordination across entities, common leadership, and a decade of continuous operation. An association-in-fact enterprise is simply a continuing unit that functions with a common purpose. *Boyle*, 556 U.S. at 948. The Complaint alleges exactly that. Defendants' objection is not that the Complaint fails to allege structure; it is that the structure is informal. *Boyle* forecloses that argument.

*Second*, Defendants argue the Enterprise is not "distinct from" the predicate acts. MTD Br. at 23. This objection misapprehends the law and the facts. As to the law: the enterprise and the pattern of racketeering activity are separate elements, but the proof supporting each "may in particular cases coalesce." *Turkette*, 452 U.S. at 583. Even overlapping evidence does not defeat the claim. As to the facts: the proof here does not fully coalesce. The Enterprise's operations at First Contact (Compl. ¶¶ 121–25) and Formulus Black (Compl. ¶¶ 126–29) are independent of the AudioEye-specific predicate acts. The Enterprise existed before those acts and continued after them at ESTP (Compl. ¶¶ 130–32). Its cross-entity operation establishes organizational existence independent of any particular racketeering act. *See Turkette*, 452 U.S. at 583 ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.").

*Third*, to the extent Defendants urge that a RICO enterprise must resemble a "business-like entity" with formal organizational attributes, the Supreme Court has expressly rejected that contention. *Boyle*, 556 U.S. at 945 ("We see no basis to impose such an extratextual requirement."). The *Boyle* majority was unequivocal: it rejected the dissent's position that RICO's enterprise

15

element demands evidence of a "business-like" organization, hierarchical structure, or formal processes. *Id.* at 945–48. RICO "is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985).

### C. RICO Standing

Defendants argue that Kovacs's injuries are merely the consequence of losing his job. MTD Br. at 24. The Complaint alleges injuries far beyond termination itself, including the stripping of the ESTP ownership interest, substantial security and displacement costs, and other concrete economic harms tied to the retaliatory campaign and later conduct. At the pleading stage, those allegations are sufficient to distinguish this case from a bare employment dispute.

At the pleading stage, damages need not be proven with precision; a plaintiff must allege only that it suffered injury to "business or property" "by reason of" the RICO violation. *See D'Addario v. D'Addario*, 901 F.3d 80, 95 (2d Cir. 2018) (RICO plaintiff must show "reasonably ascertainable" damages and "clear and definite" loss). The Complaint provides a detailed damages methodology in Schedule G, cross-referenced to public Form 4 data.

## III. THE SECURITIES FRAUD CLAIM IS ADEQUATELY PLEADED

### A. Substance

The Complaint satisfies Rule 9(b) and the PSLRA's heightened pleading requirements. Schedule E identifies specific material misrepresentations and omissions by date, filing, and content, including AudioEye's failure to disclose whistleblower complaints, insider trading exposure, governance failures, and retaliatory litigation expenditures – all while reporting misleading non-GAAP metrics. Compl. ¶¶ 213–15; Schedule E.

Scienter is adequately pleaded. Moradi sold approximately $21.6 million, Bettis approximately $5.4 million, and Tahir approximately $3.0 million – $30 million on a single day – while possessing MNPI concerning whistleblower complaints, governance failures, and regulatory

16

exposure. Compl. ¶ 139. No insider disclosed a 10b5-1 plan. These facts give rise to a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Defendants cite *In re Skechers* and *Lululemon* for the proposition that timing alone is insufficient. MTD Br. at 27. Those cases involved routine sales consistent with prior patterns. Here, the sales were concentrated ($30 million in one day), occurred during a period of specific undisclosed MNPI, and were not made under any trading plan. That is not suspicious timing; it is evidence of coordinated liquidation.

Defendants insist that nothing improper occurred here. Their position, in substance, is that AudioEye's stock rose from roughly $5 per share to roughly $35 per share, insiders sold at or near the top, the stock later collapsed, and yet no securities law, fiduciary duty, or corporate law problem is even implicated. That is an extraordinary proposition. If lawful, it would amount to a template for wealth extraction available to every public-company insider in America: drive the price upward, sell at the peak without a disclosed trading plan, and leave the remaining shareholders to absorb the fallout. Either Plaintiffs have alleged a serious fraud, or Defendants have described a sequence of events that no securities regulator would find unremarkable.

