UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID KOVACS, RUSSELL ALESI, JULIAN DUCHEINE and DEMIAN LICHTENSTEIN,

    *Plaintiffs,*

    v.

DAVID MORADI, DR. CARR BETTIS, JASON HUMBLE, JAMIL TAHIR, JAMES HAWKINS, DR. KATHERINE FLEMING, TONY COELHO, KELLY GEORGEVICH, JAMES SPOLAR, MALONEBAILEY LLC, AUDIOEYE, INC. and JOHN DOE 1-50,

    *Defendants,*

    and

ETERNAL SOURCES TECH PARTNERS LLC, FIRST CONTACT ENTERTAINMENT, INC., FORMULUS BLACK, INC.,

    *Nominal Defendants.*

Case No. 25-CV-10336 (JPO)

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JASON HUMBLE'S MOTION TO DISMISS THE COMPLAINT

JOHN H. SNYDER PLLC

John H. Snyder, Esq.
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

*Counsel for Plaintiffs*

*April 6, 2026*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................. 1

BACKGROUND .................................................................................................................... 3

ARGUMENT......................................................................................................................... 9

   I. THE RELEASE DOES NOT BAR CLAIMS BASED ON CONDUCT THAT OCCURRED SIX MONTHS AFTER THE RELEASE......................................................... 9

      A. The Release Extends Only to the Effective Date and Cannot Reach Future Conduct .... 9

      B. Humble's Post-Release Witness Tampering Constitutes Independent Predicate Acts Under 18 U.S.C. § 1512 ............................................................................................... 10

      C. Pre-Release Conduct Remains Admissible to Prove Enterprise and Pattern.................. 12

   II. THE COMPLAINT PLEADS EVERY ELEMENT OF THE RICO CLAIM AGAINST HUMBLE .......................................................................................................... 12

      A. The Complaint Identifies Humble's Defined Role, His Relationship With Enterprise Leadership, and His Financial Motive...................................................................................... 12

      B. The Post-Release Witness Tampering Satisfies § 1512(b) at the Pleading Stage  14–16, 20, 23

      C. The Enterprise's Decade-Long Pattern, Humble's Continuing Participation, and Concrete Economic Harm Satisfy the Remaining Elements ................................................ 15

   III. THE RICO CLAIM SURVIVES REGARDLESS OF THE DISPOSITION OF THE SECONDARY CLAIMS .................................................................................................... 17

   IV. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE AND WITH LEAVE TO AMEND.............................................................................................................................. 17

CONCLUSION .................................................................................................................... 18

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Arthur Andersen LLP v. United States,* 544 U.S. 696 (2005)      14

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)      1, 11

*Boyle v. United States,* 556 U.S. 938 (2009)      13

*Centro Empresarial Cempresa S.A. v. Am. Móvil, S.A.B. de C.V.,* 17 N.Y.3d 269 (2011)      9–10

*Curtis v. Citibank, N.A.,* 226 F.3d 133 (2d Cir. 2000)      9, 12

*H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229 (1989)      16

*Salinas v. United States,* 522 U.S. 52 (1997)      15

*Wade Park Land Holdings, LLC v. Kalikow,* 589 F. Supp. 3d 335 (S.D.N.Y. 2022)      12, 15

## <u>Statutes and Rules</u>

18 U.S.C. § 1512(b) .................................................................................... 7–8, 10, 12

18 U.S.C. § 1512(d) .................................................................................... 11

18 U.S.C. § 1961(1) .................................................................................... 11, 15

Fed. R. Civ. P. 15(a)(2) .................................................................................... 17

**PRELIMINARY STATEMENT**

Humble and the AudioEye/Moradi defendants make the same basic mistake: they attack a strawman. Their arguments proceed as though Plaintiffs were suing only over events that predated Kovacs I or, as to Humble, only over conduct that predated the June 29, 2024 release and July 3, 2024 dismissal. That is not the theory of the Complaint. The Complaint alleges misconduct that continued after the filing of Kovacs I and, critically for present purposes, after the release – most notably the post-release witness-tampering conduct beginning in December 2024 and continuing through July 2025. Defendants' effort to collapse everything into pre-filing or pre-release events accordingly fails.

