UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KOVACS, derivatively on behalf of AUDIOEYE, INC.; RUSSELL G. ALESI, derivatively on behalf of AUDIOEYE, INC.; and DAVID KOVACS, individually,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>DAVID MORADI; SERO CAPITAL LLC; DR. CARR BETTIS; CSB IV US HOLDINGS LLC; JAMIL TAHIR; TURNMARK PARTNERS L.P.; KELLY GEORGEVICH; and JASON HUMBLE,<br><br>    *Defendants,*<br><br>    and<br><br>AUDIOEYE, INC.,<br><br>    *Defendant and Nominal Defendant.* | Case No. 25-CV-10336 (JPO)<br><br>[PROPOSED] AMENDED COMPLAINT – JURY TRIAL DEMANDED |

**PRELIMINARY STATEMENT**

1.　　This action seeks to recover for AudioEye, Inc. an approximately $34 million corporate opportunity. AudioEye's controlling insiders diverted that opportunity to themselves and excluded the Company.

2.　　In 2024, AudioEye's stock rose from about $4 to more than $30 per share, creating an opportunity for the company to raise capital on advantageous terms. AudioEye had an effective registration statement and access to the public markets. It could have raised $34 million in equity to support its growth and compete in the market. The Company has confirmed that $21 million in additional cash would have materially improved its financial condition. Instead, the insiders consumed the opportunity for themselves. On December 4, 2024, David

1

Moradi, Carr Bettis, and Jamil Tahir sold $30 million of their own AudioEye stock through the Company's registration machinery. AudioEye received nothing. Across the November and December 2024 sales, the insiders took $34,070,724.65 (the "Insider Sales"). AudioEye's market capitalization is now about $90 million.

3.    No disinterested board approved the Insider Sales. No special committee evaluated whether the $34 million opportunity belonged to AudioEye. The Company had no independent legal counsel. It did not investigate the stock-price run-up. It did not perform a corporate-opportunity analysis. The insiders used their control of AudioEye to take the $34 million for themselves, at the Company's expense. That is the corporate-opportunity claim.

4.    The AudioEye insiders have run this playbook before. Moradi and Bettis used the same routine at Formulus Black and First Contact. Sworn declarations by Paul Arena, Demian Lichtenstein, Julian Ducheine, Nicky DiMaggio, and others describe the pattern. The insiders enter a company that needs capital, seize control of its finances and gatekeepers, extract value, and retaliate against anyone who resists. The pattern is documented across nineteen sworn declarations and 113 exhibits. These facts are documented. Plaintiffs do not ask the Court to credit a lone narrative. Their allegations rest on SEC filings, sworn deposition testimony, and exhibits before the Court. The record demonstrates the significant measures Moradi and Bettis took to silence a whistleblower.

5.    David Kovacs ("Kovacs") was a longtime AudioEye executive and shareholder. In August 2023, he refused Moradi's instruction to assist in the manipulation of AudioEye stock. He later reported the misconduct internally, first to HR and then to Executive Chairman Carr Bettis, whom he considered a friend. The Company fired him. Kovacs then reported the misconduct to the DOJ and the SEC. The response was further retaliation. The Company declared the termination "for cause." It purported to forfeit Kovacs's vested stock. Defendants

2

pursued litigation across three states. Kovacs received a written threat of physical harm. Four witnesses describe a murder-for-hire plot against Kovacs.

6.     This case asserts three categories of claims: (i) a derivative corporate-opportunity claim (Counts III–VI); (ii) civil RICO claims, direct and derivative (Count I); and (iii) a direct Dodd-Frank whistleblower-retaliation claim (Count II). Daniel Kovacs brings AudioEye's corporate-opportunity claim derivatively. He is a continuous AudioEye shareholder with no individual claim against any Defendant. Russell G. Alesi asserts shareholder-governance and Rule 23.1 process rights. The RICO claim is brought derivatively for AudioEye and individually by David Kovacs. David Kovacs also brings the Dodd-Frank retaliation claim in his personal capacity. AudioEye is a nominal defendant on the claims that belong to it. As Kovacs's employer, it is a defendant on the Dodd-Frank claim.

7.     Plaintiffs seek disgorgement to AudioEye, an accounting, a constructive trust, treble damages for the separate RICO injuries pleaded in Count I, Dodd-Frank whistleblower relief, and Rule 23.1 protection of the corporate claim. The corporate claim belongs to AudioEye. The insiders who took the proceeds cannot release it, dismiss it, or bargain it away. Neither can conflicted counsel purporting to speak for both Moradi and AudioEye.

## I. PARTIES

### A.     **Plaintiffs**

8.     Plaintiff **Daniel Kovacs** is David Kovacs's brother. He is a different individual and is referred to throughout by his full name. He beneficially owns AudioEye common stock and is the derivative plaintiff on the claims asserted on AudioEye's behalf (Counts III–VI). He has continuously owned at least 200 shares since December 11, 2023. That ownership spans the November 12–14 and December 4, 2024 transactions and continues to the present. Daniel

3

Kovacs later acquired additional shares after his brother's dispute with AudioEye arose. He has no individual claim against any Defendant and has not assigned any claim. Other than his written engagement agreement with counsel, Daniel Kovacs has no agreement with David Kovacs or anyone else concerning this litigation. He has no agreement that gives him a personal benefit or requires him to act other than in the interests of AudioEye and its shareholders. He brings the derivative claims solely for the benefit of AudioEye and its shareholders. See Daniel Kovacs Decl. ¶¶ 3–4, 11.

9.    Plaintiff **Russell G. Alesi** is a current AudioEye shareholder. He has continuously held 4 shares of AudioEye common stock in street name through Merrill Lynch since approximately October 7, 2025, after the Insider Sales. He sues solely as a current-shareholder governance plaintiff and carries the Rule 23.1 process role. He does not assert the transaction-based derivative claim, which Daniel Kovacs brings. On June 4, 2026, Alesi executed and verified a demand under 8 Del. C. §§ 219 and 220. The demand seeks inspection of the Company's stockholder list and books and records, access to the June 22, 2026 annual meeting, and corrective proxy disclosure of the derivative claim. It will be served on the Company contemporaneously with these motion papers. He asserts no individual damages claim. See Alesi Decl.

10.    Plaintiff **David Kovacs** is a former senior executive of AudioEye during the RICO Period (January 1, 2015 to the present). He is, was, and at all relevant times has been an AudioEye shareholder whose shares have never been validly revoked or cancelled. See Exh. 45, 46, 80–82. He also holds ownership interests in First Contact Entertainment ("First Contact") and Eternal Sources Tech Partners, LLC ("ESTP"). See Exh. 60–62, 75–76, 100–103. David Kovacs brings claims solely in his individual capacity: the civil RICO claim (Count I) and the Dodd-Frank § 21F whistleblower-retaliation claim (Count II). Plaintiffs do not concede that

4

David Kovacs lacks derivative standing; they plead that he was a shareholder at all relevant times. Daniel Kovacs leads the derivative claims because he has no individual claim and his ownership is documented independently.

