# EXHIBIT B

## REDLINE COMPARISON OF PROPOSED AMENDED COMPLAINT AGAINST ORIGINAL COMPLAINT

| | |
|---|---|
| **Old file** | 2025.12.12 - Kovacs Complaint SDNY - Filed(15).pdf |
| **New file** | Exh. A - 2026_06_11_-_Proposed_Amended_Complaint_v25.pdf |
| **Comparison type** | Text-only redline from PDF-extracted text |
| **Old extracted lines** | 2,731 |
| **New extracted lines** | 798 |
| **Unchanged lines** | 13 |
| **Deleted/replaced old lines** | 2,721 |
| **Inserted/replaced new lines** | 1,662 |

Deleted text appears red and struck through.

Added text appears blue and underlined.

This comparison was generated as a text-only redline from the extracted text of the two PDF documents. Page numbers and ECF filing-stamp artifacts were omitted from the comparison where mechanically extracted as standalone page artifacts.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

~~DAVID KOVACS, RUSSELL ALESI, JULIAN~~ DANIEL KOVACS, derivatively on behalf of ~~DUCHEINE and DEMIAN LICHTENSTEIN,~~ AUDIOEYE, INC.; RUSSELL G. ALESI, derivatively on behalf of AUDIOEYE, INC.; and DAVID KOVACS, individually,

Plaintiffs,

~~- versus - COMPLAINT~~

v.

DAVID MORADI~~,~~; ~~DR.~~SERO ~~CARR~~CAPITAL ~~BETTIS,~~LLC; ~~JASON~~Case No. 25-CV-10336 (JPO)
~~HUMBLE, JAMIL TAHIR, JAMES HAWKINS,~~
DR. CARR BETTIS; CSB IV US [PROPOSED] AMENDED
~~DR. KATHERINE FLEMING, TONY COELHO, Jury Trial Demanded~~
HOLDINGS LLC; JAMIL TAHIR; COMPLAINT – JURY TRIAL
~~KELLY GEORGEVICH, JAMES SPOLAR,~~
TURNMARK PARTNERS L.P.; KELLY DEMANDED
~~MALONEBAILEY LLC, AUDIOEYE, INC. and December 12, 2025~~
GEORGEVICH; and JASON HUMBLE,
~~JOHN DOE 1-50,~~

Defendants,

~~-and-~~

~~ETERNAL SOURCES TECH PARTNERS LLC,~~

AUDIOEYE, INC.,

~~FIRST CONTACT ENTERTAINMENT, INC.,~~

Defendant and Nominal Defendant.

~~FORMULUS BLACK, INC.,~~

~~Nominal Defendants.~~

~~JOHN H. SNYDER PLLC TURTURRO LAW, P.C.~~

~~John H. Snyder, Esq. Natraj S. Bhushan, Esq.~~

~~157 East 81st Street, Suite 3A 1361 N. Railroad Avenue~~

~~New York, NY 10028 Staten Island, NY 10306~~

~~(917) 292-3081 (718) 384-2323~~

~~john@jhs.nyc natraj@turturrolawpc.com~~

~~Counsel for Plaintiffs Personal Counsel~~

~~for David Kovacs~~

~~ADDRESSES OF DEFENDANTS / NOMINAL DEFENDANTS~~

DAVID MORADI DR. CARR BETTIS

Executive Chairman SPENCER FANE LLP

AudioEye, Inc. Eric D. Gere

5210 E. Williams Circle Dontan K. Hart

Suite 750 2415 E. Camelback Road, Suite 600

Tucson, AZ 85711 Phoenix, Arizona 85016-4251

JASON HUMBLE AUDIOEYE, INC.

Salzano Ettinger Lamperg & Wilson LLP AudioEye, Inc.

104 West 40th Street 5210 E. Williams Circle

14th Floor Suite 750

New York, NY 10018 Tucson, AZ 85711

VIVID STRATEGIES LLC ETERNAL SOURCES TECH PARTNERS LLC

25 Highland Park Village 25 Highland Park Village

Suite 100-510 Ste 100-510

Dallas, Texas 75205 Dallas, Texas 75205

JAMIL TAHIR JAMES HAWKINS

Director Director

AudioEye, Inc. AudioEye, Inc.

5210 E. Williams Circle 5210 E. Williams Circle

Suite 750 Suite 750

Tucson, AZ 85711 Tucson, AZ 85711

DR. KATHERINE FLEMING TONY COELHO

Director Former Director

AudioEye, Inc. AudioEye, Inc.

5210 E. Williams Circle 5210 E. Williams Circle

Suite 750 Suite 750

Tucson, AZ 85711 Tucson, AZ 85711

KELLY GEORGEVICH JAMES SPOLAR

Chief Financial Officer General Counsel

AudioEye, Inc. AudioEye, Inc.

5210 E. Williams Circle 5210 E. Williams Circle

Suite 750 Suite 750

Tucson, AZ 85711 Tucson, AZ 85711

MALONEBAILEY LLP FIRST CONTACT ENTERTAINMENT, INC.

9801 Westheimer Road, Suite 1100 David Moradi, Chairman

Houston, TX 77042 30699 Russell Ranch Road, Suite 170

Westlake Village, CA 91362

FORMULUS BLACK, INC.

Steven Mitnick, Esq.

Marc D. Miceli, Esq.

S. MITNICK LAW PC

P.O. Box 530

49 Old Turnpike Road

Oldwick, New Jersey 08858

Assignee for Benefit of Creditors

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT...................................................................................1

A. The Enterprise Leaders.................................................................................2

B. The Whistleblower......................................................................................4

C. The Retaliation...........................................................................................6

D. The Weaponized Victims.............................................................................8

E. The Independent Directors.........................................................................10

PARTIES, JURISDICTION, AND VENUE...............................................................11

I. Plaintiffs....................................................................................................11

II. Defendants................................................................................................12

A. Enterprise Defendants...............................................................................12

1. David Moradi............................................................................................12

2. Dr. Carr Bettis..........................................................................................15

3. Jason Humble............................................................................................17

4. John Doe 1-50...........................................................................................19

B. Director Defendants...................................................................................19

C. Executive Defendants................................................................................20

D. Professional Defendants............................................................................20

E. John Doe Defendants.................................................................................21

III. Nominal Defendants.................................................................................21

JURISDICTION AND VENUE................................................................................22

STATEMENT OF FACTS.......................................................................................23

I. ENTERPRISE STRUCTURE, AGREEMENT, AND CONTINUITY...............................23

A. The Existence of an Ongoing Enterprise......................................................23

B. Allocation of Roles Within the Enterprise....................................................24

C. Interstate Commerce and Continuity..........................................................26

II. PRIOR ITERATIONS OF THE ENTERPRISE PLAYBOOK........................................27

A. First Contact Entertainment.......................................................................27

B. Formulus Black / Symbolic IO....................................................................28

C. ESTP – The Same Story.............................................................................29

III. ESCALATION INTO THE PUBLIC MARKETS AT AUDIOEYE....................................30

A. Consolidation of Control.............................................................................30

B. Advance Planning of Stock Manipulation....................................................... 30

C. Liquidity Infrastructure and Insider Sales........................................................31

IV. WHISTLEBLOWING, RETALIATION, AND CONVERSION TO PROCEEDS........... 32

A. Protected Disclosures..................................................................................32

B. Retaliation.................................................................................................. 33

C. Harm and Proceeds....................................................................................36

V. WITNESS TAMPERING AND OBSTRUCTION OF JUSTICE....................................... 37

A. Witness Julian Ducheine............................................................................. 38

1. Murder Solicitations – Motive to Tamper.......................................................38

2. December 2024 – Quinn Pressure Campaign.................................................... 38

3. January 2, 2025 Text Messages ("Juju")..........................................................39

4. July 24, 2025 Voicemail — Direct Evidence of Coordinated Obstruction..............39

B. Tampering Directed at Senior Advisor to the Mayor of New York City....................... 40

C. Interference With Attorney Xavier Suarez.........................................................40

D. Pressure Through Senior Blackstone Executive Directed by Mayor Suarez................42

E. Summary of Tampering and Obstruction........................................................... 42

COUNT I – CIVIL RICO.................................................................................... 43

COUNT II – SECURITIES FRAUD.........................................................................46

COUNT III – WHISTLEBLOWER RETALIATION....................................................... 49

COUNT IV – INTERFERENCE WITH ERISA-PROTECTED BENEFITS...............................50

COUNT V – BREACH OF FIDUCIARY DUTY (DIRECT)..............................................52

COUNT VI – BREACH OF FIDUCIARY DUTY (DERIVATIVE)........................................54

COUNT VII – BREACH OF FIDUCIARY DUTY – ESTP................................................56

COUNT VIII – UNJUST ENRICHMENT....................................................................57

COUNT IX – MALICIOUS PROSECUTION AND ABUSE OF PROCESS.............................. 58

COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS............................. 60

COUNT XI – COMMON LAW TORTS – LICHTENSTEIN.............................................. 61

COUNT XII – DECLARATORY AND INJUNCTIVE RELIEF............................................64

PRAYER FOR JUDGMENT....................................................................................67

SCHEDULE A – DEFINITIONS..............................................................................69

SCHEDULE B – [DRAFT] AUDIOEYE BOARD RESOLUTIONS..................................... 75

SCHEDULE C – RICO CASE STATEMENT.............................................................. 78

SCHEDULE D – RICO PREDICATE TABLE.............................................................. 82

SCHEDULE E – MATERIAL MISREPRESENTATIONS AND OMISSIONS.......................... 88

SCHEDULE F – REBUTTAL OF AUDIOEYE'S FALSE SMEARS..................................... 91

SCHEDULE G – DAMAGES MODEL.......................................................................95

SCHEDULE H – DAMAGES MATRIX..........................................................................................102
SCHEDULE I – ANNOTATED TIMELINE................................................................................ 104
SCHEDULE J – TABLE OF EXHIBITS..................................................................................... 109

Plaintiffs David Kovacs, Russell Alesi, Julian Ducheine and Demian Lichtenstein, by and through their undersigned counsel of record, allege as follows on personal knowledge as to matters relating to them, and on information and belief as to all other matters.1

Kovacs brings this action under circumstances that raise serious concerns regarding retaliation, coercion, and personal safety, all of which are pleaded in detail below. For that reason, Plaintiffs have deliberately placed the full factual and documentary record before the Court and before the AudioEye Board of Directors, including any independent directors, special committee, or special counsel. Plaintiffs do so to ensure that the Company's fiduciaries can evaluate and act upon the matters alleged based on an immutable record that does not depend on the continued availability, cooperation, or physical safety of any individual witness. This filing is intended to foreclose informational asymmetry, prevent after-the-fact revision of events, and ensure that appropriate governance action may proceed without delay.

PRELIMINARY STATEMENT

1. AudioEye is confronted with an existential crisis.

1. This action seeks to recover for AudioEye, Inc. an approximately $34 million

2. AudioEye's independent directors, Dr. Katherine Fleming and James Hawkins

corporate opportunity. AudioEye's controlling insiders diverted that opportunity to themselves

(the "Independent Directors"), face a choice: exercise leadership now or be left holding the bag and excluded the Company.

when AudioEye collapses under the weight of insider fraud. Ignorance is no longer a plausible

2. In 2024, AudioEye's stock rose from about $4 to more than $30 per share,

excuse. The Independent Directors now face significant fiduciary risk if they fail to act upon creating an opportunity for the company to raise capital on advantageous terms. AudioEye had credible allegations supported by sworn testimony. Now it is incumbent upon the Independent an effective registration statement and access to the public markets. It could have raised $34 Capitalized terms have the meanings set forth in Schedule A. This Complaint incorporates by million in equity to support its growth and compete in the market. The Company has confirmed reference the annexed Schedules A through J and all Exhibits annexed hereto, including 19 that $21 million in additional cash would have materially improved its financial condition. sworn declarations that, together, corroborate Plaintiffs' allegations. This Complaint further Instead, the insiders consumed the opportunity for themselves. On December 4, 2024, David incorporates by reference AudioEye's SEC filings during the Class Period and the public dockets Moradi, Carr Bettis, and Jamil Tahir sold $30 million of their own AudioEye stock through the in the several Kovacs Litigations. Company's registration machinery. AudioEye received nothing. Across the November and

~~Directors to act swiftly, decisively, and independently to save 165 jobs and $150 million in~~

~~December 2024 sales, the insiders took $34,070,724.65 (the "Insider Sales"). AudioEye's market~~

~~shareholder value.~~

capitalization is now about $90 million.

~~3. This civil RICO action describes a racketeering enterprise (the "Enterprise")~~

3. No disinterested board approved the Insider Sales. No special committee

~~orchestrated over a decade by senior AudioEye executives David Moradi ("Moradi") and Dr.~~

evaluated whether the $34 million opportunity belonged to AudioEye. The Company had no

~~Carr Bettis ("Bettis") and enabled by a network of witting and unwitting accomplices. AudioEye~~

independent legal counsel. It did not investigate the stock-price run-up. It did not perform a

~~is not the first company that Moradi and Bettis (the "Enterprise Leaders") have seized, subverted,~~

corporate-opportunity analysis. The insiders used their control of AudioEye to take the $34

~~and looted for themselves.~~

million for themselves, at the Company's expense. That is the corporate-opportunity claim.

~~A. The Enterprise Leaders~~

4. The AudioEye insiders have run this playbook before. Moradi and Bettis used the

~~4. The Enterprise Leaders, Moradi and Bettis, have developed a repeatable~~

same routine at Formulus Black and First Contact. Sworn declarations by Paul Arena, Demian

~~playbook. They refined their techniques at First Contact and Formulus Black – two promising~~

Lichtenstein, Julian Ducheine, Nicky DiMaggio, and others describe the pattern. The insiders

~~companies that were destroyed by the Enterprise Leaders' fraud.~~

enter a company that needs capital, seize control of its finances and gatekeepers, extract value,

~~5. They are running the same playbook at AudioEye:~~

and retaliate against anyone who resists. The pattern is documented across nineteen sworn

~~a. Early Promises: Moradi and Bettis come in as saviors during periods of capital~~

declarations and 113 exhibits. These facts are documented. Plaintiffs do not ask the Court to

~~need, using promises of funding and expertise to gain access.~~

credit a lone narrative. Their allegations rest on SEC filings, sworn deposition testimony, and

~~b. Gatekeeper Subversion: Once inside, they centralize control over financial~~

exhibits before the Court. The record demonstrates the significant measures Moradi and Bettis

~~reporting, cash management, and key gatekeepers, reducing transparency and~~

took to silence a whistleblower.

~~subverting internal controls.~~

5. David Kovacs ("Kovacs") was a longtime AudioEye executive and shareholder. In

~~c. Insider Looting: After consolidating control, they loot the company and enrich~~

August 2023, he refused Moradi's instruction to assist in the manipulation of AudioEye stock. He

~~themselves with coerced reallocations, asset diversion, or insider trading, while~~

later reported the misconduct internally, first to HR and then to Executive Chairman Carr

shiftingBettis, downsidewhom riskhe toconsidered a friend. The Company fired him. Kovacs then reported the

company and its investors.

d. Suppression and Lawfare: When challenged, they respond with retaliation, legal

misconduct to the DOJ and the SEC. The response was further retaliation. The Company

pressure, and intimidation.

declared the termination "for cause." It purported to forfeit Kovacs's vested stock. Defendants

6. For victimized investors, the result is financial loss. For the Enterprise, it is the

pursued litigation across three states. Kovacs received a written threat of physical harm. Four

business model.

witnesses describe a murder-for-hire plot against Kovacs.

7. The Enterprise Leaders ran their playbook at Formulus Black, pushing out the

6. This case asserts three categories of claims: (i) a derivative corporate-opportunity

founder, Brian Ignomirello. Bettis financially pressured the mother of Ignomirello's children to

claim (Counts III–VI); (ii) civil RICO claims, direct and derivative (Count I); and (iii) a direct

file false criminal charges against Ignomirello, which she later recanted. Ignomirello served four

Dodd-Frank whistleblower-retaliation claim (Count II). Daniel Kovacs brings AudioEye's

months in jail and lost his company. He also lost his health insurance coverage and had to pay for

corporate-opportunity claim derivatively. He is a continuous AudioEye shareholder with no

cancer treatment out-of-pocket. He lost access to his children. The Enterprise Leaders took

individual claim against any Defendant. Russell G. Alesi asserts shareholder-governance and

advantage of Ignomirello's incarceration to take over the company, gut internal controls, raid the

Rule 23.1 process rights. The RICO claim is brought derivatively for AudioEye and individually

treasury, and ultimately destroy $250 million to $500 million in value.

by David Kovacs. David Kovacs also brings the Dodd-Frank retaliation claim in his personal

8. Moradi and Bettis ran the same playbook at First Contact, pushing out the

capacity. AudioEye is a nominal defendant on the claims that belong to it. As Kovacs's employer,

founder, Demian Lichtenstein, with false sexual harassment allegations that were later debunked.

it is a defendant on the Dodd-Frank claim.

Moradi threatened to wage lawfare against Lichtenstein, a father of young kids who did not have

7. Plaintiffs seek disgorgement to AudioEye, an accounting, a constructive trust,

resources to fight Moradi. Lichtenstein met with Moradi and asked him, in tears: "Why are you

treble damages for the separate RICO injuries pleaded in Count I, Dodd-Frank whistleblower

fucking me like this?" Moradi responded: "Because you are fuckable."

relief, and Rule 23.1 protection of the corporate claim. The corporate claim belongs to

9. The Enterprise Leaders took over First Contact, gutted internal controls, raided

AudioEye. The insiders who took the proceeds cannot release it, dismiss it, or bargain it away.

the treasury, and, due to the rampant fraud, a potential $250 million exit was lost because the

Neither can conflicted counsel purporting to speak for both Moradi and AudioEye.

company could not pass an audit and practiced illegal policies.

I. PARTIES

10. They ran the playbook at AudioEye. David Moradi became a major AudioEye

A. Plaintiffs

investor in mid-2014. Shortly thereafter, co-founder and Executive Chairman Paul Arena learned

8. Plaintiff Daniel Kovacs is David Kovacs's brother. He is a different individual

that Moradi was derelict of his SEC reporting responsibilities and possibly engaging in unlawful

and is referred to throughout by his full name. He beneficially owns AudioEye common stock

coordinated trading activity. Arena challenged Moradi, who, in response, orchestrated Arena's

and is the derivative plaintiff on the claims asserted on AudioEye's behalf (Counts III–VI). He

removal by blaming Arena for accounting issues at the company.

has continuously owned at least 200 shares since December 11, 2023. That ownership spans the

11. This was a pretext. In reality, Moradi and Bettis were motivated to eliminate Paul

November 12–14 and December 4, 2024 transactions and continues to the present. Daniel

Arena because Arena threatened their ability to defraud the markets. Since that time, the

Kovacs later acquired additional shares after his brother's dispute with AudioEye arose. He has

Enterprise Leaders have systematically gutted internal controls and looted the company.

no individual claim against any Defendant and has not assigned any claim. Other than his

12. AudioEye has disclosed in its public filings that, since at least 2019, it has not

written engagement agreement with counsel, Daniel Kovacs has no agreement with David

obtained an independent auditor attestation of internal control over financial reporting pursuant

Kovacs or anyone else concerning this litigation. He has no agreement that gives him a personal

to Section 404(b) of the Sarbanes-Oxley Act. The company's representations regarding internal

benefit or requires him to act other than in the interests of AudioEye and its shareholders. He

controls during the Relevant Period are based upon management self-certification, not an

brings the derivative claims solely for the benefit of AudioEye and its shareholders. See Daniel

external, independent audit.

Kovacs Decl. ¶¶ 3–4, 11.

B. The Whistleblower

9. Plaintiff Russell G. Alesi is a current AudioEye shareholder. He has

13. David Kovacs, age 42, was an executive at AudioEye for a decade. During that

continuously held 4 shares of AudioEye common stock in street name through Merrill Lynch

time, Kovacs was an investor (not a board member) in ventures sponsored by Moradi and Bettis

since approximately October 7, 2025, after the Insider Sales. He sues solely as a current-

including First Contact and Formulus Black.

shareholder governance plaintiff and carries the Rule 23.1 process role. He does not assert the

14. Kovacs, considerably younger than Moradi and Bettis, once imagined them to be

transaction-based derivative claim, which Daniel Kovacs brings. On June 4, 2026, Alesi executed

~~mentors. Kovacs has the dubious distinction of being defrauded by the Enterprise four times.~~

and verified a demand under 8 Del. C. §§ 219 and 220. The demand seeks inspection of the

~~15. Kovacs, as a result, was in a position to observe the Enterprise Leaders' activities~~

Company's stockholder list and books and records, access to the June 22, 2026 annual meeting,

~~across four organizations. Kovacs developed personal relationships with numerous individuals~~

and corrective proxy disclosure of the derivative claim. It will be served on the Company

~~whose lives have been profoundly harmed by the Enterprise Leaders.~~

contemporaneously with these motion papers. He asserts no individual damages claim. See Alesi

~~16. Kovacs' relationship with Moradi soured in August 2023. That is when Moradi~~

Decl.

~~(the CEO of AudioEye and Kovacs' boss) instructed Kovacs to assist him with stock fraud.~~

10. Plaintiff David Kovacs is a former senior executive of AudioEye during the

~~Moradi planned to execute a pump-and-dump strategy known as painting the tape.~~

RICO Period (January 1, 2015 to the present). He is, was, and at all relevant times has been an

~~17. Kovacs was troubled by Moradi's instruction. Previously, Moradi had pressured~~

AudioEye shareholder whose shares have never been validly revoked or cancelled. See Exh. 45,

~~Kovacs to use a VPN to post a small number of fake video game reviews, which Kovacs~~

46, 80–82. He also holds ownership interests in First Contact Entertainment ("First Contact")

~~unwisely went along with. However, Kovacs refused Moradi's orders to go further and commit~~

and Eternal Sources Tech Partners, LLC ("ESTP"). See Exh. 60–62, 75–76, 100–103. David

~~securities fraud. Mario Rodriguez, a witness to a heated argument between Kovacs and Moradi,~~

Kovacs brings claims solely in his individual capacity: the civil RICO claim (Count I) and the

~~confirms Kovacs' account.~~

Dodd-Frank § 21F whistleblower-retaliation claim (Count II). Plaintiffs do not concede that

~~18. Around this time – separate from AudioEye – Kovacs was helping Moradi find a~~

David Kovacs lacks derivative standing; they plead that he was a shareholder at all relevant

~~buyer for First Contact. In due diligence, Kovacs learned that Moradi had operated the company~~

times. Daniel Kovacs leads the derivative claims because he has no individual claim and his

~~so fraudulently that the books were unauditable. First Contact should have sold for $250M.~~

ownership is documented independently.

~~Instead it died. The investment banker on the deal called it "the greatest destruction of wealth I~~

Julian Ducheine and Demian Lichtenstein, who were plaintiffs in ECF No. 1, are not plaintiffs in this

~~have seen in my career."~~

Amended Complaint. They are witnesses. Their sworn declarations, and the conduct directed at them, remain part

~~19. In that context, Kovacs came to understand Moradi's malevolent nature.~~

of the factual record.

~~Previously, Kovacs had been naïve and, in retrospect, may have overlooked red flags. In~~

B. Enterprise Defendants

~~November 2023, those red flags became inescapable.~~

11. Defendant David Moradi is an investor, executive, and director who held senior

~~20. Kovacs became a whistleblower on November 13, 2023, reaching out to HR to~~

leadership roles at AudioEye, Inc. He joined AudioEye's Board on November 13, 2019. He

~~report securities fraud. The meeting never happened. The Chairman of the company, Carr Bettis,~~

became Interim Chief Executive Officer on August 13, 2020, permanent Chief Executive Officer

~~phoned Kovacs moments later: "Now Moradi will ruin your life." This chilling threat proved~~

on January 13, 2022, and now serves as Executive Chairman. See SEC Filings; David Kovacs

~~prescient.~~

Decl. Moradi controls Sero Capital LLC, through which he sold AudioEye stock in the Insider

~~21. On December 25, 2023, Kovacs texted holiday wishes to Ben Barton, another~~

Sales. He exercised de facto control over AudioEye's operations, disclosures, litigation strategy,

~~AudioEye insider. Barton surprised Kovacs by bringing up Moradi's fraud. Barton declared his~~

and trading conduct. He was the architect and principal beneficiary of the Enterprise. He is

~~intention to become a whistleblower. "I'll make it very public." Barton wrote.~~

named on Count I (RICO), on Counts III–V as a fiduciary and seller, and on Count VI. See

~~22. Barton added:~~

Arena Decl. ¶¶ 7–15.

~~He's the one who's scared.~~

12. Defendant Dr. Carr Bettis is an investor and executive who served as Executive

~~He's the ceo of a public company.~~

Chairman of AudioEye and held leadership roles across the Enterprise entities. See David

~~He's fucked.~~

Kovacs Decl. He controls CSB IV US Holdings LLC, through which he sold approximately $5.4

~~23. The timing is important. This was December 2023. The AudioEye stock~~

million of AudioEye stock in the Insider Sales. Bettis was the Enterprise's governance stabilizer.

~~manipulation did not move the market until March 2023. These are not insider reports made with~~

He controlled access to boards, auditors, and counsel. He also directed the response to

~~hindsight. It was two AudioEye insiders who were privy to the scheme discussing, in heated~~

whistleblower complaints. He is named on Count I (RICO) and, on Counts III–V, as a recipient

~~terms, the stock manipulation that was being hidden from shareholders.~~

of the proceeds of the breaches alleged. Bettis served as an AudioEye director until May 2025

~~24. Three weeks later, Kovacs once again reported the fraud – this time, directly to~~

and is no longer on the Board.

~~the Executive Chairman.~~

13. Defendant Jason Humble is a former AudioEye-affiliated operative who served

~~25. On or about January 17, 2024, Kovacs spoke with Bettis by phone. During the~~

as a capital-raising intermediary for the Enterprise's leadership. See Ducheine Decl.; DiMaggio

~~call, which Bettis secretly recorded, Kovacs repeatedly told Bettis about Moradi's insider trading~~

Decl. He recruited investors, transmitted instructions, and applied pressure. When financial and

~~and even threatened to file a lawsuit over it. Bettis claimed to have already looked into it and~~

reputational pressure failed to silence Kovacs, upon information and belief, Humble solicited

~~pretended to be confused.~~

Kovacs's murder on behalf of Bettis and Moradi. See Ducheine Decl. ¶¶ 22–29; DiMaggio Decl.

~~26. AudioEye's Whistleblower Protection Policy required Bettis, upon receiving a~~

¶¶ 20–32. He filed a parallel defamation action against Kovacs in this District, then dismissed it

~~good-faith report of insider trading, to ensure prompt investigation, escalation, and appropriate~~

with prejudice. See Exh. 39. Humble is named on Count I (RICO).

~~corrective action. Instead, Bettis took no investigative or corrective steps. Eleven months later,~~

C. Director and Officer Defendants

~~Bettis sold $5.4 million of stock at inflated prices.~~

14. Defendant Jamil Tahir has served as an AudioEye director since 2019. Tahir

~~27. Kovacs was promptly fired.~~

sold approximately $3.0 million of AudioEye stock through TurnMark Partners L.P. in the

~~28. From there, the retaliation escalated.~~

Insider Sales, while in possession of material nonpublic information. He holds his Board seat

~~C. The Retaliation~~

through Sero-held designation rights. He is one of the three interested directors for demand-

~~29. On January 19, 2024, AudioEye's General Counsel reiterated to Kovacs that he~~

futility purposes and is named on Counts III–V as a fiduciary and seller, and on Count VI. See

~~had been fired "for cause" without conducting a meaningful investigation.~~

Forms 4.

~~30. On February 8, 2024, Kovacs became a federal whistleblower, reporting the fraud~~

15. Defendant Kelly Georgevich served as AudioEye's Chief Financial Officer. On

~~to the Department of Justice.~~

May 4, 2026, she was elevated to Chief Executive Officer and to the Board. See SEC Filings.

~~31. On February 20, 2024, AudioEye revoked Kovacs' ERISA-protected restricted~~

While serving as CFO and in possession of material nonpublic information, Georgevich sold

~~stock. Remarkably, the letter from Akin admits retaliation, stating that the termination was "for~~

approximately $303,500 of AudioEye stock in November 2024. She is one of the three interested

~~cause" because Kovacs accused Moradi of fraud.~~

directors for demand-futility purposes and is named on Counts III–V as a fiduciary and seller,

~~32. On March 20, 2024, Bettis shipped Kovacs a letter (the "Birkin Bag Letter")~~

and on Count VI.

~~containing threats that Moradi would do "unfathomable physical harm" if Kovacs did not settle~~

D. Recipient Entity Defendants

~~his dispute with Moradi. In context, settle meant capitulate.~~

16. Defendant Sero Capital LLC is an entity controlled by David Moradi. Moradi

~~33. On April 8, 2024, Kovacs filed a whistleblower complaint with the SEC.~~

sold AudioEye stock through Sero Capital in the Insider Sales. Sero Capital received and holds

~~34. On April 10, 2024, AudioEye and Moradi sued Kovacs in Florida court alleging~~

proceeds of the usurped opportunity. It is named on Counts III–V as a knowing participant and

~~defamation. Most notably, the complaint is replete with False Smears and compares Kovacs to~~

recipient subject to restitution, disgorgement, and a constructive trust. See Exh. 48; Forms 4.

~~George Santos, the infamous charlatan who was jailed after being elected to Congress.~~

17. Defendant CSB IV US Holdings LLC is an entity controlled by Dr. Carr Bettis.

~~35. Even as AudioEye was launching its smear campaign, events confirmed that~~

Bettis sold approximately $5.4 million of AudioEye stock through CSB IV in the Insider Sales.

~~Kovacs was right. The stock price surged upward exactly as Moradi had planned in August 2023.~~

CSB IV received and holds proceeds of the usurped opportunity. It is named on Counts III–V as

~~36. On May 2, 2024, Jason Humble filed a defamation suit against Kovacs in the~~

a recipient. See Exh. 48; Forms 4.