## B. Standing

Defendants argue that Kovacs and Alesi lack standing under Section 10(b). MTD Br. at 24–26. The standing issue is acknowledged as to Alesi, who acquired shares after the Class Period. Compl. ¶ 62. As to Kovacs, Defendants argue that RSUs received through employment do not constitute a "purchase." But the offer letter tells a different story. Kovacs accepted a base salary of $30,000 per year in exchange for 208,338 shares of equity. Compl., Ex. 45. That is not the passive receipt of a compulsory benefit; it is a voluntary exchange of salary for stock – consideration that supports standing under Section 10(b). The case law on RSU standing is mixed and depends on the specific terms of the award. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560–61 (1979).

17

But the standing question does not require dismissal of Count II. Ducheine – already a named Plaintiff in this action – purchased and sold AudioEye shares during the Class Period at a loss. Compl. ¶ 64. Specifically, Humble – an Enterprise intermediary – advised Ducheine to sell his AudioEye stock, "insisting that the company was on the brink of failure" following Kovacs's termination. Ducheine Decl. ¶ 41 (ECF 2-2). Ducheine sold at a $4,500 loss on Humble's insistence. Id. He confirmed the account is "factually accurate." Id. ¶ 42. Ducheine has standing as a purchaser who transacted during the period of alleged fraud and suffered a concrete, documented loss. If the Court determines that Kovacs and Alesi individually lack standing under Section 10(b), Plaintiffs respectfully request leave to amend to designate Ducheine as the lead plaintiff on Count II.

### C. Kovacs I Distinguished

The Kovacs I court dismissed the securities-fraud-related allegations because Kovacs failed to "identify, for example, any trades or transactions that were executed as part of the alleged scheme." Compl., Ex. 83 at 5. This Complaint does exactly that: it identifies $35.2 million in specific trades, by specific insiders, on specific dates, with no 10b5-1 plans. The deficiency the prior court identified has been cured.

## IV. THE RETALIATION CLAIMS ARE TIMELY AND SUPPORTED

### A. Pre-Termination Protected Activity

Kovacs reported concerns about securities fraud to HR on November 13, 2023 and directly to Bettis on January 17, 2024. Compl. ¶ 141. Under SOX § 806, a protected disclosure includes reporting to "a person with supervisory authority over the employee." 18 U.S.C. § 1514A(a)(1)(C). Bettis, as Executive Chairman, qualifies. The termination occurred the same day as the report to Bettis, and Bettis's November 13 response – "Now Moradi will ruin your life" – is direct evidence of retaliatory animus.

Defendants argue that Kovacs has not alleged exhaustion of SOX administrative remedies. MTD Br. at 28. Plaintiffs acknowledge that SOX § 806 requires filing with the Secretary of Labor. *See Daly v. Citigroup Inc.*, 939 F.3d 415, 427 (2d Cir. 2019) (exhaustion of administrative remedies is a "jurisdictional prerequisite to suit in federal court" under SOX). To the extent that requirement has not been satisfied, Plaintiffs do not press the SOX § 806 claim independently and proceed under Dodd-Frank § 21F and ERISA § 510, neither of which requires administrative exhaustion.

### B. Post-SEC Retaliatory Acts

The Dodd-Frank anti-retaliation provision, 15 U.S.C. § 78u-6(h)(1)(A), protects individuals who provide information to the SEC. *See Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 155 (2018) (Dodd-Frank whistleblower protections extend to individuals who provide information to the SEC). Kovacs filed his SEC whistleblower complaint on April 8, 2024. Compl. ¶ 144.

The following retaliatory acts occurred after the SEC report:

- **April 10, 2024 (two days later):** Florida defamation action filed. Compl. ¶ 144.
- **May 2, 2024:** Humble SDNY suit filed. Compl. ¶ 145.
- **May 8, 2024:** ESTP interest stripped. Compl. ¶ 146.
- **June 2024 – January 2025:** $35.2 million in insider sales. Compl. ¶ 139.
- **April 2025:** Arizona lawsuit filed. Compl. ¶ 147.
- **December 2024 – July 2025:** Witness-tampering campaign. Compl. ¶¶ 166–74.

Each constitutes adverse action within the meaning of Dodd-Frank. The two-day gap between the SEC report and the Florida action is itself powerful evidence of retaliatory motive.

Defendants' sequencing argument – that the termination preceded the SEC report – does not defeat the retaliation claims. It is correct as to the termination itself. But the termination is not the only adverse action alleged. The Dodd-Frank theory is strongest as to the post-SEC retaliatory acts listed above, and the chronology supports that theory cleanly. The internal reports to HR and Bettis in November 2023 and January 2024 establish that Defendants knew Kovacs was raising

19

fraud concerns before they fired him, and Bettis's statement – "Now Moradi will ruin your life" – is direct evidence of retaliatory animus.