The Complaint alleges that, in December 2024, Humble secretly recorded a call with Julian Ducheine; that the recording was then used to pressure Ducheine into adopting a false bribery narrative against Kovacs; that in January 2025 Humble sent follow-up "Juju" texts attempting to calm and influence Ducheine; and that in July 2025 Humble left a voicemail confirming the existence of the recording, its review by Bettis and "his attorney," and its use in litigation involving Kovacs. Compl. ¶¶ 166–73. Those are the acts that matter for Count I. None is covered by a release that extends only through June 29, 2024. And none could have been asserted in the earlier Humble defamation action, because none had yet occurred.

Humble's motion does not meaningfully answer that later conduct. It addresses the December 2024 recording only in passing, as though the question were merely whether Texas permits one-party-consent recording. Humble MTD Br. at 12 n.1. That misses the point. The question is whether, as the Complaint alleges, the recording was used as part of a coordinated effort to pressure a witness, manufacture a false accusation, and suppress truthful testimony. At the motion-to-dismiss stage, those allegations must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

The Complaint also adequately pleads Humble's role in the enterprise. It alleges that Humble functioned as a capital-raising intermediary, associate, and fixer for Formulus Black and Enterprise leadership; that he used pressure tactics and reputational leverage to advance the objectives of Bettis and Moradi; that he filed retaliatory litigation at their direction; and that he remained an active participant in the later witness-tampering sequence. Compl. ¶¶ 82–87, 166–74. That is sufficient at the pleading stage.

Humble's own sworn declaration underscores the plausibility of these allegations. Through forty-two paragraphs, Humble constructed a careful defense: denials, explanations, timeline challenges. But in paragraph 43, he could not help himself:

> He is the epitome of the phrase "if you tell a lie long enough, it becomes the truth." He has lied so much about so many things over the years, that it seems he has become incapable of telling the truth. He values people only so long as they benefit him, and he will turn against anyone who disagrees with him. And in any relationship, Mr. Kovacs is two-faced and he only brings stress, foul language, negative connotations, and derogatory remarks about others. . . . [H]e seems to have become obsessed with me, and he keeps trying to find ways to drag me down – this time, with an outrageous lie about me trying to have him murdered.

Humble Decl. ¶ 43. Which is the real Jason Humble – the person who swore to forty-two paragraphs of well-lawyered denials, or the person whose raw contempt bursts through in the forty-third? Humble asks the Court to find it implausible that he would encourage someone to murder Kovacs. Humble Decl. ¶ 37. But is that really implausible, given what Humble himself said about Kovacs in sworn federal testimony? That is not implausibility. That is motive.

Finally, even if some of the secondary claims against Humble prove vulnerable, Count I survives. The RICO claim is the load-bearing claim against him. It rests on post-release conduct, not barred by the release, and the Complaint plausibly alleges predicate acts of witness tampering under 18 U.S.C. § 1512, a continuing enterprise, and resulting concrete harm. Humble's motion therefore fails where it matters most.

## BACKGROUND

Humble's motion presents a selective and incomplete account of the relevant facts. His brief devotes seven pages to denying the solicitation-of-harm allegations and characterizing the December 2024 recording as innocuous, while burying the post-release witness tampering in a single footnote. Humble MTD Br. at 4–8, 12 n.1. The following summary, drawn from the Complaint and its exhibits, provides the context necessary to evaluate the claims against Humble.

***Humble's Role in the Enterprise.*** Humble was not a peripheral figure. The Complaint alleges an association-in-fact enterprise consisting of Moradi, Bettis, Humble, senior insiders and intermediaries, and controlled entities including AudioEye, Formulus Black, First Contact Entertainment, and Eternal Sources Tech Partners. Compl. ¶ 193; Schedule D. Humble is designated an "Enterprise Associate" who operated as a capital-raising intermediary, associate, and fixer for Formulus Black and its leadership, including Bettis and Moradi. Compl. ¶¶ 82–87.

Humble recruited investors for Formulus Black under written agreements providing equity-linked compensation tied to a future liquidity event. Compl. ¶¶ 82–83; Exh. 50. He transmitted instructions between Enterprise members. Compl. ¶ 119. He applied pressure tactics and reputational leverage to advance the objectives of Bettis and Moradi. *Compl. ¶ 84.* He filed retaliatory litigation at their direction. Compl. ¶ 86. Bettis and Humble are personally linked: Bettis served on the board of Humble Philanthropy. Kovacs Decl. ¶ 392; Compl. Exh. 92. Humble repeatedly identified Bettis as "the top man" and as the person giving orders. Ducheine Decl. ¶¶ 18, 27. This is not a case in which a peripheral actor is swept into RICO allegations on bare conclusory assertions. The Complaint identifies Humble's defined role (intermediary and enforcer), his institutional relationship with Enterprise leadership, and the financial incentive that motivated his participation.