*Julian Ducheine and Demian Lichtenstein, who were plaintiffs in ECF No. 1, are not plaintiffs in this Amended Complaint. They are witnesses. Their sworn declarations, and the conduct directed at them, remain part of the factual record.*

### B.    Enterprise Defendants

11.    Defendant **David Moradi** is an investor, executive, and director who held senior leadership roles at AudioEye, Inc. He joined AudioEye's Board on November 13, 2019. He became Interim Chief Executive Officer on August 13, 2020, permanent Chief Executive Officer on January 13, 2022, and now serves as Executive Chairman. See SEC Filings; David Kovacs Decl. Moradi controls Sero Capital LLC, through which he sold AudioEye stock in the Insider Sales. He exercised de facto control over AudioEye's operations, disclosures, litigation strategy, and trading conduct. He was the architect and principal beneficiary of the Enterprise. He is named on Count I (RICO), on Counts III–V as a fiduciary and seller, and on Count VI. See Arena Decl. ¶¶ 7–15.

12.    Defendant **Dr. Carr Bettis** is an investor and executive who served as Executive Chairman of AudioEye and held leadership roles across the Enterprise entities. See David Kovacs Decl. He controls CSB IV US Holdings LLC, through which he sold approximately $5.4 million of AudioEye stock in the Insider Sales. Bettis was the Enterprise's governance stabilizer. He controlled access to boards, auditors, and counsel. He also directed the response to whistleblower complaints. He is named on Count I (RICO) and, on Counts III–V, as a recipient

of the proceeds of the breaches alleged. Bettis served as an AudioEye director until May 2025 and is no longer on the Board.

13.    Defendant **Jason Humble** is a former AudioEye-affiliated operative who served as a capital-raising intermediary for the Enterprise's leadership. See Ducheine Decl.; DiMaggio Decl. He recruited investors, transmitted instructions, and applied pressure. When financial and reputational pressure failed to silence Kovacs, upon information and belief, Humble solicited Kovacs's murder on behalf of Bettis and Moradi. See Ducheine Decl. ¶¶ 22–29; DiMaggio Decl. ¶¶ 20–32. He filed a parallel defamation action against Kovacs in this District, then dismissed it with prejudice. See Exh. 39. Humble is named on Count I (RICO).

### C.    Director and Officer Defendants

14.    Defendant **Jamil Tahir** has served as an AudioEye director since 2019. Tahir sold approximately $3.0 million of AudioEye stock through TurnMark Partners L.P. in the Insider Sales, while in possession of material nonpublic information. He holds his Board seat through Sero-held designation rights. He is one of the three interested directors for demand-futility purposes and is named on Counts III–V as a fiduciary and seller, and on Count VI. See Forms 4.

15.    Defendant **Kelly Georgevich** served as AudioEye's Chief Financial Officer. On May 4, 2026, she was elevated to Chief Executive Officer and to the Board. See SEC Filings. While serving as CFO and in possession of material nonpublic information, Georgevich sold approximately $303,500 of AudioEye stock in November 2024. She is one of the three interested directors for demand-futility purposes and is named on Counts III–V as a fiduciary and seller, and on Count VI.

### D.    Recipient Entity Defendants

16.    Defendant **Sero Capital LLC** is an entity controlled by David Moradi. Moradi sold AudioEye stock through Sero Capital in the Insider Sales. Sero Capital received and holds proceeds of the usurped opportunity. It is named on Counts III–V as a knowing participant and recipient subject to restitution, disgorgement, and a constructive trust. See Exh. 48; Forms 4.

17.    Defendant **CSB IV US Holdings LLC** is an entity controlled by Dr. Carr Bettis. Bettis sold approximately $5.4 million of AudioEye stock through CSB IV in the Insider Sales. CSB IV received and holds proceeds of the usurped opportunity. It is named on Counts III–V as a recipient. See Exh. 48; Forms 4.

18.    Defendant **TurnMark Partners L.P.** is an entity controlled by Jamil Tahir. Tahir sold approximately $3.0 million of AudioEye stock through TurnMark in the Insider Sales. TurnMark received and holds proceeds of the usurped opportunity. It is named on Counts III–V as a recipient. See Forms 4.

### E.    Nominal Defendants

19.    **AudioEye, Inc.** ("AudioEye" or "AEYE") is a Delaware corporation whose common stock trades on the Nasdaq Capital Market under the symbol "AEYE." AudioEye is named in a dual capacity. It is a **defendant** on the individual whistleblower-retaliation claim (Count II). As David Kovacs's employer and principal, it is directly and vicariously liable for retaliatory conduct by officers and agents acting within the scope of their authority. AudioEye is the **nominal defendant** on the derivative claims (Counts III–VI) and on the derivative portion of Count I, because those claims are asserted on its behalf and the relief sought runs to the Company.

## II. JURISDICTION AND VENUE

20.     This action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the whistleblower anti-retaliation provision of the Dodd-Frank Act, 15 U.S.C. § 78u-6(h). This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337.

21.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the derivative state-law claims and the governance claim: breach of fiduciary duty and usurpation of corporate opportunity (Count III), unjust enrichment and restitution (Count IV), accounting and equitable relief (Count V), and governance relief (Count VI). Each forms part of the same case or controversy as the federal claims. Declaratory relief is available under 28 U.S.C. §§ 2201–2202.

22.     At all relevant times, AudioEye was a publicly traded company whose common stock traded on the Nasdaq Stock Market, a national securities exchange operating in interstate commerce. The transactions at issue were executed through interstate markets and clearing systems and involved shareholders residing within this District and throughout the United States.

23.     Defendants used the instrumentalities of interstate commerce – including interstate telephone calls, electronic communications, securities filings with the Securities and Exchange Commission, and national securities exchanges – in furtherance of the Enterprise's activities.

24.     Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events giving rise to the claims occurred here and their effects were felt here. Acts within the District include the solicitation of Kovacs's murder in New York City; the filing of retaliatory litigation in this District; contact with a New York City municipal

official in furtherance of the scheme; and the transmission of settlement pressure through a New York-based financial intermediary.

25.     This Court has personal jurisdiction over each Defendant under 18 U.S.C. § 1965(b) and (d), which authorize nationwide service of process in civil RICO actions where the ends of justice so require. It also has personal jurisdiction under New York's long-arm statute and the Due Process Clause, because each Defendant purposefully directed the alleged conduct at this District and the United States.

### III. STATEMENT OF FACTS

#### A.      Why the Facts Are Pleaded – Context and Corroboration

26.     The AudioEye allegations are plausible because they are not isolated. Plaintiffs allege the same pattern at Formulus Black, First Contact, and AudioEye. Moradi and Bettis entered companies that needed capital, consolidated control, weakened gatekeepers, extracted value, and retaliated when challenged.

27.     Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs incorporate by reference the nineteen sworn declarations and documentary exhibits filed at ECF No. 3. The declarations provide the underlying detail. This pleading states the core facts. The exhibits and declarations show that the allegations are based on a mosaic of facts and behavior over time, not just one individual, one document, or one isolated event.