~~Southern District. On information and belief, Humble sued at the direction of Moradi and/or~~

18. Defendant TurnMark Partners L.P. is an entity controlled by Jamil Tahir.

~~Bettis, not of his own accord. A few weeks later, Humble dropped his lawsuit with prejudice.~~

Tahir sold approximately $3.0 million of AudioEye stock through TurnMark in the Insider Sales.

~~37. On May 8, 2024, the retaliation escalated beyond the bounds of AudioEye. That~~

TurnMark received and holds proceeds of the usurped opportunity. It is named on Counts III–V

~~was when Kovacs learned that Carr Bettis had ousted him from ESTP, a venture worth $250~~

as a recipient. See Forms 4.

~~million. This deprived Kovacs of more than $80 million in value.~~

E. Nominal Defendants

~~38. For good measure, in April 2025, Carr Bettis filed a frivolous lawsuit against~~

19. AudioEye, Inc. ("AudioEye" or "AEYE") is a Delaware corporation whose

~~Kovacs in Arizona state court (the "Arizona Lawsuit") over a purported $100,000 loan from~~

common stock trades on the Nasdaq Capital Market under the symbol "AEYE." AudioEye is

~~2017 that was repaid years ago.~~

named in a dual capacity. It is a defendant on the individual whistleblower-retaliation claim

~~39. Bettis stepped on a rake with the Arizona Lawsuit. Discovery will show that the~~

(Count II). As David Kovacs's employer and principal, it is directly and vicariously liable for

~~purported loan was part of a scheme by Bettis to make AudioEye pay for his girlfriend's~~

retaliatory conduct by officers and agents acting within the scope of their authority. AudioEye is

~~Manhattan apartment. This would not have been possible if AudioEye had sound internal~~

the nominal defendant on the derivative claims (Counts III–VI) and on the derivative portion

controls.

of Count I, because those claims are asserted on its behalf and the relief sought runs to the

40. For a racketeering Enterprise, Kovacs is the Enterprise Leaders' worst nightmare.

Company.

Kovacs has extensive and detailed knowledge over many years. He cannot be bribed or bullied.

II. JURISDICTION AND VENUE

He has visibility into the Enterprise as it operates across enterprises. He has personal

20. This action arises under the Racketeer Influenced and Corrupt Organizations Act

relationships with many victims. He refused to profit from the fraud. He refused to be

("RICO"), 18 U.S.C. §§ 1961–1968, and the whistleblower anti-retaliation provision of the

intimidated.

Dodd-Frank Act, 15 U.S.C. § 78u-6(h). This Court has subject-matter jurisdiction under 28

41. Kovacs represented an existential threat. No wonder Moradi and Bettis went for

U.S.C. §§ 1331 and 1337.

the nuclear option.

21. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the

D. The Weaponized Victims

derivative state-law claims and the governance claim: breach of fiduciary duty and usurpation of

42. A particularly remorseless aspect of the Enterprise is its recycling of victims into

corporate opportunity (Count III), unjust enrichment and restitution (Count IV), accounting and

instruments of further crime. The Enterprise Leaders – Moradi and Bettis – first financially

equitable relief (Count V), and governance relief (Count VI). Each forms part of the same case or

compromise people, then exploit their vulnerability to coerce participation in wrongdoing. The

controversy as the federal claims. Declaratory relief is available under 28 U.S.C. §§ 2201–2202.

sworn testimony demonstrates a consistent pattern: those harmed by Formulus Black and related

22. At all relevant times, AudioEye was a publicly traded company whose common

ventures were later pressured to commit violent acts on behalf of the Enterprise.

stock traded on the Nasdaq Stock Market, a national securities exchange operating in interstate

43. In December 2023, Defendant Jason Humble – acting, as he repeatedly

commerce. The transactions at issue were executed through interstate markets and clearing

represented, under the direction of Defendant Carr Bettis – telephoned Plaintiff Julian Ducheine

systems and involved shareholders residing within this District and throughout the United States.

with a chilling request. Humble stated: "We have to do something about David Kovacs… Kovacs

23. Defendants used the instrumentalities of interstate commerce – including

is upsetting the wrong people right now. I need your help to find someone to take care of

interstate telephone calls, electronic communications, securities filings with the Securities and

Kovacs."

Exchange Commission, and national securities exchanges – in furtherance of the Enterprise's

44. Ducheine understood "take care of" to mean murder, and "the wrong people" to mean Bettis and his associated group within the Enterprise.

45. Humble reiterated the solicitation with specificity: "Do you know someone in New York or Florida to take care of Kovacs?" Ducheine – shocked and unprepared for such a request – responded, "I don't know anyone that does that shit."

46. In January 2024, Humble approached Ducheine again, this time in person at a café in North Texas. Wearing a hooded sweatshirt, Humble again raised the subject of hiring a hitman to kill Kovacs. The meeting lasted about an hour. Humble made clear that he was operating at the direction of someone above him – describing Bettis as "the top man" and referring to Bettis and Bettis's associates as the ones giving orders.

47. After this second encounter, Ducheine no longer believed Humble was joking or exaggerating. In his declaration, he states he became "convinced that Humble was serious about having David Kovacs murdered," and that the solicitation caused him "great emotional and psychological distress."

48. Ducheine further testifies that he had, at that time, been misled by Humble and Bettis into believing false accusations against Kovacs regarding Formulus Black. Once those accusations were disproven, Ducheine understood the solicitations for what they were: an attempted enlistment of a financially harmed victim into a violent criminal act designed to eliminate a whistleblower.

49. When Ducheine refused to participate, Humble shifted to another financially distressed victim – former NFL All-Pro Muhammad Wilkerson.

50. As alleged herein and in the DiMaggio Declaration, Humble told DiMaggio that Wilkerson had been offered repayment of his lost Formulus Black investments if he would murder Kovacs. This was not idle talk; multiple witnesses independently confirmed the plot. See DiMaggio Decl.; Kovacs Decl.

51. These solicitations occurred at the exact moment Kovacs was reporting securities fraud internally and externally, and immediately before his Termination. For the Enterprise, Kovacs was a nightmare: a whistleblower who possessed deep knowledge of their multiyear pattern, had refused to participate in securities fraud, and was providing information to federal authorities.

52. Upon learning of the murder plot, Kovacs fled his residence and lived for extended periods at undisclosed locations, taking security precautions for himself and his family. His testimony is corroborated by contemporaneous communications with a security consultant and by the independent witness declarations. See Kovacs Decl.

53. These facts make clear: the Enterprise did not merely retaliate through lawsuits, smears, and financial harm – it escalated to soliciting murder, using financially ruined victims as disposable instruments. This is not merely corporate misconduct; it is racketeering activity of the

most serious nature.

E. The Independent Directors

54. This Complaint is the product of an extensive investigation drawing upon dozens of witness interviews, voluminous communications and internal corporate documents, SEC filings relating to three public companies, trading records, open source research, court filings, and sworn testimony. Plaintiffs' investigation was guided by Kovacs' knowledge of the Enterprise Leaders' historical business practices.

55. The Independent Directors joined the board relatively recently. Fleming joined the AudioEye board in March 2023; Hawkins joined in March 2025. The Independent Directors have operated with limited context. The Independent Directors could not have replicated this investigation. The company has been dominated by the Enterprise Leaders for many years. These problems pre-existed Fleming and Hawkins' tenure.

56. The Independent Directors cannot – and should not – adjudicate the merits of the allegations herein. Delay and obfuscation will fatally impair the Independent Directors' credibility to lead. The responsible course of action is for the Independent Directors to enact a Special Committee and engage Independent Counsel to advise the Special Committee. Attached as Schedule B are draft resolutions that Fleming and Hawkins should consider signing.

57. Plaintiffs do not propose for the Court to manage AudioEye. Leadership must come from the Independent Directors. Failing that, the board must resign and the shareholders must elect a new slate of directors.

58. David Kovacs never wanted to be a whistleblower. In 2023, Kovacs had what seemed like a wonderful life. That all changed in August 2023, when Kovacs found himself in an impossible situation: follow Moradi's orders and help with securities fraud or, as he chose, become a whistleblower. Exactly as Bettis predicted, Moradi ruined Kovacs' life.

59. The Enterprise Leaders are abusing the Independent Directors. They have exploited Fleming and Hawkins for their good reputations. The Independent Directors must stop allowing themselves to be used to lend legitimacy to an organized criminal enterprise. Independent Directors who receive credible notice of ongoing securities fraud and retaliation, and fail to act, risk personal liability regardless of intent.

60. The Independent Directors face a binary choice: act now or become complicit. Every day of delay compounds their personal liability and destroys the shareholder value they are duty-bound to protect. The pathway forward is clear: establish a Special Committee, engage Independent Counsel, and restore independent oversight.

PARTIES, JURISDICTION, AND VENUE

I. Plaintiffs

61. Plaintiff David Kovacs is a former senior executive of AudioEye during the RICO Period and a significant long-term shareholder of AudioEye. See Exh. 45, 46, 80-82. Kovacs also holds ownership interests in First Contact Entertainment ("First Contact"), Formulus Black LLC

("Formulus Black"), and Eternal Sources Tech Partners, LLC ("ESTP"). See Exh. 100-103; Exh. 48; Exh. 60-62, 75-76. Kovacs brings claims in his individual capacity and, where applicable, derivatively on behalf of AudioEye. Additionally, he asserts individual claims.

62. Plaintiff Russell Alesi acquired shares of AudioEye after the conclusion of the Class Period and is a Plaintiff solely for purposes of asserting shareholder derivative claims on behalf of AudioEye seeking corporate-governance reform, remediation, recovery of wasted corporate assets, and other equitable relief. Alesi does not assert individual damages claims arising from purchases or sales of AudioEye securities during the Class Period. See Alesi Decl.

63. Plaintiff Demian Lichtenstein is, and at all relevant times was, a shareholder of First Contact. Lichtenstein brings claims arising from injuries to his ownership interests. See Lichtenstein Decl. 24.

64. Plaintiff Julian Ducheine is, and at all relevant times was, a shareholder of Formulus Black. See Exh. 50. Additionally, Ducheine is a former shareholder of AudioEye, having sold his shares at the recommendation of Jason Humble at a loss. See Exh. 42. He brings claims arising from injuries to his ownership interests. Additionally, he asserts individual claims.

II. Defendants

A. Enterprise Defendants

1. David Moradi

65. Defendant David Moradi ("Moradi") is an investor, executive, and director who, during the RICO Period, served in senior leadership roles at AudioEye, Inc. Moradi became a member of AudioEye's Board of Directors on November 13, 2019; was appointed Interim Chief Executive Officer effective August 13, 2020; and was appointed permanent Chief Executive Officer effective January 13, 2022, as reflected in AudioEye's filings with the Securities and Exchange Commission. See SEC Filings; Kovacs Decl. ¶¶ 30–37.

66. During the RICO Period, Moradi exercised de facto and functional control over AudioEye's operations, disclosures, litigation strategy, insider trading conduct, and affiliated business activities. He directed the Company's response to internal whistleblower complaints, determined financial and trading narratives, and supervised retaliatory litigation efforts funded with corporate assets. Through formal title and informal dominance, Moradi controlled the Company's flow of information, risk assessments, investor-facing disclosures, and internal governance. See Kovacs Decl. ¶¶ 35, 76–92, 331–386; Arena Decl. ¶¶ 7–15.

67. Moradi was the largest shareholder of Formulus Black Corporation through Amazonas Investments LLC, which held approximately 29.25% of Formulus Black's fully diluted equity as of August 12, 2020, making Amazonas the single largest shareholder and conferring decisive voting and economic control. Moradi also owns and controls Sero Capital, which held an additional 3.8% of Formulus Black. See Exh. 48 (FB Cap Table). Through Amazonas and Sero, Moradi exercised functional authority over Formulus Black's financing, governance, and strategic direction, coordinating closely with Bettis in the removal of founder

Ignomirello, suppression of internal oversight, and dissolution of internal controls.

68. Moradi also served as the controlling shareholder and de facto controlling person of First Contact Entertainment, jointly directing financial authority, banking access, accounting oversight, reputational pressure campaigns, and governance consolidation beginning in or about 2016. Exhibits confirm Moradi's central role in decisions regarding banking signatory authority, investor communications, and the July 2016 coercive letter used to marginalize founder Demian Lichtenstein. See Exh. 52 (FC Signatory Checklist); Exh. 53 (Coercive Letter to Lichtenstein); Exh. 78 (First Contact Emails); Lichtenstein Decl. (Exh. 5) ¶¶ 9–18.

69. Across AudioEye, Formulus Black, First Contact, and affiliated entities, Moradi functioned as the Enterprise's architect. He entered companies during periods of vulnerability, used promises of capital and expertise to gain access, then centralized authority over financing, trading strategy, governance, and disclosure. Witnesses consistently describe Moradi performing sustained high-level executive functions across multiple ventures, managing complex financial negotiations, and directing coordinated control strategies with clarity and intent. See Kovacs Decl. ¶¶ 30–41, 63–67, 71–84; Arena Decl. ¶¶ 7–15; McGlashan Decl. (Exh. 18) ¶¶ 4–11.

70. Moradi repeatedly invoked his $160.5 million traumatic brain injury verdict – which reportedly resolved for approximately $240 million – to intimidate business associates, employees, and adversaries, asserting that he could outspend and outlast anyone who challenged him. These statements were later placed into the public record when AudioEye and Moradi sued Kovacs in Florida relying on the settlement as evidence of Moradi's supposed reputational injury. See Exh. 30, 54, 55; Kovacs Decl. ¶¶ 76–92. The settlement, publicly reported in 2017, was never disclosed by AudioEye despite its materiality to governance, succession risk, and oversight obligations. See Kovacs Decl. ¶¶ 93–97.

71. At AudioEye, Moradi directed and benefited from insider trading proceeds totaling approximately $21.6 million in December 2024, plus additional sales in November 2024, during a period when he possessed material nonpublic information concerning whistleblower complaints, internal-control failures, regulatory exposure, and retaliatory litigation expenditures. Not one Form 4 filed by Moradi reported a 10b5-1 trading plan. See Forms 4; Schedule E (Material Misrepresentations and Omissions); Schedule G (Damages Memorandum).

72. By virtue of his cross-entity authority, financial dominance, governance control, and role in coordinating racketeering acts across multiple companies, Moradi is an "Enterprise Leader" within the meaning of this Complaint.

2. Dr. Carr Bettis

73. Defendant Dr. Carr Bettis ("Bettis") is an investor, executive, and director who, during the RICO Period, served in senior leadership roles across multiple entities within the Enterprise. Bettis served as Executive Chairman of AudioEye, Inc., held de facto managerial authority at Formulus Black Corporation ("Formulus Black"), served as a director of First Contact Entertainment, and exercised decisive control over Eternal Sources Tech Partners, LLC

("ESTP"). See Kovacs Decl. ¶¶ 63–67, 160–184; Exh. 52; Exh. 30 (Kovacs emails referencing Bettis's FC board role); Exh. 60–62, 75–76 (ESTP governance documents).

74. During the RICO Period, Bettis exercised executive, managerial, and disclosure-related control over AudioEye, including responsibility for responding to internal whistleblower complaints, supervising litigation posture, directing the Company's response to allegations of insider trading, and controlling gatekeeping functions such as auditors, board processes, and internal investigations. Bettis used this authority not to remediate misconduct but to suppress internal reporting, protect Moradi, and retaliate against whistleblowers. See Kovacs Decl. ¶¶ 35, 140, 331–386; Exh. 105 (Whistleblower Policy); Exh. 35 (Birkin Bag Letter).

75. At Formulus Black, Bettis exercised primary managerial authority over business operations, financing strategy, capital structure, and communications with shareholders and debt holders. He served as Executive Chairman and later CEO, controlled operational decision-making, and coordinated closely with Moradi through affiliated investment vehicles. Bettis was affiliated with Reach 4 Partners (4.5% ownership) and owned an additional 2.6% through CSB IV US Holdings LLC, giving him voting, strategic, and governance influence over the company. See Exh. 48 (FB Cap Table).

76. Bettis also issued formal investor communications on behalf of Formulus Black, including the September 5, 2018 shareholder update, which described financing activities, governance structures, and strategic direction. See Exh. 49 (FB Shareholder Letter); Exh. 98, 106 (FB Pitch Decks). Bettis exerted control over payroll, related-party payments, internal accounting, and the company's financial records, and undermined governance mechanisms when they threatened Enterprise control.

77. At First Contact Entertainment, Bettis served as a director and influencer of governance and strategic decisions. Contemporaneous emails in Exh. 30 show Kovacs describing Bettis's position on the First Contact board. Exhibits 52, 53, and 78 confirm that Bettis and Moradi coordinated control over banking, financial signatory authority, internal investigations, and reputational pressure campaigns, including support for coercive tactics used to remove founder Demian Lichtenstein. See Exh. 52 (First Contact Checklist naming required signatories); Exh. 53 (July 7, 2016 coercive letter); Exh. 78 (FC emails regarding authority consolidation); Lichtenstein Decl. ¶¶ 9–18.

78. At ESTP, Bettis served as a controlling force who, once Kovacs became a whistleblower, orchestrated Kovacs's removal from ownership and governance without compensation, audit, valuation, or notice. Governance documents and cap table materials confirm Bettis's decisive influence through his affiliated entities and his unilateral decision to strip Kovacs of a stake conservatively valued between $80 million and $120 million. See Exh. 60–62, 75–76; Kovacs Decl. ¶¶ 160–184.

79. Through his cross-entity executive authority, coordination with Moradi, control over governance processes, and role in removing internal opponents across multiple ventures,

Bettis acted as a senior architect and operational executor of the Enterprise. See Arena Decl. ¶¶ 11–15; Lichtenstein Decl. ¶¶ 9–18.

80. Bettis sold $5.4 million of AudioEye stock in December 2024 and additional amounts in June 2024 while in possession of material nonpublic information concerning whistleblower complaints, governance failures, and undisclosed litigation exposure. These trades occurred outside any disclosed 10b5-1 plan. See Forms 4; Schedule E (Material Misrepresentations and Omissions); Schedule G (Damages Memorandum).

81. Bettis is an "Enterprise Leader" within the meaning of this Complaint.

3. Jason Humble

82. Defendant Jason Humble ("Humble") is affiliated with Humble Philanthropy and is a former employee of AudioEye, Inc. See Kovacs Decl. ¶¶ 160–184. During the RICO Period, Humble operated as a capital-raising intermediary, associate, and fixer for Formulus Black Corporation and its leadership, including Bettis and Moradi. In that capacity, Humble solicited and recruited investors – including Julian Ducheine and retired NFL player Muhammed "Mo" Wilkerson – to invest in Formulus Black, and entered into written agreements reflecting his role in identifying investors and receiving equity-linked compensation or success fees tied to a future liquidity event. See Exh. 50 (Humble–Ducheine Investment Agreement); Ducheine Decl. ¶¶ 6–12.

83. Humble's investor-solicitation activities, compensation arrangements, and coordination with Formulus Black principals are corroborated by the Ducheine and DiMaggio declarations, which describe Humble's direct role in inducing investments, transmitting instructions, and acting as an operational interface between outside investors and Formulus Black leadership. See Ducheine Decl. ¶¶ 6–15; DiMaggio Decl. ¶¶ 8–12.

84. Beyond fundraising, Humble acted as an enforcer and operative for Enterprise interests. Witnesses describe Humble using pressure tactics, reputational leverage, and his relationships with prior investors to advance the objectives of Bettis and Moradi, including discouraging complaints, shaping narratives about the companies, and suppressing dissent. See Ducheine Decl. ¶¶ 16–20; DiMaggio Decl. ¶¶ 8–16.

85. When financial and reputational pressure failed to silence whistleblowing activity, Humble escalated to solicitations of violence. Multiple witnesses testified that Humble approached prior victims of the Enterprise – including Ducheine and Wilkerson – to "take care of" David Kovacs on behalf of Bettis and Moradi. Ducheine testified that Humble stated: "Kovacs is upsetting the wrong people right now… I need your help to find someone to take care of Kovacs," which Ducheine understood to mean murder. See Ducheine Decl. ¶¶ 22–28; Exh. 40–42, 51 (contemporaneous messages). DiMaggio later intervened, met with Wilkerson, and secured assurances that no harm would occur. See DiMaggio Decl. (Exh. 2) ¶¶ 20–32.

86. Humble also initiated the Jason Humble Lawsuit against Kovacs in the Southern District of New York on May 2, 2024, which he voluntarily dismissed with prejudice on July 3,

2024. See Exh. 39. On information and belief, and consistent with Enterprise practice, Humble filed the action at the direction of Bettis and/or Moradi.

87. Through his roles as recruiter, intermediary, pressure agent, and operational enforcer, Humble participated in and advanced the affairs of the Enterprise. Humble is an "Enterprise Associate" within the meaning of this Complaint.

4. John Doe 1-50

88. The John Doe Defendants include individuals and entities whose identities are presently unknown, and individuals and entities whose identities are known but whose conduct intersects materially with the events described herein in ways that are still being corroborated. Upon confirmation, such individuals will be named and their roles pleaded with specificity.

B. Director Defendants

89. Defendant Dr. Katherine E. Fleming is a current member of the AudioEye Board and served as a director during a portion of the RICO Period. Fleming has served as an independent director since March 2023. Fleming personally bought $150,000 worth of AudioEye stock in June 2024.

90. Defendant James ("Jim") Hawkins is a current member of the AudioEye Board and served as a director during a portion of the RICO Period. Hawkins has served as an independent director since March 2025. Since that time, Hawkins has made only purchases of AudioEye stock.

91. Defendant Jamil Tahir served as a member of the AudioEye Board during a portion of the RICO Period. Tahir has served as an independent director since 2019. Tahir personally sold $3.0 million of AudioEye stock in December 2024 while possessing material nonpublic information.

92. Defendant Tony Coelho served as a member of the AudioEye Board during a portion of the RICO Period. Coelho served as an independent director from June 2014 until March 2025. Coelho is not alleged to have engaged in improper trading with respect to AudioEye stock.

93. Each Director Defendant owed fiduciary duties to AudioEye and its shareholders and is named based on acts or omissions in that capacity, except where otherwise expressly alleged.

C. Executive Defendants

94. Defendant Kelly Georgevich served as Chief Financial Officer and a senior executive of AudioEye during the RICO Period, with direct responsibility for the Company's financial reporting, internal controls, Adjusted EBITDA calculations, and non-GAAP disclosures. In that role, Georgevich prepared, reviewed, approved, and certified AudioEye's financial statements and related disclosures filed with the SEC. Georgevich exercised substantial control over earnings presentations, guidance, and metrics used to portray AudioEye's financial performance to investors. While in possession of material nonpublic information concerning

insider-trading risk, whistleblower allegations, and undisclosed volatility in reported results, Georgevich sold more than $300,000 of AudioEye stock in or about November 2024.

95. James Spolar served as AudioEye's General Counsel and senior legal executive during the RICO Period, with responsibility for legal strategy, regulatory compliance, and the Company's public disclosures. In that role, Spolar signed and authorized AudioEye's SEC filings, including documents containing materially false and misleading statements and omissions. Spolar acted as a central disclosure gatekeeper, managing litigation and whistleblower issues while coordinating the Company's public narrative. Despite direct knowledge of whistleblower allegations, insider-trading risk, and governance breakdowns, Spolar approved disclosures that concealed those risks from investors.

D. Professional Defendants

96. Defendant MaloneBailey, LLP is a public accounting firm that served as AudioEye's outside auditor during a portion of the RICO Period. MaloneBailey provided auditing and related professional services in connection with AudioEye's GAAP financial statements, Adjusted EBITDA calculations, and related public disclosures. During the RICO Period, MaloneBailey reviewed, approved, and issued unqualified (clean) audit opinions for AudioEye's SEC-filed financial statements, expressly consenting to their inclusion in filings disseminated to investors. MaloneBailey issued those opinions despite multiple red flags, including insider-trading risk, governance breakdowns, whistleblower escalation, and the use of distorted non-GAAP metrics that rendered the disclosures materially misleading.

97. MaloneBailey is named as a Professional Defendant based on the conduct alleged herein. Plaintiffs reserve the right to amend this Complaint to add additional Professional Defendants as their identities and roles are ascertained through discovery.

E. John Doe Defendants

98. "John Doe Defendants" means persons or entities whose identities are presently unknown to Plaintiffs but who participated in, facilitated, benefited from, or knowingly received proceeds from the conduct alleged herein, including without limitation intermediaries, agents, nominees, shell entities, tippees, downstream traders, litigation financiers, professional enablers, or recipients of diverted corporate assets.

III. Nominal Defendants

99. Nominal Defendant AudioEye, Inc. ("AudioEye" or "AEYE") is named solely because certain claims asserted herein are brought derivatively on its behalf and because the relief sought includes equitable, remedial, and governance-based measures that can be fully and effectively implemented only with the Company before the Court.

100. Nominal Defendant First Contact Entertainment ("First Contact") is named because the claims asserted involve transfers of value, coercive control-related conduct, and affiliated transactions that affected First Contact and its equity holders, and because complete and consistent relief requires the Court's ability to address such matters directly.

101. Nominal Defendant Formulus Black LLC ("Formulus Black") is named because the claims asserted involve asset transfers, governance actions, and related conduct affecting Formulus Black, and because certain remedies sought are equitable in nature and require the entity's presence to avoid inconsistent judgments.

102. Nominal Defendant Eternal Sources Tech Partners, LLC ("ESTP") is named because the claims asserted include allegations of diverted assets, stripped opportunities, and economic expectancy affecting ESTP, and because effective relief – including rescission, accounting, or restoration of assets – cannot be ordered in ESTP's absence.

JURISDICTION AND VENUE

103. This action arises under the federal securities laws, ERISA, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

104. At all relevant times, defendant AudioEye, Inc. was a publicly traded company whose common stock traded on the Nasdaq Stock Market, a national securities exchange operating in interstate commerce. The securities transactions at issue were executed through interstate markets and clearing systems and involved shareholders residing within this District and throughout the United States.

105. Defendants used the instrumentalities of interstate commerce, including interstate telephone calls, electronic communications, securities filings with the United States Securities and Exchange Commission, and national securities exchanges, in furtherance of the Enterprise's activities.

106. Jurisdiction is further proper under ERISA because AudioEye seized

24. Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 ERISA-protected equity compensation following protected whistleblower activity. because a substantial part of the events giving rise to the claims occurred here and their effects

107. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § were felt here. Acts within the District include the solicitation of Kovacs's murder in New York 1965 because acts in furtherance of the Enterprise occurred in this District, the effects of City; the filing of retaliatory litigation in this District; contact with a New York City municipal defendants' conduct were felt in this District, and an Enterprise associate filed litigation in this official in furtherance of the scheme; and the transmission of settlement pressure through a New District as part of the retaliation campaign.

York-based financial intermediary.

STATEMENT OF FACTS

25. This Court has personal jurisdiction over each Defendant under 18 U.S.C. §

I. ENTERPRISE STRUCTURE, AGREEMENT, AND

1965(b) and (d), which authorize nationwide service of process in civil RICO actions where the CONTINUITY

ends of justice so require. It also has personal jurisdiction under New York's long-arm statute and

A. The Existence of an Ongoing Enterprise

the Due Process Clause, because each Defendant purposefully directed the alleged conduct at

108. For the past decade, the Enterprise Leaders and their associates have operated

this District and the United States.

across multiple business entities using the same core methods. The Enterprise operates as a

III. STATEMENT OF FACTS

continuing organization with a common purpose maintaining stable relationships with a

A. Why the Facts Are Pleaded – Context and Corroboration

recurring set of people. The Enterprise Leaders operate methodically over years. They run the

26. The AudioEye allegations are plausible because they are not isolated. Plaintiffs

same playbook over and over. The target companies may change, but the objective remains the

allege the same pattern at Formulus Black, First Contact, and AudioEye. Moradi and Bettis

same: to enrich Moradi and Bettis.

entered companies that needed capital, consolidated control, weakened gatekeepers, extracted

109. The events described below are not isolated business disputes. Instead, what is

value, and retaliated when challenged.

described is a repeating and self-reinforcing system of criminality that has destroyed lives,

27. Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs incorporate by reference the nineteen

careers, and billions of dollars in value. See Arena Decl. ¶¶ 7–15; Kovacs Decl. ¶¶ 30–41, 57,

sworn declarations and documentary exhibits filed at ECF No. 3. The declarations provide the

66–67, 73–84, 131–151; Lichtenstein Decl. ¶¶ 4–22; Ducheine Decl. ¶¶ 4–12; DiMaggio Decl.

underlying detail. This pleading states the core facts. The exhibits and declarations show that the

¶¶ 5–14; McGlashan Decl. ¶¶ 3–10; Anderson Decl. ¶¶ 6–18). Exh. 52, 53, 78, 94, 105, 107.

allegations are based on a mosaic of facts and behavior over time, not just one individual, one

110. The Enterprise Leaders gain entry by exploiting predictable conditions: capital

document, or one isolated event.

need, fiduciary trust, and information asymmetry. Entry is followed by centralization of

B. The Enterprise and Its Playbook

authority. Founders and internal dissenters are pushed aside. When resistance emerges, the

28. Moradi and Bettis operated across a series of companies as a continuing unit with

Enterprise Leaders resort to lawfare, economic coercion, and even solicitation of violence.

a common purpose and defined roles. See Arena Decl.; David Kovacs Decl.; Lichtenstein Decl.