## V. EQUITY FORFEITURE AND THE PLAN-DOCUMENT QUESTION

Count IV presents a concrete dispute over the use of plan documents and forfeiture provisions against a whistleblower, not a vague appeal to unidentified "benefits." The Complaint incorporates the governing award materials themselves, including the March 27, 2018 RSU grant under the 2016 Incentive Compensation Plan, the May 20, 2020 RSU award under the 2019 Equity Incentive Plan, and the December 2020 amendments revising the unit counts, vesting dates, and settlement timing. Compl. Exs. 80–82. Those documents identify the participant, the plans, the grants, the unit counts, and the vesting and settlement mechanics with specificity. Moreover, the original offer letter confirms that Kovacs accepted a base salary of $30,000 per year – well below market – in exchange for 208,338 shares of equity compensation. Compl., Ex. 45. Stock was not an incidental perk. It was the consideration for which Kovacs accepted the position.

Defendants therefore misframe the issue when they invoke cases dismissing complaints that failed to identify what benefits were at stake. Plaintiff did identify the operative instruments. The real dispute is what legal effect follows from those instruments and whether Defendants used a contested interpretation of them as part of a retaliatory response to protected activity. The incorporated record is specific enough to put that issue squarely before the Court.

Nor is this a case in which benefits were lost merely as the incidental consequence of an ordinary termination. Even accepting Defendants' rule that the loss of benefits as a "mere consequence" of termination is not actionable, the Complaint alleges far more: protected internal reporting on November 13, 2023; direct reporting of insider trading to the Executive Chairman on January 17, 2024; termination immediately thereafter; a DOJ whistleblower report on February 8, 2024; and then, on February 20, 2024, a letter from AudioEye's outside counsel that in a single

communication threatened litigation, demanded silence regarding Plaintiff's fraud accusations, and purported to forfeit all unsettled RSUs. At the pleading stage, that sequence supports the inference that the deprivation of compensation and benefits was itself part of the retaliatory response, not a routine aftereffect of discharge.

The February 20, 2024 Akin letter is especially significant. It did not merely notify Plaintiff of a ministerial administrative step. It asserted that unsettled RSUs were "automatically forfeited" while simultaneously accusing Plaintiff of wrongdoing, threatening defamation litigation, and pressing for settlement. A factfinder could reasonably view that letter as a coercive economic measure aimed at a whistleblower rather than the neutral implementation of an uncontested plan rule.

The annexed documents also reveal a concrete interpretive dispute that cannot be resolved on a motion to dismiss. The Akin letter invoked the 2016 Incentive Compensation Plan as the basis for forfeiture. But the incorporated record also includes a separate 2019 Equity Incentive Plan award and amendment stating that the RSUs were to be settled promptly after vesting, and in any event no later than March 15 of the following calendar year. That creates an obvious question as to what, if anything, remained "unsettled" in February 2024 and whether Defendants' asserted forfeiture position was valid at all.

To be sure, Defendants may ultimately contend that the equity awards are incentive-compensation arrangements rather than ERISA plans. But that is a merits characterization argument, not a notice-pleading defect. Section 510 prohibits discharge "for the purpose of interfering with the attainment of any right" under a benefit plan. *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988). Count IV identifies the operative documents, alleges a targeted retaliatory sequence, and pleads a concrete dispute over Defendants' forfeiture theory. That is enough at this stage. If the Court concludes that Count IV should distinguish more sharply between

21

the equity awards and any separately ERISA-governed benefit plans, the appropriate remedy would be targeted narrowing or leave to amend, not dismissal with prejudice.

## VI. THE REMAINING CLAIMS ARE ADEQUATELY PLEADED

Kovacs's fiduciary duty claims arise from his ownership interests in ESTP and Formulus Black, not from his AudioEye employment. Under Delaware law, managers and managing members of LLCs owe default fiduciary duties unless modified by the LLC agreement. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012). *Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010), is inapposite because the fiduciary claims here arise from the retaliatory stripping of the ESTP interest and the deployment of corporate resources for retaliatory litigation, not from any contract.