The financial stakes of the Enterprise's activities are reflected in the public record. During the RICO Period, AudioEye insiders – including Moradi, Bettis, and Tahir – sold approximately $30 million in AudioEye stock in a single transaction on December 4, 2024, at or near the stock's peak. Compl. Schedule E. That transaction occurred the same month Humble secretly recorded Ducheine. The Enterprise's witness-tampering campaign – which began immediately after the insider sales and continued for seven months – is consistent with an effort to suppress the testimony of witnesses who could connect Enterprise leadership to the fraud that inflated the stock price.

***The Formulus Black Capital Raising.*** From 2017 through 2021, Humble solicited and recruited investors – including Julian Ducheine and retired NFL player Muhammad "Mo" Wilkerson – to invest in Formulus Black. Compl. ¶ 82; Ducheine Decl. ¶¶ 6–15; DiMaggio Decl. ¶¶ 8–12. Ducheine testifies that in April 2021 he made what he understood to be a personal investment in Formulus Black, as did several friends and relatives, all of whom lost some or all of their investment. Ducheine Decl. ¶ 15. His contemporaneous May 8, 2024 email identifies concrete financial discrepancies: Humble repeatedly claimed to have forwarded the full $500,000 investment to Kovacs, but only $175,000 was transmitted; $325,000 remains unexplained; and Humble appears to have used Kovacs's equity as collateral for a $500,000 loan without consent. Ducheine Decl. ¶ 34. DiMaggio independently confirms that Wilkerson acknowledged losing a $1 million investment in Formulus Black. DiMaggio Decl. ¶ 21.

***False Narratives and Information Control.*** Humble's participation in the Enterprise went beyond fundraising. He conducted a sustained disinformation campaign directed at isolating Kovacs. Humble led Ducheine to believe that Kovacs "is a manipulator, a liar, and twists situations in his favor, when it was actually the opposite." Ducheine Decl. ¶ 9. In early 2022, Humble "instructed [Ducheine] to cease all communication with [Kovacs] regarding any business deals and to report everything directly to him, promising that he would relay it to Carr and ensure we

4

were compensated." Ducheine Decl. ¶ 41. Humble deployed the same false narrative against Wilkerson – telling him that "David Kovacs had stolen his $1 million." DiMaggio Decl. ¶ 21. When the truth was explained to Wilkerson, "it slowly dawned upon [him] that Moradi, Bettis, and Humble had been trying to set him up." DiMaggio Decl. ¶ 23. This information-control function served the Enterprise's common purpose: it prevented victims from comparing notes, kept them dependent on Humble as their sole channel to Bettis, and preserved the Enterprise's ability to extract value without scrutiny. Compl. ¶ 119.

*The Recycling of Victims Into Instruments of Crime.* A distinctive feature of the Enterprise's methodology, as it operated through Humble, is the systematic conversion of victims into instruments of further crime. Compl. ¶¶ 42, 148. Humble induced Ducheine's Formulus Black investment, isolated him from Kovacs, poisoned him against Kovacs with false narratives, and then – once Ducheine was financially and psychologically compromised – solicited him to find a hitman. Ducheine Decl. ¶¶ 15, 41, 9, 19–22. When Ducheine refused, Humble pivoted to Wilkerson: he channeled Wilkerson's $1 million investment into Formulus Black, told Wilkerson that Kovacs had "stolen" his money, and then offered to restore the lost million dollars if Wilkerson would murder Kovacs. DiMaggio Decl. ¶¶ 21, 34. As DiMaggio summarizes: Wilkerson "was victimized twice" – once by the lost investment, and again "when Jason Humble attempted to trick him into committing murder on the promise that it would result in Wilkerson getting his $1 million back." DiMaggio Decl. ¶ 34. Financial fraud and physical violence were not separate categories of misconduct but sequential phases of the same scheme, unified by Humble's role as the common intermediary.

*The Pre-Release Conduct: Solicitation of Physical Harm and Retaliatory Litigation.* In December 2023, Humble telephoned Ducheine and said: "We have to do something about David Kovacs. I need your help. It's something very serious and important. . . .