#### B.      The Enterprise and Its Playbook

28.     Moradi and Bettis operated across a series of companies as a continuing unit with a common purpose and defined roles. See Arena Decl.; David Kovacs Decl.; Lichtenstein Decl. Their method was consistent: (a) enter a company during a period of capital need, using promises of funding and expertise to gain access; (b) consolidate control over financial reporting, cash, and

gatekeepers, reducing transparency and weakening internal controls; (c) extract value through diversion, coerced reallocation, or insider trading while shifting downside to the company and its investors; and (d) respond to challenges with retaliation, litigation, and intimidation.

29.      Moradi functioned as the architect and principal beneficiary. Bettis functioned as the governance stabilizer who controlled access to boards, auditors, and counsel. Humble functioned as the intermediary who recruited investors, transmitted instructions, and applied pressure when control was threatened. See Arena Decl.; David Kovacs Decl.; Ducheine Decl.; DiMaggio Decl.

### C.      The Pattern Before AudioEye

30.      **Formulus Black.** Brian Ignomirello founded Symbolic IO (later Formulus Black) and raised approximately $12.7 million at a roughly $132 million valuation, with prospects for a $250–$500 million exit. See Exh. 48–49, 97–98, 109. After Bettis entered through a convertible note and positioned himself as an advisor, funds began moving outside normal controls. When Ignomirello sought a forensic accounting review, the effort was undermined. False criminal allegations were then manufactured against him, and Bettis financially pressured the mother of Ignomirello's children to bring them. Ignomirello was jailed for four months and lost his company, health coverage, and access to his children. The accuser recanted under oath in May 2023. See Exh. 94. The company collapsed and investor equity was rendered worthless.

31.      **First Contact.** Demian Lichtenstein founded First Contact Entertainment. After Moradi entered in mid-2016, control shifted. On July 18, 2016, Moradi was named a required financial signatory. See Exh. 52. A July 7, 2016 letter leveled false harassment allegations to isolate Lichtenstein. See Exh. 53; Lichtenstein Decl. ¶¶ 9–18. A roughly $250 million sale later collapsed because the books were unauditable. See Anderson Decl.; David Kovacs Decl.

32.    The Formulus Black and First Contact episodes are pleaded as pattern and context, not as derivative claims in this Amended Complaint. They establish that the conduct alleged at AudioEye was the Enterprise's regular method, not an aberration. That adds to the plausibility of the AudioEye allegations.

**D.    AudioEye: Consolidation and the Governance Vacuum**

33.    AudioEye, Inc. is a Nasdaq-listed Delaware corporation. Moradi became a major investor in 2014. When co-founder and then-Executive Chairman Paul Arena identified Moradi's failure to meet SEC reporting obligations and possible coordinated trading, Moradi and Bettis attributed accounting issues to Arena and engineered his removal in 2015. See Arena Decl. ¶¶ 7–15. Moradi joined the board in November 2019, became Interim CEO in August 2020, and became permanent CEO in January 2022. Bettis served as Executive Chairman. Moradi later became Executive Chairman. On May 4, 2026, the Board elevated then-Chief Financial Officer Kelly Georgevich to Chief Executive Officer and to a board seat. Together, Moradi and Bettis exercised effective control over governance, disclosure, and the response to internal complaints.

34.    AudioEye has disclosed that, since at least 2019, it has obtained no independent auditor attestation of internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act. Its internal-control representations rest on management self-certification. See Exh. 86–87. The absence of a functioning, independently tested internal-control system is pleaded as context for the governance vacuum in which the conduct below occurred. No claim is asserted against any auditor.

### E.    Advance Planning of the Manipulation

35.    On August 30, 2023, Moradi instructed Kovacs to assist with coordinated trading designed to create artificial demand. Moradi described the tactic as "painting the tape." Kovacs refused. A confrontation followed, which Mario Rodriguez witnessed. See Rodriguez Decl.; David Kovacs Decl.

36.    The timing is probative of intent. On December 25, 2023 – months before AudioEye's stock experienced its later run-up – another insider, Ben Barton, exchanged messages with Kovacs. Barton described Moradi's exposure and his own intention to come forward. See Exh. 110; David Kovacs Decl. Two insiders were discussing the manipulation before it moved the market. That supports the inference that the later price movement was a manipulation, not an organic price increase.

### F.    The Whistleblowing and Protected Activity

37.    On November 13, 2023, Kovacs reported suspected securities fraud internally. See Exh. 31. The scheduled meeting did not occur. Instead, Bettis telephoned Kovacs and said, "Now Moradi will ruin your life." See David Kovacs Decl.

38.    On January 17, 2024, Kovacs reported Moradi's insider trading directly to Bettis by telephone. Bettis secretly recorded the call. AudioEye's Whistleblower Protection Policy required investigation and escalation. See Exh. 105. None occurred. Kovacs was terminated that day. See Exh. 32; David Kovacs Decl.

39.    Kovacs continued to report externally. He reported to the U.S. Department of Justice on February 8, 2024, see Exh. 33, and to the U.S. Securities and Exchange Commission on April 8, 2024, see Exh. 36. The April 8, 2024 SEC report is significant to the federal retaliation claim because it precedes the materially adverse acts on which Count II rests. The parties' prior state-court actions were Kovacs v. AudioEye, Inc., Index No. 651810/2024

12

("Kovacs I"), commenced April 5, 2024 and dismissed with prejudice on January 31, 2025; and

Kovacs v. AudioEye Inc., Index No. 651191/2025 ("Kovacs II"), commenced March 4, 2025

and dismissed on October 8, 2025. Two acts are the principal adverse acts on which Count II

rests: the November 2025 interference with Kovacs's employment verification, and the May

2026 demand that he recant his protected reports under oath as a condition of settlement. Both

postdate the dismissal of both prior actions and could not have been litigated in either. The

February 4, 2025 republication of the abandoned smears (Exh. 67) postdates the dismissal of

Kovacs I and is pleaded as part of the same continuing retaliatory campaign.

### G.    The Retaliation

40.    **Before the SEC report.** On January 19, 2024, the termination was confirmed

in writing as "for cause." On February 20, 2024, AudioEye forfeited Kovacs's restricted stock.

The forfeiture letter tied the "for cause" termination to Kovacs's accusations against Moradi on

its face. See Exh. 34. AudioEye conducted no investigation of whether Kovacs's report was made

in good faith before forfeiting his equity. Its whistleblower policy prohibits retaliation for good-

faith reports, whether or not they are ultimately substantiated. The units the letter purported to

cancel were, by the terms of AudioEye's own award agreements, contractually due to be settled

into shares no later than March 2021 – years before the forfeiture. The Company's own award

records do not establish that any such shares were ever validly cancelled. On March 20, 2024,

Bettis sent Kovacs a letter (the "Birkin Bag Letter") threatening that Moradi would inflict

"unfathomable physical harm" unless Kovacs capitulated. See Exh. 35.