111. During relevant times, the Enterprise has operated through First Contact

Their method was consistent: (a) enter a company during a period of capital need, using promises

Entertainment, Formulus Black (formerly Symbolic IO), AudioEye, Inc., ESTP, Vivid Strategies,

of funding and expertise to gain access; (b) consolidate control over financial reporting, cash, and

and affiliated vehicles. Each entity served as a platform through which Enterprise leaders

gatekeepers, reducing transparency and weakening internal controls; (c) extract value through

acquired control, suppressed internal opposition, and diverted money to themselves.

diversion, coerced reallocation, or insider trading while shifting downside to the company and its

112. The Enterprise exploited predictable conditions. These conditions included capital

investors; and (d) respond to challenges with retaliation, litigation, and intimidation.

need, fiduciary trust, and information asymmetry. Entry into a company was followed by

29. Moradi functioned as the architect and principal beneficiary. Bettis functioned as

centralization of authority. Founders and internal critics lost influence. When resistance emerged,

the governance stabilizer who controlled access to boards, auditors, and counsel. Humble

Enterprise members applied legal, reputational, or economic pressure to remove it. See

functioned as the intermediary who recruited investors, transmitted instructions, and applied

Lichtenstein Decl. ¶¶ 4–22; Arena Decl. ¶¶ 7–15; Kovacs Decl. ¶¶ 30–41, 57–67, 73–84,

pressure when control was threatened. See Arena Decl.; David Kovacs Decl.; Ducheine Decl.;

131–151; Ducheine Decl. ¶¶ 8–32; DiMaggio Decl. ¶¶ 10–20; Exh. 52, 53, 78, 94, 105, 107.

DiMaggio Decl.

B. Allocation of Roles Within the Enterprise

C. The Pattern Before AudioEye

113. David Moradi was the Enterprise's architect and primary beneficiary. He entered

30. Formulus Black. Brian Ignomirello founded Symbolic IO (later Formulus

companies during formative or destabilized periods. He represented himself as a sophisticated

Black) and raised approximately $12.7 million at a roughly $132 million valuation, with

financial insider capable of securing capital and credibility. After entry, Moradi centralized

prospects for a $250–$500 million exit. See Exh. 48–49, 97–98, 109. After Bettis entered through

authority over financing, trading strategy, and disclosure. He exercised de facto control even

a convertible note and positioned himself as an advisor, funds began moving outside normal

when he lacked formal majority ownership. See Arena Decl.; Kovacs Decl.; Lichtenstein Decl.

controls. When Ignomirello sought a forensic accounting review, the effort was undermined.

114. In April 2017, Moradi obtained a Nevada jury verdict awarding $160.5 million for

False criminal allegations were then manufactured against him, and Bettis financially pressured

traumatic brain injury stemming from an April 2012 assault at a Las Vegas nightclub. The verdict

the mother of Ignomirello's children to bring them. Ignomirello was jailed for four months and

reportedly resolved for approximately $240 million. Moradi has repeatedly represented to

lost his company, health coverage, and access to his children. The accuser recanted under oath in

business associates, employees, and adversaries that he possesses these settlement proceeds and

May 2023. See Exh. 94. The company collapsed and investor equity was rendered worthless.

can fund extended litigation against any opponent. The relevance of that settlement lies in

31. First Contact. Demian Lichtenstein founded First Contact Entertainment. After

Moradi's subsequent conduct. Moradi repeatedly invoked the settlement in business contexts to

25

Moradi entered in mid-2016, control shifted. On July 18, 2016, Moradi was named a required

~~project litigation dominance and financial power. He referenced it while threatening adversaries,~~

financial signatory. See Exh. 52. A July 7, 2016 letter leveled false harassment allegations to

~~discouraging resistance, and asserting that he could outspend and outlast any opponent.~~

isolate Lichtenstein. See Exh. 53; Lichtenstein Decl. ¶¶ 9–18. A roughly $250 million sale later

~~AudioEye and Moradi themselves placed these statements into the public record by suing~~

collapsed because the books were unauditable. See Anderson Decl.; David Kovacs Decl.

~~Kovacs over them in Florida. See Exh. 30, 54, 55; Kovacs Decl.~~

32. The Formulus Black and First Contact episodes are pleaded as pattern and

~~115. Over years of close professional interaction during the RICO Period, multiple~~

context, not as derivative claims in this Amended Complaint. They establish that the conduct

~~witnesses observed Moradi perform sustained executive functions. He managed complex~~

alleged at AudioEye was the Enterprise's regular method, not an aberration. That adds to the

~~financial strategies. He conducted detailed negotiations. He directed operations across multiple~~

plausibility of the AudioEye allegations.

~~companies. Based on these observations, witnesses concluded that Moradi functioned at a high~~

D. AudioEye: Consolidation and the Governance Vacuum

~~cognitive level. These observations informed how Moradi's colleagues understood the settlement~~

33. AudioEye, Inc. is a Nasdaq-listed Delaware corporation. Moradi became a major

~~as a coercive tool, regardless of any judicial determination underlying it.~~

investor in 2014. When co-founder and then-Executive Chairman Paul Arena identified

~~116. When Kovacs raised concerns about Moradi's conduct in private communications~~

Moradi's failure to meet SEC reporting obligations and possible coordinated trading, Moradi

~~among defrauded investors, Moradi and AudioEye responded with immediate litigation and~~

and Bettis attributed accounting issues to Arena and engineered his removal in 2015. See Arena

~~financial intimidation. They placed the traumatic brain injury settlement at the center of that~~

Decl. ¶¶ 7–15. Moradi joined the board in November 2019, became Interim CEO in August

~~lawsuit. AudioEye spent approximately $2.7 million in corporate funds prosecuting the action~~

2020, and became permanent CEO in January 2022. Bettis served as Executive Chairman.

~~while holding approximately $4.6 million in cash—an expenditure representing more than half~~

Moradi later became Executive Chairman. On May 4, 2026, the Board elevated then-Chief

~~the company's liquid assets deployed to silence a whistleblower rather than serve any legitimate~~

Financial Officer Kelly Georgevich to Chief Executive Officer and to a board seat. Together,

~~corporate purpose. Many of the allegations asserted were later abandoned or disproven, as~~

Moradi and Bettis exercised effective control over governance, disclosure, and the response to

~~evidenced by AudioEye's November 13, 2025 Motion to Amend. The action functioned as~~

internal complaints.

~~retaliation, not remediation, and constitutes recoverable corporate waste. The same approach~~

34. AudioEye has disclosed that, since at least 2019, it has obtained no independent

~~appears in the Birkin Bag Letter dated March 20, 2024, which referenced Moradi's litigation~~

auditor attestation of internal control over financial reporting under Section 404(b) of the

~~resources and financial "war chest" as leverage to force submission rather than resolve disputes.~~

Sarbanes-Oxley Act. Its internal-control representations rest on management self-certification.

~~See Exh. 30, 35, 37, 67; Kovacs Decl.~~

See Exh. 86–87. The absence of a functioning, independently tested internal-control system is

~~117. The settlement also constituted a material governance fact. A public-company~~

pleaded as context for the governance vacuum in which the conduct below occurred. No claim is

~~CEO's receipt of a nine-figure settlement for traumatic brain injury required inquiry by the board~~

asserted against any auditor.

~~and, depending on circumstances, disclosure to shareholders. The settlement was publicly~~

E. Advance Planning of the Manipulation

~~reported and readily discoverable through basic internet searches conducted in April 2017.~~

35. On August 30, 2023, Moradi instructed Kovacs to assist with coordinated trading

~~AudioEye did neither. That failure forms part of the governance breakdown that enabled the~~

designed to create artificial demand. Moradi described the tactic as "painting the tape." Kovacs

~~Enterprise's conduct.~~

refused. A confrontation followed, which Mario Rodriguez witnessed. See Rodriguez Decl.;

~~118. Carr Bettis functioned as the Enterprise's governance stabilizer. Bettis held formal~~

David Kovacs Decl.

~~leadership positions, including Executive Chairman at AudioEye. He controlled access to boards,~~

36. The timing is probative of intent. On December 25, 2023 – months before

~~auditors, and counsel. He presented himself as pastoral and conciliatory. He frequently used~~

AudioEye's stock experienced its later run-up – another insider, Ben Barton, exchanged messages

~~religious and reconciliation language. At the same time, he decided whether complaints~~

with Kovacs. Barton described Moradi's exposure and his own intention to come forward. See

~~advanced or stalled. Through these actions, Bettis preserved Enterprise continuity under the~~

Exh. 110; David Kovacs Decl. Two insiders were discussing the manipulation before it moved

~~appearance of compliance. See Arena Decl; Kovacs Decl.~~

the market. That supports the inference that the later price movement was a manipulation, not

~~119. Jason Humble served as intermediary and facilitator. He recruited investors. He~~

an organic price increase.

~~transmitted instructions between Enterprise members. He coordinated litigation pressure and~~

F. The Whistleblowing and Protected Activity

~~filed the Jason Humble Lawsuit on May 2, 2024, which he voluntarily dismissed with prejudice~~

37. On November 13, 2023, Kovacs reported suspected securities fraud internally.

~~on July 3, 2024. He extended Enterprise activity beyond formal corporate boundaries. When~~

See Exh. 31. The scheduled meeting did not occur. Instead, Bettis telephoned Kovacs and said,

~~legal and economic retaliation failed, Humble solicited violence to silence Kovacs. See Ducheine~~

"Now Moradi will ruin your life." See David Kovacs Decl.

~~Decl.; DiMaggio Decl.; Exh. 39.~~

38. On January 17, 2024, Kovacs reported Moradi's insider trading directly to Bettis

~~C. Interstate Commerce and Continuity~~

by telephone. Bettis secretly recorded the call. AudioEye's Whistleblower Protection Policy

~~120. At all relevant times during the RICO Period, the Enterprise engaged in activities~~

required investigation and escalation. See Exh. 105. None occurred. Kovacs was terminated that

~~affecting interstate commerce. These activities included interstate communications, wire~~

day. See Exh. 32; David Kovacs Decl.

~~transfers, SEC filings, operation of national payroll systems, and securities trading on national~~

39. Kovacs continued to report externally. He reported to the U.S. Department of

~~exchanges. The conduct spanned multiple states and continued over years. The Enterprise~~

Justice on February 8, 2024, see Exh. 33, and to the U.S. Securities and Exchange Commission

~~exhibited both closed-ended and open-ended continuity.~~

on April 8, 2024, see Exh. 36. The April 8, 2024 SEC report is significant to the federal

~~II. PRIOR ITERATIONS OF THE ENTERPRISE PLAYBOOK~~

retaliation claim because it precedes the materially adverse acts on which Count II rests. The

~~A. First Contact Entertainment~~

parties' prior state-court actions were Kovacs v. AudioEye, Inc., Index No. 651810/2024

~~121. First Contact demonstrates the Enterprise's methods in a private-company setting.~~

("Kovacs I"), commenced April 5, 2024 and dismissed with prejudice on January 31, 2025; and

~~Demian Lichtenstein founded the company. He developed its technology, workforce, and~~

Kovacs v. AudioEye Inc., Index No. 651191/2025 ("Kovacs II"), commenced March 4, 2025

~~industry relationships. He bore entrepreneurial risk and exercised operational control. See~~

and dismissed on October 8, 2025. Two acts are the principal adverse acts on which Count II

~~Lichtenstein Decl.~~

rests: the November 2025 interference with Kovacs's employment verification, and the May

~~122. After Moradi entered the company in mid-2016, control shifted. Financing~~

2026 demand that he recant his protected reports under oath as a condition of settlement. Both

~~decisions centralized in Moradi. Strategic authority consolidated. On July 18, 2016, Moradi was~~

postdate the dismissal of both prior actions and could not have been litigated in either. The

~~named a required financial signatory, confirming his control over bank accounts. Information~~

February 4, 2025 republication of the abandoned smears (Exh. 67) postdates the dismissal of

~~flow narrowed. Lichtenstein's operational authority declined. Internal oversight weakened. See~~

Kovacs I and is pleaded as part of the same continuing retaliatory campaign.

~~Lichtenstein Decl.; Exh. 52.~~

G. The Retaliation

~~123. Moradi threatened asymmetric lawfare. These threats suppressed dissent and~~

40. Before the SEC report. On January 19, 2024, the termination was confirmed

~~discouraged opposition.~~

in writing as "for cause." On February 20, 2024, AudioEye forfeited Kovacs's restricted stock.

~~124. Reputational pressure followed. On July 7, 2016, a coercive letter was sent to~~

The forfeiture letter tied the "for cause" termination to Kovacs's accusations against Moradi on

~~Lichtenstein containing false sexual harassment allegations designed to stigmatize Lichtenstein~~

its face. See Exh. 34. AudioEye conducted no investigation of whether Kovacs's report was made

~~and isolate him from stakeholders. When Lichtenstein confronted Moradi about his conduct,~~

in good faith before forfeiting his equity. Its whistleblower policy prohibits retaliation for good-

~~asking in tears, "Why are you fucking me like this?", Moradi responded: "Because you are~~

faith reports, whether or not they are ultimately substantiated. The units the letter purported to

~~fuckable."~~

cancel were, by the terms of AudioEye's own award agreements, contractually due to be settled

~~125. Internal controls deteriorated. During acquisition diligence, First Contact failed~~

into shares no later than March 2021 – years before the forfeiture. The Company's own award

~~basic audit review due to rampant fraud and the absence of auditable records. A transaction~~

records do not establish that any such shares were ever validly cancelled. On March 20, 2024,

~~valued at approximately $250 million collapsed, destroying $200 million to $250 million in~~

Bettis sent Kovacs a letter (the "Birkin Bag Letter") threatening that Moradi would inflict

~~enterprise value. See Kovacs Decl.; Lichtenstein Decl.; Anderson Decl.; Exh. 53, 78.~~

"unfathomable physical harm" unless Kovacs capitulated. See Exh. 35.

~~B. Formulus Black / Symbolic IO~~

41. After the SEC report. The campaign continued. Two days after Kovacs

~~126. Brian Ignomirello founded Symbolic IO, later known as Formulus Black, and~~

reported to the SEC, on April 10, 2024, AudioEye and Moradi sued him for defamation in

~~developed its core computational-defined storage technology. In January 2015, the company~~

Florida. The complaint asserted false statements about his background that were later

~~raised approximately $12.7 million at a pre-money valuation of roughly $132 million.~~

abandoned by amendment. See Exh. 30, 37. On May 2, 2024, Humble filed a parallel

~~Institutional investor interest at the time supported internal expectations of a potential $250–$500~~

defamation action in this District and dismissed it with prejudice on July 3, 2024. See Exh. 39.

~~million exit upon commercialization.~~

On or about May 8, 2024, Bettis and the other ESTP members purported to strip Kovacs of the

~~127. Carr Bettis entered the company through a minor convertible note and positioned~~

one-third ESTP membership interest he held as a co-founder and Chief Executive Officer of the

~~himself as a strategic advisor. Once inside, Bettis used that position to gain influence over~~

venture. ESTP's operating agreement required unanimous consent for any transfer. Kovacs did

~~financial operations. Funds began flowing outside normal payroll and expense systems,~~

not consent, which renders the purported transfer void. See Exh. 60 §§ 8.01, 8.04. The same

~~including payments to related parties without documentation, approval, or legitimate business~~

deals, counterparties, geography, and personnel then reappeared in Vivid Strategies. Bettis and

~~purpose.~~

his ESTP co-member formed that successor entity at ESTP's own Dallas address and claimed

~~128. When Ignomirello sought a forensic accounting review in order to protect the~~

credit for ESTP's pipeline. Kovacs received no notice, no consideration, and no distribution.

~~company, Bettis alerted individuals suspected of misconduct and undermined the effort.~~

ESTP was wound down on a final K-1 dated September 3, 2025. See Exh. 59–62, 75–76, 90;

~~Governance and oversight deteriorated rapidly. Between May 5 and May 20, 2017, false criminal~~

David Kovacs Decl. ¶¶ 131–153. ESTP's internal materials valued the venture at about $250

~~allegations were manufactured against Ignomirello. Bettis financially pressured the mother of~~

million. Kovacs's one-third interest was worth on the order of $83 million, subject to proof. See

~~Ignomirello's children to file accusations. Company resources and personnel supported the~~

Exh. 76. The retaliation did not stop. In April 2025, Bettis filed an Arizona action over a

~~accuser, and press leaks amplified the allegations. Ignomirello was arrested and spent four~~

purported 2017 loan long since repaid. See Exh. 74. On February 4, 2025, AudioEye

~~months in jail. During this period, he lost access to his employees, lost health-insurance~~

republished the abandoned smears in a press release. See Exh. 67. In November 2025,

~~coverage, and was forced to pay cancer-treatment expenses out-of-pocket. He was separated~~

Defendants interfered with Kovacs's employment verification. In May 2026, as a condition of

~~from his children.~~

settlement, they demanded that Kovacs swear under oath that his protected reports were false.

~~129. In January 2018, following months of incarceration and without resources to~~

That demand was coupled with a release of AudioEye's own corporate-recovery claim for no

~~fight, Ignomirello was compelled to settle under extreme duress. After the Enterprise Leadership~~

consideration. See Snyder Decl. (ECF 64) ¶¶ 49–50; David Kovacs Decl.

~~Defendants gained control, Symbolic IO/ Formulus Black collapsed. Settlement obligations were~~

H. Witness Tampering, Obstruction, and the Solicitation of Murder

~~breached, intellectual property reverted, and investor equity was rendered worthless. Years later,~~

42. When litigation and financial pressure failed, the Enterprise escalated. In

~~in May 2023, the accuser recanted under oath and admitted she acted under external pressure.~~

December 2023, Humble – stating that he acted for Bettis – asked Julian Ducheine to "find

~~With no remorse, the Enterprise Leadership Defendants gutted internal controls, raided the~~

someone to take care of Kovacs," which Ducheine understood as a solicitation to murder. See

~~treasury, and destroyed what had been an enterprise with credible prospects of a $250–$500~~

Ducheine Decl. ¶¶ 19–25. In January 2024, Humble renewed the request in person and

~~million valuation.~~

identified Bettis as "the top man." See Ducheine Decl. ¶¶ 26–29. When Ducheine refused,

~~C. ESTP – The Same Story~~

Humble turned to a former NFL player who had lost approximately $1 million in Formulus

~~130. The Enterprise employed the same founder-removal mechanics at ESTP. ESTP~~

Black and offered restitution of that loss in exchange for killing Kovacs. See DiMaggio Decl. ¶¶

~~was a high-value venture in which Kovacs held a substantial economic interest. As at First~~

20–32; Ducheine Decl. On or about June 6, 2024, Ducheine warned Kovacs directly by

~~Contact, Formulus Black, and AudioEye, Kovacs occupied a position that constrained the~~

telephone, around the time of a June 6, 2024 email. Ducheine said Humble had asked him to

~~Enterprise's freedom of action. Specifically, as CEO, Kovacs had the capability and inclination~~

find a hitman in New York or Florida and, after Ducheine refused, had said the former NFL

~~to resist the Enterprise Leaders.~~

player would do it. See Ducheine Decl.

~~131. When Kovacs became a whistleblower, Bettis retaliated by stripping Kovacs of~~

43. The solicitation is corroborated from several directions. DiMaggio met with the

~~his ownership interest without compensation. This was done in secret. No independent valuation,~~

former NFL player and secured his commitment that Kovacs would not be harmed. See

~~audit, or governance process preceded the removal. Kovacs learned about it via a text from~~

DiMaggio Decl. Kovacs reported the plot to NYPD detectives in April 2025. See Exh. 91. At a

~~another partner.~~

June 3, 2025 meeting attended by counsel, the former NFL player was asked directly about the

~~132. The events at ESPT mirrored prior iterations of the Enterprise playbook: removal~~

solicitation and correctly identified the address where Kovacs was then living. See DiMaggio

~~of the constraining insider, consolidation of control, and destruction of enterprise value~~

Decl.; Tannenbaum Decl.; David Kovacs Decl.; Exh. 93. He had no legitimate reason to know

~~conservatively estimated at $200 million to $300 million. Kovacs Decl., ¶¶ 160-184; Exh. 60, 61,~~

where David Kovacs lived.

~~62, 75, 76, 90.~~

44. The Enterprise also acted to shape and suppress testimony. On December 23,

~~III. ESCALATION INTO THE PUBLIC MARKETS AT~~

2024, Humble telephoned Ducheine. As Ducheine later learned, Humble secretly recorded the

~~AUDIOEYE~~

call and shared the recording with Quinn Emanuel, counsel for AudioEye and Moradi. On

~~A. Consolidation of Control~~

January 2, 2025, Quinn Emanuel lawyers pressed Ducheine to state falsely that Kovacs had

~~133. AudioEye is a Nasdaq-listed public company subject to federal securities laws.~~

offered to pay him for his testimony. They invoked the recording as leverage when he refused.

~~Moradi became a major AudioEye investor in mid-2014 and was appointed to the board on~~

On January 20–21, 2025, Quinn Emanuel's Abensohn emailed Ducheine seeking a call.

~~November 13, 2019. Bettis served as Executive Chairman. Together the Enterprise Leadership~~

Abensohn then wrote that the firm was prepared to begin formal process to compel his

~~Defendants exercised effective control over governance, disclosure, and responses to internal~~

testimony. See Ducheine Decl. ¶¶ 47–53; Exh. 51, 65, 66, 112. On July 24, 2025, Humble left

~~complaints. Arena Decl.; Kovacs Decl.~~

Ducheine a voicemail stating that the recording "was not even used," attributing that account to

~~134. Paul Arena, AudioEye's co-founder and then-Executive Chairman, identified~~

"Carr and his attorney," and repeatedly assuring Ducheine he had "nothing to worry about."

~~Moradi's failure of SEC reporting requirements and possible coordinated trading activity that~~

See Exh. 113; Ducheine Decl. All of this conduct postdated, and was independent of, the

~~raised concerns regarding trading practices and compliance. Moradi and Bettis thereafter~~

defamation action Humble dismissed with prejudice on July 3, 2024.

~~attributed responsibility for accounting and restatement issues to Arena and orchestrated his~~

I. The December 4, 2024 Financing Window and the Insider Sales

~~removal from leadership in March 2015. The stated rationale focused on the restatement. The~~

45. On February 13, 2024, AudioEye's Form S-3 registration statement became

~~functional result was the elimination of a founder-level constraint on Moradi and Bettis's control~~

effective. See Exh. 71. That registration statement allowed AudioEye to sell up to $150 million of

~~over disclosure, trading, and governance. After Arena's removal, AudioEye failed to audit~~

securities for its own treasury. It also permitted selling stockholders to sell up to 2,820,000 shares.

~~internal controls for several years. The Independent Directors should note that AudioEye's~~

The same registration machinery the insiders later used to sell their own shares was available to

~~internal controls have not been audited since Moradi joined the board in 2019. See Arena Decl.;~~

AudioEye to raise primary capital for itself.

~~SEC Filings.~~

46. That market opportunity had substantial value to AudioEye. In 2024, AudioEye's

~~B. Advance Planning of Stock Manipulation~~

stock rose from roughly $4 to more than $30 per share. AudioEye needed capital. The

~~135. By August 30, 2023, Moradi discussed stock-price manipulation techniques with~~

Company's own testimony confirms that an additional sum on the order of $21 million would

~~Kovacs. These techniques included "painting the tape." Moradi directed Kovacs to assist with~~

have materially improved its financial condition by reducing the need for outside financing,

~~coordinated trading designed to create artificial demand. Kovacs refused. A confrontation~~

improving access to debt on favorable terms, funding product development the Company had

~~followed. Mario Rodriguez witnessed it. Kovacs Decl. 35; Rodriguez Decl.~~

determined was required, and strengthening the balance sheet. AudioEye ended 2024 with

136. Discussions of manipulation continued months before any price movement. The

approximately $5.7 million in cash and $549,000 in working capital. See Exh. 72; SEC filings.

timing reflected advance planning and intent. During this period, on December 25, 2023, Ben

47. The insiders usurped the opportunity for themselves. The December 4, 2024

Barton, another AudioEye insider, exchanged the Ben Barton Christmas Texts with Kovacs. In

secondary was an express non-issuer offering. The prospectus supplement states that AudioEye

those texts, Barton declared his intention to become a whistleblower regarding Moradi's fraud,

sold no securities, received no proceeds, and that all net proceeds went to the selling stockholders.

writing: "I'll make it very public. He's the one who's scared. He's the ceo of a public company.

See Exh. 73. On that single day, Moradi (through Sero Capital), Bettis (through CSB IV), and

He's fucked." The timing is critical. The AudioEye stock price had not yet moved. The

Tahir (through TurnMark) sold 900,000, 225,000, and 125,000 shares, respectively, at $24.00 –

pump-and-dump would not affect the market for another three months. Nevertheless, two

$30 million in one day. With Moradi's additional November sales and Georgevich's November

AudioEye insiders were already discussing, in heated and unambiguous terms, the stock

sales of approximately $303,500, the insiders extracted $34,070,724.65 in the Insider Sales:

manipulation that was being hidden from shareholders. Kovacs Decl. ¶¶ 100-106, 127(b).

Moradi/Sero Capital $25,367,224.65; Bettis/CSB IV $5,400,000.00; Tahir/TurnMark

C. Liquidity Infrastructure and Insider Sales

$3,000,000.00; Georgevich $303,500.00. This figure reflects the proceeds taken by the named

137. On February 13, 2024, AudioEye filed the Shelf Registration. The registration

insider Defendants and their selling entities, documented to the dollar on their Forms 4. It is the

enabled large insider sales without the normal restrictions and delay periods. (Exh. 71).

measure of the corporate-opportunity recovery sought, based upon SEC disclosed trades. It is not

138. During Phase I (June 2, 2022 through February 12, 2024), AudioEye spent

necessarily exhaustive. AudioEye's own approximately $7 million at-the-market program that

approximately $2.7 million repurchasing its own shares while cash-burning and dependent on

year confirms that the Company could have sold $34 million of stock for its own account. Based

external financing. A company that genuinely believes its stock is fairly priced preserves

on AudioEye's own testimony, the Company had need for additional liquidity. No disinterested

liquidity. Authorizing buybacks instead is economically irrational unless management knows the

process or informed business judgment existed to determine whether the Company should take

stock will later trade substantially higher. This conduct demonstrates management's advance

advantage of the opportunity. See Exh. 72. No Form 4 filed by any insider disclosed trading

knowledge that the observed trading price was materially below the price at which they intended

under a Rule 10b5-1 plan. AudioEye's 2024 Form 10-K separately confirmed that no director or

to sell. See SEC Filings; Schedule G.

officer adopted, modified, or terminated a Rule 10b5-1 arrangement during the fourth quarter of

~~139. In December 2024, after AudioEye's stock price increased from approximately~~

2024. The first such plans for Moradi and Georgevich were not adopted until May and June

~~$4 per share to over $30 per share – a gain exceeding 650% – insiders executed their plan.~~

2025 – six months after the December 4, 2024 sale. See Forms 4; Snyder Decl. (ECF 64) ¶ 21.

~~Between June 2024 and January 2025, insiders sold $35,218,799 of AudioEye stock in~~

48. No disinterested process or informed business judgment existed to determine

~~coordinated transactions. Moradi sold approximately $21.6 million. Bettis sold approximately~~

whether the Company should take advantage of the opportunity. See Exh. 72. No special

~~$5.4 million. Tahir sold approximately $3.0 million. Kelly Georgevich sold additional shares.~~

committee was formed. No independent counsel was retained. No internal corporate-opportunity

~~The largest sales occurred on December 4, 2024, when Moradi, Bettis, and Tahir collectively~~

analysis was performed.

~~sold $30 million of stock on a single day. The insiders possessed Material Nonpublic Information~~

J. The Board, Control, and Standing

~~when they sold, including undisclosed regulatory exposure, retaliatory litigation expenditures,~~

49. AudioEye's board comprises five directors: Moradi (Executive Chairman), Tahir,

~~whistleblower complaints, and governance failures. Not one Form 4 filed by any insider~~

Georgevich (Chief Executive Officer since May 4, 2026), Katherine E. Fleming, and James

~~disclosed trading pursuant to a Rule 10b5-1 plan. See Forms 4; Exh. 71, 73; Schedule G.~~

Hawkins. Three of them – Moradi, Tahir, and Georgevich – sold AudioEye stock in the Insider

~~IV. WHISTLEBLOWING, RETALIATION, AND CONVERSION~~

Sales and cannot impartially evaluate claims arising from those sales. Dr. Carr Bettis also sold in

~~TO PROCEEDS~~

the Insider Sales through CSB IV. He served as a director until May 2025 and is no longer on

~~A. Protected Disclosures~~

the Board. The remaining two directors, Fleming and Hawkins, did not sell in the Insider Sales

~~140. Kovacs was hired at AudioEye on January 1, 2014 by founders Paul Arena and~~

and are not alleged to have personally profited from them.

~~Ted Withrow, predating Moradi's involvement by more than six months. Kovacs worked at~~

50. The corporate claim is therefore controlled by the insiders against whom it runs,

~~AudioEye for nearly a decade as an executive. Kovacs once imagined the Enterprise Leadership~~

and by counsel who simultaneously represents AudioEye and Moradi. That conflict is the subject

~~Defendants to be mentors. Kovacs' relationship with Moradi soured on August 30, 2023 when~~

of Plaintiffs' pending motion to compel AudioEye to retain unconflicted counsel. See ECF Nos.

~~Moradi instructed him to commit securities fraud. Kovacs refused. See Kovacs Decl. 35;~~

62–64. AudioEye has not disclosed this action, including the derivative corporate-recovery claim,

~~Withrow Decl.~~

in any SEC filing – including its 2025 Form 10-K, its Q1 2026 Form 10-Q, and its May 13, 2026

~~141. On November 13, 2023, Kovacs engaged in Protected Activity, reaching out to~~

definitive proxy. See Snyder Decl. (ECF 64) ¶¶ 53–57.