The IIED claim rests on alleged solicitation of extra-legal measures against Kovacs, not ordinary employment-related conduct. New York applies a rigorous standard to IIED claims and requires extreme and outrageous conduct. *See Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121–22 (1993). Two witnesses independently testified that Humble, acting at Bettis's direction, solicited third parties to physically harm Kovacs. Compl. ¶¶ 43–51. A third individual confirmed knowledge of Kovacs's home address in June 2025. Compl. ¶ 153. These allegations are materially different from those in Kovacs I and were not disclosed to Kovacs until May 2024 – after Kovacs I was filed.

The unjust enrichment claim is brought derivatively on behalf of AudioEye. The insider trading proceeds – $35.2 million – were extracted while insiders possessed MNPI. The derivative claim is viable regardless of whether Kovacs personally transacted with the insiders.

## VII. THE DERIVATIVE CLAIMS SHOULD BE PRESERVED

Plaintiffs acknowledge the procedural challenges Defendants have identified with respect to derivative standing. To the extent those challenges require cure, the proper course is dismissal without prejudice and leave to replead under Rule 23.1 – including through the addition of a properly situated derivative plaintiff.

22

The Court should be cautious about foreclosing the derivative path entirely. The derivative claims exist for AudioEye's benefit, not Plaintiffs'. The Complaint alleges that AudioEye insiders extracted $35.2 million by selling stock at peak prices while possessing material nonpublic information. Compl. ¶ 139. If those allegations are proved, the Company – not Plaintiffs – is the primary beneficiary of recovery.

That creates a structural problem the Court should note. AudioEye and Moradi are represented by the same counsel in this action. Moradi personally sold approximately $21.6 million of AudioEye stock during the relevant period. It is obviously in Moradi's interest that those proceeds remain undisturbed. It is in AudioEye's interest – and the interest of its shareholders – to recover them. Those interests are not aligned. Under these circumstances, it would be improvident to dismiss the derivative claims with prejudice and foreclose any future shareholder from raising the issue, based on procedural defects that are curable.

At least two of the four directors – Moradi and Tahir – were directly interested in the challenged conduct: Tahir sold $3.0 million on December 4, 2024, the same day Moradi and Bettis sold $27 million, while possessing MNPI. Compl. ¶¶ 91, 139. Demand on a board half-composed of interested directors would have been futile. That warrants leave to replead rather than dismissal with prejudice.

## VIII. LEAVE TO REPLEAD SHOULD BE GRANTED

Leave to amend is "freely give[n] ... when justice so requires." Fed. R. Civ. P. 15(a)(2). Although leave may be denied for reasons such as futility, undue delay, bad faith, repeated failure to cure deficiencies, or undue prejudice, no such circumstance is present here. *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016).

The Complaint is supported by nineteen sworn declarations and over one hundred exhibits. It asserts federal claims – RICO, Section 10(b), Dodd-Frank, and ERISA – arising from

23

conduct that substantially postdates the prior state-court actions. It identifies $35.2 million in specific insider trades, by specific insiders, on specific dates, without disclosed trading plans. It incorporates contemporaneous documentary evidence relevant to motive and retaliation, including the Bettis recording, the Akin forfeiture letter, and the Birkin Bag letter warning of "unfathomable physical harm." The present pleading rests on a materially more developed record and on later-arising events not adjudicated in Kovacs I or Kovacs II.

Defendants ask the Court to deny leave based on Kovacs's intemperate statements on a secretly recorded telephone call made on the day he was fired. Those statements do not determine the legal sufficiency of the pleaded claims. Nor do they alter the basic chronology. Whatever Kovacs said on that call, it was Defendants – not Kovacs – who sold $35.2 million of stock during the relevant period.

Defendants' dismissal-with-prejudice authorities – *Gitzis*, *Truong*, and *Papadopoulos* – involved *pro se* litigants with histories of frivolous filings across unrelated matters. This case is different. It was prepared by counsel, supported by a substantial evidentiary record, and grounded in federal claims based on conduct that could not have been raised in the prior state proceedings. At minimum, if the Court concludes that any claim is insufficiently pleaded, the proper course is targeted dismissal without prejudice and leave to amend.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss, or, in the alternative, grant leave to amend as to any claims the Court determines are insufficiently pleaded.

The prior New York actions ended adversely to Kovacs, and Plaintiffs do not ask this Court to revisit those judgments. The remaining question is whether the later retaliatory campaign alleged here is actionable. It is.

24

Dated: New York, New York
      April 6, 2026

            JOHN H. SNYDER PLLC

            By: /s/ John H. Snyder

            John H. Snyder
            157 East 81st Street, Suite 3A
            New York, NY 10028
            (917) 292-3081
            john@jhs.nyc

            *Counsel for Plaintiffs*