5

I need your help to find someone to take care of Kovacs." Ducheine Decl. ¶ 20; Compl. ¶ 43. Ducheine understood Humble was asking him to find someone to murder or seriously harm Kovacs. Ducheine refused. Ducheine Decl. ¶¶ 21–22. In January 2024, Humble arranged an in-person meeting at a café in North Texas and again raised the issue of finding a hitman. Ducheine Decl. ¶¶ 26–27; Compl. ¶ 46. The solicitation is independently corroborated by DiMaggio's account (DiMaggio Decl. ¶ 10) and by DiMaggio's August 5, 2024 meeting with Wilkerson at Sei Less restaurant, at which Wilkerson acknowledged that Humble had encouraged him to murder Kovacs and promised that if Kovacs were murdered, Wilkerson would get his $1 million investment back. DiMaggio Decl. ¶ 21. At a subsequent June 3, 2025 meeting at Miller's Ale House in Parsippany, New Jersey – attended by Kovacs, his attorney Richard Tannenbaum, Wilkerson, Wilkerson's criminal defense attorney John Paul Velez, and DiMaggio – Wilkerson identified Kovacs's home address, which he had no legitimate reason to know, confirming that Humble had provided it for purposes of executing the planned murder. DiMaggio Decl. ¶¶ 29–32; Kovacs Decl. ¶¶ 180–84.

In May 2024, Humble filed a defamation lawsuit against Kovacs that Plaintiffs allege was retaliatory litigation directed by Bettis and/or Moradi. Compl. ¶¶ 86, 145. That lawsuit was settled and dismissed in July 2024, pursuant to the Release Agreement with an Effective Date of June 29, 2024. Plaintiffs do not dispute that these pre-release events are covered by the release as independent claims against Humble. What Plaintiffs dispute is Humble's contention that the release extinguishes everything – including claims based on conduct that had not yet occurred.

***The Post-Release Witness Tampering.*** The conduct at the center of the RICO claim against Humble began six months after the release and continued for seven months thereafter. In December 2024, Humble reached out to Ducheine via text and they spoke by phone. Humble secretly recorded the call without Ducheine's knowledge or consent. Compl. ¶¶ 166–67; Ducheine

Decl. ¶¶ 49, 51. Humble characterizes this as a routine one-party-consent recording in Texas. Humble MTD Br. at 12 n.1. The Complaint alleges that Humble secretly recorded Ducheine and that the recording was later used in a pressure campaign against him. Compl. ¶¶ 166–69. Ducheine separately states that "in hindsight, I understand that Humble was fishing for information about David Kovacs" and that Humble "falsely led me to believe the dispute with Kovacs was already resolved." Ducheine Decl. ¶¶ 49, 51. The next day, Humble called again with his attorney and asked Ducheine to repeat what he had said. Ducheine Decl. ¶ 52. He then supplied the recording for use against Ducheine, and it was invoked by Quinn Emanuel in the ensuing pressure campaign. Compl. ¶¶ 167–69.

What happened next is significant. On January 2, 2025, Quinn Emanuel attorneys called Ducheine and "wanted me to testify falsely that David Kovacs promised to pay me for my testimony. That is categorically false." When Ducheine refused, "Quinn Emanuel claimed to have a recording in which I purportedly stated otherwise." Ducheine Decl. ¶¶ 54–55. The chilling effect was real: "I was angry to learn that Quinn Emanuel was using a secretly recorded phone call. I felt legally threatened by Quinn Emanuel attorneys, and I altered my behavior because of those communications. In particular, it made me hesitate to come forward and delay assisting Kovacs." Ducheine Decl. ¶ 56. On January 24, 2025, Quinn Emanuel sent a letter to Plaintiffs' counsel falsely accusing Kovacs of attempted bribery – an allegation Ducheine states under oath is fabricated. Compl. ¶ 169. The Complaint alleges that the recording was not an act of self-protection but part of a coordinated effort to manufacture a false accusation and suppress a witness.