41.    **After the SEC report.** The campaign continued. Two days after Kovacs

reported to the SEC, on April 10, 2024, AudioEye and Moradi sued him for defamation in

Florida. The complaint asserted false statements about his background that were later

abandoned by amendment. See Exh. 30, 37. On May 2, 2024, Humble filed a parallel defamation action in this District and dismissed it with prejudice on July 3, 2024. See Exh. 39. On or about May 8, 2024, Bettis and the other ESTP members purported to strip Kovacs of the one-third ESTP membership interest he held as a co-founder and Chief Executive Officer of the venture. ESTP's operating agreement required unanimous consent for any transfer. Kovacs did not consent, which renders the purported transfer void. See Exh. 60 §§ 8.01, 8.04. The same deals, counterparties, geography, and personnel then reappeared in Vivid Strategies. Bettis and his ESTP co-member formed that successor entity at ESTP's own Dallas address and claimed credit for ESTP's pipeline. Kovacs received no notice, no consideration, and no distribution. ESTP was wound down on a final K-1 dated September 3, 2025. See Exh. 59–62, 75–76, 90; David Kovacs Decl. ¶¶ 131–153. ESTP's internal materials valued the venture at about $250 million. Kovacs's one-third interest was worth on the order of $83 million, subject to proof. See Exh. 76. The retaliation did not stop. In April 2025, Bettis filed an Arizona action over a purported 2017 loan long since repaid. See Exh. 74. On February 4, 2025, AudioEye republished the abandoned smears in a press release. See Exh. 67. In November 2025, Defendants interfered with Kovacs's employment verification. In May 2026, as a condition of settlement, they demanded that Kovacs swear under oath that his protected reports were false. That demand was coupled with a release of AudioEye's own corporate-recovery claim for no consideration. See Snyder Decl. (ECF 64) ¶¶ 49–50; David Kovacs Decl.

### H.    Witness Tampering, Obstruction, and the Solicitation of Murder

42.    When litigation and financial pressure failed, the Enterprise escalated. In December 2023, Humble – stating that he acted for Bettis – asked Julian Ducheine to "find someone to take care of Kovacs," which Ducheine understood as a solicitation to murder. See

Ducheine Decl. ¶¶ 19–25. In January 2024, Humble renewed the request in person and identified Bettis as "the top man." See Ducheine Decl. ¶¶ 26–29. When Ducheine refused, Humble turned to a former NFL player who had lost approximately $1 million in Formulus Black and offered restitution of that loss in exchange for killing Kovacs. See DiMaggio Decl. ¶¶ 20–32; Ducheine Decl. On or about June 6, 2024, Ducheine warned Kovacs directly by telephone, around the time of a June 6, 2024 email. Ducheine said Humble had asked him to find a hitman in New York or Florida and, after Ducheine refused, had said the former NFL player would do it. See Ducheine Decl.

43.     The solicitation is corroborated from several directions. DiMaggio met with the former NFL player and secured his commitment that Kovacs would not be harmed. See DiMaggio Decl. Kovacs reported the plot to NYPD detectives in April 2025. See Exh. 91. At a June 3, 2025 meeting attended by counsel, the former NFL player was asked directly about the solicitation and correctly identified the address where Kovacs was then living. See DiMaggio Decl.; Tannenbaum Decl.; David Kovacs Decl.; Exh. 93. He had no legitimate reason to know where David Kovacs lived.

44.     The Enterprise also acted to shape and suppress testimony. On December 23, 2024, Humble telephoned Ducheine. As Ducheine later learned, Humble secretly recorded the call and shared the recording with Quinn Emanuel, counsel for AudioEye and Moradi. On January 2, 2025, Quinn Emanuel lawyers pressed Ducheine to state falsely that Kovacs had offered to pay him for his testimony. They invoked the recording as leverage when he refused. On January 20–21, 2025, Quinn Emanuel's Abensohn emailed Ducheine seeking a call. Abensohn then wrote that the firm was prepared to begin formal process to compel his testimony. See Ducheine Decl. ¶¶ 47–53; Exh. 51, 65, 66, 112. On July 24, 2025, Humble left Ducheine a voicemail stating that the recording "was not even used," attributing that account to

15

"Carr and his attorney," and repeatedly assuring Ducheine he had "nothing to worry about." See Exh. 113; Ducheine Decl. All of this conduct postdated, and was independent of, the defamation action Humble dismissed with prejudice on July 3, 2024.

**I.      The December 4, 2024 Financing Window and the Insider Sales**

45.      On February 13, 2024, AudioEye's Form S-3 registration statement became effective. See Exh. 71. That registration statement allowed AudioEye to sell up to $150 million of securities for its own treasury. It also permitted selling stockholders to sell up to 2,820,000 shares. The same registration machinery the insiders later used to sell their own shares was available to AudioEye to raise primary capital for itself.

46.      That market opportunity had substantial value to AudioEye. In 2024, AudioEye's stock rose from roughly $4 to more than $30 per share. AudioEye needed capital. The Company's own testimony confirms that an additional sum on the order of $21 million would have materially improved its financial condition by reducing the need for outside financing, improving access to debt on favorable terms, funding product development the Company had determined was required, and strengthening the balance sheet. AudioEye ended 2024 with approximately $5.7 million in cash and $549,000 in working capital. See Exh. 72; SEC filings.

47.      The insiders usurped the opportunity for themselves. The December 4, 2024 secondary was an express non-issuer offering. The prospectus supplement states that AudioEye sold no securities, received no proceeds, and that all net proceeds went to the selling stockholders. See Exh. 73. On that single day, Moradi (through Sero Capital), Bettis (through CSB IV), and Tahir (through TurnMark) sold 900,000, 225,000, and 125,000 shares, respectively, at $24.00 – $30 million in one day. With Moradi's additional November sales and Georgevich's November sales of approximately $303,500, the insiders extracted $34,070,724.65 in the Insider Sales:

Moradi/Sero Capital $25,367,224.65; Bettis/CSB IV $5,400,000.00; Tahir/TurnMark $3,000,000.00; Georgevich $303,500.00. This figure reflects the proceeds taken by the named insider Defendants and their selling entities, documented to the dollar on their Forms 4. It is the measure of the corporate-opportunity recovery sought, based upon SEC disclosed trades. It is not necessarily exhaustive. AudioEye's own approximately $7 million at-the-market program that year confirms that the Company could have sold $34 million of stock for its own account. Based on AudioEye's own testimony, the Company had need for additional liquidity. No disinterested process or informed business judgment existed to determine whether the Company should take advantage of the opportunity. See Exh. 72. No Form 4 filed by any insider disclosed trading under a Rule 10b5-1 plan. AudioEye's 2024 Form 10-K separately confirmed that no director or officer adopted, modified, or terminated a Rule 10b5-1 arrangement during the fourth quarter of 2024. The first such plans for Moradi and Georgevich were not adopted until May and June 2025 – six months after the December 4, 2024 sale. See Forms 4; Snyder Decl. (ECF 64) ¶ 21.

48.    No disinterested process or informed business judgment existed to determine whether the Company should take advantage of the opportunity. See Exh. 72. No special committee was formed. No independent counsel was retained. No internal corporate-opportunity analysis was performed.