~~HR to report securities fraud. The meeting never happened. The Chairman of the company, Carr~~

51. Plaintiff Daniel Kovacs has been a continuous beneficial owner of AudioEye

~~Bettis, phoned Kovacs moments later and stated: "Now Moradi will ruin your life." This chilling~~

common stock since at least December 11, 2023, and has been an investor in AudioEye for over

~~threat proved accurate. On January 17, 2024 – the Termination Date – Kovacs reported those~~

a decade. He owned shares at the time of the November 12–14 and December 4, 2024

~~concerns directly to Bettis during a telephone call. During the call, which Bettis secretly~~

transactions and has continued to own them through the present. He purchased additional

~~recorded, Kovacs repeatedly told Bettis about Moradi's Insider Trading and even threatened to~~

AudioEye shares after his brother's dispute with AudioEye arose. See Daniel Kovacs Decl. ¶¶ 3–

~~file a lawsuit over it. Bettis did not initiate an investigation. AudioEye's Whistleblower~~

4. Plaintiff Russell Alesi is a current AudioEye shareholder who acquired his shares after the

~~Protection Policy required one. (Exh. 30, 31, 105).~~

relevant trading and serves as a governance and Rule 23.1 plaintiff. See Alesi Decl.

~~B. Retaliation~~

K. Harm

~~142~~52. AudioEye ~~terminated~~was ~~Kovacs~~injured ~~on~~by the ~~Termination~~usurpation ~~Date.~~of ~~On~~the ~~January~~financing ~~19, 2024,~~opportunity:

~~AudioEye's General Counsel confirmed in writing that the termination was "for cause." The~~

$34,070,724.65 in proceeds taken by the insiders and held in the recipient entities. AudioEye was

~~company seized ERISA Benefits including vested RSUs worth millions of dollars that Kovacs~~

also injured by corporate waste, including corporate funds spent on retaliatory litigation against a

~~had earned over nearly a decade of service. Kovacs engaged in further Protected Activity,~~

whistleblower and economically irrational share repurchases. David Kovacs was injured in his

~~reporting the misconduct to the Department of Justice on February 8, 2024. On February 20,~~

business and property by economic losses arising from the Enterprise's post-2024 retaliatory and

~~2024, AudioEye revoked Kovacs' ERISA-protected restricted stock. Remarkably, the letter from~~

obstructive conduct. Those losses include costs incurred in response to the solicitation of violence

~~Akin Gump admits retaliation, stating that the termination was "for cause" because Kovacs~~

against him and lost employment and income caused by the November 2025 interference with

~~accused Moradi of fraud. See Exh. 32, 33, 34; Kovacs Decl. 140.~~

his employment verification. He was further injured in his property by the expropriation, without

~~143. On March 20, 2024, Bettis sent the Birkin Bag Letter to Kovacs containing~~

consideration, of the one-third ESTP membership interest he held when he engaged in protected

~~explicit threats that Moradi would do "unfathomable physical harm" if Kovacs did not settle his~~

reporting, and by the diversion of ESTP's business and goodwill to the successor entity Vivid

~~dispute with Moradi – which meant capitulate. (Exh. 35).~~

Strategies (¶41). That loss was accomplished through the Enterprise's predicate acts and is

~~144. Kovacs reported to the SEC on April 8, 2024. Two days later, on April 10, 2024,~~

pleaded as an additional measure of his RICO injury. The forfeiture of his vested AudioEye

~~AudioEye and Moradi commenced the Florida Lawsuit. The complaint asserted multiple False~~

equity is pleaded as evidence of the Enterprise's pattern and method and not as a measure of his

~~Smears comparing Kovacs to George Santos, the infamous charlatan who was jailed after being~~

RICO injury. The amount of these injuries is to be proven at trial.

~~elected to Congress based on fabricated credentials. Those allegations were later abandoned or~~

IV. DERIVATIVE AND REPRESENTATIVE ALLEGATIONS

~~disproven, as evidenced by AudioEye's Motion to Amend filed November 13, 2025. The~~

The underlying facts – board composition, the Insider Sales, the governance vacuum, and Plaintiffs'

~~company spent approximately $2.7 million—more than half its cash reserves—pursuing the~~

ownership – are pleaded in the Statement of Facts and incorporated here. This section makes the Rule 23.1

~~lawsuit while holding only $4.6 million in total cash. This expenditure constitutes corporate~~

representations and demand-futility showing. Demand is excused because a majority of the board is conflicted.

~~waste recoverable by AudioEye from the Enterprise Leadership Defendants under derivative and~~

AudioEye's refusal to create an independent corporate process confirmed futility and, in the alternative, was a

~~RICO theories. (Exh. 34, 36, 37, 67; Kovacs Decl. ¶¶ 20, 331–386; Schedule G).~~

wrongful refusal not entitled to business-judgment deference. "Demand" is used only in the Rule 23.1 sense.

~~145. On May 2, 2024, Jason Humble commenced the Jason Humble Lawsuit against~~

Plaintiffs' governance requests are pleaded as requests to create an independent process, not as litigation demands.

~~Kovacs in the Southern District of New York. On information and belief, Humble sued at the~~

53. AudioEye's dual capacity. AudioEye is named in two capacities. On the

~~direction of the Enterprise Leadership Defendants, not of his own accord. On July 3, 2024,~~

individual whistleblower-retaliation claim (Count II), AudioEye is a defendant. As David

~~Humble voluntarily dismissed the action with prejudice. (Exh. 39).~~

Kovacs's employer and principal, it is directly and vicariously liable for retaliatory conduct by its

~~146. On May 8, 2024, the retaliation escalated beyond the bounds of AudioEye when~~

officers and agents undertaken within the scope of their authority and on the Company's behalf.

~~Kovacs learned that Carr Bettis had ousted him from ESTP. This deprived Kovacs of economic~~

On all other claims – the derivative portion of Count I and the derivative claims in Counts III–

~~interests conservatively valued at more than $80 million. See Kovacs Decl. ¶¶ 160-184; Exh. 60,~~

VI – AudioEye is the nominal defendant and the real party in interest. The recovery sought on

~~61, 62, 75, 76, 90.~~

those claims runs to AudioEye's treasury, not to any individual plaintiff.

147. For good measure, in April 2025, Carr Bettis filed the Arizona Lawsuit over a

54. Daniel Kovacs's standing. Daniel Kovacs is, and at all relevant times has

purported $100,000 loan from 2017 that was repaid years ago. Discovery will show that the

been, a beneficial owner of AudioEye common stock. He has continuously owned no fewer than

purported loan was part of a scheme by Bettis to make AudioEye pay for his girlfriend's

200 shares since December 11, 2023, including at the time of the November 12–14 and

Manhattan apartment—conduct that would not have been possible if AudioEye maintained

December 4, 2024 transactions, and has continued to own them through the present (¶51). He

sound internal controls. (Exh. 74, 107).

satisfies the contemporaneous- and continuous-ownership requirements of Delaware law and

148. When financial retaliation failed to silence Kovacs, the Enterprise escalated to

brings the derivative claims on AudioEye's behalf.

soliciting murder. This is a particularly remorseless aspect of the Enterprise: its recycling of

55. Daniel Kovacs's adequacy. Daniel Kovacs has no claim of his own against

victims into accomplices. Jason Humble solicited two separate victims of the Enterprise's fraud –

any defendant and no interest other than the best recovery for AudioEye and its shareholders.

Julian Ducheine and Mo Wilkerson – to murder Kovacs.

He is David Kovacs's brother, but his stake is his own. He has held AudioEye stock continuously

149. Ducheine testified that in December 2023, Humble called him and stated, in

since December 11, 2023 – before David Kovacs commenced Kovacs I in April 2024. He added

substance: "We have to do something about David Kovacs. I need your help. . . Kovacs is

to his position with funds in accounts he controls, based on his own view of the Company, in

upsetting the wrong people right now. I need your help to find someone to take care of Kovacs."

May 2024 and April 2025, after that dispute had become public. He has not assigned any claim

Ducheine makes clear: "take care of" means murder and "wrong people" means Bettis and his

and has been promised nothing for serving. Other than his written engagement agreement with

group. Ducheine refused this outrageous request and warned Kovacs of the danger. See Ducheine

counsel, he has no agreement, arrangement, or understanding with David Kovacs or anyone else

Decl.; Exh. 40, 41, 42, 51.

concerning this litigation. No agreement gives him any personal benefit or requires him to act

150. Humble moved on to another victim. Former New York Jets All-Pro defensive

other than in the interests of AudioEye and its shareholders. His continuing investment reflects a

end Mo Wilkerson lost $1 million investing in Formulus Black. Humble made Wilkerson a

genuine economic interest aligned with the Company's recovery. He will fairly and adequately

proposal: murder Kovacs and get your million dollars back. Multiple witnesses confirm the plot

represent the interests of AudioEye and its shareholders. See Daniel Kovacs Decl. ¶¶ 2–4, 10–11.

was real, operationalized, and not mere talk. On August 5, 2024, Nicky DiMaggio met with

56. Russell G. Alesi. Alesi is a current beneficial owner of AudioEye common

Wilkerson and secured his commitment that Kovacs would not be harmed.

stock. He has held 4 shares continuously since approximately October 7, 2025. He prosecutes the

151. In an April 26, 2025 text message to NYPD detectives, Kovacs reported that

derivative governance claim and the Rule 23.1 process function. On June 4, 2026, Alesi executed

Wilkerson – who had previously lost approximately $1 million investing in Formulus Black –

and verified under oath a demand under 8 Del. C. §§ 219 and 220 (the "Alesi Demand"). It seeks

was "likely [to] come forward that he was solicited by Jason Humble on behalf of Carr Bettis

inspection of the Company's stockholder list and books and records, access to the June 22, 2026

and David Moradi to murder me in New York City or Miami," and that Wilkerson "declined the

annual meeting, and corrective proxy disclosure of the derivative claim. The Alesi Demand will

request and said he does not do that."

be served on the Company contemporaneously with these motion papers. Daniel Kovacs

152. Kovacs further informed the detectives: "I have strong guardian angels and the

executed a separate demand under 8 Del. C. §§ 219 and 220, dated June 7, 2026. His demand

fact Mo is coming forward proves that. Mo said he is speaking to his attorney over the weekend

joins in the purposes and requests of the Alesi Demand while separately stating his ownership,

and will like to sit down this week with me and his attorney to understand how he can come

status, purposes, and verification. Alesi's §§ 219–220 inspection and meeting-access rights are

forward without incriminating himself." See Exh. 91 (Text Messages with NYPD, Apr. 26,

direct shareholder rights asserted in his individual capacity. The governance declarations and

2025).

injunction in Count VI (¶¶102–103) are derivative.

153. On June 3, 2025, in a meeting at Miller's Ale House in Parsippany, New Jersey

57. David Kovacs. David Kovacs appears solely in his individual capacity on the

attended by Kovacs, his attorney Richard Tannenbaum, Wilkerson, Wilkerson's criminal defense

federal claims in Counts I–II. He is, was, and at all relevant times has been an AudioEye

attorney John Paul Velez, and DiMaggio, Kovacs asked Wilkerson directly about the murder

shareholder, and his shares were never validly revoked or cancelled. He has held AudioEye stock

solicitation. Wilkerson paused, looked Kovacs in the eye, and stated: "You're the guy who lives

since at least 2021, when the restricted stock units the Company granted him were, by the terms

at the start of Park Avenue." Wilkerson was correct – at that time, Kovacs lived at 1 Irving Place,

of AudioEye's own award agreements, contractually due to be settled into shares. See ¶ 40;

the first building on Park Avenue South. Wilkerson had no legitimate reason to know where

Snyder Decl. (ECF 64) ¶¶ 45–48. Consistent with AudioEye's own sworn testimony, the

Kovacs lived. All present understood Wilkerson's statement as confirmation that Humble had

Company conducted no good-faith investigation before purporting to cancel that equity, could

provided Kovacs's home address for purposes of executing the planned murder. Two witnesses –

not state how many AudioEye shares Kovacs held, and could not establish that any of his shares

~~Ducheine and DiMaggio – intervened and prevented the planned killing. See DiMaggio Decl. ¶¶~~

were ever validly cancelled. David Kovacs does not seek to serve as the derivative representative

~~20-32; Tannenbaum Decl.; Kovacs Decl. ¶¶ 186-215; Exh. 91, 93.~~

because he holds individual claims against the Enterprise. He does not lead the derivative claims

~~154. These contemporaneous statements reflect that Wilkerson – like Ducheine – was a~~

for that reason, and because Daniel Kovacs, a shareholder with no individual claim against any

~~targeted victim whom Humble attempted to recruit, not a willing participant. The evidence~~

Defendant, prosecutes them. The derivative claims are therefore prosecuted by Daniel Kovacs

~~indicates that Wilkerson refused, sought legal counsel, and expressed a desire to come forward~~

and Russell G. Alesi. Through their books and records demands, Daniel Kovacs and Russell G.

~~safely, underscoring that he remains a potential witness whose cooperation would further~~

Alesi are seeking information needed to communicate with other shareholders concerning this

~~illuminate the Enterprise's coercive methods.~~

matter, which the Company has not disclosed in its proxy materials.

~~155. After learning of the plot, Kovacs went on the lam. For over a year, Kovacs has~~

58. Rule 23.1 recitals. The verifications of Daniel Kovacs and Russell G. Alesi are

~~lived at an undisclosed location under constant fear for his personal safety. Kovacs Decl. 2.~~

incorporated by reference. This action is not collusive and is not brought to confer jurisdiction

~~C. Harm and Proceeds~~

the Court would otherwise lack. Daniel Kovacs and Russell G. Alesi will fairly and adequately

~~156. Public shareholders of AudioEye suffered losses conservatively estimated~~

represent AudioEye and its similarly situated shareholders. Their interests are not antagonistic to

~~between $125.5 million and $358.0 million across Phase I and Phase II. These damages are~~

the Company's interests.

~~subject to trebling under RICO, yielding shareholder recovery between $376.5 million and~~

Demand Is Excused; AudioEye's Refusal To Create an Independent Process

~~$1,074.0 million. (Schedule G).~~

Confirms Futility

~~157. Phase I damages (June 2, 2022 through February 12, 2024) compensate~~

59. The standard. Demand is excused because AudioEye does not have a board

~~shareholders who sold at artificially depressed prices during the period when insiders were~~

capable of impartially evaluating the derivative claims. Under Delaware law, futility is assessed

~~conducting economically irrational buybacks and concealing their plan to monetize at~~

director-by-director. For each director who would consider a demand, the Court asks whether

~~substantially higher prices. The irrational buybacks constitute objective evidence that~~

the director received a material personal benefit from the alleged misconduct, faces a substantial

~~management knew the market price was materially below the price at which they intended to~~

likelihood of liability, or lacks independence from a director who did. Demand is excused when a

~~sell. Phase I base damages range from $66.5 million to $126.0 million. (Schedule G).~~

majority of the board cannot impartially consider it. The derivative claims challenge a

~~158. Phase II damages (February 13, 2024 through April 1, 2025) compensate~~

transaction in which AudioEye insiders used the Company's registration machinery and market

~~shareholders who purchased at artificially inflated prices during the period when insiders were~~

opportunity to extract approximately $34 million for themselves and their selling entities, while

~~dumping $35.2 million of stock while concealing governance collapse, regulatory exposure, and~~

AudioEye received no proceeds from that resale. That conduct directly implicates members of

~~whistleblower complaints to federal authorities. Phase II base damages range from $59.0 million~~

the board and senior management.

~~to $232.0 million. (Schedule G).~~

60. The demand board. The board comprises five directors (¶49): Moradi, Tahir,

~~159. AudioEye itself suffered entity-level harm separate from and in addition to~~

Georgevich, Fleming, and Hawkins. Three – Moradi, Tahir, and Georgevich – sold in the

~~shareholder losses. This harm includes: (1) disgorgement of insider trading proceeds ($25.2~~

Insider Sales and are interested. Bettis sold through CSB IV but ceased to be a director in May

~~million to $35.2 million); (2) corporate waste and cash depletion, including $2.7 million spent on~~

2025. He is not among those who would consider a demand.

~~irrational buybacks and $2.7 million spent on retaliatory litigation against a whistleblower ($45.0~~

61. Moradi cannot impartially consider a demand. As Executive Chairman, he

~~million to $70.0 million); and (3) structural governance harm, including increased cost of capital,~~

controlled the Company and the offering mechanism. He sold through Sero Capital for

~~regulatory exposure, and reputational damage. AudioEye's base entity-level damages range from~~

$25,367,224.65, a material benefit, and faces a substantial likelihood of liability as the principal

~~$70.2 million to $105.2 million. These damages are subject to trebling under RICO, yielding~~

subject of the claims.

~~AudioEye's derivative claims against the Enterprise Leadership Defendants of $210.6 million to~~

62. Tahir cannot impartially consider a demand. He sold through TurnMark for

~~$315.6 million. (Schedule G; Schedule H). These figures are conservative and do not include~~

approximately $3,000,000, a material benefit, and faces a substantial likelihood of liability. He

~~downstream regulatory penalties, restatement costs, or increased cost of capital.~~

holds his Board seat through director-designation rights exercised by Sero Capital – the Moradi

~~160. Enterprise insiders converted the scheme into $35,218,799 in proceeds disclosed~~

entity through which Moradi sold in the Insider Sales – under an August 14, 2019 Letter

~~on Forms 4. The Enterprise Leadership Defendants added these proceeds to their already~~

Agreement disclosed in AudioEye's May 13, 2026 definitive proxy. He is not independent of

~~substantial wealth. Moradi, who has repeatedly represented that he possesses $240 million in~~

Moradi.

~~settlement proceeds from his 2017 traumatic brain injury case, is a deep-pocket defendant fully~~

63. Georgevich cannot impartially consider a demand. She sold for approximately

~~capable of satisfying AudioEye's derivative claims and shareholder judgments. (Forms 4; Kovacs~~

$303,500, a material benefit, and faces a substantial likelihood of liability as the Company's then-

~~Decl.; ¶¶ 76-92; Schedule G).~~

CFO. She was elevated to CEO and to the board on May 4, 2026 by the Moradi-controlled

~~V. WITNESS TAMPERING AND OBSTRUCTION OF~~

board, so she is not independent of Moradi. Her addition created a three-to-two interested

~~JUSTICE~~

majority.

~~161. The Enterprise engaged in a sustained pattern of witness tampering, obstruction of~~

64. Plaintiffs asked AudioEye to cure the conditions that made demand

~~justice, and improper influence directed at individuals capable of corroborating Kovacs'~~

futile. Plaintiffs did not ask the conflicted board to exercise business judgment over claims

~~allegations. These acts, spanning 2023–2025, constitute predicate offenses under 18 U.S.C. §§~~

against its own members. They repeatedly asked AudioEye to create an unconflicted corporate

~~1512(b), 1512(c), 1512(d), and 1513(e).~~

voice: independent counsel for the Company, a special committee of the two disinterested

~~162. Although Kovacs faced direct retaliation after becoming a federal whistleblower,~~

directors (Fleming and Hawkins), adherence to the Rule 23.1 process, and shareholder notice

~~he was not the only target. The Enterprise manipulated, intimidated, or attempted to control: (i)~~

before any derivative claim could be released, compromised, or dismissed. Plaintiffs also tendered

~~witness Julian Ducheine; (ii) a senior advisor to Mayor Adams; (iii) Kovacs' attorneys; and (iv)~~

proposed board resolutions that gave the disinterested directors a ready path to do so.

~~Kovacs himself.~~

65. AudioEye refused; the refusal confirms futility. AudioEye did not appoint

~~A. Witness Julian Ducheine~~

a special committee, retain independent counsel for the Company, conduct an independent

~~1. Murder Solicitations – Motive to Tamper~~

investigation of the corporate-opportunity claim, or give shareholders notice. To Plaintiffs'

~~163. In December 2023, Humble told Ducheine: "We have to do something about~~

knowledge, Fleming and Hawkins were never even provided the documentary record or the

~~David Kovacs… he is upsetting the wrong people… I need your help to find someone to take~~

proposed resolutions. The same counsel that represents Moradi signed AudioEye's motion to

~~care of Kovacs." Ducheine understood this as a solicitation to find someone to murder or~~

dismiss. That counsel stated it would continue to represent both AudioEye and Moradi through

~~seriously harm Kovacs. See Ducheine Decl. ¶¶ 19–25.~~

the motion-to-dismiss phase and would press the pending sanctions motion. As described in ECF

~~164. In January 2024, Humble again raised hiring a hitman, identifying Bettis as the~~

No. 62-64 (motion to compel AudioEye to retain unconflicted counsel), Moradi's interests are in

~~"top man" and referencing Mo Wilkerson as someone who could "take care of" Kovacs. See~~

direct conflict with AudioEye's. Through that same counsel, AudioEye pressed a global

~~Ducheine Decl. ¶¶ 26–29.~~

settlement on a one-business-day deadline. The settlement would have dismissed the derivative

~~165. After the Kerr lawsuit exposed Humble's misconduct, Ducheine disclosed the~~

claims with prejudice and released the Company's approximately $34 million corporate-recovery

~~murder plot to Kovacs on May 8, 2024. See Ducheine Decl. ¶¶ 30–46; Exh. 40. Kovacs~~

claim against Moradi and the selling insiders for no consideration to AudioEye. This was to

~~independently corroborates receiving warnings regarding potential violence.~~

occur outside the Rule 23.1 process. AudioEye represented only that the Company and Board

~~2. December 2024 – Quinn Pressure Campaign~~

would obtain separate counsel to evaluate and approve final terms "[t]o the extent" required.

~~166. In December 2024, Humble secretly recorded a call with Ducheine, attempting to~~

The refusal left the same conflicted structure in place and made it worse by adding Georgevich, a

~~steer discussion away from the murder plot and script a false narrative portraying Kovacs as~~

selling insider and former CFO, to the board.

~~dishonest. See Ducheine Decl. ¶¶ 47–50.~~

66. Demand is excused; in the alternative, any demand was wrongfully

~~167. Humble provided the recording to Quinn Emanuel, which used it to pressure~~

refused. For these reasons, a majority of the demand board is interested in the Insider Sales,

~~Ducheine. See Ducheine Decl. ¶¶ 49–50.~~

faces a substantial likelihood of liability, or lacks independence from those who are. Pre-suit

~~168. In January 2025, Quinn Emanuel attorney Adam Abensohn attempted to coerce~~

demand is excused as futile under Fed. R. Civ. P. 23.1 and Delaware law. In the alternative, to

~~Ducheine into adopting a false story that Kovacs tried to bribe him. When he refused, Abensohn~~

the extent any request for an independent process is deemed a litigation demand, that demand

~~invoked the secret recording as leverage. See Ducheine Decl. ¶¶ 49–50; Exh. 65.~~

was wrongfully refused and is not entitled to business-judgment deference. AudioEye did not

~~169. On January 24, 2025, Quinn Emanuel sent a letter falsely accusing Kovacs of~~

refuse after a disinterested, informed, good-faith investigation. It refused without independent

~~attempting to bribe Ducheine—an allegation Ducheine states is entirely fabricated. See Ducheine~~

counsel, without a special committee, without a documented investigation, and without

~~Decl. ¶¶ 1–6; Exh. 66.~~

shareholder notice, while conflicted counsel continued to speak simultaneously for AudioEye and

~~3. January 2, 2025 Text Messages ("Juju")~~

the principal insider defendant. That is not a protected corporate judgment. It is the disabling

170. On January 2, 2025, Humble texted Ducheine repeatedly addressing him as

conflict in operation.

"juju," the same nickname used in the July 24 voicemail. See Exh. 51; Ducheine Decl. 53.

V. CAUSES OF ACTION

171. In these messages, Humble attempted to calm and influence Ducheine ("my

Each Count incorporates all preceding paragraphs.

apologies," "It's all love"), reframed insider-trading issues, and instructed him not to mention

COUNT I – CIVIL RICO · 18 U.S.C. §§ 1962(c), 1962(d), 1964

Kovacs again, while admitting he had involved "that Attorney" because of perceived

(By David Kovacs individually; and by Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc.

insider-trading exposure. See Exh. 51; Ducheine Decl. ¶¶ 47, 53.

– against Moradi, Bettis, and Humble. AudioEye is the derivative victim, not a RICO person-defendant.)

4. July 24, 2025 Voicemail — Direct Evidence of

67. Plaintiffs repeat and reallege each preceding paragraph.

Coordinated Obstruction

68. The Enterprise. Moradi and Bettis, together with Jason Humble and a

172. On July 24, 2025, Humble left a voicemail confirming:

recurring group of intermediaries and controlled entities – including entities and persons beyond

a. the existence of the secret recording;

the named defendants – formed an association-in-fact enterprise within § 1961(4) (the

b. review of the recording by Bettis and "his attorney";

"Enterprise"). The Enterprise's common purpose was to seize control of companies during

c. use of the recording in litigation involving Kovacs; and

periods of capital need, consolidate control over their finances and gatekeepers, extract value,

d. ongoing coordination with Bettis.

and suppress those who threatened exposure. It functioned as a continuing unit with an

See Ducheine Decl. App'x A; ¶¶ 51–53.

ascertainable structure and an existence separate and distinct from the defendant-persons and

173. Humble repeatedly called Ducheine "juju," told him to relax, and smeared Kovacs

from the predicate acts it committed. See ¶¶28–32; Arena Decl.; David Kovacs Decl.;

as a "pathological liar"—all consistent with efforts to shape his recollection and suppress

Lichtenstein Decl.; Ducheine Decl.; DiMaggio Decl.

disclosure. See Ducheine Decl. App'x A; 53.

69. Conduct. Moradi and Bettis are "persons" under § 1961(3). They conducted and

174. This voicemail corroborates every critical element of Ducheine's testimony: the

participated in the Enterprise's affairs through a pattern of racketeering activity, in violation of §

murder solicitations, the secret recording, Bettis's involvement, Quinn Emanuel's involvement,

1962(c). Humble and the remaining participants knowingly participated in the Enterprise's affairs

~~and the Enterprise's sustained effort to silence him.~~

with knowledge of its objectives.

~~B. Tampering Directed at Senior Advisor to the Mayor of~~

70. Pattern – predicate acts within § 1961(1):

~~New York City~~

a. Wire fraud (§ 1343) – interstate communications in furtherance of the

~~175. In November 2025, a senior advisor to Mayor Eric Adams informed Kovacs she~~

fraudulent solicitation of investors in, and diversion of assets from, Formulus

~~could not provide a truthful statement confirming his role because the Mayor's lawyers were~~

Black and First Contact (¶¶30–31; Exh. 48–50, 52–53, 78, 98–99; Lichtenstein

~~threatening her. See Kovacs Decl. ¶¶ 276-77.~~

Decl.; Ducheine Decl.); the diversion of ESTP's business, contracts, and

~~176. The advisor texted: "I get yelled at every day and his lawyers threatening me… I~~

goodwill to the successor entity Vivid Strategies after Kovacs's protected

~~will go to prison."~~

reporting, through interstate communications and without consideration to

~~177. Quinn Emanuel partner Alex Spiro was publicly reported to represent Mayor~~

Kovacs (¶41; Exh. 59–62, 75–76; David Kovacs Decl. ¶¶ 140–146); the

~~Adams during this period, and Quinn Emanuel is the only firm with an interest in preventing~~

diversion of corporate funds, including use of a JDLK-titled account to cause

~~Kovacs from obtaining such a letter.~~

AudioEye to pay personal expenses (Exh. 107); and the funding and

~~178. This episode demonstrates the Enterprise's willingness to interfere with municipal~~

coordination of retaliatory litigation against Kovacs (¶41; Exh. 37, 39, 74).

~~officials to block truthful testimony.~~

b. Witness tampering / retaliation (§§ 1512(b), 1512(c), 1513(e)) – the

~~C. Interference With Attorney Xavier Suarez~~

December 23, 2024 secretly recorded Ducheine call and scripted-narrative

~~179. Attorney Xavier Suarez, who represented Kovacs in connection with the Florida~~

pressure; the January 2, 2025 effort through Quinn Emanuel to manufacture a

~~litigation, concluded that Quinn Emanuel faced a serious ethical conflict arising from its~~

false bribery account; the January 20–21, 2025 threat to begin formal process

~~communications with Kovacs while secretly aligning with adverse parties. Suarez initially agreed~~

to compel testimony; the July 24, 2025 voicemail conveying coordination with

~~that a motion to disqualify Quinn Emanuel was warranted and directed his law partner to gather~~

"Carr and his attorney"; interference with the contemplated disqualification

~~sworn affidavits to support such a motion. See Kovacs Decl. ¶¶ 255–256.~~

motion; and third-party pressure to suppress testimony (¶44; Ducheine Decl.;

~~180. Consistent with that determination, sworn affidavits were obtained from Kovacs~~

David Kovacs Decl.; Exh. 51, 65, 66, 112, 113).

~~and other witnesses, including Sean Newlin and David Tanzer, and draft motion papers seeking~~

c. Murder-for-hire (§ 1958) – at the direction of Bettis and Moradi, Humble

~~Quinn Emanuel's disqualification were prepared. Kovacs instructed his counsel to proceed with~~

used facilities of interstate commerce to solicit Kovacs's murder for

~~filing the motion and reviewed and commented on the draft papers. See Kovacs Decl. ¶¶~~

consideration of pecuniary value. He offered a former NFL player restitution

~~257–258.~~

of his approximately $1 million Formulus Black loss in exchange for killing

~~181. Despite his prior agreement and the completed preparation of motion papers,~~

Kovacs, to maintain Enterprise control and deter cooperation with regulators.

~~Xavier Suarez abruptly refused to file the disqualification motion and provided no legal~~

Humble's related solicitations of Ducheine in December 2023 and January

~~explanation for his reversal. See Kovacs Decl. 259.~~

2024 are pleaded above as obstruction under §§ 1512–1513 (¶¶42–43;

~~182. Kovacs later learned that Suarez reversed course because his two children were~~

Ducheine Decl.; DiMaggio Decl.; Tannenbaum Decl.; Exh. 40–42, 51, 91,

~~employed by Quinn Emanuel: his son, Mayor Francis Suarez, served as Of Counsel at the firm,~~

93).