The coordination continued. On January 2, 2025, Humble texted Ducheine repeatedly, using the nickname "juju" – the same nickname that appears in the July 2025 voicemail. Humble attempted to calm Ducheine, reframed insider-trading issues, and instructed him not to mention Kovacs. Compl. ¶¶ 170–71. And on July 24, 2025, Humble left a voicemail for Ducheine that is,

7

in effect, a roadmap of the witness-tampering campaign. In the voicemail – a verbatim transcription of which is Appendix A to the Ducheine Declaration – Humble confirmed: (a) the existence of the secret recording; (b) its review by Bettis and "his attorney"; (c) its use in litigation involving Kovacs; and (d) ongoing coordination between Humble and Bettis. Compl. ¶ 172. Humble addressed Ducheine as "Juju," told him repeatedly he had "nothing to worry about," falsely stated the court had dismissed Kovacs's case because of "lies," called Kovacs a "pathological liar" and a "horrible person," and attributed his information to "Carr and his attorney." Ducheine Decl. ¶¶ 61–63, App'x A. Ducheine states he "understood Humble's statements and tone as an attempt to influence my perception of the case and of Mr. Kovacs, and to reassure me in a way that suggested I should not disclose information or communicate independently about the matters in question." Ducheine Decl. ¶ 64.

    ***Cross-Corroboration.*** The factual record concerning Humble does not rest on a single witness or a single document. The murder solicitation of Ducheine is attested by Ducheine under oath (Ducheine Decl. ¶¶ 19–29), corroborated by Kovacs's account (Kovacs Decl. ¶¶ 162–66), and further corroborated by DiMaggio (DiMaggio Decl. ¶¶ 10–13). The solicitation of Wilkerson is attested by DiMaggio based on direct conversation with Wilkerson (DiMaggio Decl. ¶ 21), corroborated by Kovacs (Kovacs Decl. ¶ 174), and further corroborated by Ducheine's testimony that Humble told him Wilkerson would be the one to "do it" (Ducheine Decl. ¶ 11). The July 24, 2025 voicemail exists as a native audio recording on Ducheine's phone (Ducheine Decl. ¶ 60), with a verbatim transcription (Ducheine Decl. App'x A). The Formulus Black financial discrepancies are documented in Ducheine's contemporaneous May 8, 2024 email (Ducheine Decl. ¶ 34) and corroborated by DiMaggio's account of Wilkerson's $1 million loss (DiMaggio Decl. ¶ 21). The Bettis–Humble institutional link is documented on the Humble Philanthropy website (Exh. 92) and attested by Kovacs (Kovacs Decl. ¶ 392).

***Humble's Motion Ignores the Post-Release Conduct.*** Humble's brief does not address the January 2025 texts, the July 2025 voicemail, or the deployment of the recording as coercive leverage. It proceeds as if the only conduct at issue is the pre-release solicitation and the defamation lawsuit. The RICO claim rests on what came after.

## ARGUMENT

### I. THE RELEASE DOES NOT BAR CLAIMS BASED ON CONDUCT THAT OCCURRED SIX MONTHS AFTER THE RELEASE

#### A. The Release Extends Only to the Effective Date and Cannot Reach Future Conduct

Humble's release argument begins and ends with Paragraph 2.D of the Release Agreement, which releases claims "from the beginning of time until the Effective Date of this Settlement Agreement [June 29, 2024] relating to or arising in any way out of the allegations asserted, or which could have been asserted, by Kovacs . . . in the Lawsuit." Humble Decl. Ex. A ¶ 2.D.

The operative phrase is "until the Effective Date." A release bars only those claims that are the subject of the release, and may encompass unknown claims only where the parties intended to settle claims relating to the released subject matter. *Centro Empresarial Cempresa S.A. v. Am. Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011). A release with a defined temporal endpoint does not bar claims based on conduct occurring after that endpoint; later-arising claims are not extinguished merely because earlier related litigation existed. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139–40 (2d Cir. 2000).

Humble argues that Paragraph 2.B of the Release Agreement – which addresses unknown claims – expands the release beyond the Effective Date. It does not. Paragraph 2.B provides that the parties "may later discover Claims or facts that may be different from, or in addition to, those that he or any other Party now knows or believes to exist." Humble Decl. Ex. A ¶ 2.B. This provision addresses *unknown facts about pre-existing claims* – not claims arising from future conduct. A

release encompasses unknown claims only where the parties intended to settle all claims relating to a particular subject matter or transaction. *Centro Empresarial Cempresa*, 17 N.Y.3d at 276. The subject matter of the Release Agreement was the Humble defamation lawsuit. Post-release witness tampering is not "relating to or arising in any way out of" that lawsuit. It is new conduct, by the same actor, in furtherance of the same enterprise, directed at suppressing witness testimony in different litigation.