### J.    The Board, Control, and Standing

49.    AudioEye's board comprises five directors: Moradi (Executive Chairman), Tahir, Georgevich (Chief Executive Officer since May 4, 2026), Katherine E. Fleming, and James Hawkins. Three of them – Moradi, Tahir, and Georgevich – sold AudioEye stock in the Insider Sales and cannot impartially evaluate claims arising from those sales. Dr. Carr Bettis also sold in the Insider Sales through CSB IV. He served as a director until May 2025 and is no longer on

17

the Board. The remaining two directors, Fleming and Hawkins, did not sell in the Insider Sales and are not alleged to have personally profited from them.

50.     The corporate claim is therefore controlled by the insiders against whom it runs, and by counsel who simultaneously represents AudioEye and Moradi. That conflict is the subject of Plaintiffs' pending motion to compel AudioEye to retain unconflicted counsel. See ECF Nos. 62–64. AudioEye has not disclosed this action, including the derivative corporate-recovery claim, in any SEC filing – including its 2025 Form 10-K, its Q1 2026 Form 10-Q, and its May 13, 2026 definitive proxy. See Snyder Decl. (ECF 64) ¶¶ 53–57.

51.     Plaintiff Daniel Kovacs has been a continuous beneficial owner of AudioEye common stock since at least December 11, 2023, and has been an investor in AudioEye for over a decade. He owned shares at the time of the November 12–14 and December 4, 2024 transactions and has continued to own them through the present. He purchased additional AudioEye shares after his brother's dispute with AudioEye arose. See Daniel Kovacs Decl. ¶¶ 3–4. Plaintiff Russell Alesi is a current AudioEye shareholder who acquired his shares after the relevant trading and serves as a governance and Rule 23.1 plaintiff. See Alesi Decl.

### K.     Harm

52.     AudioEye was injured by the usurpation of the financing opportunity: $34,070,724.65 in proceeds taken by the insiders and held in the recipient entities. AudioEye was also injured by corporate waste, including corporate funds spent on retaliatory litigation against a whistleblower and economically irrational share repurchases. David Kovacs was injured in his business and property by economic losses arising from the Enterprise's post-2024 retaliatory and obstructive conduct. Those losses include costs incurred in response to the solicitation of violence against him and lost employment and income caused by the November 2025 interference with

18

his employment verification. He was further injured in his property by the expropriation, without consideration, of the one-third ESTP membership interest he held when he engaged in protected reporting, and by the diversion of ESTP's business and goodwill to the successor entity Vivid Strategies (¶41). That loss was accomplished through the Enterprise's predicate acts and is pleaded as an additional measure of his RICO injury. The forfeiture of his vested AudioEye equity is pleaded as evidence of the Enterprise's pattern and method and not as a measure of his RICO injury. The amount of these injuries is to be proven at trial.

## IV. DERIVATIVE AND REPRESENTATIVE ALLEGATIONS

*The underlying facts – board composition, the Insider Sales, the governance vacuum, and Plaintiffs' ownership – are pleaded in the Statement of Facts and incorporated here. This section makes the Rule 23.1 representations and demand-futility showing. Demand is excused because a majority of the board is conflicted. AudioEye's refusal to create an independent corporate process confirmed futility and, in the alternative, was a wrongful refusal not entitled to business-judgment deference. "Demand" is used only in the Rule 23.1 sense. Plaintiffs' governance requests are pleaded as requests to create an independent process, not as litigation demands.*

53.    **AudioEye's dual capacity.** AudioEye is named in two capacities. On the individual whistleblower-retaliation claim (Count II), AudioEye is a defendant. As David Kovacs's employer and principal, it is directly and vicariously liable for retaliatory conduct by its officers and agents undertaken within the scope of their authority and on the Company's behalf. On all other claims – the derivative portion of Count I and the derivative claims in Counts III– VI – AudioEye is the nominal defendant and the real party in interest. The recovery sought on those claims runs to AudioEye's treasury, not to any individual plaintiff.

54.    **Daniel Kovacs's standing.** Daniel Kovacs is, and at all relevant times has been, a beneficial owner of AudioEye common stock. He has continuously owned no fewer than

200 shares since December 11, 2023, including at the time of the November 12–14 and December 4, 2024 transactions, and has continued to own them through the present (¶51). He satisfies the contemporaneous- and continuous-ownership requirements of Delaware law and brings the derivative claims on AudioEye's behalf.

55.     **Daniel Kovacs's adequacy.** Daniel Kovacs has no claim of his own against any defendant and no interest other than the best recovery for AudioEye and its shareholders. He is David Kovacs's brother, but his stake is his own. He has held AudioEye stock continuously since December 11, 2023 – before David Kovacs commenced Kovacs I in April 2024. He added to his position with funds in accounts he controls, based on his own view of the Company, in May 2024 and April 2025, after that dispute had become public. He has not assigned any claim and has been promised nothing for serving. Other than his written engagement agreement with counsel, he has no agreement, arrangement, or understanding with David Kovacs or anyone else concerning this litigation. No agreement gives him any personal benefit or requires him to act other than in the interests of AudioEye and its shareholders. His continuing investment reflects a genuine economic interest aligned with the Company's recovery. He will fairly and adequately represent the interests of AudioEye and its shareholders. See Daniel Kovacs Decl. ¶¶ 2–4, 10–11.

56.     **Russell G. Alesi.** Alesi is a current beneficial owner of AudioEye common stock. He has held 4 shares continuously since approximately October 7, 2025. He prosecutes the derivative governance claim and the Rule 23.1 process function. On June 4, 2026, Alesi executed and verified under oath a demand under 8 Del. C. §§ 219 and 220 (the "Alesi Demand"). It seeks inspection of the Company's stockholder list and books and records, access to the June 22, 2026 annual meeting, and corrective proxy disclosure of the derivative claim. The Alesi Demand will be served on the Company contemporaneously with these motion papers. Daniel Kovacs executed a separate demand under 8 Del. C. §§ 219 and 220, dated June 7, 2026. His demand

joins in the purposes and requests of the Alesi Demand while separately stating his ownership, status, purposes, and verification. Alesi's §§ 219–220 inspection and meeting-access rights are direct shareholder rights asserted in his individual capacity. The governance declarations and injunction in Count VI (¶¶102–103) are derivative.

57.    **David Kovacs.** David Kovacs appears solely in his individual capacity on the federal claims in Counts I–II. He is, was, and at all relevant times has been an AudioEye shareholder, and his shares were never validly revoked or cancelled. He has held AudioEye stock since at least 2021, when the restricted stock units the Company granted him were, by the terms of AudioEye's own award agreements, contractually due to be settled into shares. See ¶ 40; Snyder Decl. (ECF 64) ¶¶ 45–48. Consistent with AudioEye's own sworn testimony, the Company conducted no good-faith investigation before purporting to cancel that equity, could not state how many AudioEye shares Kovacs held, and could not establish that any of his shares were ever validly cancelled. David Kovacs does not seek to serve as the derivative representative because he holds individual claims against the Enterprise. He does not lead the derivative claims for that reason, and because Daniel Kovacs, a shareholder with no individual claim against any Defendant, prosecutes them. The derivative claims are therefore prosecuted by Daniel Kovacs and Russell G. Alesi. Through their books and records demands, Daniel Kovacs and Russell G. Alesi are seeking information needed to communicate with other shareholders concerning this matter, which the Company has not disclosed in its proxy materials.