~~and his daughter was the co-managing partner of Quinn Emanuel's Miami office. These familial~~

d. Hobbs Act extortion (§ 1951) – the wrongful use of fear of physical harm

~~relationships were not disclosed to Kovacs at the time Suarez advised against pursuing~~

to obtain property from Kovacs, namely the surrender or release of his legal

~~disqualification. See Kovacs Decl. ¶¶ 260–261.~~

claims on the insiders' terms. The predicate includes the March 20, 2024

~~183. Subsequently, Suarez's law partner informed Kovacs that Mayor Francis Suarez~~

Birkin Bag Letter threatening physical harm unless he capitulated (¶40; Exh.

~~had personally intervened and stated that Suarez "did the right thing by not moving to disqualify~~

35).

~~Quinn Emanuel." Suarez later attempted to justify his refusal by suggesting the issue could be~~

71. Relatedness and continuity under H.J. Inc. – common participants, victims,

~~addressed "later," despite acknowledging that the motion itself was substantively sound. See~~

methods, and purpose; closed-ended continuity across three companies; and open-ended

~~Kovacs Decl. ¶¶ 262–264.~~

continuity through ongoing concealment and retaliation.

~~184. From Kovacs' perspective, the refusal to file the disqualification motion reflected~~

72. No securities-fraud predicate. No predicate act alleged rests on conduct

~~political and familial interference overriding independent legal judgment, corrupting the~~

actionable as fraud in the purchase or sale of securities. The pattern and injuries pleaded here are

~~attorney-client relationship, and blocking a meritorious motion directed at Quinn Emanuel's~~

independent of the securities-related allegations and comply with the RICO Amendment to §

~~undisclosed conflicts and improper conduct. See Kovacs Decl. ¶¶ 265–266.~~

1964(c).

~~D. Pressure Through Senior Blackstone Executive Directed~~

73. Conspiracy – § 1962(d). Moradi, Bettis, and Humble each knowingly agreed

~~by Mayor Suarez~~

to participate in the Enterprise's affairs through a pattern of racketeering. Each agreed that at

~~185. In December 2024, Mayor Francis Suarez—while serving as Of Counsel at Quinn~~

least two predicate acts would be committed.

~~Emanuel—caused a senior Blackstone executive to contact Kovacs for the purpose of pressuring~~

74. Injury and proximate cause under Holmes and Anza:

~~him to abandon his claims. See Kovacs Decl. ¶¶ 269–272.~~

a. David Kovacs suffered injury to his business and property by reason of the

~~186. During that meeting, the executive told Kovacs that he had spoken directly with~~

Enterprise's racketeering activity. His RICO standing rests on concrete

~~Mayor Suarez, that Suarez was aligned with Moradi, and that Kovacs would not receive a fair~~

economic losses arising from the Enterprise's post-2024 obstruction and the

~~trial in Miami because both Suarez siblings worked for Quinn Emanuel. See Kovacs Decl. 269.~~

solicitation of violence against him. Those losses include out-of-pocket security

~~The executive urged Kovacs to settle and conveyed that Quinn Emanuel's influence would~~

and relocation expenses and lost employment and income caused by the

~~prevent Kovacs from prevailing if he continued litigating. See Kovacs Decl. 270.~~

November 2025 interference with his employment verification (¶¶41–43, 52,

~~187. The executive further referenced his prior role in Blackstone's settlement of~~

78; David Kovacs Decl.; DiMaggio Decl.; Ducheine Decl.). Kovacs was also

~~Moradi's traumatic-brain-injury case, underscoring the seriousness of the message and the~~

injured in his property by the expropriation of his one-third ESTP

~~alignment between Moradi, Quinn Emanuel, and influential third parties. See Kovacs Decl.~~

membership interest and the diversion of ESTP's business and goodwill to

~~271.~~

Vivid Strategies, effected through the Enterprise's wire-fraud predicate (¶¶41,

~~188. Kovacs understood this interaction as a coordinated effort by Quinn Emanuel,~~

70(a); Exh. 59–62, 75–76; David Kovacs Decl. ¶¶ 140–146), in an amount to

~~acting through a politically connected financial intermediary, to pressure him into abandoning his~~

be proven at trial. The forfeiture of his vested AudioEye equity (¶40; Exh. 34,

claims. See Kovacs Decl. 272.

80–82), which was litigated in the prior state actions, is pleaded as evidence of

E. Summary of Tampering and Obstruction

the Enterprise's pattern and method and not as a measure of his RICO

189. Taken together, the tampering directed at Ducheine, the NYC senior advisor,

standing.

attorney Xavier Suarez, and Kovacs himself reveals a coordinated system of obstruction

b. AudioEye (derivatively) suffered injury to business and property through

designed to suppress truthful testimony and shield the Enterprise from accountability.

corporate waste and diversion of corporate assets, including expenditures to

190. The pattern includes secret recordings, coercive legal threats, political pressure,

fund retaliatory litigation against a whistleblower and funds diverted from the

fabricated allegations, threats delivered through intermediaries, interference with counsel, and

Company, in an amount to be proven (¶52; Exh. 37, 107). Disgorgement of

efforts to silence key witnesses.

the insider-sale proceeds is sought under Counts III–V and is not pleaded as

191. These actions were deliberate, strategic, and central to the Enterprise's operation,

RICO injury here.

constituting multiple violations of 18 U.S.C. § 1512 and predicate acts under RICO.

75. Relief. Treble damages, costs, reasonable attorneys' fees, and equitable relief

COUNT I – CIVIL RICO

under § 1964(c).

18 U.S.C. §§ 1962(c), 1962(d), 1964

COUNT II – WHISTLEBLOWER RETALIATION

(By David Kovacs, individually; and all Plaintiffs derivatively on behalf of

Dodd-Frank § 21F, 15 U.S.C. § 78u-6(h)

AudioEye, Formulus Black, First Contact, and ESTP)

(By David Kovacs, against AudioEye, Inc., as his employer.)

19276. PlaintiffsPlaintiff repeatrepeats and reallegerealleges alleach preceding paragraphs as though fully set forthparagraph.

herein.

77. Protected status. On April 8, 2024, Kovacs reported securities-law violations

193. At all relevant times, Defendants David Moradi and Carr Bettis, together with

to the SEC (¶39; Exh. 36) and is a "whistleblower" entitled to § 21F anti-retaliation protection.

Jason Humble, affiliated executives, intermediaries, and controlled entities including AudioEye,

78. Materially adverse action after the SEC report. After the SEC report,

Inc., Formulus Black LLC, First Contact Entertainment, Eternal Sources Tech Partners, LLC

AudioEye retaliated. The principal materially adverse acts on which Count II rests are: (a) the

~~("ESTP"), and Vivid Strategies, LLC, formed and conducted an association-in-fact enterprise~~

November 2025 interference with Kovacs's employment verification; and (b) the May 2026

~~within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").~~

demand, as a condition of settlement, that he swear to having made "false claims of racism,

~~194. The activities of the Enterprise affected interstate commerce and were carried out~~

fraud, and securities manipulation" – a coerced recantation intended to punish and deter his

~~through the instrumentalities of interstate communication, securities markets, and~~

protected reporting. The February 4, 2025 press release republishing abandoned smears (Exh.

~~multi-jurisdiction litigation.~~

67) is pleaded as part of the same continuing retaliatory campaign and as evidence of motive,

~~195. The Enterprise had a common purpose, namely the extraction of insider profits~~

willfulness, and causation. The funding and prosecution of litigation against Kovacs – the Florida

~~and avoidance of losses, the concealment of securities fraud and governance failures, the~~

action filed April 10, 2024, two days after the SEC report, and the Arizona action filed in April

~~suppression of internal and external oversight, the retaliation against whistleblowers and~~

2025 – are pleaded as part of the same retaliatory campaign and as evidence of motive, not as the

~~witnesses, and the preservation of control through intimidation, misuse of corporate assets, and~~

operative adverse act (¶41; Exh. 30, 37, 74).

~~retaliatory lawfare.~~

79. Causation. Retaliatory motive is shown by temporal proximity – two days from

~~196. The Enterprise had relationships among its members, with Moradi and Bettis~~

the SEC report to the Florida suit – and by the escalating, coordinated campaign. The pre-report

~~acting as its leaders and primary decision-makers, directing the actions of executives,~~

conduct is pleaded as evidence of animus, willfulness, and the continuing nature of the campaign,

~~intermediaries, and affiliated entities, and coordinating activity across nominally separate~~

not as the operative act of retaliation. That conduct includes the February 20, 2024 RSU

~~companies to serve unified objectives.~~

forfeiture letter tying the purported "for cause" termination to Kovacs's accusations against

~~197. The Enterprise had longevity sufficient to pursue its purpose and did in fact~~

Moradi (¶40; Exh. 34), the threats, and the solicitation of Kovacs's murder (¶¶42–43; Exh. 35,

~~operate continuously from at least June 2022 through April 2025, spanning multiple reporting~~

40–42; Ducheine Decl.; DiMaggio Decl.).

~~periods, insider-trading windows, acts of retaliation, and judicial and regulatory proceedings.~~

80. Relief. Reinstatement or front pay, two times back pay with interest, and

~~198. Defendants Moradi and Bettis are "persons" within the meaning of 18 U.S.C. §~~

litigation costs, expert fees, and reasonable attorneys' fees under § 78u-6(h)(1)(C).

~~1961(3) who conducted and participated, directly and indirectly, in the conduct of the~~

COUNT III – BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY /

Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

USURPATION OF CORPORATE OPPORTUNITY (DERIVATIVE)

199. Each remaining RICO Defendant knowingly participated in the Enterprise's

Delaware common law

affairs by implementing, facilitating, concealing, enabling, or benefiting from the racketeering

(By Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc. – against Moradi, Tahir, and

acts alleged herein, with knowledge of their unlawful character and of the Enterprise's

Georgevich as fiduciaries, and against Bettis, Sero Capital, CSB IV, and TurnMark as knowing participants and

objectives.

recipients.)

200. From at least June 2022 through April 2025, Defendants committed multiple acts

81. Plaintiff repeats and realleges each preceding paragraph.

of racketeering activity within the meaning of 18 U.S.C. § 1961(1), including securities fraud

82. Derivative standing and demand futility are established at ¶¶ 54–66 above

and insider trading, wire fraud through materially false public disclosures, wire fraud through

and incorporated here.

diversion and embezzlement of corporate funds, fraud relating to the reimbursement and

83. Fiduciary duty. Moradi, Tahir, and Georgevich, as directors and/or officers,

concealment of expenditures associated with the Birkin Bag Letter, wire fraud perpetrated

owed AudioEye duties of loyalty and good faith.

through retaliatory and non-productive litigation, retaliation against a whistleblower, intimidation

84. The opportunity. AudioEye had need for additional capital. AudioEye had the

of witnesses, obstruction of judicial and regulatory proceedings, concealment and destruction of

ability to sell stock for its own account through existing registration machinery. The insiders

evidence, and interference with ERISA-protected benefits.

consumed for themselves this market opportunity. The December 4, 2024 financing opportunity

201. These racketeering acts are pleaded in detail in the Statement of Facts and in the

was a corporate opportunity belonging to AudioEye because: (a) AudioEye's own registration

RICO Predicate Act Table incorporated by reference, each of which sets forth the predicate

statement created the mechanism for the sale; (b) AudioEye was financially able to exploit the

statutes, defendants involved, and factual bases for liability.

opportunity and had already accessed the market for its own account; (c) AudioEye needed

202. The racketeering acts were related within the meaning of RICO because they

capital, and the Company's own testimony confirms that at least $21 million of additional capital

involved common victims, common methods, common instrumentalities, overlapping

would have materially improved its financial condition; (d) the insiders controlled the Company,

participants, and a shared objective of extracting insider value while silencing opposition and

so no disinterested decision-maker evaluated whether the window belonged to AudioEye; and (e)

~~avoiding accountability.~~

the insiders chose the side of the registration statement that paid them rather than the side that

~~203. Defendants' conduct constituted closed-ended continuity because it involved a~~

funded the Company. See Exh. 71–73; Forms 4; SEC filings.

~~series of related predicate acts extending over a substantial period of time, spanning nearly three~~

85. Absence of process. No special committee was formed, no independent

~~years and multiple distinct but related schemes.~~

counsel retained, and no internal corporate-opportunity analysis performed before the insiders

~~204. Defendants' conduct also constituted open-ended continuity because the~~

captured the window (¶¶48, 65).

~~racketeering acts were Defendants' regular way of conducting the Enterprise's affairs and posed~~

86. Registration rights, in the alternative. Either the insiders held only limited,

~~a continuing threat of repetition, including through ongoing concealment, retaliatory litigation,~~

conditional registration rights and exercised them disloyally and without process, or the

~~suppression of whistleblowers, obstruction of regulatory and judicial oversight, and continued~~

conflicted Board discretionarily registered its own members' shares – a related-party act

~~exploitation of corporate structures absent intervention by the Court.~~

requiring disinterested approval that was never obtained. Under either alternative, no

~~205. Defendants knowingly agreed and conspired to conduct and participate in the~~

disinterested decision-maker determined whether the opportunity belonged to AudioEye.

~~conduct of the Enterprise's affairs through a pattern of racketeering activity, and each Defendant~~

87. The proceeds. The insiders extracted $34,070,724.65: Moradi/Sero Capital

~~knew the essential nature of the plan and agreed that at least two racketeering acts would be~~

$25,367,224.65; Bettis/CSB IV $5,400,000.00; Tahir/TurnMark $3,000,000.00; Georgevich

~~committed in furtherance of the conspiracy, in violation of 18 U.S.C. § 1962(d).~~

$303,500.00 (¶47). See Forms 4. The recipient entities hold those proceeds.

~~206. Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) were the direct and~~

88. Liability of participants and recipients. Dr. Carr Bettis and the recipient

~~proximate cause of Plaintiffs' injuries and the injuries of the Companies, including loss of equity,~~

entities Sero Capital, CSB IV, and TurnMark knowingly participated in and substantially

~~forfeited ERISA-protected benefits, insider-trading losses, misappropriated corporate assets,~~

assisted the breaches. They also received and hold proceeds of the usurped opportunity. They

~~massive waste through retaliatory lawfare, reputational and professional harm, and the~~

are liable for aiding and abetting breach of fiduciary duty and as recipients subject to

~~destruction of enterprise value at ESTP and other affiliated entities.~~

disgorgement (Counts IV–V).

~~207. In December 2023 and January 2024, Defendant Jason Humble, acting in concert~~

89. Injury and relief. AudioEye was injured in the amount of the usurped

~~with and for the benefit of Defendants David Moradi and Carr Bettis, solicited third parties to~~

proceeds. Plaintiff seeks, on AudioEye's behalf, disgorgement of $34,070,724.65, a constructive

~~murder Plaintiff David Kovacs because Kovacs's whistleblowing threatened the Enterprise's~~

trust (Count V), an accounting, prejudgment interest, and fees.

~~control, profits, and continued operation. They solicited Kovacs' murder because to maintain and~~

COUNT IV – UNJUST ENRICHMENT / RESTITUTION (DERIVATIVE)

~~increase Defendants' positions within the Enterprise, prevent exposure of racketeering activity,~~

(In the alternative to Count III. By Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc.,

~~and deter cooperation with regulators and law enforcement. Although the violence was not~~

against Moradi, Sero Capital, Bettis, CSB IV, Tahir, TurnMark, and Georgevich.)

~~carried out, the solicitation itself constitutes a completed violation of 18 U.S.C. § 1959.~~

90. Plaintiff repeats and realleges each preceding paragraph. This Count is pleaded

~~208. Defendants' racketeering conduct was inherently self-concealing and involved~~

expressly in the alternative under Fed. R. Civ. P. 8(d)(2)–(3). Unlike Count III, it provides an

~~affirmative acts of concealment, including the use of non-corporate communications, avoidance~~

independent basis of liability reaching the non-fiduciary recipient entities. It survives even if a

~~of internal controls, suppression of internal escalation, and abuse of litigation to delay scrutiny,~~

fiduciary or demand-futility element of Count III is not sustained.

~~thereby tolling all applicable statutes of limitation.~~

91. Enrichment at AudioEye's expense. Defendants and the recipient entities

~~209. Plaintiffs seek relief pursuant to 18 U.S.C. § 1964, including treble damages,~~

were enriched by retaining the proceeds of a financing opportunity belonging to AudioEye. The

~~costs and attorneys' fees, declaratory and injunctive relief, disgorgement of racketeering~~

enrichment came at AudioEye's expense and occurred under circumstances in which equity and

~~proceeds, an accounting, and such other relief as the Court deems just and proper.~~

good conscience do not permit retention.

~~COUNT II – SECURITIES FRAUD~~

92. Reach to the recipient entities. Sero Capital, CSB IV, and TurnMark owe

~~Exchange Act § 10(b), Rule 10b-5, and § 20(a)~~

AudioEye no fiduciary duty, but each holds proceeds that in equity belong to AudioEye. This

~~(By Kovacs and Alesi, on behalf of themselves and similarly situated parties,~~

Count reaches them where Count III does not.

~~against AudioEye, AudioEye Board, AudioEye Executives)~~

93. Governing law, in the alternative. As against the fiduciary Defendants, this

~~210. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth~~

Count is governed by Delaware law under the internal-affairs doctrine. As against the non-

~~herein.~~

fiduciary recipient entities, it is governed by New York law. It is pleaded under both.

211. This Count is brought on behalf of a class of investors (the "Class") who

94. Scope. AudioEye is entitled to restitution of the $34,070,724.65 in proceeds of

purchased or otherwise acquired publicly traded securities of AudioEye, Inc. ("AudioEye")

the Insider Sales.

during the Class Period and were damaged as a result of Defendants' unlawful conduct.

95. Relief. Restitution and disgorgement to AudioEye, together with the constructive

212. During the Class Period, AudioEye and its senior leadership, including Moradi

trust and equitable lien sought in Count V.

and Bettis, engaged in a scheme to defraud investors by making materially false and misleading

COUNT V – ACCOUNTING AND EQUITABLE RELIEF (DERIVATIVE)

statements and omissions concerning AudioEye's financial condition, governance, risk profile,

(By Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc., against Moradi, Sero Capital,

and operational performance.

Bettis, CSB IV, Tahir, TurnMark, and Georgevich.)

213. Defendants affirmatively promoted misleading non-GAAP metrics and

96. Plaintiff repeats and realleges each preceding paragraph.

performance narratives, including so-called "Rule of 40" representations, while concealing

97. Accounting. The fiduciary Defendants owe AudioEye a duty to account for the

material adverse facts regarding:

proceeds of the usurped opportunity and their disposition. The recipient entities hold identifiable

a. insider knowledge of regulatory, litigation, and whistleblower risk;

proceeds and traceable assets. Plaintiff is entitled to an accounting of the proceeds received,

b. ongoing retaliation against whistleblowers;

transfers made, expenditures charged, and present location of the funds.

c. governance failures and lack of effective internal controls; and

98. Equitable remedies. Plaintiff seeks, on AudioEye's behalf, a constructive trust

d. coordinated insider stock sales.

and equitable lien on the proceeds of the Insider Sales and all assets traceable to them –

214. At the same time that these misleading disclosures were disseminated to the

including assets held by Sero Capital, CSB IV, and TurnMark and any property acquired with

market, Moradi, Bettis, and other insiders sold substantial amounts of AudioEye stock for

the proceeds – together with tracing and disgorgement.

personal benefit, collectively generating tens of millions of dollars in proceeds.

99. No adequate remedy at law exists as to the accounting, tracing, and security

215. Defendants omitted to disclose that insiders were selling while in possession of

relief sought.

material nonpublic information concerning fraud exposure, retaliation risk, and litigation that a

COUNT VI – DECLARATORY AND INJUNCTIVE RELIEF; GOVERNANCE AND

reasonable investor would have considered important in deciding whether to buy or hold

RULE 23.1 PROCESS · 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 23.1

AudioEye securities.

(By Russell G. Alesi and Daniel Kovacs derivatively on behalf of Nominal Defendant AudioEye, Inc.)

216. Defendants acted with scienter, or at least with deliberate recklessness, by

100. Plaintiffs repeat and reallege each preceding paragraph.

knowingly or recklessly disregarding the falsity and misleading nature of their statements and

101. Controversy. An actual, justiciable controversy exists concerning AudioEye's

omissions. Moradi and Bettis exercised direct control over AudioEye's disclosures, governance,

governance, the disinterestedness of those who control the prosecution and disposition of the

and trading environment.

derivative claim, and protection of that claim from release without value to the Company.

217. In connection with the purchase or sale of securities, Defendants employed

102. Declarations sought. Plaintiffs seek declarations that: (a) a majority of the

devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to

current Board is interested and cannot impartially evaluate, prosecute, settle, or release the

state material facts necessary to make statements not misleading; and engaged in acts and

derivative claim; (b) counsel purporting to act for AudioEye is conflicted to the extent it also

courses of business that operated as a fraud and deceit upon purchasers of AudioEye securities.

represents the interested insiders (see the pending motion to compel unconflicted counsel, ECF

218. AudioEye's securities traded in an efficient market. Plaintiffs and the Class relied

Nos. 62–64); and (c) the derivative corporate-opportunity claim belongs to AudioEye and may

on the integrity of that market and on Defendants' public statements and omissions when

not be released, dismissed, compromised, or impaired without notice and approval under Rule

purchasing AudioEye securities.

23.1(c) and reasonable consideration to the Company.

219. As the truth was concealed and later partially revealed, AudioEye's stock price

103. Injunctive relief. Plaintiffs seek to enjoin any release, dismissal, or compromise

was artificially maintained at inflated levels, causing the Class to suffer economic loss when the

of the derivative claim absent Rule 23.1(c) approval. They also seek corrective-disclosure,

inflation dissipated or risks materialized.

stockholder-list, and annual-meeting-access relief. Alesi's §§ 219–220 inspection and meeting-

220. Moradi and Bettis are liable as control persons under Exchange Act § 20(a)

access relief is sought in his direct shareholder capacity. The governance declarations and the

because they exercised power and influence over AudioEye's operations, disclosures, and stock

Rule 23.1 injunction are derivative.

trading, and directly or indirectly induced or participated in the primary violations.

104. Independent process welcomed. Plaintiffs do not seek to manage AudioEye.

~~221. Plaintiffs and the Class seek damages, rescission or rescissory damages,~~

They welcome the Board's seating of a special committee or the engagement of independent

~~disgorgement of insider-trading profits, prejudgment interest, and equitable relief.~~

special counsel to evaluate the derivative claim on its merits and to determine which claims

~~Class Allegations~~

should be brought, and against whom, on the Company's behalf. The relief sought is designed to

~~222. The Class consists of all persons and entities that purchased or otherwise acquired~~

ensure that the evaluation and disposition proceed through a disinterested, independent process

~~AudioEye publicly traded securities during the Class Period and were damaged thereby,~~

rather than conflicted control.

~~excluding Defendants and their affiliates.~~

105. Relief. Declaratory and injunctive relief, costs, and fees.

~~223. The members of the Class are so numerous that joinder is impracticable.~~

VI. PRAYER FOR RELIEF

~~224. Common questions of law and fact predominate, including whether Defendants~~

WHEREFORE, Plaintiffs respectfully request judgment as follows:

~~made materially false or misleading statements or omissions; whether Defendants acted with~~

A. On Count I, treble damages, costs, and fees under 18 U.S.C. § 1964(c) to

~~scienter; whether the market price of AudioEye securities was artificially inflated; and whether~~

David Kovacs and, derivatively, to AudioEye;

~~Class members suffered damages.~~

B. On Count II, reinstatement or front pay, two times back pay with interest, and

~~225. Plaintiffs' claims are typical of the Class, and Plaintiffs will fairly and adequately~~

costs and fees under § 78u-6(h), against AudioEye;

~~protect the interests of the Class.~~

C. On Counts III–V, on AudioEye's behalf, disgorgement of $34,070,724.65,

~~226. A class action is superior to other available methods for the fair and efficient~~

restitution, an accounting, a constructive trust and equitable lien on the

~~adjudication of this controversy.~~

proceeds and traceable assets, prejudgment interest, and fees;

~~COUNT III – WHISTLEBLOWER RETALIATION~~

D. On Count VI, the declaratory and injunctive relief specified, including Rule

~~Sarbanes-Oxley Act § 806; Dodd-Frank Act § 21F; ERISA § 510~~

23.1(c) protection of the derivative claim;

~~(By David Kovacs)~~

E. Such other and further legal or equitable relief as the Court deems just and

~~227. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth~~

proper.

herein.

JURY TRIAL DEMANDED on all claims so triable.

228. David Kovacs engaged in protected activity under federal law by reporting,

VII. RESERVATION OF RIGHTS

internally and externally, conduct he reasonably believed constituted securities fraud, disclosure

The Causes of Action above are the strongest and best-supported claims to assert at this

violations, insider trading, governance failures, ERISA violations, and related misconduct at

stage on AudioEye's behalf and on behalf of the individual Plaintiff. They are asserted without

AudioEye and affiliated entities.

prejudice to, and reserve, all additional claims that AudioEye – or a duly constituted special

229. Kovacs made these reports to AudioEye management, members of the Board,

committee or independent special litigation counsel – may elect to assume, add, substitute, or

counsel, regulators, and others with authority to investigate or remedy the misconduct.

pursue, including claims against persons not named here. Nothing in this Amended Complaint

230. Defendants Moradi and Bettis were aware of Kovacs's protected activity. Indeed,

releases, waives, impairs, settles, or adjudicates any such claim.

Kovacs's disclosures directly threatened Defendants' personal financial interests, insider trading

proceeds, and continued control over AudioEye and related enterprises.

231. After learning of Kovacs's whistleblowing, Defendants embarked on a

coordinated retaliation campaign designed to silence, punish, and economically destroy him.

232. Adverse actions taken against Kovacs included, among others:

a. termination of employment;

b. initiation and coordination of retaliatory litigation in multiple jurisdictions;

c. smear campaigns and false accusations to isolate and discredit him;

d. seizure and forfeiture of equity compensation and retirement benefits; and

e. indirect economic retaliation, including the stripping of his interests in ESTP.

233. These actions were materially adverse and would deter a reasonable employee

from engaging in protected whistleblowing activity.

234. Defendants' retaliation was motivated, at least in significant part, by Kovacs's

protected activity. The proximity in time, escalation of hostility, and alignment with insider

selling and litigation strategy establish causation.

235. Defendants' conduct violated:

a. SOX § 806, which prohibits retaliation against employees of publicly traded

companies for protected disclosures;

b. Dodd-Frank § 21F, which prohibits retaliation against whistleblowers who

provide information to regulators; and

c. ERISA § 510, which prohibits interfering with an employee's attainment of

benefits to retaliate for protected conduct.

236. Defendants acted intentionally, willfully, and in bad faith.

237. As a direct and proximate result of Defendants' conduct, Kovacs suffered substantial economic loss, career harm, emotional distress, and loss of benefits.

238. Kovacs seeks all relief available under law, including reinstatement or front pay, back pay, restoration of benefits, compensatory damages, interest, attorneys' fees, and equitable relief.

COUNT IV – INTERFERENCE WITH ERISA-PROTECTED BENEFITS

ERISA §§ 502(a)(1)(B), 502(a)(3), and 510

(By Kovacs Against against AudioEye, David Moradi, and Carr Bettis)

239. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

240. AudioEye maintained one or more ERISA-governed employee benefit plans, including equity-based compensation and retirement benefits, under which David Kovacs was a participant and beneficiary.

241. Kovacs earned substantial benefits under these plans, including restricted stock units ("RSUs") and related equity compensation, portions of which were vested or on track to vest pursuant to plan terms and historical practice.

242. Defendants Moradi and Bettis exercised discretionary authority and de facto control over AudioEye's benefit decisions, plan administration, and termination determinations affecting Kovacs.

243. After Kovacs engaged in protected whistleblowing activity, Defendants intentionally interfered with his attainment and enjoyment of ERISA-protected benefits.

244. Defendants accomplished this interference by, among other things:

a. engineering Kovacs's termination under a pretextual and bad-faith "for cause" narrative;

b. seizing vested and unvested RSUs and associated benefits;

c. manipulating plan interpretations and administrative discretion to justify forfeiture; and

d. applying benefit determinations selectively and inconsistently to punish Kovacs.

245. Defendants' actions were taken for the specific purpose of preventing Kovacs from obtaining benefits to which he was or would have become entitled and to retaliate against him for protected activity.

246. These actions violated ERISA § 510, which prohibits interfering with an employee's attainment of benefits for retaliatory or discriminatory reasons.

247. Defendants further violated ERISA § 502(a)(1)(B) by wrongfully denying benefits owed under the terms of the plans and ERISA § 502(a)(3) by engaging in inequitable

conduct requiring equitable relief.

248. As a direct and proximate result of Defendants' conduct, Kovacs lost substantial compensation and benefits, including equity that would have vested absent Defendants' unlawful interference.

249. Kovacs seeks recovery of benefits due, enforcement of plan rights, surcharge, equitable relief including reinstatement of benefits, pre- and post-judgment interest, attorneys' fees, and costs.

COUNT V – BREACH OF FIDUCIARY DUTY (DIRECT)

Common Law

(By Kovacs against Moradi and Bettis)

250. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

251. At all relevant times, Defendants Moradi and Bettis owed fiduciary duties of loyalty, good faith, honesty, and fair dealing to David Kovacs arising from their positions of control, trust, and dominance, and from Kovacs's reasonable reliance on them in matters affecting his employment, equity, benefits, and business interests.

252. Moradi and Bettis exercised direct and indirect control over Kovacs's employment status, equity compensation, reputation, access to information, and participation in affiliated ventures, placing them in a position of special confidence and influence over him.

253. Kovacs relied on Defendants to exercise their authority in good faith and for proper purposes, not to weaponize corporate power or insider influence against him personally.

254. In breaching their fiduciary duties, Moradi and Bettis treated AudioEye, Formulus Black, First Contact, and ESTP as interchangeable instrumentalities of their personal will, deploying corporate entities, officers, resources, litigation authority, and economic leverage to retaliate against Kovacs, suppress dissent, and protect their own interests rather than advancing the legitimate interests of those entities or their stakeholders.