### B. Humble's Post-Release Witness Tampering Constitutes Independent Predicate Acts Under 18 U.S.C. § 1512

The following conduct occurred after the June 29, 2024 Effective Date and is not covered by the Release Agreement:

**December 2024 – Secret recording of Ducheine.** Humble secretly recorded a telephone call with Ducheine. The Complaint alleges that the recording was later used in a pressure campaign against him. Compl. ¶¶ 166–69. Ducheine separately states that, in hindsight, Humble was fishing for information about Kovacs and falsely led him to believe the dispute was already resolved. Ducheine Decl. ¶¶ 49, 51. Humble was in Texas during the call. *Id.* He then supplied the recording for use against Ducheine, and it was invoked by Quinn Emanuel in the ensuing pressure campaign. Compl. ¶ 167. The recording was subsequently used as leverage against Ducheine. Compl. ¶ 168.

**January 2025 – Coordination with Quinn Emanuel.** Quinn Emanuel used the recording to pressure Ducheine. Attorney Adam Abensohn attempted to coerce Ducheine into adopting a false story that Kovacs had tried to bribe him. When Ducheine refused, Abensohn invoked the recording as leverage. Compl. ¶ 168. On January 24, 2025, Quinn Emanuel sent a letter falsely accusing Kovacs of attempted bribery – an allegation Ducheine states under oath is fabricated. Compl. ¶ 169.

**January 2, 2025 – "Juju" text messages.** Humble texted Ducheine repeatedly, using the same nickname ("juju") that appears in the July voicemail. Humble attempted to calm and influence Ducheine, reframed insider-trading issues, and instructed him not to mention Kovacs. Compl. ¶¶ 170–71.

**July 24, 2025 – Voicemail confirming coordination.** Humble left a voicemail for Ducheine confirming: (a) the existence of the secret recording; (b) its review by Bettis and "his attorney"; (c) its use in litigation involving Kovacs; and (d) ongoing coordination with Bettis. Compl. ¶ 172. Humble called Ducheine "juju," told him to relax, and disparaged Kovacs as a "pathological liar" – consistent with efforts to shape Ducheine's recollection and suppress disclosure. Compl. ¶ 173.

Each of these acts constitutes witness tampering under 18 U.S.C. § 1512(b) (knowingly using intimidation, threats, or corrupt persuasion to influence testimony) or § 1512(d) (intentionally harassing another person to hinder, delay, or prevent communication to a law enforcement officer or judge). These are enumerated RICO predicate offenses under 18 U.S.C. § 1961(1).

Humble's motion does not meaningfully engage any of this conduct as an independent basis for Count I. His sole reference to the December 2024 recording is a footnote asserting there is "nothing improper about recording a telephone conversation in a one-party state such as Texas." Humble MTD Br. at 12 n.1. That addresses the legality of the recording under state wiretap law – not its use as an instrument of witness tampering. The question is not whether Humble could lawfully record the call. It is whether, as the Complaint alleges, the recording was supplied to Enterprise leadership and then deployed by counsel as coercive leverage to pressure a witness into adopting a fabricated account. At the motion-to-dismiss stage, the Complaint's allegations must be taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

11

Humble cannot escape liability for post-release conduct by pointing to a release that, by its own terms, extends only to the Effective Date. *See* Curtis, 226 F.3d at 139–40.

### C. Pre-Release Conduct Remains Admissible to Prove Enterprise and Pattern

Even where a release bars claims based on pre-release conduct, it does not render that conduct invisible. Humble's own authority confirms this: in the case he cites three times (Humble MTD Br. at 15, 20, 21), the court dismissed RICO claims based on released predicate acts but did not hold that the underlying facts were inadmissible or irrelevant to the enterprise analysis. *See Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 364–65 (S.D.N.Y. 2022) (released predicate acts may be barred as independent bases for recovery while still informing the enterprise and pattern analysis). The same principle applies here: the pre-release solicitation of physical harm may be barred as an independent claim against Humble, but it remains evidence of Humble's role in the Enterprise, his relationship with Bettis, and the escalating methods the Enterprise employed.

Courts routinely hold that prior acts are admissible to prove enterprise and pattern in RICO cases. *See Wade Park*, 589 F. Supp. 3d at 364–65.

The Complaint does not rely solely on pre-release conduct to state a RICO claim against Humble. The post-release witness tampering is independently sufficient. But the pre-release conduct provides essential context for understanding Humble's role and the Enterprise's pattern.