58.    **Rule 23.1 recitals.** The verifications of Daniel Kovacs and Russell G. Alesi are incorporated by reference. This action is not collusive and is not brought to confer jurisdiction the Court would otherwise lack. Daniel Kovacs and Russell G. Alesi will fairly and adequately represent AudioEye and its similarly situated shareholders. Their interests are not antagonistic to the Company's interests.

21

**Demand Is Excused; AudioEye's Refusal To Create an Independent Process Confirms Futility**

59.    **The standard.** Demand is excused because AudioEye does not have a board capable of impartially evaluating the derivative claims. Under Delaware law, futility is assessed director-by-director. For each director who would consider a demand, the Court asks whether the director received a material personal benefit from the alleged misconduct, faces a substantial likelihood of liability, or lacks independence from a director who did. Demand is excused when a majority of the board cannot impartially consider it. The derivative claims challenge a transaction in which AudioEye insiders used the Company's registration machinery and market opportunity to extract approximately $34 million for themselves and their selling entities, while AudioEye received no proceeds from that resale. That conduct directly implicates members of the board and senior management.

60.    **The demand board.** The board comprises five directors (¶49): Moradi, Tahir, Georgevich, Fleming, and Hawkins. Three – Moradi, Tahir, and Georgevich – sold in the Insider Sales and are interested. Bettis sold through CSB IV but ceased to be a director in May 2025. He is not among those who would consider a demand.

61.    **Moradi** cannot impartially consider a demand. As Executive Chairman, he controlled the Company and the offering mechanism. He sold through Sero Capital for $25,367,224.65, a material benefit, and faces a substantial likelihood of liability as the principal subject of the claims.

62.    **Tahir** cannot impartially consider a demand. He sold through TurnMark for approximately $3,000,000, a material benefit, and faces a substantial likelihood of liability. He holds his Board seat through director-designation rights exercised by Sero Capital – the Moradi entity through which Moradi sold in the Insider Sales – under an August 14, 2019 Letter

Agreement disclosed in AudioEye's May 13, 2026 definitive proxy. He is not independent of Moradi.

63.    **Georgevich** cannot impartially consider a demand. She sold for approximately $303,500, a material benefit, and faces a substantial likelihood of liability as the Company's then-CFO. She was elevated to CEO and to the board on May 4, 2026 by the Moradi-controlled board, so she is not independent of Moradi. Her addition created a three-to-two interested majority.

64.    **Plaintiffs asked AudioEye to cure the conditions that made demand futile.** Plaintiffs did not ask the conflicted board to exercise business judgment over claims against its own members. They repeatedly asked AudioEye to create an unconflicted corporate voice: independent counsel for the Company, a special committee of the two disinterested directors (Fleming and Hawkins), adherence to the Rule 23.1 process, and shareholder notice before any derivative claim could be released, compromised, or dismissed. Plaintiffs also tendered proposed board resolutions that gave the disinterested directors a ready path to do so.

65.    **AudioEye refused; the refusal confirms futility.** AudioEye did not appoint a special committee, retain independent counsel for the Company, conduct an independent investigation of the corporate-opportunity claim, or give shareholders notice. To Plaintiffs' knowledge, Fleming and Hawkins were never even provided the documentary record or the proposed resolutions. The same counsel that represents Moradi signed AudioEye's motion to dismiss. That counsel stated it would continue to represent both AudioEye and Moradi through the motion-to-dismiss phase and would press the pending sanctions motion. As described in ECF No. 62-64 (motion to compel AudioEye to retain unconflicted counsel), Moradi's interests are in direct conflict with AudioEye's. Through that same counsel, AudioEye pressed a global settlement on a one-business-day deadline. The settlement would have dismissed the derivative

23

claims with prejudice and released the Company's approximately $34 million corporate-recovery claim against Moradi and the selling insiders for no consideration to AudioEye. This was to occur outside the Rule 23.1 process. AudioEye represented only that the Company and Board would obtain separate counsel to evaluate and approve final terms "[t]o the extent" required. The refusal left the same conflicted structure in place and made it worse by adding Georgevich, a selling insider and former CFO, to the board.

66.    **Demand is excused; in the alternative, any demand was wrongfully refused.** For these reasons, a majority of the demand board is interested in the Insider Sales, faces a substantial likelihood of liability, or lacks independence from those who are. Pre-suit demand is excused as futile under Fed. R. Civ. P. 23.1 and Delaware law. In the alternative, to the extent any request for an independent process is deemed a litigation demand, that demand was wrongfully refused and is not entitled to business-judgment deference. AudioEye did not refuse after a disinterested, informed, good-faith investigation. It refused without independent counsel, without a special committee, without a documented investigation, and without shareholder notice, while conflicted counsel continued to speak simultaneously for AudioEye and the principal insider defendant. That is not a protected corporate judgment. It is the disabling conflict in operation.

## V. CAUSES OF ACTION

*Each Count incorporates all preceding paragraphs.*

### COUNT I – CIVIL RICO · 18 U.S.C. §§ 1962(c), 1962(d), 1964

*(By David Kovacs individually; and by Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc. – against Moradi, Bettis, and Humble. AudioEye is the derivative victim, not a RICO person-defendant.)*

67.    Plaintiffs repeat and reallege each preceding paragraph.

68.     **The Enterprise.** Moradi and Bettis, together with Jason Humble and a recurring group of intermediaries and controlled entities – including entities and persons beyond the named defendants – formed an association-in-fact enterprise within § 1961(4) (the "Enterprise"). The Enterprise's common purpose was to seize control of companies during periods of capital need, consolidate control over their finances and gatekeepers, extract value, and suppress those who threatened exposure. It functioned as a continuing unit with an ascertainable structure and an existence separate and distinct from the defendant-persons and from the predicate acts it committed. See ¶¶28–32; Arena Decl.; David Kovacs Decl.; Lichtenstein Decl.; Ducheine Decl.; DiMaggio Decl.

69.     **Conduct.** Moradi and Bettis are "persons" under § 1961(3). They conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, in violation of § 1962(c). Humble and the remaining participants knowingly participated in the Enterprise's affairs with knowledge of its objectives.