255. Defendants breached their fiduciary duties by acting in bad faith and for self-interested purposes, including by:

a. retaliating against Kovacs for whistleblowing;

b. abusing their authority to engineer his termination and financial ruin;

c. orchestrating smear campaigns and retaliatory litigation; and

d. using corporate and enterprise resources to punish Kovacs rather than protect legitimate corporate interests.

256. Defendants' conduct constituted disloyalty, bad faith, and misuse of entrusted power, and was undertaken to silence dissent, protect insider profits, and deter exposure of misconduct.

257. Defendants acted willfully and with conscious disregard of Kovacs's rights and interests.

258. As a direct and proximate result of Defendants' breaches, Kovacs suffered substantial economic harm, loss of equity and benefits, reputational injury, emotional distress, and other damages.

259. Kovacs seeks compensatory damages, equitable relief, disgorgement of gains obtained through the breach, prejudgment interest, and all other relief available at law and equity.

COUNT VI – BREACH OF FIDUCIARY DUTY (DERIVATIVE)

Failure of Oversight, Corporate Waste, and Usurpation of Corporate Opportunities

(Derivatively on behalf of AudioEye, Formulus Black, and First Contact

Against Moradi, Bettis, AudioEye Board of Directors, and Georgevich)

260. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

261. Defendants owed fiduciary duties of loyalty, good faith, candor, and oversight to AudioEye, Formulus Black, and First Contact (the "Derivative Entities").

262. Defendants Moradi and Bettis exercised de facto and de jure control over the Derivative Entities and dominated their boards, management, and strategic decision-making. The remaining board and executive defendants knowingly enabled, tolerated, or failed to stop the misconduct alleged herein.

263. Defendants breached their fiduciary duties by consciously failing to implement, monitor, or enforce reasonable systems of oversight and internal control, notwithstanding repeated and obvious red flags, including:

a. large-scale insider selling by officers and directors;

b. whistleblower complaints regarding securities fraud and governance failures;

c. escalating litigation risk and retaliation exposure; and

d. misuse of corporate funds for personal protection and lawfare.

264. Rather than exercising oversight, Defendants permitted the Derivative Entities to be used as instrumentalities of the Moradi-Bettis enterprise, approving or acquiescing in actions designed to conceal misconduct, punish whistleblowing, and preserve insider control.

265. Defendants further breached their duties by causing the Derivative Entities to engage in corporate waste, including the expenditure of millions of dollars on retaliatory and defensive litigation undertaken not for the benefit of the companies, but to protect Moradi and Bettis personally from accountability.

266. These expenditures lacked any rational business purpose, conferred no corporate benefit, and constituted a waste of corporate assets.

267. Defendants also breached their fiduciary duties by usurping corporate opportunities belonging to the Derivative Entities, including by diverting business opportunities, strategic relationships, and economic value away from the companies and toward insiders or affiliated entities.

268. Defendant Georgevich, while serving as Chief Financial Officer of AudioEye,

sold stock while in possession of material nonpublic information and failed to prevent or disclose insider trading and disclosure violations, rendering her liable for breach of fiduciary duty and for disgorgement of ill-gotten gains to the Company.

269. John Doe Defendants 1-10 are entities or individuals who knowingly received misappropriated corporate funds or benefits resulting from the breaches alleged herein and are liable as aiders and abettors and/or recipients of unjust benefit.

270. As a direct and proximate result of Defendants' breaches, the Derivative Entities suffered substantial damages, including depletion of corporate assets, exposure to regulatory and litigation liability, reputational harm, and loss of shareholder value.

271. Plaintiffs seek all appropriate relief on behalf of the Derivative Entities, including damages, disgorgement of insider trading profits and wasted expenditures, accounting, rescission of improper transactions, governance reforms, injunctive relief, attorneys' fees, and costs.

COUNT VII – BREACH OF FIDUCIARY DUTY – ESTP

(By Kovacs derivatively on behalf of ESTP against Bettis, Vivid, and John Does)

272. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

273. At all relevant times, David Kovacs, Carr Bettis, and Giorgi Rtskhiladze were partners in ESTP, and Bettis owed fiduciary duties of loyalty, good faith, and fair dealing to ESTP and its partners.

274. Kovacs served as ESTP's Chief Executive Officer and was responsible for U.S. strategy, fundraising, and partner relationships, while ESTP pursued valuable projects, sovereign relationships, and development opportunities abroad.

275. After Kovacs engaged in protected whistleblowing activity adverse to Moradi and Bettis, Bettis retaliated by moving to strip Kovacs of his interests in ESTP and to appropriate ESTP's assets and opportunities for himself and affiliated entities.

276. Bettis breached his fiduciary duties by, among other things:

a. engineering Kovacs's ouster from ESTP without notice;

b. shutting down ESTP's operations and causing the entity to be rendered dormant;

c. diverting ESTP projects, relationships, and sovereign opportunities to successor or affiliate entities, including Vivid Strategies, LLC; and

d. excluding Kovacs from participation in the value created by those transferred opportunities.

277. ESTP's K-1s and public-facing materials reflect that ESTP was effectively shut down, while substantially identical business initiatives were later resumed through affiliate entities controlled by Bettis.

278. Bettis's actions were not taken for legitimate business reasons, but as retaliation against Kovacs for being a whistleblower at AudioEye.

279. Bettis knowingly used Vivid Strategies and Doe entities as conduits to receive ESTP's diverted assets, opportunities, and economic expectancy, rendering them liable as aiders and abettors and/or recipients of misappropriated corporate property.

280. As a direct and proximate result of Defendants' breaches, ESTP suffered catastrophic harm, including the loss of core business opportunities, destruction of enterprise value, and impairment of partner equity interests.

281. Plaintiffs seek relief on behalf of ESTP including damages, disgorgement, accounting, imposition of a constructive trust over diverted assets and opportunities, equitable relief, attorneys' fees, and costs.

COUNT VIII – UNJUST ENRICHMENT

By David Kovacs, individually; and all Plaintiffs derivatively on behalf of AudioEye, Formulus Black, First Contact, and ESTP against All Defendants and John Does 1–10

282. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

283. Defendants have been unjustly enriched at the expense of Plaintiffs and the Companies through the misconduct alleged herein.

284. Defendants obtained substantial benefits, including but not limited to:

a. insider trading proceeds and avoided losses;

b. diverted corporate assets and opportunities;

c. misappropriated equity and benefits;

d. reimbursement of personal expenses through fraudulent means; and

e. litigation expenditures funded by corporate entities for Defendants' personal protection.

285. These benefits were obtained through wrongful conduct, including fraud, breach of fiduciary duty, retaliation, misuse of corporate authority, and abuse of legal process.

286. Defendants consciously retained these benefits with full knowledge that they were wrongfully obtained and at the direct expense of Plaintiffs and the Companies.

287. The circumstances render it inequitable for Defendants to retain such benefits without compensation or restitution.

288. No adequate remedy at law exists to recover all categories of unjust benefit obtained by Defendants through the conduct alleged.

289. Plaintiffs seek restitution, disgorgement, and all equitable relief necessary to prevent Defendants' unjust enrichment, including the imposition of a constructive trust over misappropriated assets and proceeds.

COUNT IX – MALICIOUS PROSECUTION AND ABUSE OF PROCESS

Common Law

(By David Kovacs Against AudioEye, Inc., David Moradi, Carr Bettis, and Jason Humble)

290. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth

herein.

291. Defendants initiated, maintained, and coordinated multiple legal proceedings against David Kovacs, including actions in Florida, Arizona, and New York, not to obtain legitimate judicial relief, but to intimidate, retaliate, and economically exhaust him for engaging in whistleblowing and opposition to Defendants' misconduct.

292. These proceedings were part of a deliberate enterprise strategy to weaponize the judicial process as a tool of coercion and suppression rather than to resolve bona fide disputes on the merits.

293. Defendants employed lawful process in an improper manner and for an ulterior purpose, including:

a. filing actions based on knowingly false or abandoned allegations;

b. asserting claims designed to smear, harass, and burden rather than adjudicate;

c. coordinating litigation positions across jurisdictions to maximize pressure and cost; and

d. using discovery, motion practice, and publicity as instruments of intimidation.

294. The Florida litigation initiated by AudioEye included numerous false and defamatory allegations that were later abandoned in an amended complaint, demonstrating the absence of probable cause and the retaliatory nature of the original filing.

295. The Arizona action initiated by Bettis sought to re-characterize long-repaid personal expenditures as a loan and was filed for the ulterior purpose of financial retaliation and leverage, not legitimate debt recovery.

296. At all relevant times, Defendants acted with malice, knowledge of falsity, and conscious disregard of Kovacs's rights.

297. Defendants' misuse of legal process caused Kovacs substantial damages, including legal expenses, lost income, reputational injury, emotional distress, and diversion of time and resources.

298. Defendants' conduct constitutes abuse of process. To the extent required, the termination, abandonment, or meritless nature of the proceedings supports a claim for malicious prosecution.

299. Plaintiffs seek compensatory damages, punitive damages, costs, attorneys' fees, and all other relief the Court deems just and proper.

COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Common Law

(By Kovacs and Ducheine against Moradi, Bettis and Humble)

300. Plaintiffs repeat and reallege all preceding paragraphs as though fully set forth herein.

301. Defendants engaged in a prolonged course of extreme and outrageous conduct directed at Plaintiffs David Kovacs and Julian Ducheine, exceeding all bounds of decency

tolerated in a civilized society.

302. Defendants' conduct included, among other things:

a. sustained retaliation against Kovacs for whistleblowing;

b. coordinated smear campaigns and threats designed to destroy his livelihood;

c. weaponized litigation used to intimidate and financially exhaust him;

d. intimidation and pressure placed upon witnesses; and

e. conduct creating credible fear for personal safety.

303. Defendants knew or recklessly disregarded the substantial probability that their conduct would cause severe emotional distress to Plaintiffs.

304. The conduct was intentional, malicious, and undertaken as part of a broader effort to silence, punish, and deter exposure of misconduct.

305. As a direct and proximate result of Defendants' actions, Kovacs and Ducheine suffered severe emotional distress, including anxiety, fear, humiliation, sleep disruption, and emotional trauma.

306. Defendants' conduct was a substantial factor in causing Plaintiffs' distress and was not justified by any legitimate business, legal, or personal objective.

307. Plaintiffs seek compensatory damages, punitive damages, interest, costs, and such other relief as the Court deems just and proper.

COUNT XI – COMMON LAW TORTS – LICHTENSTEIN

(Abuse of Process, Tortious Interference, Fraud, Coercion, and Related Torts)

(Against Defendants Carr Bettis and David Moradi)

308. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

309. Plaintiff Demian Lichtenstein is an entrepreneur and investor who, at all relevant times, held ownership interests, contractual rights, management involvement, and substantial existing and prospective business relationships relating to First Contact Entertainment and affiliated ventures.

310. Defendants Carr Bettis and David Moradi, acting individually and in concert, and through agents, intermediaries, and instrumentalities subject to their direction and control, engaged in a deliberate and coordinated course of wrongful conduct designed to intimidate, neutralize, and economically harm Lichtenstein in furtherance of Defendants' efforts to seize and consolidate control of First Contact and suppress opposition.

311. Defendants knowingly instigated, encouraged, or ratified the initiation of false and misleading criminal accusations, threats of prosecution, and legal pressure against Lichtenstein for improper purposes, including intimidation, coercion, and leverage, rather than to seek any legitimate adjudicative relief.

312. Defendants knowingly misused criminal and civil legal process, including threats of investigation, prosecution, and litigation, for purposes wholly unrelated to the lawful function

of such processes, including forcing Lichtenstein to disengage from business affairs, abandon contractual and ownership rights, and refrain from opposing Defendants' conduct.

313. Defendants' actions constituted abuse of process, as Defendants used the threat and machinery of legal proceedings to accomplish collateral objectives unrelated to any lawful claim, including silencing dissent, instilling fear, and altering corporate control.

314. Defendants intentionally interfered with Lichtenstein's existing and prospective business relationships, including relationships with investors, partners, counterparties, and other participants in First Contact, by means of threats, false accusations, coercion, and misuse of legal process.

315. Defendants employed coercion, intimidation, and fraudulent misrepresentations, including false portrayals of criminal exposure and legal peril, in order to pressure Lichtenstein to withdraw from business activity, relinquish economic and governance rights, and cease opposition to Defendants' takeover efforts.

316. Defendants' conduct was intentional, willful, malicious, and undertaken in bad faith, was not privileged or justified, and was designed to advance Defendants' personal and financial interests at Lichtenstein's expense.

317. Defendants' actions constituted extreme and outrageous departures from accepted standards of lawful competition, corporate governance, and dispute resolution.

318. As a direct and proximate result of Defendants' conduct, Lichtenstein suffered loss of business opportunities, destruction of investment value, interference with contractual and governance rights, reputational harm, and substantial economic damages.

319. As a further direct and proximate result of Defendants' conduct, Lichtenstein suffered severe emotional distress, fear of criminal jeopardy, and disruption of livelihood and professional standing.

320. Defendants Bettis and Moradi are liable to Lichtenstein for abuse of process, tortious interference with business relations, fraud, coercion, and related common-law torts under applicable state law.

321. Defendants acted with actual malice, oppression, and conscious disregard for Lichtenstein's rights, entitling Plaintiffs to compensatory, consequential, and punitive damages.

322. This claim is timely. Defendants' misconduct was inherently concealed and enforced through threats, intimidation, and abuse of legal process, preventing Lichtenstein from discovering the full wrongful nature of the conduct or pursuing relief earlier.

323. Defendants further engaged in a continuing course of tortious conduct, including ongoing threats, interference, and coercive pressure, such that each act constituted a new injury and a new accrual for statute-of-limitations purposes.

324. The statute of limitations was equitably tolled by Defendants' concealment, intimidation, and misuse of criminal and civil process and did not begin to run until the coercive circumstances abated and material facts became reasonably discoverable.

325. Plaintiffs seek all available relief, including compensatory damages, punitive damages, disgorgement, pre- and post-judgment interest, attorneys' fees where permitted by law, and such other and further relief as the Court deems just and proper.

COUNT XII – DECLARATORY AND INJUNCTIVE RELIEF

28 U.S.C. §§ 2201–2202

(Governance Failure, Lack of Disinterested Control, and Mandatory Remedial Measures)

326. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

327. An actual, immediate, and justiciable controversy exists between Plaintiffs and Defendants concerning the governance of AudioEye, Inc. ("AudioEye"), the exercise of fiduciary authority by its Board of Directors, the control and allocation of corporate assets, and the continuing risk of retaliation, asset diversion, and misuse of corporate authority absent judicial intervention.

Declaration of Governance Failure at AudioEye

328. Plaintiffs seek a declaration that AudioEye's Board of Directors has suffered a systemic failure of governance, including failures of oversight, fiduciary compliance, independence, internal controls, and good-faith supervision, as alleged throughout this Complaint.

329. Plaintiffs further seek a declaration that, as a result of these failures, AudioEye's current Board and senior management are incapable of exercising disinterested, independent business judgment with respect to:

a. the investigation of alleged wrongdoing by officers, directors, or controlling persons;

b. the prosecution, defense, settlement, or resolution of claims arising from the conduct alleged herein;

c. the allocation and protection of corporate assets, insurance coverage, and indemnification rights; and

d. the protection of shareholder, employee-beneficiary, and creditor interests.

330. These governance failures are not historical or cured. They are ongoing and pose a continuing risk to the Company and its stakeholders.

Necessity of Judicial Intervention

331. Absent declaratory and injunctive relief, AudioEye remains exposed to continued misuse of corporate authority, retaliatory conduct, asset dissipation, conflicted decision-making, and further harm to the Company and its shareholders.

332. Plaintiffs seek a declaration that the Board's continued operation under its present composition constitutes a failure of fiduciary duty, and that reliance on internal remedial processes would be futile.

Mandatory Remedial Relief

333. Plaintiffs therefore seek injunctive and declaratory relief requiring AudioEye to:

a. remove and replace its current Board of Directors and senior management to the extent necessary to restore independent and disinterested governance;

b. constitute a new, fully independent board, the members of which have no prior ties to Moradi, Bettis, or affiliated entities; and

c. appoint truly independent special counsel, with full authority to investigate, pursue, resolve, or settle claims on behalf of the Company, free from influence by Defendants or their affiliates.

Declaration of Enterprise Control and Cross-Entity Misuse

334. Plaintiffs further seek a declaration that AudioEye, Formulus Black, First Contact Entertainment, Eternal Sources Technology Partners, and Vivid Strategies operated not as independent companies, but as an integrated enterprise dominated and controlled by Defendants Moradi and Bettis.

335. Plaintiffs seek a declaration that Defendants used these entities interchangeably as instrumentalities of a common scheme, rather than respecting corporate separateness, to:

a. generate and conceal insider profits;

b. divert assets and corporate opportunities;

c. fund retaliation and weaponized litigation; and

d. evade accountability through artificial adherence to formal separateness.

336. Declaratory relief as to enterprise unity is necessary to prevent continued abuse of the corporate form, dissipation of assets, and gamesmanship through entity fragmentation.

Necessity of Prospective Relief

337. Declaratory and injunctive relief are necessary to resolve the parties' legal relations, prevent irreparable and ongoing harm, and avoid piecemeal or inconsistent adjudications.

338. Plaintiffs have no adequate remedy at law for the prospective, structural, governance-related, and fiduciary harms addressed by this Cause of Action.

339. Plaintiffs therefore seek declaratory and injunctive relief, together with costs and attorneys' fees where permitted, as the Court deems just and proper.

PRAYER FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

A. Declaratory Relief. Declaring that Defendants violated the federal securities laws, RICO, ERISA, and applicable state law, and breached fiduciary duties owed to AudioEye and its shareholders;

B. Injunctive and Equitable Relief. Enjoining Defendants from further retaliation, witness tampering, evidence destruction, misuse or diversion of corporate assets, and other unlawful conduct, and ordering appropriate equitable relief, including governance reforms,

accountings, rescission, and restitution;

C. Damages. Awarding Plaintiffs and AudioEye all damages sustained as a result of Defendants' conduct, including compensatory damages, disgorgement, restitution, and treble damages as authorized by law;

D. Derivative Relief. Awarding damages, restitution, and equitable relief to AudioEye on all derivative claims, including recovery of corporate waste and unlawfully obtained proceeds;

E. Attorneys' Fees and Costs. Awarding reasonable attorneys' fees, expert fees, and costs pursuant to RICO, ERISA, the federal securities laws, and applicable equitable principles;

F. Pre- and Post-Judgment Interest. Awarding pre-judgment and post-judgment interest as permitted by law; and

G. Further Relief. Granting such other and further legal or equitable relief as the Court deems just and proper.

Dated: New York, New York

DecemberJune 1211, 20252026

Respectfully submitted,

JOHN H. SNYDER PLLC

By: _____

John H. Snyder

Thomas C. Sima

157 East 81st Street, Suite 3A

New York, NYNew York 10028

(917) 292-3081

john@jhs.nyc

Counsel for Plaintiffs

SCHEDULE A – DEFINITIONS

Unless the context otherwise requires, the following terms have the meanings set forth below. These definitions apply uniformly throughout the Complaint, the Statement of Facts, all Schedules, and the Kovacs Declaration. The Causes of Action are pleaded based on these definitions.

"Adjusted EBITDA" means the non-GAAP financial metric publicly used and promoted by AudioEye during the Class Period that excluded material expenses and risks, including litigation costs, regulatory exposure, whistleblower-related costs, retaliatory legal expenditures, and other recurring or foreseeable items that materially affected AudioEye's actual financial condition. As used herein, Adjusted EBITDA was not merely aggressive or discretionary, but was knowingly employed to create the false appearance of profitability and liquidity while the Company was, in reality, cash-burning and dependent on dilutive financing, including the February 2024 Shelf Registration and subsequent at-the-market ("ATM") offering.

"Arizona Lawsuit" means CSB IV US Holdings LLC v. JDLK Partners, Inc. and David J.

Kovacs, Case No. CV2025-013285 (Ariz. Super. Ct.).

"AudioEye" or "AEYE" means AudioEye, Inc., a Delaware corporation whose common stock traded on the Nasdaq Global Market during the Class Period.

"Ben Barton Christmas Texts" means the series of text-message communications exchanged between David Kovacs and Ben Barton during approximately December 25 through December 30, 2023, concerning AudioEye, its internal operations, governance environment, disclosure posture, and related matters. The contents, timing, and context of those texts constitute contemporaneous documentary evidence relevant to Defendants' knowledge, notice, and state of mind during the RICO Period.

"Birkin Bag Letter" means the letter dated March 20, 2024, sent by Carr Bettis to David Kovacs via UPS.

"Class Period" means June 2, 2022 through April 1, 2025. The Class Period is used solely for purposes of Plaintiffs' federal securities law claims and does not limit the temporal scope of the Enterprise, the RICO Period, or any racketeering, conspiracy, retaliation, fiduciary, or tort claims.

"Declarants" means any individual who has submitted or files a declaration in this action, including in support of the Complaint, any Order to Show Cause, or any application for temporary or preliminary injunctive relief.

"Defendants" means, collectively, the Enterprise Leadership Defendants, Director Defendants, Executive Defendants, Professional Defendants, and John Doe Defendants. The term "Defendants" does not include Nominal Defendants unless expressly stated.

"Director Defendants" means all persons who served as members of AudioEye's Board of Directors at any time during the RICO Period, including but not limited to James Hawkins, Katherine Fleming, Jamil Tahir, and Tony Coelho.

"Enterprise" means the association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of David Moradi, Carr Bettis, Jason Humble, affiliated executives, intermediaries, and related entities operating in concert across AudioEye; First Contact Entertainment; Formulus Black LLC; Eternal Sources Tech Partners, LLC; Vivid Strategies, LLC; and related instrumentalities. The Enterprise existed independently of the commission of any single racketeering act and was a continuing unit with a shared purpose, relationships, and longevity, notwithstanding changes in particular entities, projects, or victims.

"Enterprise Associate" means any non-lead participant who, with knowledge of the Enterprise's objectives, assisted, facilitated, or carried out activities on behalf of the Enterprise or its leaders, including intermediaries, fundraisers, fixers, pressure agents, operational facilitators, and other individuals who executed instructions, coordinated communications, or advanced retaliatory or coercive actions for Enterprise benefit.

"Enterprise Conduct" means conduct or participation, directly or indirectly, in the conduct of the Enterprise's affairs through acts, schemes, or courses of conduct constituting a

pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c), and conspiracy under § 1962(d).

"Enterprise Leadership Defendants" means David Moradi and Carr Bettis.

"ERISA Benefits" means compensation, equity awards, retirement benefits, medical coverage, and other benefits protected under the Employee Retirement Income Security Act of 1974 ("ERISA"), including vested and unvested Restricted Stock Units.

"ESTP" means Eternal Sources Tech Partners, LLC.

"Executive Defendants" means individuals, other than the Enterprise Leadership Defendants, who served as officers or senior executives of AudioEye or other Enterprise entities during the RICO Period and exercised authority over disclosures, finances, personnel, litigation strategy, or internal controls, including Kelly Georgevich and Michael Spolar.

"False Smears" means the statements and allegations first asserted in the April 10, 2024 original Florida complaint against David Kovacs, including factual claims regarding his education, employment history, professional credentials, personal conduct, mental stability, motives, and alleged market-manipulation threats, many of which were later abandoned, narrowed, or omitted in the amended pleading, and which were asserted without evidentiary support and in retaliation for Kovacs's Protected Activity.

"First Contact" or "FC" means First Contact Entertainment, a private company founded by Demian Lichtenstein and later controlled by David Moradi and Carr Bettis.

"Florida Lawsuit" means the civil action commenced in the State of Florida by AudioEye, Inc. and/or the Enterprise Leadership Defendants against David Kovacs asserting defamation or related claims, portions of which were later abandoned, withdrawn, or materially narrowed, and which Plaintiffs allege was initiated and maintained as part of Retaliatory Lawfare.

"Formulus Black" or "FB" means Formulus Black LLC.

"George Santos" refers to a former United States Congressman from New York who was expelled from Congress after it was revealed that he fabricated large portions of his education, employment history, and personal background, and who later pleaded guilty to federal fraud and identity-theft offenses.

"Insider Trading" means the purchase or sale of a security of AudioEye by any officer, director, employee, or affiliate of AudioEye, directly or indirectly, while in possession of Material Nonpublic Information, or the communication of such information to others for the purpose of enabling or facilitating such trading (including tipping), in violation of federal securities laws, including but not limited to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

"Jason Humble Lawsuit" means Humble v. Kovacs, No. 24-cv-03404-MMG (S.D.N.Y.), an action asserting claims for defamation and defamation per se. Humble voluntarily dismissed the action with prejudice on July 3, 2024.

"John Doe Defendants" means persons or entities whose identities are presently unknown but who participated in, facilitated, benefited from, or knowingly received proceeds from the conduct alleged herein.

"Knowledge or Foreseeability" means actual knowledge, conscious avoidance, or circumstances under which Defendants knew or reasonably should have known that whistleblower reporting to regulators or law enforcement was likely or imminent.

"Kovacs Declaration" means the sworn declaration or declarations of David Kovacs dated December 9, 2025, including all exhibits and materials incorporated by reference.

"Kovacs Litigations" means, collectively, Kovacs I, Kovacs II, the Florida Lawsuit, the Arizona Lawsuit, and the Jason Humble Lawsuit.

"Material Nonpublic Information" or "MNPI" means information that was not generally disclosed to the investing public and that a reasonable investor would consider important in deciding whether to purchase, sell, or hold a security.

"Nominal Defendants" means entities named solely in a derivative or representative capacity.

"Phase I" means June 2, 2022 through February 12, 2024.

"Phase II" means February 13, 2024 through April 1, 2025.

"Plaintiffs" means David Kovacs, Russell Alesi, Julian Ducheine, and Demian Lichtenstein.

"Professional Defendants" means individuals or entities that provided legal, audit, accounting, financial, advisory, communications, banking, or consulting services to AudioEye or other Enterprise entities during the RICO Period, including MaloneBailey, LLP.

"Protected Activity" means David Kovacs's good-faith reporting of suspected misconduct to AudioEye, regulators, or law enforcement, including on November 13, 2023; January 17, 2024; February 8, 2024; and April 8, 2024.

"Racketeering Acts" means acts chargeable or indictable under 18 U.S.C. §§ 1343, 1348, 1512–1513, 1958, 1959, and 1961(1)(D), and related federal or state offenses constituting racketeering activity within the meaning of 18 U.S.C. § 1961.

"Retaliatory Lawfare" means litigation, threats of litigation, or use of legal process authorized, directed, coordinated, or funded by AudioEye or the Enterprise Leadership Defendants after Protected Activity for the purpose of suppressing disclosure, punishing whistleblowing, intimidating witnesses, or deterring cooperation with regulators or courts.

"RICO Period" or "Relevant Period" means the period beginning on January 1, 2015 and continuing to the present.

"RSUs" means Restricted Stock Units issued pursuant to AudioEye's equity compensation or benefit plans.

"Secretly-Recorded Bettis Phone Call" means the telephone conversation on or about January 17, 2024 between David Kovacs and Carr Bettis, during which Kovacs reported insider

trading and related misconduct at AudioEye, and which Bettis recorded without Kovacs's contemporaneous knowledge or consent.

"Shelf Registration" means AudioEye's Form S-3 registration statement that became effective on February 13, 2024.

"Termination Date" means January 17, 2024.

"Vivid Strategies" or "Vivid" means Vivid Strategies, LLC.

SCHEDULE B – [DRAFT] SPECIAL COMMITTEE RESOLUTIONS

WHEREAS, the Board of Directors of AudioEye, Inc. (the "Company") has received allegations raising concerns regarding insider trading, retaliation, and interference with witnesses, and determines that immediate, independent protective measures are required to safeguard the Company and ensure lawful governance;

WHEREAS, Directors Dr. Katherine E. Fleming and James Hawkins are disinterested and independent with respect to these matters and are authorized under Delaware law to act on behalf of the Company;

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby establishes a Special Committee consisting solely of Dr. Fleming and Mr. Hawkins, with authority to retain independent counsel and act on behalf of the Company;

RESOLVED, that for purposes of these resolutions, "Declarants" means any individual who has submitted or files a declaration in this action;

RESOLVED, that the Special Committee shall instruct independent counsel to immediately implement and oversee the following protective measures:

(1) Evidence Preservation – Implement, enforce, and monitor comprehensive litigation holds and preservation protocols covering all relevant documents, communications, devices, and electronically stored information;

(2) Witness Protection and Non-Retaliation – Establish and enforce Company-wide safeguards to protect employees, former employees, witnesses, and Declarants from retaliation, intimidation, coercion, or adverse action, and to maintain secure reporting channels independent of management;

(3) Access Restrictions – Suspend or restrict, pending completion of the investigation, the access of David Moradi and Carr Bettis to Company funds, payment authority, confidential information, data systems, physical premises, and other Company property, to the extent reasonably necessary to prevent interference with the investigation or risk to the Company;

(4) Insider Trading Restrictions – Implement an immediate trading blackout applicable to all directors, officers, and insiders of the Company, including David Moradi and Carr Bettis, pending further determination by the Special Committee;

RESOLVED, that all officers, employees, and agents of the Company shall cooperate fully with these measures and shall not interfere with their implementation.

Date: _____ Date: _____

———————————————  ———————————————

Dr. Katherine Fleming James Hawkins

SCHEDULE C – RICO CASE STATEMENT

I. STATEMENT OF THE ALLEGED RICO CLAIM

Plaintiffs submit this RICO Case Statement in support of Count I of the Complaint. This action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d).