## II. THE COMPLAINT PLEADS EVERY ELEMENT OF THE RICO CLAIM AGAINST HUMBLE

### A. The Complaint Identifies Humble's Defined Role, His Relationship With Enterprise Leadership, and His Financial Motive

The Complaint alleges that Humble functioned as an intermediary and enforcer within the Enterprise. He recruited investors for Formulus Black. Compl. ¶¶ 82–83. He transmitted instructions between Enterprise members. Compl. ¶ 119. He applied pressure tactics and

reputational leverage to advance the objectives of Bettis and Moradi. *Compl. ¶ 84.* He filed litigation at their direction. Compl. ¶ 86. And when other methods failed, he escalated to solicitations of violence. Compl. ¶¶ 85, 163–65.

Humble argues that the Complaint fails to allege his "relationship" with Bettis and Moradi or explain "why Mr. Humble would participate in a fraudulent scheme with them and for what purpose." Humble MTD Br. at 20. He contends the enterprise element requires information about "Defendants' respective roles" and "the group's organization or hierarchy." Humble MTD Br. at 20. The Complaint provides exactly that.

The Complaint alleges a defined structure: Moradi was the architect; Bettis was the governance stabilizer; Humble was the intermediary and enforcer. Compl. ¶¶ 113, 118–19. It alleges Humble's specific role: he recruited investors for Formulus Black under written agreements providing equity-linked compensation (Compl. ¶¶ 82–83); he transmitted instructions between Enterprise members (Compl. ¶ 119); he applied pressure tactics to advance Bettis and Moradi's objectives (Compl. ¶ 84); he filed retaliatory litigation at their direction (Compl. ¶ 86); and he escalated to violence solicitation and then to witness suppression when other methods failed (Compl. ¶¶ 85, 163–65, 166–74). The Complaint identifies the "respective roles" and "organization" that Humble's own authority requires – using his cases against him.

His financial interest in the Enterprise's success is directly alleged, and the broader Complaint supports the inference that he acted to protect the Enterprise from exposure. Compl. ¶¶ 82–83, 193–96.

An association-in-fact enterprise need not have a hierarchical structure or a chain of command. *Boyle v. United States*, 556 U.S. 938, 946 (2009) (an association-in-fact enterprise requires purpose, relationships among associates, and sufficient longevity, but need not have a hierarchical structure or chain of command). It requires only an ongoing organization with associates

13

functioning as a continuing unit. *Id.* at 944–45. The Complaint alleges exactly that: Humble functioned as a continuing associate of Bettis and Moradi across multiple years and multiple events, from investor recruitment through litigation pressure through witness suppression. That is sufficient at the pleading stage.

### B. The Post-Release Witness Tampering Satisfies § 1512(b) at the Pleading Stage

The RICO claim against Humble does not depend on pre-release conduct. The post-release witness tampering plausibly supports predicate acts under 18 U.S.C. § 1512(b), which prohibits "knowingly us[ing] intimidation, threats, or corrupt persuasion" to "influence . . . the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1).

The allegations support a plausible inference of corrupt persuasion: Humble secretly recorded Ducheine, and the recording was subsequently deployed as coercive leverage against him. Compl. ¶¶ 166–69. Humble's January 2025 texts to Ducheine – using the familiar nickname "juju," urging him to relax, reframing insider-trading issues, and instructing him not to mention Kovacs – are consistent with efforts to shape a witness's recollection and discourage cooperation. Compl. ¶¶ 170–71. And the July 24, 2025 voicemail – confirming the recording's existence, its review by Bettis and "his attorney," and its use in litigation – establishes ongoing coordination directed at suppressing Ducheine's testimony. Compl. ¶ 172.

Taken together, these allegations plausibly allege a course of conduct aimed at corruptly persuading a witness. Section 1512(b) reaches "corrupt persuasion" where the defendant acts with "consciousness of wrongdoing." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705–06 (2005) (section 1512(b) reaches corrupt persuasion only where the defendant acted with consciousness of wrongdoing). Whether Humble's conduct ultimately satisfies § 1512(b) is a question for summary

14

judgment or trial. At the pleading stage, the allegations are sufficient. Section 1512 is an enumerated RICO predicate under 18 U.S.C. § 1961(1)(B).

Plaintiffs do not rely on securities fraud as a RICO predicate – a point on which Plaintiffs and Humble agree. The RICO claim against Humble rests on witness tampering under § 1512(b), which is squarely within § 1961(1) and not subject to the PSLRA bar.