70.     **Pattern – predicate acts** within § 1961(1):

a.  **Wire fraud (§ 1343)** – interstate communications in furtherance of the fraudulent solicitation of investors in, and diversion of assets from, Formulus Black and First Contact (¶¶30–31; Exh. 48–50, 52–53, 78, 98–99; Lichtenstein Decl.; Ducheine Decl.); the diversion of ESTP's business, contracts, and goodwill to the successor entity Vivid Strategies after Kovacs's protected reporting, through interstate communications and without consideration to Kovacs (¶41; Exh. 59–62, 75–76; David Kovacs Decl. ¶¶ 140–146); the diversion of corporate funds, including use of a JDLK-titled account to cause AudioEye to pay personal expenses (Exh. 107); and the funding and coordination of retaliatory litigation against Kovacs (¶41; Exh. 37, 39, 74).

b.  **Witness tampering / retaliation (§§ 1512(b), 1512(c), 1513(e))** – the December 23, 2024 secretly recorded Ducheine call and scripted-narrative pressure; the January 2, 2025 effort through Quinn Emanuel to manufacture a false bribery account; the January 20–21, 2025 threat to begin formal process to compel testimony; the July 24, 2025 voicemail conveying coordination with "Carr and his attorney"; interference with the contemplated disqualification motion; and third-party pressure to suppress testimony (¶44; Ducheine Decl.; David Kovacs Decl.; Exh. 51, 65, 66, 112, 113).

c. **Murder-for-hire (§ 1958)** – at the direction of Bettis and Moradi, Humble used facilities of interstate commerce to solicit Kovacs's murder for consideration of pecuniary value. He offered a former NFL player restitution of his approximately $1 million Formulus Black loss in exchange for killing Kovacs, to maintain Enterprise control and deter cooperation with regulators. Humble's related solicitations of Ducheine in December 2023 and January 2024 are pleaded above as obstruction under §§ 1512–1513 (¶¶42–43; Ducheine Decl.; DiMaggio Decl.; Tannenbaum Decl.; Exh. 40–42, 51, 91, 93).

d. **Hobbs Act extortion (§ 1951)** – the wrongful use of fear of physical harm to obtain property from Kovacs, namely the surrender or release of his legal claims on the insiders' terms. The predicate includes the March 20, 2024 Birkin Bag Letter threatening physical harm unless he capitulated (¶40; Exh. 35).

71. **Relatedness and continuity** under H.J. Inc. – common participants, victims, methods, and purpose; closed-ended continuity across three companies; and open-ended continuity through ongoing concealment and retaliation.

72. **No securities-fraud predicate.** No predicate act alleged rests on conduct actionable as fraud in the purchase or sale of securities. The pattern and injuries pleaded here are independent of the securities-related allegations and comply with the RICO Amendment to § 1964(c).

73. **Conspiracy – § 1962(d).** Moradi, Bettis, and Humble each knowingly agreed to participate in the Enterprise's affairs through a pattern of racketeering. Each agreed that at least two predicate acts would be committed.

74. **Injury and proximate cause** under Holmes and Anza:

a. **David Kovacs** suffered injury to his business and property by reason of the Enterprise's racketeering activity. His RICO standing rests on concrete economic losses arising from the Enterprise's post-2024 obstruction and the solicitation of violence against him. Those losses include out-of-pocket security and relocation expenses and lost employment and income caused by the November 2025 interference with his employment verification (¶¶41–43, 52, 78; David Kovacs Decl.; DiMaggio Decl.; Ducheine Decl.). Kovacs was also injured in his property by the expropriation of his one-third ESTP membership interest and the diversion of ESTP's business and goodwill to Vivid Strategies, effected through the Enterprise's wire-fraud predicate (¶¶41,

70(a); Exh. 59–62, 75–76; David Kovacs Decl. ¶¶ 140–146), in an amount to be proven at trial. The forfeiture of his vested AudioEye equity (¶40; Exh. 34, 80–82), which was litigated in the prior state actions, is pleaded as evidence of the Enterprise's pattern and method and not as a measure of his RICO standing.

b. **AudioEye (derivatively)** suffered injury to business and property through corporate waste and diversion of corporate assets, including expenditures to fund retaliatory litigation against a whistleblower and funds diverted from the Company, in an amount to be proven (¶52; Exh. 37, 107). Disgorgement of the insider-sale proceeds is sought under Counts III–V and is not pleaded as RICO injury here.

75.     **Relief.** Treble damages, costs, reasonable attorneys' fees, and equitable relief under § 1964(c).

## COUNT II – WHISTLEBLOWER RETALIATION

## Dodd-Frank § 21F, 15 U.S.C. § 78u-6(h)

*(By David Kovacs, against AudioEye, Inc., as his employer.)*

76.     Plaintiff repeats and realleges each preceding paragraph.

77.     **Protected status.** On April 8, 2024, Kovacs reported securities-law violations to the SEC (¶39; Exh. 36) and is a "whistleblower" entitled to § 21F anti-retaliation protection.

78.     **Materially adverse action after the SEC report.** After the SEC report, AudioEye retaliated. The principal materially adverse acts on which Count II rests are: (a) the November 2025 interference with Kovacs's employment verification; and (b) the May 2026 demand, as a condition of settlement, that he swear to having made "false claims of racism, fraud, and securities manipulation" – a coerced recantation intended to punish and deter his protected reporting. The February 4, 2025 press release republishing abandoned smears (Exh. 67) is pleaded as part of the same continuing retaliatory campaign and as evidence of motive, willfulness, and causation. The funding and prosecution of litigation against Kovacs – the Florida action filed April 10, 2024, two days after the SEC report, and the Arizona action filed in April

2025 – are pleaded as part of the same retaliatory campaign and as evidence of motive, not as the operative adverse act (¶41; Exh. 30, 37, 74).

79.    **Causation.** Retaliatory motive is shown by temporal proximity – two days from the SEC report to the Florida suit – and by the escalating, coordinated campaign. The pre-report conduct is pleaded as evidence of animus, willfulness, and the continuing nature of the campaign, not as the operative act of retaliation. That conduct includes the February 20, 2024 RSU forfeiture letter tying the purported "for cause" termination to Kovacs's accusations against Moradi (¶40; Exh. 34), the threats, and the solicitation of Kovacs's murder (¶¶42–43; Exh. 35, 40–42; Ducheine Decl.; DiMaggio Decl.).

80.    **Relief.** Reinstatement or front pay, two times back pay with interest, and litigation costs, expert fees, and reasonable attorneys' fees under § 78u-6(h)(1)(C).

## COUNT III – BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY / USURPATION OF CORPORATE OPPORTUNITY (DERIVATIVE)

### Delaware common law

*(By Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc. – against Moradi, Tahir, and Georgevich as fiduciaries, and against Bettis, Sero Capital, CSB IV, and TurnMark as knowing participants and recipients.)*

81.    Plaintiff repeats and realleges each preceding paragraph.

82.    **Derivative standing and demand futility** are established at ¶¶ 54–66 above and incorporated here.

83.    **Fiduciary duty.** Moradi, Tahir, and Georgevich, as directors and/or officers, owed AudioEye duties of loyalty and good faith.

84.    **The opportunity.** AudioEye had need for additional capital. AudioEye had the ability to sell stock for its own account through existing registration machinery. The insiders

consumed for themselves this market opportunity. The December 4, 2024 financing opportunity was a corporate opportunity belonging to AudioEye because: (a) AudioEye's own registration statement created the mechanism for the sale; (b) AudioEye was financially able to exploit the opportunity and had already accessed the market for its own account; (c) AudioEye needed capital, and the Company's own testimony confirms that at least $21 million of additional capital would have materially improved its financial condition; (d) the insiders controlled the Company, so no disinterested decision-maker evaluated whether the window belonged to AudioEye; and (e) the insiders chose the side of the registration statement that paid them rather than the side that funded the Company. See Exh. 71–73; Forms 4; SEC filings.

85.    **Absence of process.** No special committee was formed, no independent counsel retained, and no internal corporate-opportunity analysis performed before the insiders captured the window (¶¶48, 65).