Plaintiffs allege that Defendants conducted and participated, directly and indirectly, in the conduct of an association-in-fact enterprise through a pattern of racketeering activity, and knowingly conspired to do so, causing substantial injury to Plaintiffs, shareholders, and affiliated entities. All predicate acts are identified and particularized in Schedule E (RICO Predicate Act Table), which is incorporated herein by reference as if fully set forth.

II. DESCRIPTION OF THE ENTERPRISE

The Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

It consists of David Moradi, Carr Bettis, Jason Humble, senior insiders and intermediaries including Kelly Georgevich, Michael Spolar, Jamil Tahir, and John Doe participants whose identities will be revealed in discovery, together with controlled or affiliated entities including AudioEye, Inc., First Contact Entertainment, Formulus Black LLC, Eternal Sources Tech Partners, LLC ("ESTP"), and Vivid Strategies, LLC.

The Enterprise did not function as a legitimate business organization. Instead, it operated as an integrated and ongoing scheme for insider profit extraction, concealment of fraud, diversion of corporate assets, retaliation against whistleblowers, manipulation of legal and regulatory processes, and preservation of control through intimidation and lawfare. The Enterprise used legitimate corporate forms as instruments of racketeering, rather than for bona fide business purposes.

The Enterprise had a common purpose, consisting of enriching insiders through securities fraud and asset diversion, maintaining control by suppressing dissent and oversight, and retaliating against individuals who exposed or threatened to expose wrongdoing. Relationships among Enterprise members were hierarchical and functional.

Moradi and Bettis served as Enterprise leadership and primary decision-makers.

Executive and director insiders facilitated execution and concealment of misconduct.

Intermediaries, including Humble, were deployed to recruit capital, transmit threats, apply pressure, and execute retaliatory litigation strategies.

The Enterprise exhibited continuity and longevity, operating continuously from 2015 to present, and building on substantially similar conduct previously executed at Formulus Black and First Contact.

III. DEFENDANTS' ASSOCIATION WITH AND PARTICIPATION IN THE ENTERPRISE

71

Each Defendant was associated with or employed by the Enterprise and knowingly conducted or participated, directly or indirectly, in its affairs through the commission of the racketeering acts described in Schedule E and incorporated by reference herein. Moradi and Bettis exercised direction and control over Enterprise strategy, including disclosure posture, trading activity, litigation decisions, and retaliation.

Executive and Director Defendants enabled and concealed the misconduct through action and inaction, including approval of misleading disclosures, failure to impose trading restrictions, authorization of retaliatory expenditures, and suppression of independent oversight. Humble and other intermediaries acted as agents and operatives of the Enterprise, transmitting inducements, threats, and litigation pressure.

The entity defendants served as conduits for extraction of value, diversion of assets, and execution of racketeering acts.

IV. CONDUCT OR PARTICIPATION IN THE ENTERPRISE'S AFFAIRS

Defendants conducted and participated in the Enterprise's affairs through a coordinated course of racketeering conduct, including the specific predicate acts enumerated in Schedule E. That conduct included manipulation of public disclosures and non-GAAP financial metrics; coordinated insider trading while in possession of material nonpublic information; diversion and misuse of corporate funds; fraudulent reimbursement and off-system payment schemes; retaliation against whistleblowers and witnesses; interference with ERISA-protected benefits; concealment and destruction of evidence; obstruction of judicial and regulatory proceedings; and weaponized, multi-jurisdiction litigation designed to intimidate, silence, and exhaust those who threatened Enterprise interests.

The same methods were employed across multiple entities. At Formulus Black, Enterprise leaders bypassed internal controls, routed payments outside authorized systems, retaliated against founders who sought forensic accounting review, and weaponized false criminal allegations to seize control and silence opposition, as detailed in the incorporated predicate table. Those methods later reappeared at AudioEye in a public-company context, amplified through securities markets, insider trading, and retaliatory lawfare funded with corporate assets.

V. PATTERN OF RACKETEERING ACTIVITY

Defendants committed multiple related acts of racketeering within ten years, each of which qualifies as a predicate offense under 18 U.S.C. § 1961(1) and is specifically identified in Schedule E. Those acts include securities fraud and insider trading (18 U.S.C. § 1961(1)(D)); wire fraud (18 U.S.C. § 1343) through fraudulent public disclosures, diversion and embezzlement of corporate funds, fraudulent reimbursement schemes, and retaliatory litigation; witness retaliation and intimidation (18 U.S.C. §§ 1513(e), 1512(b)); obstruction of justice and concealment of evidence (18 U.S.C. §§ 1512(c)(2), 1519); interference with ERISA-protected benefits (29 U.S.C. § 1140); and extortion under the Hobbs Act (18 U.S.C. § 1951).

The factual bases for each predicate act are pleaded in detail in Schedule E and the Statement of Facts, both of which are incorporated herein by reference.

The racketeering acts were related and constituted a pattern because they shared common participants, victims, purposes, and methods. The acts were directed toward the same objectives: insider enrichment, concealment of misconduct, suppression of oversight, and retaliation against those who threatened Enterprise continuity.

The pattern demonstrates both closed-ended and open-ended continuity. Defendants engaged in repeated racketeering acts over a substantial period spanning multiple years and transactions, and the Enterprise posed a continuing threat of criminal conduct absent judicial intervention.

VI. CLAIMED RICO VIOLATIONS

Defendants violated 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity comprised of the predicate acts set forth in Schedule E. Defendants further violated 18 U.S.C. § 1962(d) by conspiring to commit those violations, with knowledge of the Enterprise's unlawful objectives and agreement to facilitate the commission of the racketeering acts.

The solicitation of violence against a witness, undertaken to maintain enterprise control and suppress whistleblowing, independently constitutes racketeering activity under 18 U.S.C. § 1959 and reinforces both continuity and irreparable harm.

VII. INJURY AND DAMAGES

Plaintiffs suffered concrete and proximate injuries by reason of Defendants' racketeering conduct, including the predicate acts incorporated from Schedule E.

Those injuries include loss of equity and ERISA-protected benefits; insider-trading losses to public shareholders; depletion of corporate assets through fraud and retaliatory lawfare; economic and professional harm to whistleblowers; and destruction of enterprise value at Formulus Black, ESTP, and related ventures.

The Formulus Black scheme resulted in the destruction of enterprise value reasonably estimated between $250 million and $500 million.

The First Contact scheme resulted in the destruction of enterprise value reasonably estimated between $175 million and $250 million.

The AudioEye scheme resulted in harm to shareholders of between $100 million and $250 million.

During Phase I, Defendants engaged in a scheme to suppress AudioEye's stock price by disseminating misleading narratives of weakness and uncertainty while concealing material facts, including Defendants' intent to inflate financial metrics, induce a subsequent price run-up, and monetize insider positions. Defendants further reinforced this artificial price suppression through economically irrational share repurchases conducted while the Company was cash-constrained, creating false signals of value without disclosure of forthcoming metric manipulation or insider

liquidity plans. As a result, shareholders sold their shares at prices artificially depressed below their true economic value. Phase I damages are measured by the difference between the price at which those shareholders sold and the price that would have prevailed absent Defendants' deceptive conduct—i.e., the fair value reflected once Defendants' concealed plans were executed and the stock traded at substantially higher levels. The resulting losses were foreseeable, direct, and an intended component of Defendants' scheme, which functioned to transfer value from early sellers to insiders.

In Phase II, Defendants artificially inflated AudioEye's stock price by continuing to disseminate materially false and misleading disclosures concerning financial performance, non-GAAP metrics, internal controls, and risk, while omitting known adverse facts, including whistleblower allegations, disclosure-fraud warnings, and escalating litigation and regulatory exposure. During this period, Defendants executed coordinated insider sales while in possession of material nonpublic information, monetizing at prices that did not reflect the Company's true risk profile. Phase II damages are measured by the inflation-deflation method commonly applied in securities-fraud cases: the difference between the price paid by investors who purchased during the inflationary period and the price that prevailed once the truth regarding the Company's condition and risks began to emerge. These damages were proximately caused by Defendants' racketeering acts and resulted in substantial losses to public shareholders.

VIII. REMEDIES SOUGHT

Plaintiffs seek all relief available under 18 U.S.C. § 1964, including treble damages, disgorgement and accounting of racketeering proceeds, injunctive relief barring Defendants from further Enterprise misconduct, imposition of governance and compliance reforms, and such other relief as the Court deems just and proper.

IX. RELATED CIVIL ACTIONS

Related proceedings include the Kovacs Litigations, as defined herein, which includes the Florida Lawsuit, the Arizona Lawsuit, and the Jason Humble Lawsuit. Each constitutes part of the Enterprise's retaliatory and obstructive conduct.

SCHEDULE D – RICO PREDICATE TABLE

Predicate Racketeering Act Defendants Factual Basis

Statute

18 U.S.C. § Securities Fraud Moradi; Bettis; From June 2022–April 2025, Defendants disseminated materially false

1961(1)(D) Tahir; Georgevich; SEC filings and earnings disclosures, promoted inflated non-GAAP Spolar metrics (Adjusted EBITDA, Rule of 40), and concealed whistleblower complaints, internal control failures, and litigation exposure while insiders sold $25.2M–$35.2M in stock following the February 2024 shelf registration. These misrepresentations continued even after Defendants were on notice of the whistleblower's disclosures, reinforcing the

enterprise's effort to maintain an artificially inflated narrative that enabled insider sales and concealment of the same misconduct identified in other predicates.

18 U.S.C. § Insider Trading Moradi; Bettis; Defendants executed coordinated insider sales totaling $25.2M–$35.2M

1961(1)(D) Tahir; Georgevich while possessing MNPI including: (1) Kovacs' November 2023 whistleblower complaint; (2) Bettis' secretly recorded January 17, 2024 call documenting insider trading allegations; (3) pending regulatory exposure; and (4) concealed governance breakdowns. These coordinated sales were executed while Defendants knowingly possessed the whistleblower's internal disclosures, governance-failure findings, and litigation exposure. This information was concealed from the market and allowed for substantial personal gains before those risks were exposed.

18 U.S.C. § Wire Fraud – Moradi; Bettis; Defendants transmitted false SEC filings, earnings releases, and investor

1343 Public Disclosures Georgevich; Spolar communications via interstate wires, omitting whistleblower retaliation, material litigation risks, and internal findings contradicting public guidance, causing shareholder losses of $125.5M–$358.0M. These omissions persisted even after Defendants were on notice of the whistleblower's disclosures and internal findings, reflecting the enterprise's ongoing practice of suppressing adverse information to preserve insider benefit.

Predicate Racketeering Act Defendants Factual Basis

Statute

18 U.S.C. § Wire Fraud – Formulus Moradi; Bettis; From 2017–2021, Defendants solicited investments using false claims

1343 Black Capital Raising Humble regarding control, valuation, IP ownership, and governance while concealing insider self-dealing, off-system payments, and fund misappropriation, destroying $250M–$500M in enterprise value. This earlier pattern of concealed control and misrepresentation mirrors the same enterprise architecture later challenged by the whistleblower, underscoring a continuous scheme by the same individuals to obscure governance failures and extract value.

18 U.S.C. § Wire Fraud – Corporate Bettis Bettis caused unapproved payments outside ADP systems to relatives and

1343 Embezzlement affiliated entities, bypassing corporate controls at Formulus Black and AudioEye, including payments for his girlfriend's Manhattan apartment disguised as corporate expenses, contributing to $45.0M–$70.0M in

corporate waste. This misuse of corporate funds demonstrates the same concealed-control and misappropriation practices that the whistleblower later sought to expose, reinforcing a long-running pattern rather than isolated misconduct.

18 U.S.C. § Wire Fraud – Moradi; Bettis; Defendants used interstate wires to coordinate and fund retaliatory 1343 Retaliatory Lawfare Spolar; Humble lawsuits against Kovacs (Florida defamation, SDNY defamation, Arizona fraudulent debt claim) to silence whistleblowing and deter regulatory reporting, contributing to $45.0M–$70.0M in corporate waste and $35.0M–$70.0M in direct harm to Kovacs. These coordinated legal attacks were undertaken after the whistleblower's disclosures emerged, serving the enterprise's objective of protecting the concealed misconduct at issue in the other predicates.

Predicate Racketeering Act Defendants Factual Basis
Statute

18 U.S.C. § Witness Retaliation Moradi; Bettis; After Kovacs reported misconduct internally (Nov. 2023) and to DOJ 1513(e) Georgevich; Spolar; (Feb. 2024) and SEC (Apr. 2024), Defendants terminated him for cause, Humble seized vested RSUs worth $2.9M–$7.8M, and initiated coordinated legal attacks causing $35.0M–$70.0M in total damages. Humble's July 24, 2025 voicemail to Ducheine—repeating defamatory accusations and conveying purported updates from "Carr and his attorney" – evidences ongoing witness intimidation. These acts followed the whistleblower's disclosures and continued cooperation, forming a unified pattern of retaliation designed to suppress exposure of the enterprise's concealed misconduct.

29 U.S.C. § ERISA Benefits AudioEye; Moradi; Defendants forfeited Kovacs' vested RSUs worth $2.9M–$7.8M and 1140 Interference Bettis; Georgevich; deferred compensation following whistleblowing, with Akin Gump's Spolar February 20, 2024 forfeiture letter expressly citing Kovacs' fraud accusations as the termination basis. This forfeiture forms part of the same retaliatory pattern undertaken by the enterprise to deter continued cooperation and suppress exposure of the concealed misconduct.

18 U.S.C. § Evidence Destruction Moradi; Bettis; Defendants destroyed, altered, or concealed records during periods of 1519 Spolar active securities communications and foreseeable investigations. This included deletion of emails required to be retained under FINRA and SEC books-and-records rules; "painting the tape" by removing or editing internal Slack, Teams, and email threads referencing whistleblower complaints, insider-trading exposure, and litigation risk; and directing

employees to avoid written communication or move discussions to non-retained channels after whistleblower escalation. These acts constitute anticipatory obstruction and unlawful destruction of records in contemplation of federal investigation, aligning with the enterprise's broader pattern of suppressing information that threatened to reveal the same underlying misconduct.

Predicate Racketeering Act Defendants Factual Basis

Statute

18 U.S.C. § Obstruction of Moradi; Bettis; Defendants obstructed regulatory and judicial proceedings by suppressing

1512(c)(2) Proceedings Spolar; Humble internal findings, concealing whistleblower complaints from the Board,

and managing information flow to regulators. Humble's July 24, 2025 voicemail—claiming insider knowledge of case status and conveying litigation updates from "Carr and his attorney" – corroborates coordinated efforts to shape witness understanding and impede truthful testimony and underscores the enterprise's continued effort to control information flow and prevent scrutiny of the same underlying misconduct identified in the other predicate acts.

18 U.S.C. § Witness Tampering Humble; Bettis; Humble made three documented witness tampering attempts: (1)

1512(b) Moradi December 2023 solicitation of Ducheine to "take care of" Kovacs; (2) January 2024 solicitation of Wilkerson to murder Kovacs in exchange for $1M restitution from Formulus Black losses; and (3) July 24, 2025 voicemail to Ducheine attempting to reassure, coach, and influence testimony by conveying false litigation updates and disparaging Kovacs while claiming to speak for "Carr and his attorney." These solicitations reflect a unified and escalating pattern of enterprise retaliation undertaken after the whistleblower's disclosures, reinforcing the enterprise's objective of deterring cooperation and suppressing exposure.

18 U.S.C. § Murder-for-Hire Moradi; Bettis; In December 2023 and January 2024, Humble—acting on behalf of

1959 (VICAR) Humble Moradi and Bettis—solicited Ducheine and Wilkerson separately to murder Kovacs. Ducheine was told Kovacs was "upsetting the wrong people" and Humble needed help to "take care of" him. Wilkerson was offered $1M restitution from Formulus Black losses in exchange for killing Kovacs. Both targets refused and provided corroborating declarations. Kovacs reported the plot to NYPD on April 26, 2025. These solicitations were the extreme culmination of the enterprise's efforts to

prevent exposure following the whistleblower's disclosures.

Predicate Racketeering Act Defendants Factual Basis

Statute

18 U.S.C. § Extortion – Hobbs Act Moradi; Bettis Defendants used economic threats, control over governance and

1951 disclosure, and coercive settlement pressure (including the March 20,

2024 "Birkin Bag Letter" threatening "unfathomable physical harm") to

maintain enterprise control and suppress whistleblowing. These coercive

tactics formed part of the same coordinated enterprise pattern undertaken

after the whistleblower's disclosures, serving the objective of suppressing

exposure and preserving insider control.

SCHEDULE E – MATERIAL MISREPRESENTATIONS AND OMISSIONS

FORM 10-K (2024)

Topic Affirmative Material Omission / Fraudulent Circumstances 10-K

Representation Why Misleading (Scienter) Citation

Disclosure Company certified Omitted that the Company had received Management cannot certify Item 9A

Controls & disclosure controls federal whistleblower submissions effective controls while concealing

Procedures and procedures as alleging insider trading and securities federal whistleblower complaints

effective fraud (DOJ 2/8/24; SEC 4/8/24), and and retaliating against the reporting

that senior management had retaliated executive; retaliation itself

against the whistleblower instead of evidences breakdown of controls

investigating

Internal Controls Management implied Omitted that ICFR had not been Chronic lack of SOX 404(b) audit Item 9A

Over Financial adequacy of ICFR independently audited for years and that plus retaliation against the person

Reporting through routine internal controls failed to detect or raising control failures supports

(ICFR) certifications prevent insider trading, retaliatory inference of knowing control

expenditures, and improper exclusions circumvention

from Adjusted EBITDA

Market Insider sales Omitted coordination, clustering, and Over $30M in insider sales Item 5

Transactions / disclosed timing of insider sales at or near peak contemporaneous with ATM

Insider Trading mechanically via prices while insiders possessed MNPI activity reflects pre-planned

Form 4 concerning whistleblower reports, liquidity extraction, not routine

cross-reference regulatory exposure, and planned trading

dilution

Liquidity & ATM offering Omitted that insiders knew of ATM Selling personally while knowing Item 7

Capital described as routine timing and dilution before selling tens imminent dilution to public

Resources capital-raising of millions of dollars of personal stock shareholders is classic exploitation

of MNPI

**FORM 10-K (2024)**

| | | | | |
|---|---|---|---|---|
| Risk Factors — Regulatory | Generic discussion of potential regulatory scrutiny | Failed to disclose that the Company was already subject to DOJ and SEC whistleblower submissions alleging insider trading | Once regulators are notified, risk is no longer hypothetical; omission converts risk disclosure into misrepresentation | Item 1A |
| Legal Proceedings | Retaliatory litigation described neutrally as ordinary disputes | Omitted that litigation was initiated after protected whistleblower activity, funded with corporate assets, and intended to silence disclosure | Use of corporate funds to punish a whistleblower constitutes retaliation, corporate waste, and obstruction | Item 3 |
| Earnings Quality / Profitability | Emphasis on "Adjusted EBITDA" and improving profitability | Omitted that a substantial majority of EBITDA was derived from add-backs, including litigation, regulatory, and insider exits retaliation-related costs, masking growing operating losses | Knowingly excluding recurring legal and regulatory costs to enable constitutes deceptive earnings management | Item 7 |
| Cash Flow Narrative | implied Reality improving cash generation | Omitted that, absent add-backs, AudioEye was burning cash, not generating it, and was dependent on dilutive financing | December 2024 ATM offering confirms that purported profitability was illusory | Item 7 |
| Whistleblower Matters | No disclosure of whistleblower activity | Omitted that the Company terminated a senior executive for reporting securities fraud, seized ERISA-protected equity, and financed retaliation | Retaliation against a whistleblower for reporting securities is per se material to investors and regulators | Items 1, 3, 7 |
| Insider Alignment | Statements aligning management interests with shareholders | Omitted that insiders extracted 19–27× more value through personal trading than the Company realized through operations | Extreme economic asymmetry is incompatible with good-faith alignment | Item 11 |

**FORM 10-K (2024)**

| | | | | |
|---|---|---|---|---|
| Audit & Governance History | Silence regarding historical governance failures | Omitted long-running audit gaps, whistleblower suppression, and control failures dating back years | Sustained nondisclosure supports inference of scheme rather than isolated error | Items 9A, 11 |

Notes

During the Class Period (June 2, 2022 through April 1, 2025), AudioEye repeatedly emphasized "Adjusted EBITDA" as evidence of

profitability and operational momentum. In reality, the Company's reported Adjusted EBITDA was driven predominantly by

aggressive add-backs that excluded litigation expenses, regulatory exposure, whistleblower-related costs, and retaliatory legal

expenditures. When those excluded items are properly considered, AudioEye was not generating operating profits but incurring

growing losses and negative cash flow.

This distinction is fundamental. A profitable company generates internal liquidity. A cash-burning company must rely on external

financing. AudioEye's December 2024 at-the-market offering demonstrates that the purported profitability presented to investors was

illusory. At the same time the Company was promoting adjusted profitability, insiders sold tens of millions of dollars of personal stock

while possessing material nonpublic information concerning whistleblower complaints, regulatory exposure, and imminent dilution.

The omission of whistleblower retaliation from the Company's disclosures independently renders its Form 10-K misleading.

Retaliation against a whistleblower alleging securities fraud is not a peripheral employment matter; it is a direct indicator of disclosure

failure, governance breakdown, and scienter. The Company's decision to conceal both the protected disclosures and its retaliatory

response deprived investors of information necessary to assess management integrity, earnings quality, litigation risk, and the

reliability of reported financial metrics.

SCHEDULE F – AUDIEOEYE'S FALSE SMEARS

# Smear Topic Florida Quoted Allegation Rebuttal (with Citation) Smear Status

Compl.

1 Short and 5 Kovacs threatened to initiate a "I do not own, and have never owned, any short Frivolously

Distort Scheme "short and distort scheme" and position, put options, swaps, or any other Maintained

would recruit "powerful Wall derivative instrument designed to profit from a

Street investors" to drive decline in AudioEye's stock price. The

AudioEye's stock to zero. AudioEye Board of Directors has access to

market and trading information that can confirm

this." (Kovacs Decl.).

2 Worthless ¶¶ 19, 38 Kovacs "failed spectacularly" Kovacs was hired in 2014 by founders Paul Walked Back

Employee / No and did nothing to provide any Arena and Ted Withrow, who provided positive

Value Provided value for the salary and benefits reviews. Kovacs received performance-based

he received. equity. AudioEye's termination letter does not

cite performance issues. (Exh. 46 – Bankofier

Letter; Exh. 34 – Akin Gump Letter).

3 Did Not 22 Kovacs did not graduate college False. Diplomas and transcripts establish the Abandoned

Graduate in Two in two years as he claimed. timing of graduation. (Exh. 20–21).

Years

4 Did Not 23 Kovacs was not eighteen (18) False. Documentary proof establishes age at Abandoned Graduate at Age years old when he completed his graduation. (Exhs. 20–21). 18 undergraduate degree.

5 Columbia 24 There is "no record" of Kovacs False. Enrollment documentation confirms Abandoned University having attended Columbia attendance. (Exh. 22). Enrollment University.

6 Citigroup ¶¶ 25–26 Kovacs was not an False. Citigroup confirmed analyst employment Abandoned Employment investment-banking analyst at in writing. (Exh. 27 – Citigroup Letter). Citigroup.

# Smear Topic Florida Quoted Allegation Rebuttal (with Citation) Smear Status Compl.

7 Blackstone ¶¶ 27–28 Kovacs never worked for "The Misleading. Kovacs never claimed to work for Frivolously Employment Blackstone Group." The Blackstone Group. He worked at Blackstone Maintained Capital Markets, an affiliate. (Exh. 28–29).

8 Hinduja Group ¶¶ 29–31 Kovacs was never a Managing False. Documentary proof confirms Managing Abandoned Employment Director at the Hinduja Group. Director role. (Exh. 26 – Nauer Letter).

9 Evicted From 32 Kovacs was evicted from his False and retaliatory. Landlord confirms no Abandoned Apartment apartment. eviction occurred. (Exh. 24 – Towne Associates Letter).

10 SEC ¶¶ 33–34 Kovacs was investigated by the False and retaliatory. Declarations and Abandoned Investigation / SEC and misused company corroborating letters confirm no SEC Escorts funds on escorts. investigation and no misuse of funds. (Exh. 8 – Wagers Decl.; Exh. 25 – Baez Letter).

11 Advisor to NYC ¶¶ 35–36 Kovacs fabricated an advisory False. Mayor Adams' legal counsel confirmed Frivolously Mayor role with the Mayor of New Kovacs's appointment to the Mayor's Maintained York. Technology & IT Transition Committee. (Exh. 23 – Pitta Letter).

12 Education / 55 Kovacs made false No specific misrepresentation pleaded; Abandoned in Background – representations regarding conclusory allegation. Substance Global Smear education, skills, experience, and relationships.

13 False Claim of 41 Kovacs publicly claimed to own False. Kovacs never made this claim. The Abandoned 25% Ownership 25% of AudioEye. secretly recorded Bettis call confirms Kovacs sought only his RSUs.

14 Insinuation of Fn.1 to 5 Kovacs appeared unhinged and Discredited whistleblower-smear trope. Ben Frivolously

Mental made irrational threats. Barton Christmas texts corroborate Kovacs's Maintained

Instability concerns. (Kovacs Decl.; Barton Texts).

# Smear Topic Florida Quoted Allegation Rebuttal (with Citation) Smear Status

Compl.

15 George Santos 21 "Before George Santos, there Retaliatory character assassination unrelated to Discredited Ad

Comparison was David Kovacs." any factual allegation. Hominem

16 False Fraud 56 Kovacs falsely accused Moradi Statements were protected disclosures among Frivolously

Accusations of fraud and criminal conduct. shareholders and to regulators and are Maintained

substantiated by this Complaint.

17 Bad-Faith Passim Kovacs engaged in a campaign Litigation followed termination, threats, and Retaliatory

Litigation Actor against Plaintiffs. retaliation. Narrative

18 Disloyalty to Passim Whistleblowing is equated with This is an inversion of truth. Kovacs was Retaliatory

AudioEye betrayal. protecting the shareholders from Moradi's fraud. Narrative

The insiders were disloyal.

19 Improper Passim Whistleblowing motivated by Carr Bettis violated AudioEye's Whistleblower Red Herring

Whistleblowing personal animus. Protection Policy (Exh. 105) by failing to initiate

Motive or cause any investigation after receiving a direct

insider-trading complaint, expressly articulated

during the January 17, 2024 recorded call (Exh.

30). In that transcript, Kovacs states that the

issue is insider trading, and Bettis acknowledges

the allegation and claims to have "looked into

it," yet no investigation, escalation to the Audit

Committee, trading blackout, or independent

review followed. Kovacs's animus or anger is

irrelevant.

20 Fabricated Passim Implicit denial of threats against Threats documented contemporaneously. Disproven

Safety Concerns Kovacs. (DiMaggio Decl.; Ducheine Decl.; Tannenbaum

Decl.; Kovacs Decl.; Birkin Bag Letter; police

texts).

# Smear Topic Florida Quoted Allegation Rebuttal (with Citation) Smear Status

Compl.

21 Overall Entire Cumulative effect of the above Majority of smears disproven, abandoned, or Retaliatory

Character Complaint allegations. frivolously maintained. Lawfare

Assassination

The evolution from the Original Florida Complaint to the amended pleading reinforces the retaliatory nature of the smear campaign

reflected in this Schedule.

Plaintiffs initially advanced numerous specific factual attacks on Kovacs's education, employment history, and personal conduct. After

those allegations were disproved by documentary evidence, Plaintiffs abandoned them by omission while continuing to litigate

aggressively under a reframed narrative of animus and malice.

This retreat from falsifiable facts, coupled with the persistence of hostility and punitive framing, evidences pressure-driven lawfare

rather than a good-faith effort to adjudicate truth. Such conduct is a recognized indicator of retaliation in whistleblower cases.

SCHEDULE G – DAMAGES MODEL

(Preliminary, Subject to Discovery and Expert Proof)

Executive Summary2

Defendants' misconduct exposes them to extraordinary damages exceeding $1 billion, with a

reasonable, evidence-supported range of approximately $800 million to $1.75 billion, exclusive

of additional exposure that may be revealed through discovery, including undisclosed insider

trading, tippee liability, hidden short positions, and broader market-wide corrective effects.

This memorandum presents a disciplined, non-duplicative damages analysis grounded in

standard federal securities, RICO, ERISA, and corporate-governance principles. Harms are

separated into: (i) entity-level harm to AudioEye; (ii) trading losses suffered by public

shareholders during two analytically distinct phases (Phase I and Phase II); (iii) destruction of

value at related enterprises controlled or looted by Defendants; and (iv) individualized harms

suffered by whistleblowers and founders. Each category is mutually exclusive, additive, and

supported by observable transactions, disclosed trading data, and accepted valuation

methodologies.

I. Harm to AudioEye

(Entity-Level and Derivative Damages)

A. Disgorgement of Usurping Insider Sales (Phase II)

During Phase II, AudioEye insiders extracted $35,218,799 in personal proceeds through stock

sales disclosed on SEC Forms 4. These sales were tightly clustered around periods when insiders

possessed material nonpublic information concerning governance collapse, retaliatory lawfare,

undisclosed liquidity stress, and imminent dilution.

Under a conservative disgorgement methodology, insiders are credited with a notional $5.00 per

share cost basis, reflecting Phase I accumulation and equity grants, yielding approximately $10

million in aggregate cost. Net disgorgeable profit under this approach is therefore approximately

$25.2 million. Under a more aggressive approach – consistent with case law denying offsets

where equity was obtained through fiduciary breach or fraud – the entire $35.2 million is treated

as illicit gain. Either approach yields disgorgement recoverable independently of shareholder loss. (No Form 4 discloses trading pursuant to Rule 10b5-1 plans.)

The undersigned counsel recognizes Sydney Lanyon's outstanding contributions to the formulation, research, and drafting of this Damages Model.