### C. The Enterprise's Decade-Long Pattern, Humble's Continuing Participation, and Concrete Economic Harm Satisfy the Remaining Elements

Humble argues that his alleged conduct spans only seven months and therefore cannot satisfy the continuity requirement. Humble MTD Br. at 21. This argument misapprehends how RICO pattern analysis works in the context of a conspiracy claim.

Because Count I includes a RICO conspiracy claim under § 1962(d), Humble need not have personally committed every predicate act. In a RICO conspiracy, a conspirator need not personally commit or agree to commit two predicate acts; it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. *Salinas v. United States*, 522 U.S. 52, 63–66 (1997). The Enterprise's pattern spans a decade and four entities. Humble's participation in that pattern – as an intermediary who recruited investors, filed retaliatory litigation, and then suppressed witnesses – is part of the broader enterprise conduct.

The pre-release acts, while not independently recoverable against Humble because of the release, remain relevant as context establishing the enterprise's existence and Humble's role within it. *See Wade Park*, 589 F. Supp. 3d at 364–65. And the post-release witness tampering – running from December 2024 through July 2025 – demonstrates that the enterprise's activities continued and that Humble remained an active participant.

The threat of repetition is not abstract: Humble covertly recorded a witness, provided the recording to Enterprise leadership, coordinated messaging through texts and voicemails, and as of

July 2025 was still actively managing Ducheine's cooperation. The voicemail confirms that Humble remained in contact with Bettis, that the recording was being used in litigation, and that Humble was still working to shape Ducheine's account. Compl. ¶ 172. That is open-ended continuity: the enterprise's regular way of doing business projected into the future with a demonstrated threat of repetition. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 242–43 (1989) (open-ended continuity exists where the predicates reflect the enterprise's regular way of doing business or otherwise carry a threat of repetition).

As to RICO injury, Humble argues that Plaintiffs have not alleged concrete business-or-property loss proximately caused by his conduct. Humble MTD Br. at 21–22. The Complaint alleges specific, concrete harm flowing from Humble's post-release witness tampering. Humble's covert recording of Ducheine was provided to Bettis and then to Quinn Emanuel. Compl. ¶¶ 167–68. Quinn Emanuel used it to manufacture a false bribery accusation against Kovacs in a January 24, 2025 letter. Compl. ¶ 169. Plaintiffs were forced to expend resources responding to that false accusation, which was deployed in pending litigation. Ducheine's willingness to cooperate as a witness was chilled, impairing Plaintiffs' ability to prosecute claims with substantial economic value – including the ESTP claim (valued at over $80 million) and the securities fraud claim (involving $35.2 million in insider sales). These are concrete, out-of-pocket harms – litigation costs incurred and claim value impaired – caused "by reason of" Humble's post-release conduct. At the pleading stage, that is sufficient.

### III. THE RICO CLAIM SURVIVES REGARDLESS OF THE DISPOSITION OF THE SECONDARY CLAIMS

Plaintiffs' principal submission is that Count I survives regardless of the disposition of the secondary claims. The RICO claim rests on post-release witness tampering that is not covered by

16

the release, not barred by any statute of limitations, and adequately pleaded as set forth in Sections I and II above.

As to the remaining claims – whistleblower retaliation (Count III), unjust enrichment (Count VIII), malicious prosecution (Count IX), and IIED (Count X) – Plaintiffs do not rely on those claims for purposes of defeating this motion. Any dismissal of those claims should be without prejudice and with leave to amend.

## IV. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE AND WITH LEAVE TO AMEND

If the Court dismisses any claims against Humble, Plaintiffs respectfully request leave to amend rather than dismissal with prejudice. Leave to amend should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).

Humble asks for dismissal with prejudice "without leave to amend." Humble MTD Br. at 27. That is inappropriate as to claims that may be curable through amendment.

### CONCLUSION

The release bars claims based on pre-release conduct. It does not bar claims based on conduct that occurred six months later. The RICO claim against Humble rests on post-release witness tampering – secret recording, coercive deployment of that recording, coordinated suppression of testimony, and a voicemail confirming ongoing coordination with Bettis. None of that is covered by the June 29, 2024 release, and none of it is addressed on the merits by Humble's motion.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Humble's motion to dismiss the RICO claim (Count I). As to the state-law claims and the standalone retaliation claim, Plaintiffs request that any dismissal be without prejudice and with leave to amend.

17

Dated: April 6, 2026
New York, New York

Respectfully submitted,

JOHN H. SNYDER PLLC


By: /s/ John H. Snyder
John H. Snyder, Esq.
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

*Counsel for Plaintiffs*

18