86.    **Registration rights, in the alternative.** Either the insiders held only limited, conditional registration rights and exercised them disloyally and without process, or the conflicted Board discretionarily registered its own members' shares – a related-party act requiring disinterested approval that was never obtained. Under either alternative, no disinterested decision-maker determined whether the opportunity belonged to AudioEye.

87.    **The proceeds.** The insiders extracted $34,070,724.65: Moradi/Sero Capital $25,367,224.65; Bettis/CSB IV $5,400,000.00; Tahir/TurnMark $3,000,000.00; Georgevich $303,500.00 (¶47). See Forms 4. The recipient entities hold those proceeds.

88.    **Liability of participants and recipients.** Dr. Carr Bettis and the recipient entities Sero Capital, CSB IV, and TurnMark knowingly participated in and substantially assisted the breaches. They also received and hold proceeds of the usurped opportunity. They

29

are liable for aiding and abetting breach of fiduciary duty and as recipients subject to disgorgement (Counts IV–V).

89.    **Injury and relief.** AudioEye was injured in the amount of the usurped proceeds. Plaintiff seeks, on AudioEye's behalf, disgorgement of $34,070,724.65, a constructive trust (Count V), an accounting, prejudgment interest, and fees.

## COUNT IV – UNJUST ENRICHMENT / RESTITUTION (DERIVATIVE)

*(In the alternative to Count III. By Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc., against Moradi, Sero Capital, Bettis, CSB IV, Tahir, TurnMark, and Georgevich.)*

90.    Plaintiff repeats and realleges each preceding paragraph. This Count is pleaded expressly in the alternative under Fed. R. Civ. P. 8(d)(2)–(3). Unlike Count III, it provides an independent basis of liability reaching the non-fiduciary recipient entities. It survives even if a fiduciary or demand-futility element of Count III is not sustained.

91.    **Enrichment at AudioEye's expense.** Defendants and the recipient entities were enriched by retaining the proceeds of a financing opportunity belonging to AudioEye. The enrichment came at AudioEye's expense and occurred under circumstances in which equity and good conscience do not permit retention.

92.    **Reach to the recipient entities.** Sero Capital, CSB IV, and TurnMark owe AudioEye no fiduciary duty, but each holds proceeds that in equity belong to AudioEye. This Count reaches them where Count III does not.

93.    **Governing law, in the alternative.** As against the fiduciary Defendants, this Count is governed by Delaware law under the internal-affairs doctrine. As against the non-fiduciary recipient entities, it is governed by New York law. It is pleaded under both.

94.    **Scope.** AudioEye is entitled to restitution of the $34,070,724.65 in proceeds of the Insider Sales.

30

95.    **Relief.** Restitution and disgorgement to AudioEye, together with the constructive trust and equitable lien sought in Count V.

## COUNT V – ACCOUNTING AND EQUITABLE RELIEF (DERIVATIVE)

*(By Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc., against Moradi, Sero Capital, Bettis, CSB IV, Tahir, TurnMark, and Georgevich.)*

96.    Plaintiff repeats and realleges each preceding paragraph.

97.    **Accounting.** The fiduciary Defendants owe AudioEye a duty to account for the proceeds of the usurped opportunity and their disposition. The recipient entities hold identifiable proceeds and traceable assets. Plaintiff is entitled to an accounting of the proceeds received, transfers made, expenditures charged, and present location of the funds.

98.    **Equitable remedies.** Plaintiff seeks, on AudioEye's behalf, a constructive trust and equitable lien on the proceeds of the Insider Sales and all assets traceable to them – including assets held by Sero Capital, CSB IV, and TurnMark and any property acquired with the proceeds – together with tracing and disgorgement.

99.    **No adequate remedy at law** exists as to the accounting, tracing, and security relief sought.

## COUNT VI – DECLARATORY AND INJUNCTIVE RELIEF; GOVERNANCE AND RULE 23.1 PROCESS ·28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 23.1

*(By Russell G. Alesi and Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc.)*

100.    Plaintiffs repeat and reallege each preceding paragraph.

101.    **Controversy.** An actual, justiciable controversy exists concerning AudioEye's governance, the disinterestedness of those who control the prosecution and disposition of the derivative claim, and protection of that claim from release without value to the Company.

102.    **Declarations sought.** Plaintiffs seek declarations that: (a) a majority of the current Board is interested and cannot impartially evaluate, prosecute, settle, or release the derivative claim; (b) counsel purporting to act for AudioEye is conflicted to the extent it also represents the interested insiders (see the pending motion to compel unconflicted counsel, ECF Nos. 62–64); and (c) the derivative corporate-opportunity claim belongs to AudioEye and may not be released, dismissed, compromised, or impaired without notice and approval under Rule 23.1(c) and reasonable consideration to the Company.

103.    **Injunctive relief.** Plaintiffs seek to enjoin any release, dismissal, or compromise of the derivative claim absent Rule 23.1(c) approval. They also seek corrective-disclosure, stockholder-list, and annual-meeting-access relief. Alesi's §§ 219–220 inspection and meeting-access relief is sought in his direct shareholder capacity. The governance declarations and the Rule 23.1 injunction are derivative.

104.    **Independent process welcomed.** Plaintiffs do not seek to manage AudioEye. They welcome the Board's seating of a special committee or the engagement of independent special counsel to evaluate the derivative claim on its merits and to determine which claims should be brought, and against whom, on the Company's behalf. The relief sought is designed to ensure that the evaluation and disposition proceed through a disinterested, independent process rather than conflicted control.

105.    **Relief.** Declaratory and injunctive relief, costs, and fees.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment as follows:

    A.  On Count I, treble damages, costs, and fees under 18 U.S.C. § 1964(c) to David Kovacs and, derivatively, to AudioEye;

B. On Count II, reinstatement or front pay, two times back pay with interest, and costs and fees under § 78u-6(h), against AudioEye;

C. On Counts III–V, on AudioEye's behalf, disgorgement of $34,070,724.65, restitution, an accounting, a constructive trust and equitable lien on the proceeds and traceable assets, prejudgment interest, and fees;

D. On Count VI, the declaratory and injunctive relief specified, including Rule 23.1(c) protection of the derivative claim;

E. Such other and further legal or equitable relief as the Court deems just and proper.

**JURY TRIAL DEMANDED** on all claims so triable.

## VII. RESERVATION OF RIGHTS

The Causes of Action above are the strongest and best-supported claims to assert at this stage on AudioEye's behalf and on behalf of the individual Plaintiff. They are asserted without prejudice to, and reserve, all additional claims that AudioEye – or a duly constituted special committee or independent special litigation counsel – may elect to assume, add, substitute, or pursue, including claims against persons not named here. Nothing in this Amended Complaint releases, waives, impairs, settles, or adjudicates any such claim.

Dated: New York, New York
        June 11, 2026

Respectfully submitted,

**JOHN H. SNYDER PLLC**


_____

John H. Snyder
157 East 81st Street, Suite 3A
New York, New York 10028
(917) 292-3081
john@jhs.nyc
*Counsel for Plaintiffs*