B. Corporate Waste, Self-Dealing, and Cash Depletion

AudioEye also suffered direct corporate waste. During Phase I, the Company spent approximately $2.7 million on economically irrational stock repurchases while cash-burning and dependent on external capital. During Phase II, the Company spent an additional ~$2.7 million on retaliatory lawfare designed not to advance corporate interests, but to silence a whistleblower and conceal misconduct. These expenditures directly depleted corporate assets without corresponding benefit.

Beyond discrete cash outflows, AudioEye suffered structural enterprise harm. Governance collapse, undisclosed litigation exposure, and insider self-dealing materially increased the Company's cost of capital, constrained access to non-dilutive financing, and imposed sustained enterprise-risk discounts. Conservatively measured through recognized financial channels, this derivative harm reasonably ranges from $40 million to $60 million.

C. Summary of AudioEye Entity-Level Harm (Base)

Category Estimated Range

Insider disgorgement (Phase II) $25.2M – $35.2M

Corporate waste & cash depletion $5.4M

Structural / governance / credit harm $40.0M – $60.0M

Total entity-level harm (base) $70.2M – $105.2M

Substantial portions of this harm are recoverable under RICO and related theories and are therefore treble-eligible, yielding potential company-level exposure of approximately $210.6M to $315.6M, exclusive of equitable relief.

II. Harm to AudioEye Shareholders

(Rule 10b-5 Trading Losses)

Shareholder damages arise from two analytically distinct phases that injure different cohorts of investors and do not overlap.

A. Phase I – Depressed-Price Sellers

(June 2, 2022 – February 12, 2024)

During Phase I, AudioEye stock traded primarily in the $4–$6 range, while management internally authorized irrational buybacks and positioned for later monetization at dramatically higher prices. This conduct is economically irrational unless insiders believed the stock was materially undervalued. Price suppression is demonstrated by objective revealed-preference signals, including irrational repurchases during cash burn, contradiction between public pessimism and private action, coordinated pessimistic messaging to third parties, and preservation of insider exposure.

Using standard Rule 10b-5 methodologies:

Assumption Conservative Upper-Bound

Non-insider volume ~17–21M shares ~17–21M shares

Observed price ~$5.00 ~$5.00

"But-for" price ~$8.25 ~$11.00

Artificial depression ~$3.25 ~$6.00

Aggregate Phase I damages (base) $66.5M $126.0M

B. Phase II – Inflated-Price Purchasers

(February 13, 2024 – April 1, 2025)

During Phase II, Defendants reversed disclosure posture. Following shelf registration and escalating whistleblower exposure, public statements emphasized accelerating growth, margin expansion, Adjusted EBITDA, and "Rule of 40" performance, while continuing to conceal insider dumping, governance collapse, retaliatory lawfare, and liquidity stress.

1. Illusory Profitability Driven by Add-Backs

By Q3 and Q4 2024, approximately 90% of reported Adjusted EBITDA consisted of add-backs for depreciation and amortization, litigation expense, acquisition-related costs, severance, restructuring, and similar exclusions. By Q1 2025, that figure rose to approximately 94%. Nearly all reported profitability during Phase II was therefore accounting-driven rather than operational. When these add-backs are removed, AudioEye's GAAP net losses widened throughout Phase II, demonstrating increasing cash burn rather than improving fundamentals. Reported Adjusted EBITDA rose even as actual losses deepened, creating a widening divergence between public narrative and economic reality.

2. Liquidity Reality: December 2024 ATM

In December 2024, at the height of its purported profitability, AudioEye executed an at-the-market equity offering, diluting shareholders to raise cash. A genuinely profitable, cash-generating company does not need to access the equity markets for emergency liquidity. The ATM offering is objective proof that the Company's reported profits were illusory and that insiders knew the Company lacked sufficient internal cash generation.

This accounting-driven illusion of profitability sustained inflated prices long enough to facilitate more than $35 million in insider sales during Phase II.

3. Phase II Shareholder Damages

Assumption Conservative Upper-Bound

Non-insider purchase volume ~9-12M shares ~9-12M shares

Average purchase price ~$22.50 ~$27.00

Estimated corrective price ~$17.00 ~$7.50

Artificial inflation per share ~$5.50 ~$19.50

Aggregate Phase II damages (base) $59.0M $232.0M

C. Estimation of Affected Share Volume (Phase I and Phase II)

The estimates of affected share volume for both Phase I and Phase II are derived using standard event-study and Rule 10b-5 loss-causation methodologies designed to identify economically meaningful investor transactions rather than raw trading turnover.

For Phase I, the estimated 17–21 million share range reflects non-insider sales during the suppression period after excluding insider transactions disclosed on Forms 4, option exercises, equity issuances, and other non-open-market transfers. Reported trading volume is further adjusted to discount market-maker activity, short-term liquidity provision, and high-frequency trading that does not correspond to permanent investor exits. The resulting range represents a deliberately conservative proxy for net shares sold by public investors at artificially depressed prices.

For Phase II, the estimated 9–12 million share range reflects non-insider purchases during the inflation period, similarly adjusted to exclude insider sales, derivative-related hedging, and transient trading volume. The Phase II range is further constrained by float dynamics and insider lockups, ensuring that only shares purchased at inflated prices and retained through the inflationary period are counted. As with Phase I, the estimate conservatively discounts turnover to avoid double-counting shares that may have changed hands multiple times.

In both phases, a more precise estimate of affected share volume will be available through discovery, including granular daily trading data, shareholder position records, and transaction-level information maintained by the Company and its transfer agent. Such data will permit expert refinement of net buyer and seller identification and eliminate residual conservatism embedded in the present estimates.

D. Aggregation and Trebling of Shareholder Damages

Component Amount

Phase I damages (base) $66.5M – $126.0M

Phase II damages (base) $59.0M – $232.0M

Total base shareholder damages $125.5M – $358.0M

RICO trebling ×3

Total shareholder damages (trebled) $376.5M – $1.074B

III. Harm to Related Enterprises

● Formulus Black: Enterprise value destruction conservatively estimated at $250M – $500M.

● First Contact: Lost anticipated exit value of $200M – $250M.

● ESTP: Enterprise-level destruction estimated at $200M – $300M, exclusive of Kovacs' individual losses.

IV. Harm to Individual Plaintiffs

● David Kovacs: ERISA restoration $2.9M – $7.8M; retaliation damages $15M – $30M; abuse of process / IIED $20M – $40M; total $37.9M – $77.8M.

● Lichtenstein: $50M – $125M.

● Ducheine: $5M – $15M.

Aggregate individual damages therefore total approximately $92.9M – $292.8M, with treble eligibility for enterprise-related conduct.

V. Attorneys' Fees, Costs, and Interest

Reasonable legal and forensic fees advanced to date are estimated at $2.5M – $3.0M, subject to fee-shifting. Pre-judgment interest is conservatively estimated at $30M – $54M.

VI. Aggregate Exposure

Combining treble-eligible shareholder damages ($376.5M – $1.074B), treble-eligible company-level harm (~$210.6M – $315.6M), updated individual damages ($92.9M – $292.8M), and fees and interest yields total damages exposure of approximately $700 million on the low end, exceeding $1.6 billion on the high end under reasonable assumptions.

SCHEDULE H – DAMAGES MATRIX

(Preliminary, Subject to Discovery and Expert Proof)

Damages Category Base Treble With Notes / Legal Basis

Damages (No Eligible? Trebling

Treble)

AudioEye – Insider $25.2M – Yes $75.6M – RICO proceeds; independent of Disgorgement $35.2M $105.6M shareholder loss

AudioEye – Corporate Waste / $45.0M – Yes $135.0M – Irrational buybacks, retaliatory Self-Dealing $70.0M $210.0M lawfare, governance harm

Subtotal: AudioEye Entity-Level $70.2M – Yes (part) $210.6M – Derivative claims on behalf of Harm $105.2M $315.6M AudioEye

Shareholders – Phase I $66.5M – Yes $199.5M – RICO & Rule 10b-5 Suppression Losses $126.0M $378.0M

Shareholders – Phase II Inflation $59.0M – Yes $177.0M – RICO & Rule 10b-5 Losses $232.0M $696.0M

Subtotal: Harm to Shareholders $125.5M – Yes $376.5M – Class recovery $358.0M $1,074.0M

Formulus Black – Enterprise $250M – Yes $750M – Enterprise conduct Destruction $500M $1.50B

First Contact – Destroyed Exit $200M – Yes $600M – Enterprise conduct $250M $750M

ESTP – Fraudulent Transfer & $200M – Yes $600M – Enterprise conduct; fraudulent Waste $300M $900M transfer

Subtotal: Related-Enterprise $650M – Yes $1.95B – Non-duplicative enterprise loss Harm $1.05B $3.15B

Kovacs – ERISA Restoration $2.9M – No $2.9M – Make-whole equitable relief $7.8M $7.8M

Kovacs – Retaliation / IIED / $35.0M – Yes $105.0M – RICO + state torts

Lawfare $70.0M (enterprise) $210.0M

Lichtenstein – Coercion / $50.0M – Yes $150.0M – Enterprise conduct

Enterprise Loss $125.0M $375.0M

Ducheine – IIED / Witness Harm $5.0M – Yes $15.0M – Enterprise conduct

$15.0M $45.0M

Damages Category Base Treble With Notes / Legal Basis

Damages (No Eligible? Trebling

Treble)

Subtotal: Individual Plaintiffs $92.9M – Partial $272.9M – Mixed treble eligibility

$217.8M $637.8M

Attorneys' Fees & Forensic $2.5M – Yes $2.5M – Mandatory fee-shifting

Costs $3.0M $3.0M

Pre-Judgment Interest (est.) $30.0M – No $30.0M – Court discretion

$54.0M $54.0M

TOTAL DAMAGES ≈ $870M – — ≈ $700M – Narrowed to avoid

EXPOSURE $1.73B (base) $1.6B+ (net) double-counting

SCHEDULE I – ANNOTATED TIMELINE

Date Event Significance Sources

2002/01/31 Kovacs graduates from the College of Refutes smear in Florida action; Exh. 20-21 (Transcript and Diploma)

Staten Island (CUNY) at age 18 biography.

2003–2004 Kovacs attends night classes at Refutes smear in Florida action; Exh. 22 (Registrar Letter and

Columbia University (Premed) biography. Transcript)

2003-2004 Kovacs works for Citigroup Refutes smear in Florida action; Exh. 27 (Letter from Citi)

biography.

2004-2007 Kovacs associated with Blackstone Refutes smear in Florida action; Exh. 28-29 (Blackstone Emails)

Group (Senior VP, Equity Research & biography.

Investment Banking)

2007–2012 Kovacs serves as Managing Director at Refutes smear in Florida action; Exh. 26 (Nauer Letter, Apr. 12, 2024)

the Hinduja Group (New York) biography.

2012/04 David Moradi assaulted at Las Vegas Origin of later $160.5M TBI verdict; Exh. 54 (news article);

nightclub, sustaining TBI. undisclosed reputational, litigation, and Exh. 55 (court records)

governance risk in subsequent

public-company roles.

2012–2014 Kovacs serves as Head of North Establishes senior executive credibility Exh. 9 (Wieczorek)

American Training Practice at Fitch overlapping early AudioEye involvement

Learning (Fitch Group)

2014/01 Kovacs hired at AudioEye by founders Establishes long-term insider status Exh. 16 (Withrow Decl.);

Paul Arena and Ted Withrow predating Moradi Exh. 17 (Arena Decl.).

2014/06 Tony Coelho joins AudioEye Board of Early governance structure prior to AEYE SEC filings; Proxy Statements

Directors Moradi alignment

Date Event Significance Sources

2014/10– Kovacs retained by Breitling Energy to Refutes smear in Florida Lawsuit. Exh. 8 (Wagers)

2014/12 review financials and challenge CFO Establishes pre-AudioEye whistleblower

Rick Hoover and forensic accounting role

2015/02/27 Rick Hoover terminated; Kovacs Refutes smear that SEC investigated Exh. 8 (Wagers Decl.)

appointed Interim CFO of Breitling Kovacs; shows board-level trust

Energy following identification of accounting

irregularities

2015/01 $12.7M Series A financing of Demonstrates substantial standalone Witness Interview

Symbolic IO at ~$132M post-money Formulus Black IP value

2015/09/24 Alexandre Zyngier joins AudioEye Outside investor-linked director during AEYE SEC filings

Board pre-Moradi governance phase

2015/11/16 Kalobios Schedule 13D discloses Public disclosure of de facto control bloc Kalobios Schedule 13D

~70% ownership by Shkreli/Moradi

group

2015/12/03 Kalobios Form 8-K identifies Shkreli SEC confirmation of contemporaneous Kalobios Form 8-K

as CEO/Chairman and Moradi as takeover

Director

2015/12/17 Martin Shkreli indicted in EDNY for Contextualizes Moradi's Kalobios DOJ Press Release; EDNY Indictment

securities fraud association

2016/07/07 Coercive letter sent to Lichtenstein Early use of false accusations and Exh. 5 (Lichtenstein Decl.);

alleging fabricated misconduct reputational coercion Exh. 53 (coercive letter).

2016/07 Moradi achieves de facto control of Operational and financial control via Exh. 5 (Lichtenstein Decl.);

First Contact Entertainment threats and governance Exh. 52

Date Event Significance Sources

2016/07/18 Moradi named required financial Documentary confirmation of control First Contact Checklist

signatory over bank accounts

2016/07/29 Kovacs receives founder equity in First Confirms founder status, paid-for equity, First Contact

Restricted Stock

Contact (1,290,000 shares) pursuant to and contribution of core IP; rebuts Purchase Agreement (Kovacs, July 29,

Restricted Stock Purchase Agreement employee-only narrative 2016)

2017/04 Jury verdict entered against Moradi in Massive undisclosed reputational and Public court records TBI litigation ($160.5M) financial risk

2017/05/05– False criminal accusations; Ignomirello Weaponization of criminal process to Witness Interview

2017/05/20 removed from Symbolic IO seize IP

2018/01 Ignomirello forced to settle under Completion of coercive Formulus Black Witness Interview duress asset capture

2018/03 Founder Paul Arena departs AudioEye Erosion of founder-led governance AEYE Proxy Statements

2018/04/19 Bankofier letter awards RSUs to Confirms employee status and equity Bankofier Letter; Kovacs Decl.

Kovacs compensation

2019/03 Founder Ted Withrow departs Completion of founder exits prior to AEYE Proxy Statements AudioEye Moradi consolidation

2019/10/04 Moradi announced as UCLA Reputational signaling prior to board UCLA Announcement Economics Board of Visitors member appointment

2019/11/12 Moradi publishes Medium/Authority Self-promotion contemporaneous with Medium Article Magazine article governance entry

2019/11/13 Moradi and Tahir appointed to Formal entry into public-company AudioEye Press Release; AEYE AudioEye Board governance Proxy

2020/04/24 Formulus Black circulates investor Evidence of operational traction and Formulus Black Deck presentation substantial IP

Date Event Significance Sources

2020/07/15 Zyngier resigns from AudioEye Board Governance shift during consolidation AudioEye Form 8-K

2020/08/13 Moradi named Interim CEO Consolidation of executive authority AudioEye Form 8-K

2021/11 Kovacs advises NYC Mayor-elect as Demonstrates civic trust and Pitta Letter (May 8, 2024) Transition IT Committee member contemporaneous credibility

2021/10– Humble and Bettis coordinate against Early plotting predating termination and Ducheine Decl.

2021/12 Kovacs insider trading

2022/06/02 Phase I period begins Start of depressed-price trading window AEYE SEC filings

2022/09/06 First Contact issues Q3 2022 Investor Documents strong operating performance FCE Q3 2022 Investor Letter Letter

2023/03 ESTP works with Alex Spiro–aligned Evidence of premeditated lawfare Ducheine Decl.; ESTP records counsel

2023/08/30 Moradi solicits insider trading; Kovacs Direct evidence of scienter Rodriguez Decl.; Kovacs Decl. refuses

2023/11/13 Kovacs reports suspected securities Protected whistleblower activity Kovacs Decl.

fraud internally

2023/12 Humble solicits Ducheine to "take care Witness intimidation Ducheine Decl.; DiMaggio Decl. of" Kovacs

2023/12/25 Ben Barton Christmas Texts Proves that multiple insiders were aware Kovacs Decl. of Moradi's fraud 3 months before the pump-and-dump affected the market.

2024/01/17 Recorded Bettis call; Kovacs Explicit retaliation; demand futility Kovacs Decl.; audio recording terminated

Date Event Significance Sources

2024/02/13 AudioEye S-3 shelf becomes effective Opens Phase II insider-monetization Form S-3 window

2024/04/12 Kovacs engaged by Hinduja Group Independent mitigation of damages Nauer Letter

2024/04/23 AudioEye reports record Q1 2024 Public bullish narrative during Phase II AudioEye Q1 2024 Release results buildup

2024/06/12 Bettis sells 7,330 shares; Fleming Divergence between insider monetization Forms 4 purchases 7,330 shares ($150K) and independent confidence

2024/06/21 Roth MKM initiates "Buy" coverage Analyst price support during insider Roth MKM Report selling

2024/06– Insiders sell ~$35M of AudioEye stock Core Phase II damages period Forms 4
2024/12

2024/08/05 Wilkerson meeting re Kovacs and FB Corroborates intimidation and DiMaggio Decl. obstruction

2025/04– Law-enforcement corroboration Independent confirmation of obstruction NYPD Text Messages
2025/05 obtained

2025/06/03 Wilkerson meeting with counsel Near-admission corroborating DiMaggio Decl.; Ducheine present obstruction corroboration

2025/10– Director Hawkins makes multiple Hawkins trading activity suggests good Forms 4
2025/11 open-market purchases faith.

2025/11 Interference with Kovacs' employment Ongoing retaliation impairing mitigation Kovacs Decl. verification

SCHEDULE J – TABLE OF EXHIBITS

Exh. Description Date Significance

1 Declaration of David Kovacs Dec. 9, 2025 Primary factual declaration.

2 Declaration of Nicky DiMaggio Aug. 25, 2025 Describes a series of meetings with Mo Wilkerson including the sit-down on June 3, 2025.

3 Declaration of Julian Ducheine Dec. 11, 2025 Describes Jason Humble murder solicitation and subsequent Quinn Emanuel pressuring of a witness.

4 Declaration of Paul Arena Dec. 10, 2025 Describes hiring Kovacs in 2014 and concerns about Moradi; no indication of TBI.

5 Declaration of Demian Lichtenstein Oct. 4, 2025 Coercive tactics used to seize First Contact; Moradi character.

6 Declaration of Danny Anderson Sept. 23, 2025 Moradi misconduct destroyed the First Contact sale.

7 Declaration of Mario Rodriguez Sept. 8, 2025 Eyewitness to argument between Moradi and Kovacs re insider trading on August 30, 2023.

8 Declaration of Jeremy Wagers Sept. 17, 2025 Kovacs activities at Breitling Energy; Kovacs was not investigated by the SEC; Kovacs cleaned up the

company.

9 Declaration of Robert Wieczorek III Oct. 30, 2025 Kovacs professional competence at Fitch.

10 Declaration of Luke Destin Nov. 14, 2025 Bettis character evidence.

11 Declaration of Richard Tannenbaum Nov. 27, 2025 Eyewitness corroboration of DiMaggio recollection of June 3, 2025 sit-down with Wilkerson.

Exh. Description Date Significance

12 Declaration of Dr. Yasser M. Said Nov. 22, 2025 General medical expert testimony re TBI.

13 Declaration of David Tanzer July 8, 2024 Recounts meeting with Alex Spiro.

14 Declaration of David Kovacs (2024) July 11, 2024 Recounts meeting with Alex Spiro.

15 Declaration of Sean Newlin July 15, 2025 Recounts meeting with Alex Spiro.

16 Declaration of Edward Withrow Mar. 24, 2024 Describes hiring David Kovacs for AudioEye in 2014

17 Declaration of Paul Arena (2024) Mar. 25, 2024 Describes hiring David Kovacs for AudioEye in 2014

18 Declaration of Chris McGlashan Dec. 4, 2025 FC investors suffered losses due to Moradi; no indication of TBI; no defamatory statements by Kovacs.

19 Declaration of Russell Alesi Dec. 11, 2025 Confirmation of AEYE shareholder status

20 College of Staten Island Transcript Jan. 31, 2002 Kovacs graduated in 2 years at age 18; refutes smear.

21 College of Staten Island Diploma Jan. 31, 2002 Kovacs graduated in 2 years at age 18; refutes smear.

22 Columbia U. Registrar Letter and Transcript Apr. 17, 2024 Kovacs attended Columbia; refutes smear.

23 Pitta LLP Letter (Mayor Adams) May 8, 2024 Kovacs was advisor to Mayor Adams; refutes smear.

24 Towne Associates Letter Apr. 24, 2024 Kovacs never evicted; refutes smear.

25 Cesar Baez Letter (Breitling) Apr. 29, 2024 Kovacs was not investigated by SEC; refutes smear.

26 Robert Nauer Letter (Hinduja) Apr. 12, 2024 Kovacs worked for Hinduja; refutes smear.

27 Citigroup Employment Letter Apr. 22, 2024 Kovacs worked for Citi; refutes smear.

28 Blackstone Email Jan. 13, 2006 Kovacs worked for Blackstone; refutes smear.

Exh. Description Date Significance

29 Blackstone Email Jan. 14, 2006 Kovacs worked for Blackstone; refutes smear.

30 Motion to Amend Florida Complaint Nov. 13, 2025 Includes proposed amended complaint that abandons most of the false smears; proof of whistleblower report.

31 HR Emails (Morelli) Nov. 13, 2023 Protected internal whistleblower activity.

32 Spolar "For Cause" Email Jan. 19, 2024 Termination following protected activity.

33 DOJ Whistleblower Report Feb. 8, 2024 Kovacs warns DOJ of AudioEye fraud.

34 Akin Gump Letter Feb. 20, 2024 RSUs seized in retaliation for protected activity.

35 Birkin Bag Letter Mar. 20, 2024 Psychological coercion and physical threats.

36 SEC Whistleblower Submission Apr. 8, 2024 Kovacs warns DOJ of AudioEye fraud.

37 Florida Defamation Complaint Apr. 10, 2024 Original complaint containing false smears.

38 AEYE Q1 2024 Press Release Apr. 23, 2024 Bullish public statements; undisclosed risks.

39 Humble SDNY Lawsuit May 2, 2024 Parallel smear-and-retreat litigation.

40 Ducheine Email to Kovacs May 8, 2024 Contemporaneous corroboration of enterprise conduct.

41 Kovacs Email to Ducheine May 8, 2024 Refutes witness-bribery allegations.

42 Ducheine Follow-Up Email June 6, 2024 Confirms consistency of Ducheine's account.

43 Roth MKM Analyst Initiation June 21, 2024 Bullish analysts; MKM dual role.

44 Consulting Agreement Jan. 15, 2014 Kovacs initial consulting agreement.

45 Employment Offer Letter Oct. 25, 2016 Kovacs hired as W2 employee.

Exh. Description Date Significance

46 Bankofier RSU Letter Apr. 19, 2018 Equity grant in recognition of contributions.

47 Kovacs II Complaint Mar. 4, 2025 Referred to as the New York Lawsuit.

48 Formulus Black Cap Table Aug. 12, 2020 Identifies shareholders / fraud victims.

49 Formulus Black Shareholder Letter Sept. 5, 2018 Investor representations and pattern evidence.

50 FB $100k Investment Record Apr. 28, 2021 Ducheine reliance and loss causation.

51 Humble–Ducheine Texts Jan. 2, 2025 Texts messages between Humble and Ducheine.

52 First Contact Org Deck July 2016 Baseline value of First Contact (before looting)

53 Moradi Letter to Lichtenstein July 7, 2016 Coercive false allegations used to seize equity.

54 LV Review-Journal Article Apr. 28, 2017 Open-source info available to Independent Directors.

55 Nevada Trial Records 2017 Open-source info available to Independent Directors.

56 Moradi Foundation Website —— Reputation laundering.

57 Medium Article re Moradi Nov. 12, 2019 PR puff-piece; no mention of TBI.

58 UCLA Press Release Oct. 4, 2019 PR puff-piece; no mention of TBI.

59 Vivid Strategies Screenshots 2025 Successor to ESTP; same people and projects.

60 ESTP Operating Agreement May 1, 2023 Proof of Kovacs 33% equity in ESTP (Exh. A)

61 ESTP Certificate of Incorporation Sept. 21, 2022 Proof of ESTP formation.

62 ESTP Board Consent Sept. 21, 2022 Proof of Kovacs officer role at ESTP.

Exh. Description Date Significance

63 QEP Letter of Introduction Feb. 4, 2023 Evidence that ESTP opportunities were significant.

64 Zuber Lawler Letter May 3, 2024 Quinn appeared for AEYE and DM on April 25, 2025

65 Quinn Emails to Ducheine Jan. 21, 2025 Quinn communication with murder-for-hire witness.

66 Quinn Letter re Ducheine Jan. 24, 2025 Quinn falsely accuses Kovacs of paying witness.

67 AudioEye Litigation PR Feb. 4, 2025 Repeats and publicizes false smears from Florida

Lawsuit.

68 Quinn Settlement Demand July 8, 2025 Further retaliation – financially ruining a whistleblower.

69 Kovacs W-2 Forms 2023–2024 Kovacs was a W-2 employee.

70 Insider Trading Policy 2013 Company Policy; see also Exh. 104-106.

71 Shelf Offering Prospectus Feb. 13, 2024 Start of Phase II; mechanism for insider dump; scienter.

72 ATM Agreement June 6, 2024 Mechanism for company dump; scienter.

73 Prospectus Supplement Dec. 4, 2024 Insiders dump $30M of inflated stock.

74 Arizona Retaliation Complaint Apr. 14, 2025 Retaliation / Lawfare – frivolous claim over loan by Carr Bettis.

75 ESTP Final K-1 Sept. 3, 2025 Proof that ESTP was shut down; proof that Kovacs owned 33% of ESTP; inference of fraudulent transfer.

76 ESTP Opportunities Email May 21, 2023 Proof that ESTP was projected to be worth $250M by October 2023.

77 BoA Sellam Email Chain Feb. 16, 2023 Early stages of effort to sell First Contact.

Exh. Description Date Significance

78 First Contact Sale Emails Nov. 14, 2023 Kovacs alerts fellow investors re problems with First Contact sale; attempt to salvage $250M shareholder value.

79 Analyst Coverage Summary 2024–2025 Summary of equity research re AEYE; bullish.

80 RSU Grant May 20, 2020 Grant of equity wrongfully seized by AEYE

81 RSU Grant Mar. 27, 2018 Grant of equity wrongfully seized by AEYE

82 RSU Amendment Dec. 20, 2020 Reaffirms vesting rights.

83 Kovacs I Decision Jan. 31, 2025 Dismissal on technical grounds.

84 Kovacs II Decision Oct. 8, 2025 Dismissal on technical grounds.

85 AEYE Form 8K June 2, 2022 Announcing Stock Buyback (Start of Phase I)

86 AEYE Form 10-K (2023) 2023 See Schedule E (misrepresentations and omissions).

87 AEYE Form 10-K (2024) 2024 See Schedule E (misrepresentations and omissions).

88 Hawkins Board PR Mar. 4, 2025 Press release announcing Hawkins joins board.

89 Fleming Board PR Mar. 28, 2023 Press release announcing Fleming joins board.

90 Text Messages with Giorgi May 8, 2024 Retaliation: Kovacs pushed out of ESTP for Bettis dispute.

91 Text Messages with Police April-May 2025 Kovacs: Mo Wilkerson will come forward.

92 Humble Philanthropy Website —– Linking Bettis and Humble

93 Text Messages with Mike Dow July 12, 2024 Contemporaneous messages re murder plot.

Exh. Description Date Significance

94 Press Release – Ignomirello Cleared May 9, 2023 Girlfriend recants false accusations; coercive tactics.

95 Text Messages with Hess Barber Oct. 16, 2023 Discussions re First Contact sale, Moradi

96 Text Messages with Alex Spiro May-June 2024 After Quinn Emanuel appeared in FL Lawsuit

97 Formulus Black Deck Feb. 4, 2020 Relied upon by investors.

98 Formulus Black Deck Apr. 24, 2020 Relied upon by investors.

99 First Contact Investor Letter Sept. 6, 2022 Relied upon by investors.

100 Kovacs' First Contact Promissory Note Aug. 1, 2016 Kovacs Invested in First Contact – $10K

101 Kovacs' First Contact Promissory Note Aug. 1, 2016 Kovacs Invested in First Contact – $145K

102 Kovacs' First Contact Promissory Note Aug. 1, 2016 Kovacs Invested in First Contact – $36,250

103 Restricted Stock Purchase Agreement July 29, 2016 Kovacs Founders Shares – 12.9% equity (of 10M shares)

104 Code of Business Conduct and Ethics Jan. 14, 2021 Company Website

105 Whistleblower Protection Policy Jan. 14, 2021 Company Website

106 Related Party Transaction Policy Jan. 14, 2021 Company Website

107 Emails re JDLK Partners / GF Apartment 2017-2018 Example of Bettis using JDLK email account to impersonate David Kovacs and obtain reimbursement

from AudioEye.

108 AEYE Stock Transfer July 29, 2014 Moradi AEYE Shares

109 Symbolic IO Articles 2016-2018 Symbolic IO was a quality company

Exh. Description Date Significance

110 Barton / Kovacs Text Messages Various Includes Christmas Texts

111 Kovacs Status Change May 1, 2019 Kovacs change in responsibility

112 Shehigian / Ducheine Email Jan. 23, 2025 Humble's personal lawyer speaks with Ducheine re AEYE

113 Jason Humble Voicemail July 24, 2025 Message to Ducheine (Native)

The descriptions below are illustrative only. Each exhibit may support multiple factual narratives, legal theories, defenses, or strategic

uses. Nothing in this table limits the manner in which any exhibit may be used in pleadings, discovery, motion practice, enforcement

referrals, negotiations, or at trial.